7

# EXHIBIT 7

In addition to exhibits cited in the January 6, 2005 Pre-Trial Order, ACS may use the following exhibits:

| EX. NO. | DESCRIPTION | PRODUCTION NOS. | WITNESS | ADMITTED |
|---|---|---|---|---|
| AX-2500 | USP 3,105,492 (Jeckel) 10/1/63 | | | |
| AX-2501 | USP 3,657,744 (Ersek) 4/25/72 | | | |
| AX-2502 | USP 3,993,078 (Bergentz et al.) 11/23/76 | | | |
| AX-2503 | USP 4,130,904 (Whalen) 12/26/78 | | | |
| AX-2504 | USP 4,140,126 (Choudhury) 2/20/79 | | | |
| AX-2505 | USP 4,159,719 (Haerr) 7/3/79 | | | |
| AX-2506 | USP 4,512,338 (Balko et al.) 4/23/85 | | | |
| AX-2507 | USP 4,531,933 (Norton et al.) 7/30/85 | | | |
| AX-2508 | USP 4,553,545 (Maass et al.) 11/19/85 | | | |
| AX-2509 | USP 4,619,246 (Molgaard-Nielson et al.) 10/28/86 | | | |
| AX-2510 | USP 4,649,922 (Wiktor) 3/17/87 | | | |
| AX-2511 | USP 4,650,466 (Luther) 3/17/87 | | | |
| AX-2512 | USP 4,681,110 (Wiktor) 7/21/87 | | | |
| AX-2513 | USP 4,706,671 (Weinrib) 11/17/87 | | | |
| AX-2514 | USP 4,740,207 (Kreamer) 4/26/88 | | | |
| AX-2515 | USP 4,767,418 (Deninger et al.) 8/30/88 | | | |
| AX-2516 | USP 4,795,458 (Regan) 1/3/89 | | | |
| AX-2517 | USP 4,870,966 (Dellon et al.) 10/3/89 | | | |
| AX-2518 | USP 4,877,030 (Beck et al.) 10/31/89 | | | |
| AX-2519 | USP 4,878,906 (Lindemann et al.) 11/7/89 | | | |
| AX-2520 | USP 4,892,539 (Koch) 1/9/90 | | | |
| AX-2521 | USP 4,893,623 (Rosenbluth) 1/16/90 | | | |
| AX-2522 | USP 4,907,336 (Gianturco) 3/13/90 | | | |
| AX-2523 | USP 4,913,141 (Hillstead) 4/3/90 | | | |
| AX-2524 | USP 4,922,905 (Strecker) 5/8/90 | | | |
| AX-2525 | USP 4,950,227 (Savin et al.) 8/21/90 | | | |
| AX-2526 | USP 4,969,458 (Sugita et al.) 11/13/90 | | | |

| EX. NO. | DESCRIPTION | PRODUCTION NOS. | WITNESS | ADMITTED |
|---|---|---|---|---|
| AX-2527 | USP 4,986,831 (King et al.) 1/22/91 | | | |
| AX-2528 | USP 4,990,155 (Wilkoff) 2/5/91 | | | |
| AX-2529 | USP 4,998,539 (Delsanti) 3/12/91 | | | |
| AX-2530 | USP 5,002,560 (Machold et al.) 3/26/91 | | | |
| AX-2531 | USP 5,007,926 (Derbyshire) 4/16/91 | | | |
| AX-2532 | USP 5,015,253 (MacGregor) 5/14/91 | | | |
| AX-2533 | USP 5,019,085 (Hillstead) 5/28/91 | | | |
| AX-2534 | USP 5,026,377 (Burton et al.) 6/25/91 | | | |
| AX-2535 | USP 5,034,001 (Garrison et al.) 7/23/91 | | | |
| AX-2536 | USP 5,035,706 (Gianturco et al.) 7/30/91 | | | |
| AX-2537 | USP 5,037,377 (Alonso) 8/6/91 | | | |
| AX-2538 | USP 5,037,392 (Hillstead) 8/6/91 | | | |
| AX-2539 | USP 5,037,427 (Harada et al.) 8/6/91 | | | |
| AX-2540 | USP 5,041,126 (Gianturco) 8/20/91 | | | |
| AX-2541 | USP 5,059,211 (Stack et al.) 10/22/91 | | | |
| AX-2542 | USP 5,061,275 (Wallsten et al.) 10/29/91 | | | |
| AX-2543 | USP 5,062,829 (Pryor et al.) 11/5/91 | | | |
| AX-2544 | USP 5,064,435 (Porter) 11/12/91 | | | |
| AX-2545 | USP 5,071,407 (Termin et al.) 12/10/91 | | | |
| AX-2546 | USP 5,078,720 (Burton et al.) 1/7/92 | | | |
| AX-2547 | USP 5,078,726 (Kreamer) 1/7/92 | | | |
| AX-2548 | USP 5,078,736 (Behl) 1/7/92 | | | |
| AX-2549 | USP 5,084,065 (Weldon et al.) 1/28/92 | | | |
| AX-2550 | USP 5,089,005 (Harada) 2/18/92 | | | |
| AX-2551 | USP 5,089,006 (Stiles) 2/18/92 | | | |
| AX-2552 | USP 5,092,877 (Pinchuk) 3/3/92 | | | |
| AX-2553 | USP 5,100,429 (Sinofsky et al.) 3/31/92 | | | |
| AX-2554 | USP 5,108,416 (Ryan et al.) 4/28/92 | | | |
| AX-2555 | USP 5,108,417 (Sawyer) 4/28/92 | | | |
| AX-2556 | USP 5,116,318 (Hillstead) 5/26/92 | | | |
| AX-2557 | USP 5,116,360 (Pinchuk et al.) 5/26/92 | | | |

