IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ADVANCED CARDIOVASCULAR
SYSTEMS, INC. and GUIDANT SALES
CORPORATION,

         Plaintiffs,

    v.

MEDTRONIC VASCULAR, INC. and
MEDTRONIC USA, INC.,

        Defendants.

C.A. No. 98-80 (SLR)
(Consolidated with Civil Action
No. 98-314 (SLR) and Civil Action
No. 98-316 (SLR))

**REDACTED**
**MEDTRONIC'S *CORRECTED* SUBMISSION REGARDING THE**
**TRIAL OF DAMAGES AND WILLFULNESS**

MORRIS, NICHOLS, ARSHT & TUNNELL
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Attorneys for Defendants Medtronic Vascular, Inc.
and Medtronic USA, Inc.

OF COUNSEL:
Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
James G. Rizzo
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005

Fay M. Morisseau
Mauricio A. Flores
Matthew F. Weil
Michael R. O'Neill
David M. Stein
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue
Suite 400
Irvine, CA 92612-7107

Original filing: April 18, 2005; Corrected filing: May 18, 2005; Redacted Filing June 2, 2005

TABLE OF CONTENTS

Page

TABLE OF CITATIONS

INTRODUCTION                                                                          1

I.    DAMAGES AND WILLFULNESS SHOULD REMAIN
      STAYED PENDING RESOLUTION OF LIABILITY
      ISSUES IN THIS AND RELATED CASES THAT MAY
      IMPACT DAMAGES AND WILLFULNESS.                                                 1

      A.    The Medtronic/Cordis Arbitration–Which Was The
            Basis On Which ACS Moved, And The Court
            Granted, A Stay In This Case–Has Not Yet Been
            Completed.                                                                2

      B.    Medtronic's Appeal On Liability In This Case May
            Significantly Impact ACS's Damages And
            Willfulness Claims, And Could Ultimately Render
            A Damages And Willfulness Trial Unnecessary.                              3

      C.    Medtronic's Appeal On The Boneau Patents May
            Impact ACS's Damages Claim In This Case.                                  4

      D.    Cordis's Ongoing Lawsuits Against Medtronic For
            Infringement Of The Palmaz Patents May
            Significantly Impact Damages In This Case, And
            May Even Warrant Consolidating The Cordis And
            ACS Cases For Purposes Of Trying Damages.                                 6

      E.    The Existence Of So Many Unresolved Cases And
            Issues Has Made It Practically Impossible To Fully
            Assess Alternative Non-Infringing Products—An
            Issue That May Have A Significant Impact On
            ACS's Damages Claim.                                                      9

II.   SIGNIFICANT FACT AND EXPERT DISCOVERY
      STILL NEEDS TO BE CONDUCTED RELATED TO
      THE DAMAGES AND WILLFULNESS ISSUES.                                             10

III.  THE PARTIES WILL HAVE TO PRESENT A GREAT
      DEAL OF EVIDENCE, INCLUDING EVIDENCE THAT
      OVERLAPS WITH THE EVIDENCE THAT WAS
      PRESENTED DURING THE LIABILITY TRIAL,
      DURING A TRIAL ON DAMAGES AND
      WILLFULNESS.                                                                    12

ii.

## TABLE OF CONTENTS (continued)

Page

IV.    A TRIAL ON DAMAGES AND WILLFULNESS
WOULD REQUIRE AT LEAST TWO FULL WEEKS OF
COURT TIME, IF NOT MORE.                                                15

V.    A CONTINUED STAY ON DAMAGES AND
WILLFULNESS WILL NOT IMPACT THE LIABILITY
ISSUES THAT HAVE ALREADY BEEN TRIED.                       16

<u>TABLE OF CITATIONS</u>

Page(s)

<u>Cases</u>

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
    1 F.3d 1214 (Fed. Cir. 1993)     6

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    18 F. Supp. 1116 (S.D.N.Y. 1970)     9, 13

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)     9

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004)     12

*Micro Motion, Inc. v. Kane Steel Co.*,
    894 F.2d 1318 (Fed. Cir. 1990)     4

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992)     12, 13

*Ryco, Inc. v. Ag-Bag Corp.*,
    857 F.2d 1418 (Fed. Cir. 1988)     13

*THK America, Inc. v. NSK Co.*,
    151 F.R.D. 625 (N.D. Ill. 1993)     13

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
    750 F.2d 1552 (Fed. Cir. 1984)     7

<u>Statutes</u>

35 U.S.C. §271     16

35 U.S.C. §285     16

**INTRODUCTION**

Pursuant to the Court's instructions at the March 2, 2005 hearing on this matter, Medtronic submits this brief addressing the following <u>five</u> issues: (1) why the existing stay on damages and willfulness should remain in effect; (2) the nature and scope of the damages and willfulness discovery that would have to be conducted if the stay is lifted; (3) an overview of the evidence Medtronic intends to present at the damages and willfulness trial; (4) an estimate of the amount of time necessary to try damages and willfulness; and (5) why a continued stay on damages and willfulness will not have any impact on the liability issues.

I.    **DAMAGES AND WILLFULNESS SHOULD REMAIN STAYED PENDING RESOLUTION OF LIABILITY ISSUES IN THIS AND RELATED CASES THAT MAY IMPACT DAMAGES AND WILLFULNESS.**

As the Court is well aware, the "stent wars" involve a myriad of patent infringement suits that have been brought by the major players in the stent industry against one another and involve a number of different patents claiming various aspects of "first generation" and "second generation" stent technology and beyond.[1] As the Court is also aware, none of these cases has been fully and finally adjudicated, and, as a result,

---

[1]    The cases pending in this district alone include, among others, *Cordis v. Medtronic (AVE)*, C.A. No. 97-550 (Palmaz patents); *Cordis v. Medtronic*, C.A. No. 00-886 (Palmaz patents); *Cordis v. Boston Scientific*, C.A. No. 03-027 (Palmaz patents); *Boston Scientific Scimed v. Cordis*, C.A. No. 03-283 (BSC patents); *Boston Scientific Scimed v. Cordis*, C.A. No. 03-1138 (BSC patents); *Medtronic v. ACS*, C.A. No. 98-80 (Boneau patents); *Medtronic v. BSC*, C.A. No. 98-478 (Boneau patents); *ACS v. Medtronic*, C.A. Nos. 98-80, 98-314, and 98-316 (Lau patents); *Medtronic v. Cordis*, C.A. No. 03-402 (Boneau patents); and *Medtronic v. Boston Scientific*, C.A. No. 04-034 (Boneau patents).

there is still significant uncertainty concerning who in the end will be liable to whom and for what conduct. ███████████████████████████████████████████████

███████████████████ It therefore makes sense to keep the current stay on damages and willfulness in place until at least some of these uncertainties can be fully resolved. ACS would be hard-pressed to contend otherwise because this is the exact same position that ACS itself asserted in the past.

The following facts (among others) justify maintaining the stay.

### A. The Medtronic/Cordis Arbitration–Which Was The Basis On Which ACS Moved, And The Court Granted, A Stay In This Case–Has Not Yet Been Completed.