| EX. NO. | DESCRIPTION | PRODUCTION NOS. | WITNESS | ADMITTED |
|---------|-------------|-----------------|---------|----------|
| AX-2558 | USP 5,116,365 (Hillstead) 5/26/92 | | | |
| AX-2559 | USP 5,122,154 (Rhodes) 6/16/92 | | | |
| AX-2560 | USP 5,123,917 (Lee) 6/23/92 | | | |
| AX-2561 | USP 5,133,732 (Wiktor) 7/28/92 | | | |
| AX-2562 | USP 5,135,536 (Hillstead) 8/4/92 | | | |
| AX-2563 | WO 92/09246 (Tower) 6/11/92 | | | |
| AX-2564 | EP 0,338,816 (Iguchi et al.) 10/25/89 | | | |
| AX-2565 | EP 0,361,192 (Mattelin) 4/4/90 | | | |
| AX-2566 | EP 0,407,951 (D'Ottavio et al.) 1/16/91 | | | |
| AX-2567 | EP 0,423,916 (Gianturco) 4/24/91 | | | |
| AX-2568 | EP 0,428,471 (Wedel et al.) 5/22/91 | | | |
| AX-2569 | WO 91/07139 (Leonard) 5/30/91 | | | |
| AX-2570 | GB 2,135,585 (Wallsten) 11/10/83 | | | |
| AX-2571 | Reexamination Certificate B1 4,733,665 (Palmaz) 1/11/94 | | | |
| AX-2571.1 | Reexamination Certificate 4,733,665 C2 (Palmaz) 1/29/02 | | | |
| AX-2572 | Declaration of J. Kula dated 3/11/93 | | | |
| AX-2573 | Declaration of G. Andros dated 7/14/98 | | | |
| AX-2574 | Letter to Dr. M. Nobuyoshi from AVE., Inc. dated 7/7/93 | | | |
| AX-2575 | *DiMassa v. Stertzer et al.* (Case No. 222363) Defendants Trial Brief re: Equitable Isuues dated 4/10/02 | | | |
| AX-2576 | *DiMassa v. Stertzer et al.* (Case No. 222363) Defendants Trial Brief dated 4/10/02 | | | |
| AX-2577 | European Search Reports | | | |
| AX-2578 | Reserved | | | |
| AX-2579 | Reserved | | | |
| AX-2580 | 2/2/05 Order, *ACS v. Medtronic et al.* (98-80-SLR) | | | |
| AX-2581 | 2/4/05 Order, *ACS v. Medtronic et al.* (98-80-SLR) | | | |
| AX-2582 | 2/14/05 Order, *ACS v. Medtronic et al.* (98-80-SLR) | | | |
| AX-2583 | Instruction sheet "PE Plus Peripheral Ballon Dilatation Catheter" | | | |

| EX. NO. | DESCRIPTION | PRODUCTION NOS. | WITNESS | ADMITTED |
|---|---|---|---|---|
| AX-2584 | Article "Technical Developments and Instrumentation: Transluminal Expandable Nitinol Coil Stent Grafting: Preliminary Report" by C. Dotter et al., *Radiology*, April 1983 | ACS187767-69 | | |
| AX-2585 | Article "Radiological Follow-up of Transluminally Inserted Vascular Endoprostheses: An Experimental Study Using Expanding Spirals" by D. Maasset al., *Radiology*, September 1984 | ACS187747-53 | | |
| AX-2586 | Lau Joint Appendix | LJA0001-2547 | | |
| AX-2587 | Article "Nonsurgical Placement of Arterial Endoprostheses: A New Technique Using Nitinol Wire" by A. Cragg et al.,*Radiology*, April 1983 | ACS187770-74 | | |
| AX-2588 | U.S. Patent 4,856,516 (Hillstead) dated 8/15/89 | | | |
| AX-2589 | U.S. Patent 5,728,158 (Lau et al.) dated 3/17/98 | | | |
| AX-2590 | U.S. Patent 5,766,238 (Lau et al.) dated 6/16/98 | | | |
| AX-2591 | U.S. Patent 6,309,412 B1 (Lau et al.) dated 10/30/01 | | | |
| AX-2592 | U.S. Patent 6,485,511 B2 (Lau et al.) dated 11/26/02 | | | |
| AX-2593 | U.S. Patent 6,511,504 B1 (Lau et al.) dated 1/28/03 | | | |
| AX-2594 | U.S. Patent 6,596,022 B2 (Lau et al.) dated 7/22/03 | | | |
| AX-2595 | U.S. Patent 6,626,933 B1 (Lau et al.) dated 9/30/03 | | | |
| AX-2596 | U.S. Patent 6,629,991 B1 (Lau et al.) dated 10/7/03 | | | |
| AX-2597 | U.S. Patent 6,689,159 B2 (Lau et al.) dated 2/10/04 | | | |

466399

8

**EXHIBIT 8**

**<u>MEDTRONIC'S LIST OF LIVE WITNESSES TO BE CALLED AT TRIAL</u>**

1.    Michael Boneau

2.    James Eakin

3.    Sunil Saigal

4.    Simon Stertzer

5.    Robert Wagoner

6.    Edward Lynch

9

**EXHIBIT 9**

<u>**MEDTRONIC'S LIST OF WITNESSES TO TESTIFY AT TRIAL BY DEPOSITION**</u>

1.  Bruce Barclay

2.  John Frantzen

3.  William Hartigan

4.  Farhad Khosravi

5.  Lilip Lau

6.  Edward Lynch

7.  Elizabeth McDermott

8.  John Nagy

9.  Michael Orth

10. Gary Schneiderman

11. Carl Simpson

12. Wilfred Samson

10

**EXHIBIT 10**

**ACS'S LIST OF WITNESSES IT INTENDS TO CALL LIVE AT TRIAL**

1.    Lilip Lau;

2.    Edward Lynch;

3.    Michael Orth;

4.    Dr. Jerome Segal.

**EXHIBIT 11**

**ACS'S LIST OF WITNESSES TO TESTIFY
AT TRIAL BY PRIOR DEPOSITION**

1.  William Hartigan;

2.  Bradley Jendersee;

3.  Farhad Khosravi;

4.  Robert Lashinski;

5.  Elizabeth McDermott;

6.  John Nagy;

7.  Carl Simpson;

8.  Wilfred Samson;

9.  Any witness identified on Medtronic's List of Live Witnesses to be Called at Trial, to the extent that Medtronic does not call them live;

10. Any witness identified on Medtronic's List of Witnesses to Testify at Trial by Deposition, to the extent Medtronic does not introduce their prior deposition testimony;

11. Any witness identified on ACS's live witness list, to the extent they do not appear live.

12

# EXHIBIT 12

## MEDTRONIC'S STATEMENT OF INTENDED PROOFS

1.    Medtronic intends to prove that at least ACS's engineer Lilip Lau, ACS's executives Elizabeth McDermott and Michael Orth, ACS's in-house patent counsel Bruce Barclay, ACS's outside patent counsel Edward Lynch, Esq., and other ACS counsel, agents, and representatives who were substantially involved in the preparation, filing, and prosecution of the various patent applications that matured into the Lau Patents (collectively, "the ACS representatives") committed inequitable conduct through a pattern of acts, omissions, and misrepresentations during the prosecution of those applications, all with the intent to deceive the PTO.

### A.    Failure To Disclose The Boneau Prior Art

2.    The ACS representatives committed inequitable conduct by repeatedly failing to disclose the Boneau Patent Application, the Boneau '331 Patent, the Boneau European Application, and any information pertaining to the Boneau stent (collectively, "the Boneau prior art") to the PTO during the prosecution of several of the Lau patent applications.

3.    Medtronic intends to prove that the ACS representatives knew about and fully understood the Boneau prior art well before they began filing the Lau patent applications in October 1991.