In the 03-402 case, Medtronic alleged that Cordis's stents infringed Medtronic's Boneau patents. Cordis argued that it could not be held liable for infringement because it has a license to the Boneau patents. In May 2004, the Court stayed that case pending the resolution of an arbitration of Cordis's license defense (D.I. 167 (03-402 case)). Shortly afterward, ACS moved the Court in the 98-80, 98-314, and 98-316 cases to stay *both* Medtronic's suit against ACS for infringement of the Boneau patents (the 98-80 case) *and* ACS's suit against Medtronic for infringement of the Lau patents (the 98-80, 98-314, and 98-316 cases) pending the outcome of the Medtronic/Cordis arbitration (D.I. 371 (98-80 case)). ACS argued (among other things) that the outcome of the arbitration could impact damages (D.I. 372 at 2 and 5 (98-80 case)). In August 2004, the Court granted ACS's motion in part and stayed damages and willfulness in *both* cases pending completion of the Cordis arbitration (D.I. 444 at 3-4 (98-80 case)).

The Medtronic/Cordis arbitration has not been completed, though it is now set for hearing in November 2005. Thus, the very event that ACS argued warranted the stay has not taken place and will not take place for some time. Moreover, depending on how the Court rules on Medtronic's motion to stay litigation of the 00-886 case pending arbitration,[2] that panel also may decide whether Medtronic has a license to the Palmaz patents with respect to certain Medtronic products. As such, the stay should remain in effect at least until the Medtronic/Cordis arbitration is resolved.

> **B.    Medtronic's Appeal On Liability In This Case May Significantly Impact ACS's Damages And Willfulness Claims, And Could Ultimately Render A Damages And Willfulness Trial Unnecessary.**

The Court has already commented that claim construction in this case presented very close issues and that the Court is uncertain as to how the Federal Circuit will resolve those issues on appeal (2/16/05 Tr. at 1711:8-19 ("I have to admit, I think both parties stated absolutely appropriate constructions in this case. . . . I don't have a clue which way the Federal Circuit will go on this.")). Thus, it is possible the Federal Circuit will reverse at least some aspects of the Court's claim construction rulings and remand for a retrial of liability. Medtronic also is moving for a new trial. That being the case, it certainly will not serve the interests of efficiency and economy for the Court and the parties to spend significant time and resources engaging in fact and expert discovery and conducting a full blown trial on damages and willfulness. Indeed, if Medtronic

---

[2]    The Court recently issued an Order indicating that it is in the process of reviewing its prior Order on the topic and that it will issue a decision in due course (D.I. 112).

prevails on appeal or upon retrial, any interim trial on damages and willfulness will have been a waste of time and resources. Thus, the stay should remain in effect until Medtronic's appeal of the liability issues in this case is resolved.

> **C.      Medtronic's Appeal On The Boneau Patents May Impact ACS's Damages Claim In This Case.**

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████

If the Court's order granting ACS's motion for partial summary judgment that the ACS Multilink stents do not infringe the Medtronic Boneau patents is reversed on appeal, and Medtronic is able to prove that the Multilink stents infringe those Boneau patents, then ACS would not be able to collect any lost profits damages at all in its case against Medtronic. That is because ACS could not prove that it had the lawful ability to make and sell any of its Multilink stents, let alone the ability to make and sell more of those stents. *See Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1322 (Fed. Cir.

---

3       These numbers presumably will go up when financial information after March 2004 is included.

1990) (a source of supply cannot be considered in a lost profits analysis if that source is itself an infringer).  It certainly would not serve the interests of efficiency and economy for the Court and the parties to expend an enormous amount of time and resources engaging in discovery (and discovery disputes), motion practice, and conducting a full blown damages and willfulness trial when the verdict resulting from such a trial may have to be set aside and retried all over again if Medtronic is successful on its appeal in the 98-80 case.  Thus, the stay should remain in effect until Medtronic's appeal of the liability issues in its suit against ACS is fully resolved.

It bears emphasis that ACS previously argued for practically the same approach.  In the 98-478 case, in July 2004, BSC moved to bifurcate and stay all damages issues pending the final resolution, "including appeals," of all of the many stent cases (D.I. 231 (98-478 case)).  In its motion, BSC noted that there were at least nine stent cases pending before the Court involving Medtronic, Cordis, ACS, and BSC.  BSC argued that "no one" could determine the proper measure of damages in any of these cases until all of the liability issues were finally determined, including the resolution of all appeals.  BSC argued that because all of the parties were "large multinational companies with substantial financial resources, there would be no prejudice to stay damages issues until "all liability determinations become final" (D.I. 232 at 2).  In August 2004, ACS joined BSC's motion, stating: "ACS requests that the Court bifurcate trial of the above captioned case into a liability phase and a damages phase, with the

damages phase taking place only after the Court has resolved all issues as to liability in this and in the other pending stent cases." (emphasis added) (D.I. 393 (98-80 case)).[4]

### D. Cordis's Ongoing Lawsuits Against Medtronic For Infringement Of The Palmaz Patents May Significantly Impact Damages In This Case, And May Even Warrant Consolidating The Cordis And ACS Cases For Purposes Of Trying Damages.

As the Court is aware, in the 97-550 and 00-886 cases, Cordis has sued Medtronic for infringing the Palmaz patents. The Court entered judgment of liability in the 97-550 case against Medtronic on March 31, 2005, and the 00-886 case is still ongoing. It is crucial to note that in those two cases, Cordis has accused some of the same Medtronic stents as ACS has accused in this case. It is just as critical to note that Cordis and ACS are both seeking lost profits and reasonable royalty damages on some of the same accused Medtronic stents. This raises a host of significant damages issues.

Under a lost profits analysis, a patentholder can seek to recover its lost profits on the accused infringer's sales it would have made "but for" the alleged infringement. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993). In the first trial of the 97-550 case, Cordis's damages expert testified that from 1998 to 1999, Cordis would have made about 80% of Medtronic's accused sales[5] (Exh. A (Trial Tr.) at 2908-09; 2938; 2978-79; 3594; 3596-97; 3610). ██████

████████████████████████████████████████████████████

---

[4]     These motions were withdrawn as moot after the Court issued its Order bifurcating damages pending the Cordis arbitration.

[5]     ████████████████████████████████████████████



Moreover, under a reasonable royalty analysis, a royalty rate is determined by the amount that a person in a "hypothetical negotiation" would have been willing to pay as a royalty and yet be able to make a reasonable profit. *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984). Here, Cordis's and ACS's separate patent claims against some of the same products may lead to inconsistent royalty determinations in the Cordis cases and this case. ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████  And, during the hypothetical negotiations, would Medtronic have argued for a reduced royalty rate on both the Cordis Palmaz patents and the ACS Lau patents so that it could make and sell its stents at a reasonable profit as the law contemplates? These complex questions are compounded by the fact that Johnson & Johnson, the parent of Cordis, recently inked a deal to acquire Guidant Corporation, the parent of ACS (Exh. C (Guidant webpage)). Thus, if that acquisition goes through, Johnson & Johnson will be in a position in these lawsuits to essentially seek a double recovery from Medtronic.