4.    In October 1988, Michael Boneau first conceived of the Boneau stent. The Boneau stent is a balloon-expandable, plastically deformable stent consisting of either a single one-piece ring or multiple one-piece rings having a sinusoidal pattern, a length ranging anywhere from one millimeter to two centimeters, and a diameter ranging anywhere from 1.5 millimeters to five millimeters.

5.    Beginning in October 1988, Mr. Boneau made and successfully tested a series of prototypes of the Boneau stent.

6.      In August 1989, Mr. Boneau filed the Boneau Patent Application with the PTO in which he fully disclosed the Boneau stent, including its physical shape and characteristics, as well as the ranges of its possible length and diameter.

7.      In August 1990, Mr. Boneau filed the Boneau European Application with the European Patent Office in which he once again fully disclosed the Boneau stent, including its physical shape and characteristics, as well as the ranges of its possible length and diameter.

8.      In or about May 1989, Mr. Boneau and his partner, Dr. Simon Stertzer, approached various representatives of ACS regarding whether ACS would be interested in manufacturing and selling the Boneau stent.  ACS responded that it would be interested in meeting with Mr. Boneau to discuss his stent technology.

9.      In May 1989, Mr. Boneau and ACS signed a nondisclosure agreement.  In August 1989, Mr. Boneau, on behalf of his company Accuterix, signed a second nondisclosure agreement with ACS.  Both agreements reflected that ACS wished to speak with Mr. Boneau about that technology.

10.      From May 1989 to October 1990, Mr. Boneau and Dr. Stertzer met with a number of ACS's senior executives and engineers on several occasions.  These included Mr. Lau, who was named as one of the inventors on the Lau Patents; Michael Orth, who had responsibilities with respect to ACS's patent prosecution work; and Elizabeth McDermott, who also had responsibilities with respect to ACS's patent prosecution work.

11.      During these meetings, Mr. Boneau and Dr. Stertzer provided ACS's executives and engineers with all of the details of the Boneau stent, prototypes of the Boneau stent, a copy of the Boneau Patent Application, and the results of their testing work involving the Boneau stent.  In addition, during at least one of these meetings, Mr. Boneau discussed with ACS's executives and engineers that his stents could be connected together through the use of surgical sutures or by some other means.

12.      During several months in the 1990 time frame, ACS repeatedly told Mr. Boneau and Dr. Stertzer that the company was interested in pursuing the Boneau stent.  ACS also

told Mr. Boneau and Dr. Stertzer that, at the time, ACS did not have an active stent program of its own. That was false. Instead, in July 1989, ACS hired Mr. Lau for the express purpose of heading up a stent program.

13.    In January 1990, Edward Lynch, Esq., ACS's outside patent counsel who later prepared, filed, and prosecuted at least some of the early Lau patent applications, spent hours reviewing and analyzing the Boneau Patent Application, presumably the copy that Mr. Boneau had provided to ACS.

14.    On January 17, 1990, Mr. Lynch sent a letter to ACS's in-house patent counsel, Bruce Barclay, regarding Mr. Lynch's "legal research" related to the Boneau Patent Application.

15.    In March 1990, Mr. Lynch contacted James Eakin, Esq., the outside patent counsel for Mr. Boneau's new company, Endothelial Support Systems, and requested another copy of the Boneau Patent Application. In that same month, Mr. Eakin again spent hours reviewing and analyzing the Boneau Patent Application.

16.    In March 1990, Mr. Eakin sent another copy of the Boneau Patent Application to Mr. Lynch who again reviewed and analyzed the application.

17.    In mid-1990, Mr. Lau and several other ACS employees conducted a study in which they tested and compared a number of stents, including the Boneau stent. This presumably was one of the prototypes that Mr. Boneau had previously provided to ACS.

18.    In October 1990, after meeting with Mr. Boneau and Dr. Stertzer several times and gathering as much information from them as it could, ACS finally told Mr. Boneau and Dr. Stertzer that it was not going to pursue the Boneau stent. Indeed, ACS's executives told both Mr. Boneau and Dr. Stertzer that they were unsure whether ACS was even going to pursue making any type of stent. These statements were false.

19.    In March 1991, the Boneau European Patent Application was published and became a matter of public record. It appears that ACS's patent counsel involved in

prosecuting the Lau patent application conducted at least one prior art search in the 1991-1992 time frame that would have identified the Boneau European Patent Application.

20.     As a result, the ACS representatives had access to, knew about, reviewed, and even discussed among themselves much of the Boneau prior art well before they filed any of the Lau patent applications beginning in October 1991.

21.     Medtronic also intends to prove that the Boneau prior art was material to the patentability of several of the Lau patent applications. Yet, for almost six years, the ACS representatives failed to disclose the Boneau prior art to the PTO. Indeed, given their actual knowledge and review and analysis of the Boneau prior art, it can be concluded only that the ACS representatives made the conscious decision not to disclose the Boneau prior art to the PTO.

22.     The Lau patent applications disclosed a stent consisting of a number of one-piece "cylindrical elements" with a length less than their diameter connected together by a series of "connecting elements." The "cylindrical elements" disclosed in the Lau patent applications are remarkably similar in shape and design to the sinusoidal-shaped Boneau stents. Indeed, under the claim construction urged by ACS, the Lau patent applications claimed little more than a series of Boneau stents connected together. In fact, at least one of ACS's engineers has testified that ACS's MultiLink stent, the commercial embodiment of the Lau Patents, is nothing more than a series of Boneau stents shortened and connected together. Thus, again, the Boneau prior art was material to the patentability of the claims set forth in the Lau patent applications.

23.     The prior art references that the ACS representatives did disclose to the PTO did not disclose as complete a set of material features as the Boneau prior art. For example, the ACS representatives disclosed the prior art Gianturco patent, which discloses a long, zig-zag-shaped self-expanding stent. However, unlike the "cylindrical elements" disclosed in the Lau patent applications, the Gianturco patent discloses a stent that has a length that is much greater than its diameter and that is made of two separate pieces. On the other hand, the Boneau prior

art, including the Boneau Patent Application, expressly discloses a stent that has a length less than its diameter and that is made of a single-piece ring. Moreover, the Boneau Patent Application disclosed a stent that was expandable, and thus plastically deformable by a balloon catheter.

24.     Again, the Boneau prior art was material; it disclosed a more complete set of features than any other reference before the PTO, and, in fact, was more material to the patentability of the Lau patent applications than any of the other, disclosed references. Moreover, based on their own knowledge and review of the Boneau prior art, the ACS representatives knew or should have known and understood the significant materiality of the Boneau prior art.

25.     Nonetheless, the ACS representatives repeatedly failed, for nearly six years, to disclose the Boneau prior art to the PTO. They finally disclosed the Boneau prior art to the PTO in August 1997, which was only a few months before ACS filed this lawsuit. By August 1997, however, some of the Lau Patents had already issued, including the '154 Patent.