Moreover, as this Court is aware, Medtronic believes that it has the right to arbitrate whether it has a license to the Cordis patents with respect to certain products. The resolution of this issue may also impact the reasonable royalty analysis.

These considerations warrant maintaining the stay in this case until liability in all of these cases is fully resolved, just as ACS had previously proposed. After those issues are fully resolved, to the extent there is even a need for a damages trial, consideration should be given to consolidating the two Cordis cases and this case for purposes of determining damages and willfulness. This proposal will save time and resources and will reduce the chances of inconsistent judgments and having to retry damages later on down the road.

**E.     The Existence Of So Many Unresolved Cases And Issues Has Made It Practically Impossible To Fully Assess Alternative Non-Infringing Products—An Issue That May Have A Significant Impact On ACS's Damages Claim.**

At the March 2 hearing, the Court noted that the issue of alternative non-infringing products is a significant damages-related issue and that determining such products is difficult given the procedural posture of the various stent cases (03/02/05 Tr. at 10:5-8 ("We've got so much going on.  And it is hard to keep track of and hard to tell whether there are any non-infringing alternatives to any patents at this point.")).  The Court was correct on both points.  First, the existence of actual or potential alternative non-infringing products may have an enormous impact on both the lost profits and the reasonable royalty analysis.  *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353-55 (Fed. Cir. 1999); *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Second, to date, it has been practically impossible for Medtronic and its technical and damages experts to fully assess alternative non-infringing products.

For example, all of the asserted claims of the four ACS patents require "cylindrical elements," which the Court construed in pertinent part to mean "a radially expandable segment of a stent having a *longitudinal length less than its diameter* with a circumferential undulating pattern" (D.I. 542 at 2-3).  In its renewed JMOL filed concurrently herewith, Medtronic shows that, to satisfy the requirement of a longitudinally flexible stent (which the Court said must "facilitate delivery" to the body lumens), the longitudinal length of the cylindrical elements must be less than their diameter in the crimped state.  With the exception of Medtronic's Driver and

MicroDriver stents, however, ACS failed to prove that Medtronic's accused stents have cylindrical elements with a longitudinal length less than their diameter in the crimped state.

The Court's resolution of Medtronic's JMOL may shed some light on the issue of alternative non-infringing products. The Federal Circuit's resolution of many of the liability issues in all of the stent cases may further impact that issue. As a limited example, Medtronic may be able to argue that a design around was available by making a stent in which the longitudinal length of the sinusoidal rings was greater than their diameter. This may eliminate ACS's ability to recover any lost profits and may significantly reduce ACS's claim of reasonable royalty damages. *Grain Processing*, 185 F.3d at 1356 ("[W]ith proper economic proof of availability, . . . an acceptable substitute not on the market during the infringement may nonetheless become part of the lost profits calculus and therefore limit or preclude those damages").

█████████████████████████████████████

███████████████████████████████████ Therefore, the issue of alternative non-infringing products is a significant issue that may have an equally significant impact on ACS's damages claims in this case. For that reason, the stay should remain in effect until all of these cases are resolved and Medtronic is able to fully assess the issue of alternative non-infringing products.

## II.     SIGNIFICANT FACT AND EXPERT DISCOVERY STILL NEEDS TO BE CONDUCTED RELATED TO THE DAMAGES AND WILLFULNESS ISSUES.

With respect to damages, at the March 2 hearing, the Court instructed the parties to exchange updated sales and cost information, exchange amended expert reports

based on the updated sales and cost information, and schedule the damages experts' depositions (D.I. 642 at 25). Although ACS produced its updated sales information, it initially resisted producing its updated cost information and providing updated expert reports. Although the parties recently agreed to a schedule for exchanging amended expert reports, that schedule may now be delayed because ACS has not yet produced its updated cost information (and agreed to do so only within the last day or so).

As Medtronic argued in Section I, *supra*, Medtronic believes that it will be premature to go forward with damages proceedings at this time in light of, *inter alia*, the lack of finality on non-infringing substitutes. If, however, the Court were to lift the stay on the damages phase of the case, Medtronic would file a motion for leave to permit its technical and damages experts to supplement their reports to include their opinions that Medtronic could have designed around ACS's patents-in-suit.[8] This would likely require some additional fact discovery (to address Medtronic's manufacturing and design capabilities) as well as expert discovery. The exact scope and nature of this testimony, furthermore, may be impacted by the Court's ruling on Medtronic's JMOL motion (and, possibly, the new trial motion), filed concurrently with this submission.

To date, the parties have not engaged in any significant discovery focused specifically on willfulness, primarily because the parties had not yet agreed to a date for the election on whether to waive the attorney-client privilege with respect to opinions of counsel. The Court has, in the past, been justifiably hesitant to force such an election

---

[8]    Medtronic's experts could not have reasonably anticipated this issue earlier because the Court stayed the damages case in August 2004 and their opinions would be based on the Court's claim constructions which issued in January 2005, nearly five months later.

prematurely; and not forcing Medtronic to decide whether to waive the privilege until the matter of liability has been definitively resolved remains in and of itself ample justification for delaying proceedings on damages and willfulness.

If Medtronic is put to an election and decides to waive its attorney-client privilege, the parties presumably would have to schedule the depositions of Medtronic's opinion counsel and also current or former Medtronic executives who will testify concerning Medtronic's reliance on the opinion(s) of counsel. Further, irrespective of whether Medtronic waives the privilege, in view of significant changes in the law governing the waiver of attorney-client privilege (*see Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004)) Medtronic would need to supplement the evidence upon which it would rely in defending against a charge of willfulness. For example, the parties will likely need discovery on the other willfulness factors, including that Medtronic did not deliberately copy ACS's patented design; Medtronic did not conceal its allegedly infringing activity; Medtronic did not believe that any of its defenses were frivolous; Medtronic allegedly infringing activity was not designed to injure ACS; and Medtronic formed a good faith belief as to invalidity or non-infringement (apart from the advice of counsel). *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-29 (Fed. Cir. 1992).

Given that the parties' various fact and expert witnesses reside throughout the country from New York to California, completing all of this discovery will involve significant time and expense.

**III.    THE PARTIES WILL HAVE TO PRESENT A GREAT DEAL OF EVIDENCE, INCLUDING EVIDENCE THAT OVERLAPS WITH THE EVIDENCE THAT WAS PRESENTED DURING THE**

## LIABILITY TRIAL, DURING A TRIAL ON DAMAGES AND WILLFULNESS.

In a patent case, when liability is tried separately from damages and willfulness before separate juries, the damages and willfulness trial cannot be conducted in an "evidentiary vacuum." *See THK Am., Inc. v. NSK Co.*, 151 F.R.D. 625, 630 (N.D. Ill. 1993). During the damages and willfulness trial, the jury has to be educated as to the technology at issue, the patents in suit, the claims and the claim constructions, the relevant industry and market conditions, the embodying and accused products, and the parties' respective positions on both infringement and invalidity. *See id.* Although evidence on these issues would appear to relate only to liability issues, that is not the case; such evidence also bears significantly on issues of damages and willfulness. *See id.*; *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 427-28 (Fed. Cir. 1988) (lost profits analysis requires evidence related to market demand); *Georgia-Pacific,* 318 F. Supp. at 1120 (reasonable royalty analysis requires evidence related to nature and advantages of patented invention); *Read Corp.*, 970 F.2d at 826-29 (willfulness analysis requires evidence of whether the defendant had a good faith basis to believe that the patents in suit were not infringed or invalid). Only then will the jury be in a position to understand the additional evidence that relates even more directly to both damages and willfulness, such as testimony from the parties' financial personnel and damages experts and the parties' witnesses on the various willfulness factors.