26.     Medtronic intends to prove that the ACS representatives failed to disclose the Boneau prior art to the PTO with an intent to deceive. In fact, Medtronic intends to prove that not only was ACS's failure to disclose the Boneau prior art over so many years completely unexplainable, but also ACS's ultimate disclosure of the Boneau prior art only months before suing Medtronic was equally unexplainable.

**B.     Failure To Disclose Joint Inventor**

27.     Medtronic intends to prove that the ACS representatives also committed inequitable conduct by failing to disclose to the PTO, during the prosecution of any of the Lau patent applications, that Mr. Boneau substantially contributed to the inventions claimed in the Lau patent applications and the resulting Lau patents.

28.    Again, the Lau patent applications disclosed a stent consisting of a number of one-piece "cylindrical elements" with a length less than their diameter that are connected together by a series of "connecting elements."

29.    Mr. Boneau disclosed to at least some of the ACS representatives that a number of his one-piece sinusoidal ring stents could be made having a length less than their diameter and could be connected together.

30.    However, the ACS representatives failed to disclose Mr. Boneau's substantial contributions to the inventions claimed in the Lau patent applications to the PTO.

31.    Medtronic intends to prove that the ACS representatives' repeated failure to disclose Mr. Boneau's substantial contributions to the inventions claimed in the Lau patent applications was material and was done with an intent to deceive the PTO.

## C.    Misrepresentations Regarding The Palmaz Prior Art

32.    Medtronic intends to prove that the ACS representatives also committed inequitable conduct by making material misrepresentations to the PTO about the prior art Palmaz stent during the prosecution of the Lau patent applications, and, in particular, the applications that matured into the '154 patent.

33.    The ACS representatives knew about and had experience using the prior art Palmaz stent. Indeed, Mr. Lau's mid-1990 analysis of the prior art stents included the Palmaz stent. As a result, the ACS representatives knew that the Palmaz stent had outwardly projecting edges when expanded and did not experience appreciable shortening during expansion. Nonetheless, the ACS representatives expressly told the PTO that the Palmaz stent did not have outwardly projecting edges when expanded and did experience appreciable shortening during expansion. These statements were 180 degrees opposite from the known facts. Moreover, the examiner was neither in a position to appreciate that these statements were false, nor appreciate that they were, in fact, false.

34.     Medtronic intends to prove that these misrepresentations were material to the patentability of the Lau patent applications.  Indeed, ACS was able to overcome PTO rejections only by making the false statements.

35.     Medtronic also intends to prove that ACS and those substantially involved in the patenting process made these material misrepresentations about the prior art Palmaz stent with an intent to deceive.

### D.     Improper Forum Shopping Involving The "Kit" Claim

36.     Medtronic intends to prove that ACS also committed inequitable conduct by pursuing a "kit" claim before two different patent examiners at the same time without revealing to either examiner the work of the other.

37.     ACS submitted a patent application seeking a "kit" claim, or a claim that covered both a stent and a stent delivery system.  Despite ACS's objections, the PTO repeatedly rejected the kit claim.

38.     After the rejection, ACS improperly submitted a divisional patent application, which included the previously rejected kit claim, and ACS took steps to ensure that the divisional application would be assigned to a different examiner by directing it to a different examining group.  Afterward, ACS falsely told the second PTO examiner that the "kit" claim was the subject of a restriction requirement and had not previously been considered on the merits.

39.     ACS and those substantially involved in the patenting process failed to inform either examiner of the duplicative efforts to push the "kit" claim through the PTO, as it was required to do.

40.     While pursuing the "kit" claims, ACS and those substantially involved in the patenting process failed to highlight the most pertinent prior art involving the "kit" claim. Specifically, ACS and those substantially involved in the patenting process failed to adequately

point out the MacGregor and Palmaz references, which related to the rejected "kit" claim, while prosecuting the "kit" claim before the second examiner.

      41.    ACS's pursuit of the "kit" claims before two different patent examiners at the same time without revealing to either examiner the work of the other, as well as ACS's act of making material misrepresentations to the PTO about the "kit" claim, was material and was done with an intent to deceive.

### F.    <u>Infectious Inequitable Conduct</u>

      42.    Medtronic intends to prove that each of the Lau Patents is unenforceable as a result of infectious unenforceability due to the broad ranging scope of the cited misconduct.

      43.    Each of the Lau Patents issued from a continuation, continuation-in-part, or divisional application. Thus, each of the Lau Patents relate to one another and incorporate the inequitable conduct from previous patent application and patent.

      44.    There is an immediate and necessary relationship between the inequitable conduct of the ACS representatives and the enforcement of each of the Lau patents. In particular, the repeated failure of the ACS representatives to disclose the Boneau prior art to the PTO and their misrepresentations regarding the Palmaz patent during the prosecution of some of the earlier Lau patent applications formed the basis of ACS's ability to successfully prosecute the remaining Lau patent applications.

13

## EXHIBIT 13

### ACS'S STATEMENT OF INTENDED PROOFS

1. Medtronic bears the burden of proof, by clear and convincing evidence, on <u>all</u> issues in this trial.  ACS will nevertheless establish that it did not commit inequitable conduct during prosecution of the Lau patents.

### A. <u>ACS DID NOT COMMIT INEQUITABLE CONDUCT WITH RESPECT TO THE BONEAU PATENT APPLICATION</u>

#### The Boneau Application Is Not Material

2. The Boneau Application is not material because it does not establish, either by itself or in combination with any other reference, a *prima facie* case of unpatentability of the Lau claims and is not inconsistent with any position taken by ACS or its representatives during prosecution of the Lau Patents.

3. As the Court has already found, the Boneau Application discloses a stand-alone stent comprised of "substantially straight segments that extend from one end of the stent to the other."  When multiple stents are used, they are unconnected.

4. In contrast, all claims of the Lau patents are directed to a longitudinally flexible stent, made by connecting a plurality of cylindrical elements together that are not, themselves, stents.

5. The lack of materiality of the Boneau Patent Application is further evidenced by the fact that, in the eight years that have passed since the Boneau '331 patent was disclosed to the PTO in August 1997, 15 related Lau patents (including 3 of the 4 patents in suit) have issued without the PTO ever making a single rejection based on Boneau.

#### The Boneau Application Is Cumulative

6. The Boneau application is not material because it is cumulative to art cited by the applicants to the PTO during prosecution of the Lau patents, e.g., in Information Disclosure Statements dated August 20, 1992, December 8, 1992, and May 25, 1993.

**No Intent To Deceive The PTO**

7.     ACS did not act with any intent to deceive the PTO during prosecution of the Lau Patents.

**B.    NO INEQUITABLE CONDUCT FOR ALLEGED FAILURE TO DISCLOSE JOINT INVENTOR**

8.     This allegation is improper because the Court has already found on Summary Judgment that Mr. Boneau is not a joint inventor of the Lau Patents (D.I. 544).  *See* Ex. 14.