In this case in particular, as set forth in its new trial motion, Medtronic believes that it has been greatly prejudiced because, if damages and willfulness are heard now, the jury that will decide these issues will be different from the jury that heard the liability issues. The new jury will not have the same appreciation for how close the claim

construction issues were, how the jury heard evidence regarding both proposed constructions, and how the claim construction issue was ultimately resolved by the Court in ACS's favor. Medtronic was prejudiced once by having claim construction played out before the jury. Medtronic submits that it will be prejudiced once again by having a different jury decide willfulness. After a finding of liability, it is naturally very difficult to recreate that evidence for a new jury.

Notwithstanding these concerns, with a stay in place almost nine months now, Medtronic has not come anywhere near completing its preparation for a trial on damages and willfulness. Even so, Medtronic at this point expects that it would have to call at least the following witnesses in a damages/willfulness trial:

- Medtronic's expert Dr. David Pearle on the background of the technology;

- Michael Boneau on the background of the technology and Medtronic's good faith belief that ACS's Lau patents are invalid;

- Jeff Allen on the background of the technology and Medtronic's good faith belief that ACS's Lau patents are not infringed, not willfully infringed, and are invalid;

- Medtronic's executives on Medtronic's ability to design around ACS's Lau patents;

- Medtronic's expert Dr. Raymond Vito on Medtronic's good faith belief that ACS's Lau patents are not infringed;

- Medtronic's expert Dr. Sunil Saigal on Medtronic's good faith belief that ACS's Lau patents are invalid;

- Medtronic's technical expert on Medtronic's ability to design around the ACS Lau patents;

- Medtronic's opinion counsel on Medtronic's good faith belief that ACS's Lau patents are not infringed and are invalid (assuming Medtronic waives the privilege);

- Medtronic's executives who relied on the opinion of counsel on Medtronic's good faith belief that ACS's Lau patents are not infringed and are invalid (assuming Medtronic waives the privilege);

- Several of ACS's personnel (by videotaped deposition) on Medtronic's good faith belief that ACS's Lau patents are invalid;

- Medtronic's sales and marketing personnel on market data and Medtronic's financial information; and

- Medtronic's damages expert Dr. Michael Keeley.

Moreover, it would not be surprising if ACS had to call many of the same witnesses it called during the liability trial, as well as its two damages experts, Dr. Sharon Oster and Dr. Ashley Stevens.

## IV. A TRIAL ON DAMAGES AND WILLFULNESS WOULD REQUIRE AT LEAST TWO FULL WEEKS OF COURT TIME, IF NOT MORE.

Both the question of when the Court could proceed with a damages trial and the question of how long such a trial would take is difficult to answer with certainty before the Court addresses several threshold issues: first, there is the possibility of additional fact and expert discovery (fact and expert discovery on non-infringing alternatives and with respect to the evidence upon which Medtronic would rely in

defending against a charge of willfulness). Second, there are the motions for judgment as a matter of law and new trial filed with this submission. In addition, Medtronic filed two damages related motions for summary judgment, one going to ACS's lost profits claim and the other going to the amount of offset that Medtronic is entitled to based on an amount Medtronic paid to ACS based on an arbitration in an earlier case (D.I. 413 & 417).[9]

As discussed above, a trial on damages and willfulness will require that the parties go over much of the same ground that they did during the trial on the liability issues, and then introduce additional evidence that relates solely to damages and willfulness. The Court will recall that the trial on the liability issues in this case lasted almost two full weeks with each side allotted twenty hours. It is difficult to imagine that a trial on damages and willfulness could be completed in less than that. Indeed, the Court will recall from the original trial in the 97-550 case between Cordis and Medtronic, it took the parties a full week to try the issue of damages alone (not also willfulness) before the same jury that also heard the liability issues.

████████████████████████████████████

████████████████████████████████████

Medtronic respectfully submits that both parties should be given the opportunity to present all of their evidence and arguments.

## V.     A CONTINUED STAY ON DAMAGES AND WILLFULNESS WILL NOT IMPACT THE

---

[9]     After the damages case was stayed, these motions were withdrawn from the Court's docket without prejudice (D.I. 450). Medtronic intends to refile these motions and would hope to have them resolved before trial.

## LIABILITY ISSUES THAT HAVE ALREADY BEEN TRIED.

At the close of ACS's evidence in this case, Medtronic asked the Court to enter a JMOL of non-infringement because ACS had failed to show that Medtronic made, used, sold or offered for sale any of the accused stents *during the terms of the ACS patents*, as plainly required under 35 U.S.C. §271. At the time, ACS argued that the missing evidence "goes to damages," and notwithstanding that it had the opportunity to do so, ACS declined to supplement its proof for purposes of the liability trial. Based on the record before it, the Court denied Medtronic's JMOL motion.

During the March 2 hearing, the Court said it might delay entering judgment on liability (or certifying such judgment for appeal) and proceed immediately with a damages trial. The Court suggested this might allow ACS to present evidence on the timing of Medtronic's sales before liability is presented to the Federal Circuit. Respectfully, Medtronic believes these concerns should not influence the decision of whether and when to proceed to a full-blown trial on damages and willfulness.

In its renewed JMOL motion, filed with this submission, Medtronic argues that judgment should be entered against ACS without further proceedings because ACS failed to establish a fundamental element of its liability case. The jury's finding of infringement must stand or fall on the evidentiary record that was before it. Nothing the Court or ACS does now will alter that conclusion. ACS may argue, for example, that it should be permitted to submit a written offer of proof concerning the additional evidence that it would hope to submit in a subsequent proceeding (to permit ACS to detail its expected evidence without wasting the Court's and the parties' resources). Medtronic would urge the Court to reject even this sort of approach so that the parties can have the

issue heard by the appellate court as expeditiously as possible. Moreover, there can be little question but that ACS's failure of proof provides no justification for holding now the full-blown damages trial that ACS seeks.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Karen Jacobs Louden

_____

Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Attorneys for Defendants Medtronic Vascular, Inc. and Medtronic USA, Inc.

OF COUNSEL:

Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
James G. Rizzo
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005

Fay M. Morisseau
Mauricio A. Flores
Matthew F. Weil
Michael R. O'Neill
David M. Stein
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue
Suite 400
Irvine, CA 92612-7107

Original filing: April 18, 2005
Corrected filing: May 18, 2005
Redacted Filing: June 2, 2005
460495

CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2005 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following: Frederick L. Cottrell, III (cottrell@rlf.com), Stuart M. Grant (sgrant@gelaw.com), and Karen Jacobs Louden (kjlefiling@mnat.com).