9.     As the Court has already found on summary judgment (and reconsideration), Mr. Boneau was not a joint inventor of the Lau Patents.

**C.    NO INEQUITABLE CONDUCT FOR ALLEGED MISREPRESENTATIONS REGARDING PALMAZ**

10.     This allegation is improper because Medtronic did not include it in its Answer (D.I. 331).  *See* Ex. 14.

11.     The alleged "misrepresentations" were not misrepresentations at all, and are instead entirely consistent with the express disclosure of the Palmaz '417 patent at issue.

12.     There is no evidence of any intent to deceive the PTO.

**D.    NO INEQUITABLE CONDUCT FOR ALLEGED "FORUM SHOPPING"**

13.     This allegation is improper because Medtronic specifically withdrew it in its May 21, 2004, interrogatory responses.  *See* Ex. 14.

14.     The alleged "forum shopping" activity was in no way material to patentability.

15.     There is no evidence of any intent to deceive the PTO.

**E.    THERE IS NO "INFECTIOUS" INEQUITABLE CONDUCT**

16.     There can be no "infectious" inequitable conduct because there was no inequitable conduct committed during prosecution of the Lau Patents.

17.     In any event, inequitable conduct during prosecution of the '955 patent could not render the patents-in-suit unenforceable because, *inter alia,* (1) none of the patents-in-suit descended from the '955 patent application and (2) there is no "immediate and necessary relationship" between the activities alleged by Medtronic and the issuance of the patents in suit.

18.     Inequitable conduct during prosecution of the '154 patent could not render any of the remaining three patents-in-suit unenforceable because there is no "immediate and necessary relationship" between the activities alleged by Medtronic and the issuance of the patents in suit.

14

# EXHIBIT 14

## MEDTRONIC'S MISCELLANEOUS ISSUES

**I.      ACS's Objections to the Substance of Medtronic's Inequitable Conduct Claims**

ACS has taken the position that certain bases of Medtronic's inequitable conduct claim that were disclosed in, *e.g.*, Medtronic's pleadings and discovery responses, in ACS's own production documents, during the depositions of ACS's own witnesses, and/or in related stent litigations should be precluded at trial.   These issues were described in detail in e-mail correspondence with the Court on April 29 and May 2, 2005.   Medtronic is attaching to this Exhibit a copy of its May 2, 2005 e-mail to the Court in which Medtronic demonstrated that ACS's arguments lack merit.   For example, ACS repeats again its oft-stated argument that "Medtronic told the Court that Medtronic's inequitable conduct claim was solely premised on ACS's alleged failure to cite the Boneau Patent Application."   As Medtronic pointed out in its February 2 and 4, 2005 letters to the Court, that assertion is plainly incorrect.   Medtronic has always alleged a number of other bases for its claim and has so advised the Court. (*See* D.I. 581 and 588).

Medtronic respectfully requests that it should be permitted to present *all* of its evidence at trial so that its inequitable conduct claim can be decided on the merits, rather than on ACS's procedural maneuverings.   If at trial ACS believes it was prejudiced by the facts, it can make its objection and seek post-trial relief.   *See, e.g., Lucent Technologies, Inc. v. Extreme Networks, Inc., et al.,* C.A. No. 03-508-JJF, Memorandum Order at 1 (D. Del. April 28, 2005) (attached hereto) (noting that it is unlikely the trial testimony of an expert could be objectionable and unduly prejudicial to the opposing party, for failure to disclose; the proper remedy, however, is to raise the issue in post-trial motions).

Furthermore, the exclusion of critical evidence is an extreme sanction, not normally imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence. *Tracinda Corp. v. DaimlerChrysler AG*, Civil Action No. 00-993-JJF, 2005 U.S. Dist. LEXIS 5096 at *42 (D. Del. Mar. 30, 2005). The Court has broad discretion to determine whether exclusion is proper and should consider the following factors: a) the prejudice or surprise to the party against whom the evidence is offered; b) the ability of the party to cure the prejudice; c) the likelihood of disruption at trial; and d) the bad faith or willfulness involved in the non-disclosure. *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir. 1985); *see also Int'l Truck & Engine Corp. v. Caterpillar, Inc.*, Cause No. 1:03-CV-265, 2004 U.S. Dist. LEXIS 27447 at *4-*5 (D. Ind. May 26, 2004) (same); *High Concrete Structures, Inc. v. New Enter. Stone & Lime Co.*, Civ. No. 02-CV-0086, 2003 U.S. Dist. LEXIS 6605 at *9-*11 (D. Pa. Mar. 27, 2003) (evidence of prior art not identified during discovery was not excluded; no showing of prejudice because party received notice of the evidence more than a month before the trial date).

## II.    Scope of Medtronic's Inequitable Conduct Claims

Throughout the course of this litigation, ACS accused Medtronic of infringing the claims of nine of ACS's Lau patents. Medtronic requested a declaratory judgment that all nine ACS patents are not infringed, invalid, and/or unenforceable for inequitable conduct. During discovery and/or immediately prior to the liability trial, ACS withdrew its claims of infringement as to five of the nine patents, *i.e.*, the '504, '955, '721, '893, and '776 patents, and now takes the position that those patents are no longer at issue in this case.[1]  ACS has refused, however, to

---

[1] The '955 Patent was not included in either of ACS's Second or Third Amended Complaints.

move to dismiss with prejudice its claims on those patents; stipulate to the dismissal with prejudice of its claims on those patents; and/or provide Medtronic with a covenant not to sue on those patents based on Medtronic's past and present products.

Under clear Federal Circuit precedent, found in *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995), the Court still has jurisdiction over Medtronic's declaratory relief claims on the five "withdrawn" patents and, therefore, Medtronic's claim that those five patents are unenforceable due to inequitable conduct is still at issue in this case. Moreover, under the theory of infectious inequitable conduct, if Medtronic is able to demonstrate ACS's inequitable conduct through a breach of the duty of candor to the PTO, that breach may render unenforceable *all* claims which eventually issue from the same or even a related patent application. *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803-804 (Fed. Cir. 1990).

## III.    Scope of Testimony From ACS's Patent Attorney Edward J. Lynch

ACS has identified as one of its live witnesses at trial Edward J. Lynch, one of its outside patent attorneys, who prepared and prosecuted at least the first application that led to the issuance of the ACS Lau patents.  Medtronic suspects that ACS will be calling Mr. Lynch to testify that certain nondisclosures or misrepresentations made to the Patent Office were neither material nor committed with an intent to deceive the Patent Office.  However, at a prior deposition in the matter captioned as *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc., et al.*, C.A. No. IP 98-1108 C-H/G (the "*Scimed* litigation"), ACS asserted the attorney-client privilege with respect to Mr. Lynch's work on the patent application.