I further certify that on June 2, 2005 I served copies of the foregoing on the following counsel in the manner indicated:

| BY HAND | BY FEDERAL EXPRESS |
|---|---|
| Frederick L. Cottrell, III<br>Anne Shea Gaza<br>**Richards Layton & Finger**<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, DE  19899 | Michael A. Morin<br>**Finnegan Henderson Farabow Garrett &<br>Dunner**<br>901 New York Avenue<br>Washington, D.C.   20001-4413 |

/s/ Karen Jacobs Louden (#2881)
MORRIS, NICHOLS, ARSHT AND TUNNELL
 (302) 658-9200
klouden@mnat.com

# EXHIBIT A

**12/18/2000  Trial Transcript Day 14**

1    infringing stents.

2    Q.    Let's step back a moment.  Did AVE sell -- well, how

3    many total stents did AVE sell here in the United States?

4    A.    From our summary of AVE sales documents, domestic

5    sales, were just about 391,000 stents during this period.

6    And those amount to about $618 million.  That should

7    comport with the numbers that we heard in the openings

8    this morning.

9    Q.    And this is total (indicating)?  This is the revenue

10    to AVE as the result of selling these stents?

11    A.    That's the revenue, that's the sales dollars that

12    came in to AVE from selling stents in the United States.

13    There's another 400 and some million overseas, so the

14    total is about a billion dollars, more than a billion.

15    Q.    Let's stay with the U.S. market for now.

16    A.    Yes.

17    Q.    Now, what is the -- what did you do in order to

18    arrive at a lost-profit calculation?

19    A.    Well, I thought about this and realized that it was

20    unlikely that Cordis, in fact, would have made all 391,000

21    of those.  And I thought about it in a fairly -- we did a

22    number of analyses.  And I'm sure we'll be going through

23    those.  But when all was said and done, I was -- I

24    calculated that there were about 78, 79 thousand of these

25    stents that, although AVE, in fact, sold them here in the

2908

**12/18/2000 Trial Transcript Day 14**

1    United States, Cordis wouldn't have made those sales.  And

2    Cordis wasn't damaged in the sense of having its sales

3    reduced.  And that works out to being about 20 percent of

4    the stents that AVE sold here in the United States.

5              The other 80 percent, the 312,000, really did

6    come out of Cordis' sales, I believe, and Cordis' sales

7    were reduced by those.  So I -- one of the first steps

8    here was to simply, you know, break this -- I say simply.

9    It wasn't that simple.  To get it broken into the two

10   components, those that Cordis would have sold and those

11   that Cordis probably would not have sold.

12   Q.    So these are the AVE stent sales which you

13   determined are appropriate for a lost -- for lost profit

14   purposes?

15   A.    Absolutely.  And the others would then qualify for

16   reasonable royalty.  They were sold.  They were infringing.

17   There's no question about that.  But I don't think -- I

18   don't think Cordis would have made those sales, but AVE

19   made them and AVE would owe Cordis a royalty on the 20

20   percent and lost profits on the 80 percent.

21             MR. CAVANAUGH:  If we could go back to our

22   summary chart...

23   BY MR. CAVANAUGH:

24   Q.    So we have -- we have these additional stents which

25   are available for lost profit treatment.  And then the

1    paid on that, so it's a before-tax number.

2            Also, if Cordis had been making the money over

3    the two-year period when infringement happened, it would

4    have to be paying taxes on that.  Just to avoid all the

5    complication of getting into the tax return, we always do

6    these things on a pre-tax basis.  In general, pay the tax

7    before the award check arrives.

8    Q.    Is this the total amount of damages which you have

9    determined are due Cordis here?

10   A.    No.  There are two more elements that are due.  The

11   first we've already talked about, and that's the wedge

12   that -- the sales that -- I don't think Cordis would have

13   made.  AVE made them.

14   Q.    Okay.

15   A.    And I think there's a -- there's a reasonable royalty

16   due on those.  It's 78,000 stents.  I've determined that

17   the reasonable royalty rate would be 40 percent.  And I'm

18   sure we'll be going into that in some detail.  And so if I

19   take the 78,000 stents that AVE sold, and here I have to

20   multiply by AVE's selling price because it's -- the license

21   would be based on AVE's selling price and they're somewhat

22   higher.  I think it's something over $1500 a stent, but if

23   you take the 78,000, you multiply by AVE's selling price,

24   and say that's their revenue and take 40 percent of that,

25   you come to the number that was on the screen, if you back

**12/18/2000  Trial Transcript Day 14**

1  up one.

2  Q.    So that's the -- those are on U.S. sales; correct?

3  A.    Those are U.S. sales that were made by AVE.  I don't

4  think Cordis would have made.  So we've got $354 million

5  of lost profits on the sales that it would have made and

6  49, almost 50 million dollars as a reasonable royalty on

7  the other sales that AVE made that Cordis could not have

8  made, would not have made.

9  Q.    Let me stop you for a moment.  You've been using

10  the term royalty.  Can you explain to the jury what a

11  royalty is?

12                         - - -

13  A.    A royalty is just like rent which -- I think we may

14  have mentioned that.  You're going to use somebody else's

15  intellectual property; it's like going to their vacation

16  home, using their apartment.  You pay rent.

17              In the case of intellectual property, it's

18  called a royalty.  I'm not sure why the word rent isn't

19  used, but it's royalty.

20                         - - -

21

22

23

24

25

12/19/2000  Trial Transcript Day 15

1               Mr. Cavanaugh.

2                    - - -

3          ... CREIGHTON G. HOFFMAN, having

4          been previously duly sworn as a witness,

5          was resumed and testified further as

6          follows ...

7                    DIRECT EXAMINATION

8                    CONTINUED

9    BY MR. CAVANAUGH:

10   Q.   Mr. Hoffman, we had finished the wonderful world of

11   cost accounting.  I promised we won't go back to it.

12             Let's see where we left off.

13             We left off with lost profits.  Now let's turn

14   to reasonable royalties.

15   A.   Okay.

16   Q.   If you could just remind the jury what we are talking

17   about when we are talking about royalties...

18   A.   Sure.  Of the 391,000 infringing stents that were

19   sold by AVE, I concluded that about 312,000 of those would

20   have, in fact, been sold by Cordis if AVE had not been on

21   the market and the other 78, 79 thousand I don't think

22   Cordis would have sold, but Cordis is still entitled to a

23   reasonable royalty for AVE's use of its patented technology

24   to make and sell those.

25   Q.   How do you approach the issue of determining a

2938

1    constant, at about 2 to 2-1/2 percent.  And then it leaves

2    us with the Cook and Medtronic coil stents.  And what I

3    did here was I simply summarized how many units got sold

4    over the two-year period that is in question here.  And

5    during that period of time, on the coil stents, the

6    returns were actually greater than the sales.  There

7    were more coming back from the hospitals than being

8    shipped out.  So, you know, they're really not on the

9    market in any meaningful sense during this two-year period.