ACS also has withheld certain of Mr. Lynch's documents on the ground of privilege.  Other documents that Medtronic believes exist, which relate to Mr. Lynch's patent prosecution

activities, have neither been produced by ACS nor appear on its privileged document log. Despite Medtronic's requests to ACS to either identify within its production where these documents might be found or, alternatively, produce them, those requests have gone unheeded.

It is well-settled that ACS cannot use the attorney-client privilege as both a sword and a shield by disclosing only certain privileged communications that it believes helps its case, but refusing to disclose other portions of allegedly privileged communications. *See Medtronic, Inc. v. Guidant Corp.,* Civ. No. 03-848-SLR , 2004 U.S. Dist. LEXIS 23468 at *3 (D. Del. Oct. 24, 2004) (defendants may not use the attorney client privilege as both a sword and a shield); *see also Allergan Inc. v. Pharmacia Corp.,* Civ. No. 01-141-SLR, 2002 U.S. Dist. LEXIS 19811 at *6 (D. Del. May 17, 2003) (reliance on advice of counsel renders the advice both relevant and admissible because the party has waived the privilege with regard to subject matter of the advice); *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 486 (3d Cir. 1995) (permitting a party to selectively define the subject matter to limit the scope of waiver of the attorney-client privilege would undermine issues of fairness); *Multiform Dessicants, Inc. v. Stanhope Products Co., Inc.,* 930 F. Supp. 45,47 (W.D.N.Y. 1996) (plaintiff waived the attorney-client privilege as to all communications pertaining to the patent prosecution by naming the patent attorney as a witness).

Medtronic is scheduled to depose Mr. Lynch on Friday, May 20, 2005, and will be in a position to brief the Court on this issue at the May 23, 2004 Pretrial Conference.

## IV.    ACS's Ability to Use Deposition Transcripts From Prior Litigation

ACS has advised that at trial, it may use the deposition transcript of John Nagy, presumably from the *Scimed* litigation. Mr. Nagy is ACS's outside patent attorney who prepared and prosecuted many of the applications that issued as the Lau patents.

4

Generally speaking, testimony from other proceedings is inadmissible as hearsay. It is only admissible if: (1) the declarant is unavailable; (2) the testimony was taken at a hearing, deposition or civil action or proceeding; *and* (3) the party against whom the testimony is now offered, or its predecessor in interest, had an opportunity *and similar* motive to develop the testimony by direct, cross or redirect examination. *See* Fed. R. Evid. 804(b)(1); *New Jersey Turnpike Authority v. PPG Indus., Inc.*, 197 F.3d 96, 110 (3d Cir. 1999) (emphasis supplied). Determining similarity of motive requires evaluating: the similarity of issues, (2) the purpose for which the testimony is offered, and (3) the context or circumstances in which the testimony is given. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1190, 1252 (E.D. Pa. 1980), *aff'd in part, rev'd in part on other grounds*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574 (1986).

First of all, ACS has not demonstrated that Mr. Nagy is unavailable to testify live at trial as provided under Fed. R. Civ. P. 45. Second, Medtronic was not a party to the *Scimed* litigation and, therefore, had no opportunity to examine Mr. Nagy or to develop his testimony. As a result, unless Medtronic first designates certain portions of Mr. Nagy's deposition transcript from that prior case, ACS cannot use Mr. Nagy's transcript in this case.

466364

5

A



"Leslie A. Polizoti"
&lt;LPolizoti@mnat.com&gt;

05/02/2005 10:27 AM

To: &lt;Slr_Civil@ded.uscourts.gov&gt;
cc: &lt;cottrell@rlf.com&gt;, &lt;jrizzo@mwe.com&gt;,
    &lt;michael.morin@finnegan.com&gt;, &lt;fmorisseau@mwe.com&gt;, "Karen
    Jacobs Louden" &lt;KLouden@MNAT.com&gt;, "Maryellen Noreika"
    &lt;MNoreika@MNAT.com&gt;, &lt;james.barney@finnegan.com&gt;,
    &lt;dstein@mwe.com&gt;, &lt;moneill@mwe.com&gt;
Subject: C.A. No. 98-80

Dear Chief Judge Robinson:

On behalf of Medtronic Vascular ("Medtronic"), we are writing in response to the April 29, 2005 e-mail from ACS regarding issues pertaining to the inequitable conduct trial scheduled for June 7-8, 2005. As demonstrated below, ACS's assertions that Medtronic is now making "improper allegations;" "ambushing" ACS with new allegations; and, at the same time, "hiding" its case from ACS are not only inconsistent, but are also completely without merit. Simply put, Medtronic's inequitable conduct claims, and the factual bases of those claims, have been fully and thoroughly disclosed *to ACS* throughout this litigation, *and by ACS* in, *e.g.*, its document production from the related stent case *ACS v. Scimed Life Systems, Inc.*, C.A. No. IP 98-1108-C-H/G, S.D. Ind. (1988). Indeed, the vast majority of the factual support for Medtronic's inequitable conduct claims comes from ACS's own witnesses and files.

By way of important background, it was *ACS* that approached Medtronic shortly after the liability trial and insisted that well before the June 7-8 trial, Medtronic should lay out its entire inequitable conduct case--chapter and verse--in the form of a Supplemental Joint Pretrial Order. The mere fact that ACS made such a request cuts against its present position that Medtronic had previously limited the scope of its inequitable conduct claims to just ACS's failure to disclose the Boneau prior art. If that were the case, logically speaking, there would have been no need and no reason for ACS to demand that Medtronic spell out the particulars of its inequitable conduct claims in a detailed Supplemental Joint Pretrial Order. Nonetheless, Medtronic agreed to ACS's request and, on April 25th per the parties' agreement, provided ACS with a proposed Supplemental Joint Pretrial Order, a copy of which is attached below, in which Medtronic detailed the factual and legal bases of its claims. Thus, in summary, ACS previously took the position that Medtronic had not provided it with enough information; yet after Medtronic acquiesced to its demand for more information, ACS is now taking a totally inconsistent position that Medtronic has provided it with *too much* information.

Medtronic now turns to the substance of ACS's e-mail.