10   The numbers should actually be negative, but I did not

11   draw a negative piece of pie.

12   Q.    All right.  Let's go to the next factor.

13         Georgia-Pacific Factor 14 and 15 are any

14   other factors that a normally prudent businessperson

15   would take into consideration in looking at this

16   hypothetical license.

17         What factors did you consider?

18   A.    Well, at that point I considered what we had been

19   talking about, the fact that AVE was a -- an one product

20   company, that these were very, very profitable.  AVE

21   needed this in order to get into the business.  AVE was

22   clearly a competitor of Cordis and these were kind of the

23   important thoughts that I had in mind with respect to

24   where the royalty negotiation would have come out, and I

25   wound up effectively taking that 82-percent gross margin

1    and kind of splitting it at 40 for J&J and the rest for

2    AVE.

3              I didn't feel like that was a very good deal,

4    quite frankly, for Cordis. They knew that every sale AVE

5    made was going to come out of Cordis' pocket.  Cordis

6    would lose on every one of those sales.  But if we

7    assumed that Cordis was willing to grant a license, the

8    negotiation had to come out someplace, so I set it at

9    about 42 -- 40 percent.  I also knew that was about half

10   of AVE's gross profits at the time.

11             So that struck me as kind of the lowest

12   reasonable royalty that would be appropriate.

13   Q.   Did you consider the size of the U.S. coronary

14   stent market?

15   A.   Oh, absolutely.  It's a -- it's a big market.

16   It's -- it's a well-developed market and it's a market

17   that, if I could come up with a stent, I could enter it

18   today and I know it's there.  And my risk would be

19   relatively low.

20             And it's a big and very, very profitable

21   market.  Good market to be in.

22   Q.   What did AVE's expert assume providing AVE's gross

23   and operating margins?

24   A.   He assumed that the operating margins were the same

25   as Cordis' in his last report.  He simply used the same

2965

**12/19/2000  Trial Transcript Day 15**

1    calculation X-32528...

2    BY MR. CAVANAUGH:

3    Q.    And if you can explain to the jury what this shows?

4    A.    Sure.  There were almost a half a billion stents

5    that AVE sold overseas.  There's no -- no lost profit,

6    not being claimed here on those, even though they were

7    competitors overseas.

8         So I multiplied that by AVE's average selling

9    price for foreign sales.  You notice that was only $918,

10   as opposed to the $1500 when they sell the same product

11   here in the United States.  Multiply those out.  You get

12   $458 million times a reasonable royalty of 10 percent.

13   That gets us down to $45 million as the royalty that is,

14   in fact, due for foreign sales.  A product that's made

15   here in the United States.

16        MR. CAVANAUGH:  Your Honor, we would move

17   PX-3955 into evidence.

18        MR. UNDERHILL:  No objection, your Honor.

19        THE COURT:  Thank you.

20   ***    (Plaintiff's Exhibit No. 3955 was received

21   into evidence.)

22   BY MR. CAVANAUGH:

23   Q.    And does this get added into the total damage

24   schedule?

25   A.    That is the third element.

2970

**12/19/2000  Trial Transcript Day 15**

1    Q.    Put that in.

2              And then what's the last step?

3    A.    The last step is to add it altogether.  We've got

4    three elements there.  We've got the profits that Cordis

5    lost, because it didn't make the sales that it would have.

6    And then we've got two pieces of royalty for sales that I

7    assume Cordis would not have made.  And the royalties on

8    those are 40 percent here in the U.S. and 10 percent

9    overseas.  When you add all that together, you get just

10   about $450 million.

11              MR. CAVANAUGH:  Your Honor, we would move

12   PX-3951 into evidence.

13              MR. UNDERHILL:  No objection.

14              THE COURT:  Thank you.

15   ***        (Plaintiff's Exhibit No. 3951 was received

16   into evidence.)

17   BY MR. CAVANAUGH:

18   Q.    Now, have you reviewed the report by AVE's expert,

19   Dr. Addanki?

20   A.    Yes, I have.  I've reviewed each of his reports.

21   Q.    Do the numbers in Mr. Wallace's opening statement

22   differ from the last report you saw from Dr. Addanki?

23   A.    The last report I saw from Dr. Addanki was dated

24   December 14th.  I think it was just last week.  And the

25   numbers in the opening statement were slightly different.

**12/19/2000  Trial Transcript Day 15**

1    Q.    Were they ever sold in the United States?

2    A.    To the best of my knowledge, they've never been

3    approved and they have never been sold.  The FDA hasn't

4    approved them.

5          You can't buy one.  Dr. Herrmann can't put one

6    in here in the United States.

7    Q.    How else do you and Dr. Addanki differ in your lost-

8    profit calculation?

9    A.    The -- well, there are two other areas.  One,

10   obviously, is the cost of Cordis' stents, as to what it

11   costs Cordis to make and sell a stent.

12   Q.    What is your cost calculation?

13   A.    Well, my cost calculation put together, as described

14   yesterday, went through the books at Cordis in some detail,

15   took all of the manufacturing costs, everything in the

16   shop, fixed and variable, and said I'm going to consider

17   all of those to be variable expenses.  That worked out to

18   be the $159.

19          Then I took the SG&A.  I couldn't find any

20   variable SG&A expenses, but I wound up throwing in a

21   third of them.  Take off another 120 two dollars for each

22   stent.  So I came down, average stent that Cordis sells,

23   $1415, take those out and I came down to $1134, having

24   backed out all the manufacturing expenses as well as, you

25   know, a third of the SG&A expenses, I think have little

2978

1    basis, but I did it anyway.

2    Q.    Now, where does Dr. Addanki come out in his

3    calculation?

4    A.    Dr. Addanki comes out at about 834.  I think he's

5    about $300 less than I am.

6              (Pause.)

7    BY MR. CAVANAUGH:

8    Q.    And how does Dr. Addanki arrive at a different number

9    than you?

10   A.    He does two things that are different and I think

11   both of them are wrong.  He does not really go through

12   the books.

13              There we are. He's at 836.  So, yes, we're

14   basically $300 apart in terms of the profit.  And we don't

15   disagree on the average selling price.  That's all built

16   into the -- into the incremental cost.

17              So what we have here is we've got two

18   circumstances that drive this extra $300.  The first thing

19   is he has included in there payments that would have to be

20   made by Cordis to the EGP partnership, this 9-percent

21   royalty.  And 9 percent on $1400, about $130.

22              So $130 he has included, because he has used

23   historical prices.  They should not be included because

24   they're not payable.  Cordis has bought out that agreement.

25   Cordis, you know, has bought it out for anything that's

1

2          THE WITNESS (Continuing):  Next question is to

3     figure out of the remaining sales AVE would have made, how

4     many of them would Cordis have got as opposed to Cook and

5     Medtronic?  And let's remember that if AVE couldn't have

6     sold the MicroStent 2, it would have tried to sell the

7     MicroStent 1.  If the MicroStent 1 had been available, how

8     many sales would that have gotten?