First, ACS's initial position that a party asserting an inequitable conduct claim is forever locked in to the factual allegations set forth in its pleading, and is forever barred from developing and supplementing those factual allegations after years of discovery, finds absolutely no support in the law. Rule 9(b) of the Federal Rules of Civil Procedure provides that a party asserting an inequitable conduct claim (a claim that courts have found to be a form of fraud) must merely plead with "particularity" the "circumstances" constituting the alleged inequitable conduct. But naturally, Rule 26 of the Federal Rules of Civil Procedure contemplates that through the discovery process, the party asserting the claim will be able to further develop and supplement its

factual allegations. Indeed, it is worth noting that in response to Medtronic's allegations that
ACS was infringing Medtronic's Boneau patents, ACS asserted a defense of inequitable conduct.
In its answer, ACS stated: "Although certain bases for these contentions are set forth herein,
ACS/Guidant believes that additional bases will be developed during discovery." Thus, while
ACS expected to use the discovery process to more fully develop and supplement its own
inequitable conduct allegations, in its view, Medtronic was not entitled to do so. The single case
that ACS cites, *EMC Corp. v. Storage Technology Corp.*, 921 F. Supp. 1261 (D. Del. 1996), does
not support ACS's position. Instead, the *EMC* case merely stands for the proposition that a party
asserting an inequitable conduct claim cannot cure a defective pleading through subsequent
interrogatory responses. That is not the issue here since ACS does not argue, and has never
argued, that Medtronic's pleading was defective. If ACS believed that Medtronic's pleading was
defective, it was free, years ago, to file a motion for a more definite statement under Rule 12(b)
(e) of the Federal Rules of Civil Procedure.

Second, ACS's position that Medtronic is only now asserting that ACS's inequitable conduct
included making misrepresentations regarding the prior art Palmaz stent also lacks merit. The
Court will recall that during the liability trial, Medtronic wanted to show that the only way ACS
was able to overcome a series of Patent Office rejections and obtain the Lau patents was to make
misrepresentations to the Patent Office regarding the Palmaz stent not having outwardly
projecting edges and not appreciably shortening upon expansion. Those issues were covered
extensively in fact and expert discovery. However, ACS successfully precluded Medtronic from
arguing those issues to the jury on the ground that they did not relate to Medtronic's invalidity
claim, but instead, related to Medtronic's inequitable conduct claims. Thus, ACS is hardly in a
position now to claim that these issues are somehow "new."

Third, ACS's position that Medtronic is only now specifically naming certain of the ACS
representatives who engaged in the inequitable conduct also lacks merit. Medtronic has long
claimed that ACS, its counsel, and its representatives committed inequitable conduct by, among
other things, failing to disclose the Boneau prior art to the Patent Office. The names of the ACS
attorneys and representatives who engaged in that conduct have always been well known to ACS
and also were identified through various depositions of ACS's own deponents and documents
that ACS itself produced in this case. Mr. Boneau testified that he disclosed his prior art stent
technology to a number of ACS in-house representatives, including Lilip Lau and Michael Orth.
In turn, Mr. Lau testified that he worked under the direct supervision of Elizabeth McDermott
and Mr. Orth. Mr. Lau also testified that he worked closely with ACS's in-house patent attorney,
Bruce Barclay, with respect to the patenting issues. Mr. Barclay testified that he was aware of
the Boneau prior art and that he actually engaged an outside attorney, Edward Lynch — the same
attorney who prosecuted the first Lau patent application — to provide an opinion of counsel on
the Boneau prior art. ACS's privilege log indicates that Mr. Lynch actually provided that opinion
of counsel to Mr. Barclay. Mr. Lynch's billing records also indicate that he discussed that
opinion with at least Ms. McDermott. Nonetheless, for nearly six years after filing the first Lau
application, ACS inexplicably failed to disclose the Boneau prior art to the Patent Office. In the
Supplemental Joint Pretrial Order, Medtronic merely identified the names of the various people
who were identified in discovery, and, in particular, who were identified in the depositions of
ACS's own representatives and in ACS's own documents. ACS is hardly in a position to claim

that the names of certain of its own representatives are somehow "new."

Fourth, ACS's position that Medtronic is only now claiming that ACS's inequitable conduct consisted of failing to disclose the Boneau U.S. patent and the Boneau European patent, in addition to failing to disclose the Boneau patent application, is a matter of mere semantics and lacks any merit whatsoever. It was made perfectly clear to ACS, through both fact and expert discovery, that ACS committed inequitable conduct by failing to disclose the Boneau prior art at every possible turn. This included ACS's failure to disclose the Boneau patent application that Mr. Boneau physically provided to ACS, the Boneau U.S. patent that issued several years afterward, and the Boneau European patent application that was published and became a part of the public record in March 1991. ACS's suggestion that this is somehow "new" is somewhat disingenuous, to say the least.

Fifth, ACS's position that Medtronic is somehow violating the Court's previous Orders by asserting that ACS's inequitable conduct included the failure to identify Mr. Boneau as a joint inventor also lacks merit. Medtronic raised two separate and distinct claims; first, that the ACS Lau patents are invalid for failing to identify Mr. Boneau as a joint inventor, and second, that ACS committed inequitable conduct by failing to disclose Mr. Boneau as a joint inventor. In *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1322 (Fed. Cir. 2000), the Federal Circuit made very clear that these are two separate and distinct claims and that findings on one claim are not necessarily dispositive to the other claim. Here, ACS moved for summary judgment on Medtronic's first claim, that the ACS Lau patents are invalid for failing to identify Mr. Boneau as a joint inventor. ACS's motion was premised entirely on the proposition that the Boneau stent was nothing more than the prior art Gianturco stent. The parties did not submit any briefing ON, and the Court did not make any findings or enter any Orders related to, Medtronic's separate and distinct claim that ACS committed inequitable conduct by failing to identify Mr. Boneau as a joint inventor. Moreover, Medtronic is now prepared to offer significantly more evidence than it previously filed in connection with ACS's motion for summary judgment showing that the Boneau prior art was significantly different from, and was far more material than, the other prior art that ACS did provide to the Patent Office. For example, the Lau patent application claimed a stent consisting of a series of single-piece sinusoidal rings with a length less than their diameter that are connected together. The prior art Gianturco patent disclosed a zig-zag ring made of two pieces with a length greater than its diameter. However, the Boneau patent application that was given to ACS (and to Mr. Lau) well before ACS filed the first Lau patent application discloses a single-piece sinusoidal ring with a length less than its diameter. This bolster's Medtronic's position that Mr. Lau did not do anything more than take Mr. Boneau's stent rings and connect them together, and that not only did Mr. Boneau provide a significant part of the inventions claimed in the Lau patent applications, but also that ACS committed inequitable conduct by failing to disclose that fact to the Patent Office.

Sixth, ACS's position that Medtronic is only now claiming that ACS's inequitable conduct included improper forum shopping among the patent examiners also lacks merit. Medtronic spelled out this issue in its pleading, and it is spelled out in even greater detail in the documents that ACS produced from the *ACS v. Scimed Life Systems, Inc.* case. In that case, the very issue of ACS's improper forum shopping was the subject of an exhaustive motion for summary judgment

on which Judge David F. Hamilton ruled that there were genuine issues of material fact as to whether ACS had engaged in inequitable conduct by taking claims that one examiner had rejected and re-filing those same exact claims with another examiner without telling the second examiner of the prior rejection. Thus, these allegations cannot come as any surprise to ACS. Further, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Medtronic was not under any duty to supplement its interrogatory responses with these issues since they are based on information that was already known to ACS, and, indeed, had come from ACS's own document production.