9              And that is what the other pieces of the pie

10    are.  You can see by the colors that sort of peach color

11    is the sales of the licensees would have made which is

12    Cook and Medtronic with GR 2 and Wiktor.

13             As you can see, it's not that big and the

14    pale bluish greenish color is the sales the MicroStent

15    MS 1 would have made less of the sales Cordis could have

16    made of no more than 230,063 stents.

17             And, again, my analysis of how the market

18    would have broken out among these participants, how they

19    would have shared that pie is also based on econometrics.

20    And it's an econometrics a little different from the

21    previous one, because this one says, okay, for a given

22    size of the pie, how will stents grab market share.

23    Depending how good they are, what the stent attribute is

24    like.  And that, too, was an econometrics of actual

25    market data, no assumptions there.

1    ***         (Defendant's Exhibit No. 4781 was received

2    into evidence.)

3              THE WITNESS:  Okay.  I haven't gotten to that

4    exhibit yet.

5    BY MR. WALLACE:

6    Q.    Go ahead.

7    A.    But a better thing to do is to look at all of the

8    costs.  You simply add up all the costs and try to let

9    the data on the costs themselves tell you what part varies

10   and what part doesn't vary.  And that, again, is something

11   that econometrics is ideal for.  And in the real world,

12   firms actually used econometrics quite often to try to

13   figure out what the costs are, because accounting

14   statements won't do it.

15             So I did an econometrics of Cordis' actual

16   cost data, total cost and how the cost variable sales

17   and I found incremental cost per stent was $540, which

18   is quite a bit higher than what Mr. Hoffman was talking

19   about the day before yesterday.

20             We're almost there.  I calculate the average

21   selling price of Cordis as being, $1,376.  Subtract one

22   from the other and you get an incremental profit of $836

23   per stent.  That's what we have here.  Multiply that by

24   the stent sales Cordis could have made and you get to

25   $192,393,020.  So this is the lost-profit piece of what

12/21/2000  Trial Transcript Day 17

1    Mr. Hoffman did, but recalculated, fixing some of the

2    profits.

3              Do you want to talk about that?

4    Q.    Yes.

5    A.    This is a recalculation simply multiplying out both

6    lines the cost line, the revenue line, by the number of

7    stents to get a dollar revenue that Cordis could have made

8    if it had sold these stents and the dollar cost that would

9    have been incurred if it had sold those stents.

10   Q.    And, again, for the record, Dr. Addanki, what you

11   are referring to is AVE Exhibit 5800.

12   A.    Yes.  If that is what the number is, yes.

13             MR. WALLACE:  And we move it into evidence,

14   your Honor.

15             MR. CAVANAUGH:  No objection.

16             THE COURT:  Thank you.

17   ***       (Defendant's Exhibit No. 5800 was received

18   into evidence.)

19             THE WITNESS:  So I guess the remaining part

20   is what do you do with the sales that Cordis would not

21   have made?  And starting with the top line, $391,000

22   something, you have 161,000 stents that Cordis would not

23   have sold.  And, as we talked about yesterday, they're

24   entitled to royalty, because AVE used their intellectual

25   property, they have to pay a rent for the use of that

**12/21/2000  Trial Transcript Day 17**

1    property.

2         We talk about it like rent, but there is a bit

3    of a difference between renting intellectual property and

4    renting an apartment, because you rent out an apartment

5    to someone, you can't rent it to someone else not without

6    getting into some trouble with the law, but if you rent

7    intellectual property, you can rent it over and over again,

8    as long as you don't have an exclusive license to give it

9    to anyone.

10        But, be that as it may, they're entitled to

11   a royalty, they're entitled to payment for use of the

12   property.  The question is how you get to the right

13   royalty rate.

14        And Mr. Hoffman assumes the right royalty

15   rate is a royalty rate that takes into account the fact

16   that they compete with each other.  But now, I've shown

17   you yesterday how you calculate the royalty rate, when

18   they do compete, how you actually calculate it, what each

19   side has to lose when they're competing for each and

20   every sale.  Here they're not completing for each and

21   every sale.  In fact, they're not competing for any of

22   these sales.  These are all sales we already agreed Cordis

23   would not make, so these are sales for which you wanted

24   pure intellectual property rent.  You don't want lost

25   profits, you don't want how many sales would I lose, any

**12/21/2000  Trial Transcript Day 17**

1    of those calculations.  You just want what is it worth

2    when this intellectual is used by someone else.  That's

3    it.  And to do that, it's a very different type of

4    calculation.

5              I showed you yesterday that if they do compete

6    for each and every sale, you are talking about royalty

7    rate of 16 percent, and you can work that out.  With this

8    situation when they're not completing for the sales,

9    we're simply compensating Cordis for the intellectual

10   property, I calculate it would be 8 percent, half the 16

11   percent, and 8 percent also happens to be about what

12   Cordis is paying, as Mr. Hoffman says, for the BX Velocity

13   and the CrossFlex stent is paying a royalty to Bard for

14   those stents.

15             So that amounts to a royalty of $126 per unit,

16   multiplied by the number of stents, and that is an 8-

17   percent royalty, gives you $20,375,000 in royalty.  And

18   I also told you about the flat fee for international

19   royalties.  That is $1 million.  And you get a total of

20   $213,768,738, which is here.

21   BY MR. WALLACE:

22   Q.    Thank you.  Are you done here?

23   A.    I'm done here.

24   Q.    Dr. Addanki, you received last night a demonstrative

25   that Cordis is going to use after we rested our case, and

1

2    A.    Okay.

3    Q.    You did a unit calculation that had AVE total sales

4    of 391,000; right?

5    A.    Right.

6    Q.    And you have Cordis capturing 294,000 units; correct?

7    A.    In this calculation, yes.

8    Q.    All right.  Well, let's put a pie chart up showing

9    that.

10    A.    This is before I was taking into account the fact

11    that the MS 1 did not infringe.

12    Q.    I understand that, Doctor.  We will get to the MS 1.

13          But let me ask you, how many MS 1 units have

14    been sold in the United States?

15    A.    As you know, none.

16    Q.    And when did the FDA approve the MS 1 for sale in

17    the United States?

18    A.    As you know, that hasn't happened.

19    Q.    Well, then let's work with this.  When you were doing

20    this calculation, you were working off products that had

21    been approved by the Food and Drug Administration for sale

22    in the United States; correct?

23    A.    I was working off products that I knew, at that

24    time, were considered to be noninfringing products.

25    Q.    And all of those stents that you talked about, the

# EXHIBIT B

# CONFIDENTIAL EXHIBIT

# EXHIBIT C



ABOUT US

Corporate Overview
  Management
  Committee
  Locations
  Guidant Code of
  Business Conduct
  Guidant Foundation
  Guidant Compass
  Group

Careers at Guidant

Newsroom

Investor Resources

# Johnson & Johnson and Guidant Announce Definitive Agreement Valued at $23.9 Billion Based on $76 per Share

## Transaction will bring together cardiovascular expertise and technologies to benefit patients and physicians worldwide

**New Brunswick, N.J. and Indianapolis, Ind. — December 15, 2004 —** Johnson & Johnson (NYSE: JNJ), the world's most comprehensive and broadly based manufacturer of health care products, and Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today announced that they have entered into a definitive agreement whereby Johnson & Johnson will acquire Guidant for $25.4 billion in fully diluted equity value.