Finally, ACS's objections to Medtronic's disclosure of five live witnesses and 12 witnesses by deposition lack merit and sets up a number of contradictions. On the one hand, ACS is arguing that through the Supplemental Joint Pretrial Order, Medtronic is providing ACS with too much information. But, on the other hand, ACS is arguing that Medtronic is "hiding" its case from ACS by listing too many witnesses. Moreover, in the original Joint Pretrial Order, ACS listed about 40 potential fact witnesses and 5 potential expert witnesses. As we now know, ACS called a total of three (3) witnesses at trial. Putting these issues aside, Medtronic is well aware that each side has been allotted a total of six hours to present its case. However, Medtronic has every intention of calling all five of its designated live witnesses. Those examinations should only range between 15 and 30 minutes each, leaving Medtronic with more than ample time to play a number of short, targeted videotaped depositions. Indeed, Medtronic has already agreed to provide ACS with the deposition designations well in advance of trial so that ACS can assert any objections it deems appropriate.

The bottom line is that the available evidence strongly suggests a pattern of unexplained disclosures of material information, which leads to the inevitable conclusion that ACS engaged in inequitable conduct in the procurement of the Lau patents. Faced with this reality, ACS now seeks to prevent Medtronic from proving it. Medtronic respectfully submits that it should be permitted to present its entire case at trial so that this case can be tried on its merits, not on last-minute procedural maneuverings.

Respectfully,

Leslie A. Polizoti (#4299)

.....

B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC.,          :
                                    :
          Plaintiff,                :
                                    :
     v.                             : Civil Action No. 03-508 JJF
                                    :
EXTREME NETWORKS, INC.              :
and FOUNDRY NETWORKS, INC.,         :
                                    :
          Defendants.               :

## MEMORANDUM ORDER

During the course of patent trials, counsel often raise
objections to the testimony of an expert witness, arguing that
the trial opinion testimony was not disclosed as required by
Federal Rule of Civil Procedure 26.

Prior to the commencement of a patent trial, the Court,
counsel, and the parties spend a substantial amount of time and
effort in preparation for the trial, including drafting a pre-
trial order and attending a pretrial conference.  A good bit of
the effort is directed at the disclosure, by report and
deposition, of the expert witnesses' opinions.  Because of this
preparation, the Court believes that it is unlikely the trial
testimony of an expert could be objectionable, for failure to
disclose, and unduly prejudicial to the opposing party.

For these reasons, any party believing that an expert
is offering an opinion at trial that was not disclosed pursuant
to Rule 26 and the pretrial conference procedures shall object on
the record at the time the purported undisclosed opinion

testimony is offered.  No response from opposing counsel is required.  If the objecting party desires to maintain its objection post trial, that party shall file an appropriate post-trial motion.  After full briefing of the motion, the Court will determine if the opinion testimony violated Rule 26 and the pretrial order, and what remedy and sanctions are appropriate.


<u>April 28, 2005</u>
DATE

_Joseph J. Farnan Jr._
UNITED STATES DISTRICT JUDGE

2

15

## EXHIBIT 15

## MISCELLANEOUS ISSUES

### 1.  Medtronic's Improper Allegations

As the Court will recall, in February of this year, Medtronic told the Court that
Medtronic's inequitable conduct claim was solely premised on ACS's alleged failure to cite the
Boneau Patent Application (D.I. 580 at 26-27).  On April 25, however, just six weeks before
trial, Medtronic informed ACS that it intends to advance many other allegations that, in addition
to being contrary to Medtronic's express representations, are improper for other reasons.  ACS
respectfully requests that the Court strike these allegations, which generally fall into one or both
of two categories.

### A.    Allegations that Medtronic Did Not Include in Its Answer

First, ACS respectfully requests that this Court strike the following allegations because
they were not included in Medtronic's Answer (D.I. 331), and are thus plainly impermissible
under Federal Rule of Civil Procedure 9(b):

(1)    Medtronic's allegation that ACS committed inequitable conduct because of
alleged "Misrepresentations Regarding the Palmaz Prior Art;"

(2)    Medtronic's allegation that three former ACS employees, Michael Orth, Bruce
Barclay, and Elizabeth McDermott, committed inequitable conduct; and

(3)    Medtronic's allegation that ACS committed inequitable conduct based on an
alleged failure to disclose the Boneau '331 Patent and Boneau European
Application, in addition to the Boneau Application, during prosecution.  Of these,
only the Boneau Application was identified in the Answer.

Medtronic cannot (and does not) dispute that the above allegations are nowhere to be found in its
Answer.  Instead, Medtronic alleges that ACS was somehow on notice of these allegations
because they were raised by another party (SciMed) in an Indiana case several years ago or
because Medtronic's proof on these issues is allegedly derived from ACS's documents.  Such

arguments are irrelevant. *See, e.g., EMC Corp. v. Storage Tech. Corp.,* 921 F. Supp. 1261, 1262-63 (D. Del. 1996) (a party cannot cure deficiencies in its Answer through subsequent interrogatory responses). In addition to being legally irrelevant, Medtronic's "notice" argument is further belied by the fact that it included none of the above allegations in response to ACS's Interrogatory No. 74, served at the end of fact discovery nearly a year ago, which required Medtronic to set forth the details of its inequitable conduct defense.

### B.     Medtronic's Other Improper Allegations

ACS also respectfully requests that the Court strike the following allegations, which are in direct contravention of this Court's rulings and/or Medtronic's own prior representations:

(1)     The Court should strike Medtronic's allegation that ACS committed inequitable conduct by failing to identify Mr. Boneau as a "joint inventor" because the Court has already ruled that Mr. Boneau is not, in fact, a joint inventor (D.I. 544, 579);

(2)     The Court should strike Medtronic's allegation that ACS engaged in improper "examiner shopping" because Medtronic specifically removed any reference to this allegation in its interrogatory responses a year ago; and

(3)     The Court should strike Medtronic's allegations regarding Mr. Boneau's supposed "suture stent" because the Court has already ruled that such testimony is inadmissible for lack of corroboration. (See D.I. 586 at 2-3.)

In addition, Medtronic contends that ACS has refused to dismiss the '955 patent from the present case. That contention is misplaced, however, because ACS withdrew the '955 patent by deleting it from its Amended Complaint. By amending its Complaint in that manner, ACS complied with the well-established principle that a party should withdraw a claim by amending the complaint under Fed. R. Civ. P. 15(a), rather than seeking dismissal under Fed. R. Civ. P. 41(a). *See* MOORE'S FEDERAL PRACTICE 3D., § 41.21[2]. Accordingly, there is nothing to "dismiss" with respect to the '955 patent, contrary to Medtronic's assertion.

466401

2