Under the terms of the agreement, each share of Guidant common stock will be exchanged for $30.40 in cash and $45.60 in Johnson & Johnson common stock, provided the average Johnson & Johnson common stock price is between $55.45 and $67.09 during the 15-day trading period ending three days prior to the transaction closing. Each Guidant share exchanged would be converted into Johnson & Johnson common stock of not more than .8224 and not less than .6797 shares, plus $30.40 in cash. The transaction has an estimated net acquisition cost of $23.9 billion, as of the close of business on December 15, 2004, based upon Guidant's approximately 334 million fully diluted shares outstanding, net of estimated cash on hand at the time of closing.

The boards of directors of Johnson & Johnson and Guidant have given their respective approvals to the transaction, which is subject to clearance under the Hart-Scott-Rodino Antitrust Improvements Act, the European Union merger control regulation, and other customary closing conditions. The agreement will require the approval of Guidant's shareholders.

Guidant and Cordis Corporation, a Johnson & Johnson Company, will become part of a newly created cardiovascular device unit within Johnson & Johnson. The newly created franchise will be named Guidant while the Cordis name will be retained for select businesses within the franchise. The franchise will be operated consistent with the Johnson & Johnson operating principle of decentralized management, which provides for focused management and fosters an entrepreneurial culture. This business unit will report to Nicholas J. Valeriani, a member of the Johnson & Johnson Executive Committee.

"The combination of these businesses will enable us to bring innovative new therapies to patients and their physicians in this very important and fast growing therapeutic area," said William C. Weldon, Chairman and Chief Executive Officer of Johnson & Johnson. "Bringing Guidant into the Johnson & Johnson family of companies builds on our history of strategic acquisitions and partnerships that provide a foundation for sustained leadership and growth."

Guidant business units include cardiac rhythm management (e.g. pacemakers and implantable cardioverter defibrillators), vascular intervention, cardiac surgery and endovascular solutions. These businesses will complement Johnson & Johnson's products and services in cardiology and medical devices, as well as provide future benefits for patients and physicians as a result of collaboration with the Johnson &

Johnson pharmaceuticals and diagnostics businesses.

"This exciting new partnership opens a dynamic era of innovation and product development that will benefit millions of patients around the world," said Ronald W. Dollens, President and Chief Executive Officer of Guidant. "We are pleased to be joining Johnson & Johnson, one of the world's premier companies. We strongly believe that this exciting collaboration will benefit patients, customers, employees and shareholders." Mr. Dollens has agreed to continue to serve as Chief Executive Officer of Guidant until the transaction has closed.

The cardiovascular segment continues to be one of the fastest growing areas in health care as populations in the United States and other countries age. As a combined entity, Guidant and Cordis will more effectively bring technologically based and innovative approaches to the treatment of cardiovascular diseases.

This new organization will enable Johnson & Johnson to better address the needs of patients around the world who require treatment for heart failure and sudden cardiac death. This patient population continues to be significantly underserved. Additionally, Guidant's technology platforms, such as implantable micro-electronics, could be applied to current and future Johnson & Johnson products as part of future efforts to create innovative and advanced technologies in other healthcare areas, such as the neuromodulation market.

In the interventional cardiology market, this business combination provides the capability to accelerate development of new technologically advanced products. This new business can utilize Cordis' expertise, intellectual property and experience in drug development, coating technology and polymers. Together with Guidant's strength in rapid and innovative development of stent platforms and delivery systems, the combined company will bring superior products to the market faster than either company could on its own.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company, driven by a strong entrepreneurial culture of approximately 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

Johnson & Johnson, with approximately 109,000 employees, is the world's most comprehensive and broadly based manufacturer of health care products, as well as a provider of related services, for the consumer, pharmaceutical, and medical devices and diagnostics markets. Johnson & Johnson has more than 200 operating companies in 57 countries, selling products throughout the world. For more information visit www.jnj.com.

Additional commentary regarding the financial impact will be discussed during the conference call noted below. Johnson & Johnson and Guidant will not be available for further comment until after the conference call has concluded.

**Note to Investors**

Johnson & Johnson and Guidant will conduct a conference call with financial analysts to discuss this news release on December 16, 2004 at 9:00 a.m., Eastern Standard Time. A simultaneous webcast of the call for interested investors and others may be accessed by visiting the Johnson & Johnson website at www.jnj.com and clicking on "Webcasts/Presentations" in the Investor Relations section or by visiting the Investor Resources section on the Guidant website at www.guidant.com. A replay will be available at both websites.

(This press release contains "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. These statements are based on current

expectations, forecasts and assumptions that are subject to risks and uncertainties which could cause actual outcomes and results to differ materially from these statements. Risks and uncertainties include the satisfaction of the conditions to closing, including receipt of shareholder and regulatory approval; general industry and market conditions; general domestic and international economic conditions, such as interest rate and currency exchange rate fluctuations; technological advances and patents attained by competitors; challenges inherent in new product development, including obtaining regulatory approvals; domestic and foreign health care reforms and governmental laws and regulations affecting domestic and foreign operations; and trends toward health care cost containment.

A further list and description of these risks, uncertainties and other factors can be found in Exhibit 99(b) of Johnson & Johnson's Annual Report on Form 10-K for the fiscal year ended December 28, 2003 and Exhibit 99 of Guidant's most recent 10-Q. Copies of said 10-K and 10-Q are available online at www.sec.gov or on request from the applicable company. Neither company assumes any obligation to update any forward-looking statements as a result of new information or future events or developments.)

## Additional Information And Where To Find It

This material is not a substitute for the prospectus/proxy statement Johnson & Johnson and Guidant (and a subsidiary thereof) will file with the Securities and Exchange Commission. Investors are urged to read the prospectus/proxy statement which will contain important information, including detailed risk factors, when it becomes available. The prospectus/proxy statement and other documents which will be filed by Johnson & Johnson and Guidant (and a subsidiary thereof) with the Securities and Exchange Commission will be available free of charge at the SEC's website, www.sec.gov, or by directing a request when such a filing is made to Johnson & Johnson, One Johnson & Johnson Plaza, New Brunswick, NJ 08933, Attention: Investor Relations; or by directing a request when such a filing is made to Guidant Corporation, 111 Monument Circle, #2900, Indianapolis, IN 46204-5129, Attention: Investor Relations.

Guidant Corporation, its directors, and certain of its executive officers may be considered participants in the solicitation of proxies in connection with the proposed transactions. Information about the directors and executive officers of Guidant Corporation and their ownership of Guidant stock is set forth in the proxy statement for Guidant Corporation's 2003 annual meeting of shareholders. Investors may obtain additional information regarding the interests of such participants by reading the prospectus/proxy statement when it becomes available.

