# EXHIBIT A

**12/18/2000  Trial Transcript Day 14**

1    infringing stents.

2    Q.    Let's step back a moment.  Did AVE sell -- well, how

3    many total stents did AVE sell here in the United States?

4    A.    From our summary of AVE sales documents, domestic

5    sales, were just about 391,000 stents during this period.

6    And those amount to about $618 million.  That should

7    comport with the numbers that we heard in the openings

8    this morning.

9    Q.    And this is total (indicating)?  This is the revenue

10   to AVE as the result of selling these stents?

11   A.    That's the revenue, that's the sales dollars that

12   came in to AVE from selling stents in the United States.

13   There's another 400 and some million overseas, so the

14   total is about a billion dollars, more than a billion.

15   Q.    Let's stay with the U.S. market for now.

16   A.    Yes.

17   Q.    Now, what is the -- what did you do in order to

18   arrive at a lost-profit calculation?

19   A.    Well, I thought about this and realized that it was

20   unlikely that Cordis, in fact, would have made all 391,000

21   of those.  And I thought about it in a fairly -- we did a

22   number of analyses.  And I'm sure we'll be going through

23   those.  But when all was said and done, I was -- I

24   calculated that there were about 78, 79 thousand of these

25   stents that, although AVE, in fact, sold them here in the

2908

12/18/2000 Trial Transcript Day 14

1    United States, Cordis wouldn't have made those sales.  And

2    Cordis wasn't damaged in the sense of having its sales

3    reduced.  And that works out to being about 20 percent of

4    the stents that AVE sold here in the United States.

5              The other 80 percent, the 312,000, really did

6    come out of Cordis' sales, I believe, and Cordis' sales

7    were reduced by those.  So I -- one of the first steps

8    here was to simply, you know, break this -- I say simply.

9    It wasn't that simple.  To get it broken into the two

10   components, those that Cordis would have sold and those

11   that Cordis probably would not have sold.

12   Q.    So these are the AVE stent sales which you

13   determined are appropriate for a lost -- for lost profit

14   purposes?

15   A.    Absolutely.  And the others would then qualify for

16   reasonable royalty.  They were sold.  They were infringing.

17   There's no question about that.  But I don't think -- I

18   don't think Cordis would have made those sales, but AVE

19   made them and AVE would owe Cordis a royalty on the 20

20   percent and lost profits on the 80 percent.

21             MR. CAVANAUGH:  If we could go back to our

22   summary chart...

23   BY MR. CAVANAUGH:

24   Q.    So we have -- we have these additional stents which

25   are available for lost profit treatment.  And then the

2909

1      paid on that, so it's a before-tax number.

2              Also, if Cordis had been making the money over

3      the two-year period when infringement happened, it would

4      have to be paying taxes on that.  Just to avoid all the

5      complication of getting into the tax return, we always do

6      these things on a pre-tax basis.  In general, pay the tax

7      before the award check arrives.

8      Q.    Is this the total amount of damages which you have

9      determined are due Cordis here?

10     A.    No.  There are two more elements that are due.  The

11     first we've already talked about, and that's the wedge

12     that -- the sales that -- I don't think Cordis would have

13     made.  AVE made them.

14     Q.    Okay.

15     A.    And I think there's a -- there's a reasonable royalty

16     due on those.  It's 78,000 stents.  I've determined that

17     the reasonable royalty rate would be 40 percent.  And I'm

18     sure we'll be going into that in some detail.  And so if I

19     take the 78,000 stents that AVE sold, and here I have to

20     multiply by AVE's selling price because it's -- the license

21     would be based on AVE's selling price and they're somewhat

22     higher.  I think it's something over $1500 a stent, but if

23     you take the 78,000, you multiply by AVE's selling price,

24     and say that's their revenue and take 40 percent of that,

25     you come to the number that was on the screen, if you back

**12/18/2000  Trial Transcript Day 14**

1    up one.

2    Q.    So that's the -- those are on U.S. sales; correct?

3    A.    Those are U.S. sales that were made by AVE.  I don't

4    think Cordis would have made.  So we've got $354 million

5    of lost profits on the sales that it would have made and

6    49, almost 50 million dollars as a reasonable royalty on

7    the other sales that AVE made that Cordis could not have

8    made, would not have made.

9    Q.    Let me stop you for a moment.  You've been using

10   the term royalty.  Can you explain to the jury what a

11   royalty is?

12                         - - -

13   A.    A royalty is just like rent which -- I think we may

14   have mentioned that.  You're going to use somebody else's

15   intellectual property; it's like going to their vacation

16   home, using their apartment.  You pay rent.

17              In the case of intellectual property, it's

18   called a royalty.  I'm not sure why the word rent isn't

19   used, but it's royalty.

20                         - - -

21

22

23

24

25

**12/19/2000 Trial Transcript Day 15**

1          Mr. Cavanaugh.

2                    - - -

3          ... CREIGHTON G. HOFFMAN, having

4          been previously duly sworn as a witness,

5          was resumed and testified further as

6          follows ...

7                    DIRECT EXAMINATION

8                    CONTINUED

9     BY MR. CAVANAUGH:

10    Q.   Mr. Hoffman, we had finished the wonderful world of

11    cost accounting.  I promised we won't go back to it.

12         Let's see where we left off.

13         We left off with lost profits.  Now let's turn

14    to reasonable royalties.

15    A.   Okay.

16    Q.   If you could just remind the jury what we are talking

17    about when we are talking about royalties...

18    A.   Sure.  Of the 391,000 infringing stents that were

19    sold by AVE, I concluded that about 312,000 of those would

20    have, in fact, been sold by Cordis if AVE had not been on

21    the market and the other 78, 79 thousand I don't think

22    Cordis would have sold, but Cordis is still entitled to a

23    reasonable royalty for AVE's use of its patented technology

24    to make and sell those.

25    Q.   How do you approach the issue of determining a

**12/19/2000 Trial Transcript Day 15**

1    constant, at about 2 to 2-1/2 percent.  And then it leaves

2    us with the Cook and Medtronic coil stents.  And what I

3    did here was I simply summarized how many units got sold

4    over the two-year period that is in question here.  And

5    during that period of time, on the coil stents, the

6    returns were actually greater than the sales.  There

7    were more coming back from the hospitals than being

8    shipped out.  So, you know, they're really not on the

9    market in any meaningful sense during this two-year period.

10   The numbers should actually be negative, but I did not

11   draw a negative piece of pie.

12   Q.    All right.  Let's go to the next factor.

13              Georgia-Pacific Factor 14 and 15 are any

14   other factors that a normally prudent businessperson

15   would take into consideration in looking at this

16   hypothetical license.

17              What factors did you consider?

18   A.    Well, at that point I considered what we had been

19   talking about, the fact that AVE was a -- an one product

20   company, that these were very, very profitable.  AVE

21   needed this in order to get into the business.  AVE was

22   clearly a competitor of Cordis and these were kind of the

23   important thoughts that I had in mind with respect to

24   where the royalty negotiation would have come out, and I

25   wound up effectively taking that 82-percent gross margin

**12/19/2000 Trial Transcript Day 15**

1    and kind of splitting it at 40 for J&J and the rest for

2    AVE.

3            I didn't feel like that was a very good deal,

4    quite frankly, for Cordis. They knew that every sale AVE

5    made was going to come out of Cordis' pocket.  Cordis

6    would lose on every one of those sales.  But if we

7    assumed that Cordis was willing to grant a license, the

8    negotiation had to come out someplace, so I set it at

9    about 42 -- 40 percent.  I also knew that was about half

10   of AVE's gross profits at the time.

11           So that struck me as kind of the lowest

12   reasonable royalty that would be appropriate.

13   Q.    Did you consider the size of the U.S. coronary

14   stent market?

15   A.    Oh, absolutely.  It's a -- it's a big market.

16   It's -- it's a well-developed market and it's a market

17   that, if I could come up with a stent, I could enter it

18   today and I know it's there.  And my risk would be

19   relatively low.

20           And it's a big and very, very profitable

21   market.  Good market to be in.

22   Q.    What did AVE's expert assume providing AVE's gross

23   and operating margins?

24   A.    He assumed that the operating margins were the same

25   as Cordis' in his last report.  He simply used the same

**12/19/2000 Trial Transcript Day 15**

1  calculation X-32528...

2  BY MR. CAVANAUGH:

3  Q.  And if you can explain to the jury what this shows?

4  A.  Sure.  There were almost a half a billion stents

5  that AVE sold overseas.  There's no -- no lost profit,

6  not being claimed here on those, even though they were

7  competitors overseas.

8        So I multiplied that by AVE's average selling

9  price for foreign sales.  You notice that was only $918,

10  as opposed to the $1500 when they sell the same product

11  here in the United States.  Multiply those out.  You get

12  $458 million times a reasonable royalty of 10 percent.

13  That gets us down to $45 million as the royalty that is,

14  in fact, due for foreign sales.  A product that's made

15  here in the United States.

16        MR. CAVANAUGH:  Your Honor, we would move

17  PX-3955 into evidence.

18        MR. UNDERHILL:  No objection, your Honor.

19        THE COURT:  Thank you.

20  ***    (Plaintiff's Exhibit No. 3955 was received

21  into evidence.)

22  BY MR. CAVANAUGH:

23  Q.  And does this get added into the total damage

24  schedule?

25  A.  That is the third element.

**12/19/2000  Trial Transcript Day 15**

1   Q.   Put that in.

2        And then what's the last step?

3   A.   The last step is to add it altogether.  We've got

4   three elements there.  We've got the profits that Cordis

5   lost, because it didn't make the sales that it would have.

6   And then we've got two pieces of royalty for sales that I

7   assume Cordis would not have made.  And the royalties on

8   those are 40 percent here in the U.S. and 10 percent

9   overseas.  When you add all that together, you get just

10  about $450 million.

11       MR. CAVANAUGH:  Your Honor, we would move

12  PX-3951 into evidence.

13       MR. UNDERHILL:  No objection.

14       THE COURT:  Thank you.

15  ***      (Plaintiff's Exhibit No. 3951 was received

16  into evidence.)

17  BY MR. CAVANAUGH:

18  Q.   Now, have you reviewed the report by AVE's expert,

19  Dr. Addanki?

20  A.   Yes, I have.  I've reviewed each of his reports.

21  Q.   Do the numbers in Mr. Wallace's opening statement

22  differ from the last report you saw from Dr. Addanki?

23  A.   The last report I saw from Dr. Addanki was dated

24  December 14th.  I think it was just last week.  And the

25  numbers in the opening statement were slightly different.

**12/19/2000  Trial Transcript Day 15**

1    Q.    Were they ever sold in the United States?

2    A.    To the best of my knowledge, they've never been

3    approved and they have never been sold.  The FDA hasn't

4    approved them.

5              You can't buy one.  Dr. Herrmann can't put one

6    in here in the United States.

7    Q.    How else do you and Dr. Addanki differ in your lost-

8    profit calculation?

9    A.    The -- well, there are two other areas.  One,

10   obviously, is the cost of Cordis' stents, as to what it

11   costs Cordis to make and sell a stent.

12   Q.    What is your cost calculation?

13   A.    Well, my cost calculation put together, as described

14   yesterday, went through the books at Cordis in some detail,

15   took all of the manufacturing costs, everything in the

16   shop, fixed and variable, and said I'm going to consider

17   all of those to be variable expenses.  That worked out to

18   be the $159.

19              Then I took the SG&A.  I couldn't find any

20   variable SG&A expenses, but I wound up throwing in a

21   third of them.  Take off another 120 two dollars for each

22   stent.  So I came down, average stent that Cordis sells,

23   $1415, take those out and I came down to $1134, having

24   backed out all the manufacturing expenses as well as, you

25   know, a third of the SG&A expenses, I think have little

2978

**12/19/2000 Trial Transcript Day 15**

1    basis, but I did it anyway.

2    Q.    Now, where does Dr. Addanki come out in his

3    calculation?

4    A.    Dr. Addanki comes out at about 834.  I think he's

5    about $300 less than I am.

6              (Pause.)

7    BY MR. CAVANAUGH:

8    Q.    And how does Dr. Addanki arrive at a different number

9    than you?

10   A.    He does two things that are different and I think

11   both of them are wrong.  He does not really go through

12   the books.

13              There we are. He's at 836.  So, yes, we're

14   basically $300 apart in terms of the profit.  And we don't

15   disagree on the average selling price.  That's all built

16   into the -- into the incremental cost.

17              So what we have here is we've got two

18   circumstances that drive this extra $300.  The first thing

19   is he has included in there payments that would have to be

20   made by Cordis to the EGP partnership, this 9-percent

21   royalty.  And 9 percent on $1400, about $130.

22              So $130 he has included, because he has used

23   historical prices.  They should not be included because

24   they're not payable.  Cordis has bought out that agreement.

25   Cordis, you know, has bought it out for anything that's

**12/21/2000  Trial Transcript Day 17**

1

2          THE WITNESS (Continuing):  Next question is to

3    figure out of the remaining sales AVE would have made, how

4    many of them would Cordis have got as opposed to Cook and

5    Medtronic?  And let's remember that if AVE couldn't have

6    sold the MicroStent 2, it would have tried to sell the

7    MicroStent 1.  If the MicroStent 1 had been available, how

8    many sales would that have gotten?

9          And that is what the other pieces of the pie

10   are.  You can see by the colors that sort of peach color

11   is the sales of the licensees would have made which is

12   Cook and Medtronic with GR 2 and Wiktor.

13         As you can see, it's not that big and the

14   pale bluish greenish color is the sales the MicroStent

15   MS 1 would have made less of the sales Cordis could have

16   made of no more than 230,063 stents.

17         And, again, my analysis of how the market

18   would have broken out among these participants, how they

19   would have shared that pie is also based on econometrics.

20   And it's an econometrics a little different from the

21   previous one, because this one says, okay, for a given

22   size of the pie, how will stents grab market share.

23   Depending how good they are, what the stent attribute is

24   like.  And that, too, was an econometrics of actual

25   market data, no assumptions there.

12/21/2000  Trial Transcript Day 17

1    ***        (Defendant's Exhibit No. 4781 was received

2    into evidence.)

3                THE WITNESS:  Okay.  I haven't gotten to that

4    exhibit yet.

5    BY MR. WALLACE:

6    Q.    Go ahead.

7    A.    But a better thing to do is to look at all of the

8    costs.  You simply add up all the costs and try to let

9    the data on the costs themselves tell you what part varies

10   and what part doesn't vary.  And that, again, is something

11   that econometrics is ideal for.  And in the real world,

12   firms actually used econometrics quite often to try to

13   figure out what the costs are, because accounting

14   statements won't do it.

15                So I did an econometrics of Cordis' actual

16   cost data, total cost and how the cost variable sales

17   and I found incremental cost per stent was $540, which

18   is quite a bit higher than what Mr. Hoffman was talking

19   about the day before yesterday.

20                We're almost there.  I calculate the average

21   selling price of Cordis as being, $1,376.  Subtract one

22   from the other and you get an incremental profit of $836

23   per stent.  That's what we have here.  Multiply that by

24   the stent sales Cordis could have made and you get to

25   $192,393,020.  So this is the lost-profit piece of what

**12/21/2000 Trial Transcript Day 17**

1    Mr. Hoffman did, but recalculated, fixing some of the

2    profits.

3                    Do you want to talk about that?

4    Q.    Yes.

5    A.    This is a recalculation simply multiplying out both

6    lines the cost line, the revenue line, by the number of

7    stents to get a dollar revenue that Cordis could have made

8    if it had sold these stents and the dollar cost that would

9    have been incurred if it had sold those stents.

10   Q.    And, again, for the record, Dr. Addanki, what you

11   are referring to is AVE Exhibit 5800.

12   A.    Yes.  If that is what the number is, yes.

13                   MR. WALLACE:  And we move it into evidence,

14   your Honor.

15                   MR. CAVANAUGH:  No objection.

16                   THE COURT:  Thank you.

17   ***       (Defendant's Exhibit No. 5800 was received

18   into evidence.)

19                   THE WITNESS:  So I guess the remaining part

20   is what do you do with the sales that Cordis would not

21   have made?  And starting with the top line, $391,000

22   something, you have 161,000 stents that Cordis would not

23   have sold.  And, as we talked about yesterday, they're

24   entitled to royalty, because AVE used their intellectual

25   property, they have to pay a rent for the use of that

3597

**12/21/2000  Trial Transcript Day 17**

1    property.

2            We talk about it like rent, but there is a bit

3    of a difference between renting intellectual property and

4    renting an apartment, because you rent out an apartment

5    to someone, you can't rent it to someone else not without

6    getting into some trouble with the law, but if you rent

7    intellectual property, you can rent it over and over again,

8    as long as you don't have an exclusive license to give it

9    to anyone.

10           But, be that as it may, they're entitled to

11   a royalty, they're entitled to payment for use of the

12   property.  The question is how you get to the right

13   royalty rate.

14           And Mr. Hoffman assumes the right royalty

15   rate is a royalty rate that takes into account the fact

16   that they compete with each other.  But now, I've shown

17   you yesterday how you calculate the royalty rate, when

18   they do compete, how you actually calculate it, what each

19   side has to lose when they're competing for each and

20   every sale.  Here they're not completing for each and

21   every sale.  In fact, they're not competing for any of

22   these sales.  These are all sales we already agreed Cordis

23   would not make, so these are sales for which you wanted

24   pure intellectual property rent.  You don't want lost

25   profits, you don't want how many sales would I lose, any

**12/21/2000  Trial Transcript Day 17**

1    of those calculations.  You just want what is it worth

2    when this intellectual is used by someone else.  That's

3    it.  And to do that, it's a very different type of

4    calculation.

5             I showed you yesterday that if they do compete

6    for each and every sale, you are talking about royalty

7    rate of 16 percent, and you can work that out.  With this

8    situation when they're not completing for the sales,

9    we're simply compensating Cordis for the intellectual

10   property, I calculate it would be 8 percent, half the 16

11   percent, and 8 percent also happens to be about what

12   Cordis is paying, as Mr. Hoffman says, for the BX Velocity

13   and the CrossFlex stent is paying a royalty to Bard for

14   those stents.

15            So that amounts to a royalty of $126 per unit,

16   multiplied by the number of stents, and that is an 8-

17   percent royalty, gives you $20,375,000 in royalty.  And

18   I also told you about the flat fee for international

19   royalties.  That is $1 million.  And you get a total of

20   $213,768,738, which is here.

21   BY MR. WALLACE:

22   Q.    Thank you.  Are you done here?

23   A.    I'm done here.

24   Q.    Dr. Addanki, you received last night a demonstrative

25   that Cordis is going to use after we rested our case, and

3599

12/21/2000  Trial Transcript Day 17

1

2    A.    Okay.

3    Q.    You did a unit calculation that had AVE total sales

4    of 391,000; right?

5    A.    Right.

6    Q.    And you have Cordis capturing 294,000 units; correct?

7    A.    In this calculation, yes.

8    Q.    All right.  Well, let's put a pie chart up showing

9    that.

10   A.    This is before I was taking into account the fact

11   that the MS 1 did not infringe.

12   Q.    I understand that, Doctor.  We will get to the MS 1.

13              But let me ask you, how many MS 1 units have

14   been sold in the United States?

15   A.    As you know, none.

16   Q.    And when did the FDA approve the MS 1 for sale in

17   the United States?

18   A.    As you know, that hasn't happened.

19   Q.    Well, then let's work with this.  When you were doing

20   this calculation, you were working off products that had

21   been approved by the Food and Drug Administration for sale

22   in the United States; correct?

23   A.    I was working off products that I knew, at that

24   time, were considered to be noninfringing products.

25   Q.    And all of those stents that you talked about, the

# EXHIBIT B

# CONFIDENTIAL EXHIBIT

# EXHIBIT C

**GUIDANT**    About Us

**ABOUT US**

**Corporate Overview**
Management
Committee
Locations
Guidant Code of
Business Conduct
Guidant Foundation
Guidant Compass
Group

**Careers at Guidant**

**Newsroom**

**Investor Resources**

# Johnson & Johnson and Guidant Announce Definitive Agreement Valued at $23.9 Billion Based on $76 per Share

## Transaction will bring together cardiovascular expertise and technologies to benefit patients and physicians worldwide

**New Brunswick, N.J. and Indianapolis, Ind. — December 15, 2004 —** Johnson & Johnson (NYSE: JNJ), the world's most comprehensive and broadly based manufacturer of health care products, and Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today announced that they have entered into a definitive agreement whereby Johnson & Johnson will acquire Guidant for $25.4 billion in fully diluted equity value.

Under the terms of the agreement, each share of Guidant common stock will be exchanged for $30.40 in cash and $45.60 in Johnson & Johnson common stock, provided the average Johnson & Johnson common stock price is between $55.45 and $67.09 during the 15-day trading period ending three days prior to the transaction closing. Each Guidant share exchanged would be converted into Johnson & Johnson common stock of not more than .8224 and not less than .6797 shares, plus $30.40 in cash. The transaction has an estimated net acquisition cost of $23.9 billion, as of the close of business on December 15, 2004, based upon Guidant's approximately 334 million fully diluted shares outstanding, net of estimated cash on hand at the time of closing.

The boards of directors of Johnson & Johnson and Guidant have given their respective approvals to the transaction, which is subject to clearance under the Hart-Scott-Rodino Antitrust Improvements Act, the European Union merger control regulation, and other customary closing conditions. The agreement will require the approval of Guidant's shareholders.

Guidant and Cordis Corporation, a Johnson & Johnson Company, will become part of a newly created cardiovascular device unit within Johnson & Johnson. The newly created franchise will be named Guidant while the Cordis name will be retained for select businesses within the franchise. The franchise will be operated consistent with the Johnson & Johnson operating principle of decentralized management, which provides for focused management and fosters an entrepreneurial culture. This business unit will report to Nicholas J. Valeriani, a member of the Johnson & Johnson Executive Committee.

"The combination of these businesses will enable us to bring innovative new therapies to patients and their physicians in this very important and fast growing therapeutic area," said William C. Weldon, Chairman and Chief Executive Officer of Johnson & Johnson. "Bringing Guidant into the Johnson & Johnson family of companies builds on our history of strategic acquisitions and partnerships that provide a foundation for sustained leadership and growth."

Guidant business units include cardiac rhythm management (e.g. pacemakers and implantable cardioverter defibrillators), vascular intervention, cardiac surgery and endovascular solutions. These businesses will complement Johnson & Johnson's products and services in cardiology and medical devices, as well as provide future benefits for patients and physicians as a result of collaboration with the Johnson &

Johnson pharmaceuticals and diagnostics businesses.

"This exciting new partnership opens a dynamic era of innovation and product development that will benefit millions of patients around the world," said Ronald W. Dollens, President and Chief Executive Officer of Guidant. "We are pleased to be joining Johnson & Johnson, one of the world's premier companies. We strongly believe that this exciting collaboration will benefit patients, customers, employees and shareholders." Mr. Dollens has agreed to continue to serve as Chief Executive Officer of Guidant until the transaction has closed.

The cardiovascular segment continues to be one of the fastest growing areas in health care as populations in the United States and other countries age. As a combined entity, Guidant and Cordis will more effectively bring technologically based and innovative approaches to the treatment of cardiovascular diseases.

This new organization will enable Johnson & Johnson to better address the needs of patients around the world who require treatment for heart failure and sudden cardiac death. This patient population continues to be significantly underserved. Additionally, Guidant's technology platforms, such as implantable micro-electronics, could be applied to current and future Johnson & Johnson products as part of future efforts to create innovative and advanced technologies in other healthcare areas, such as the neuromodulation market.

In the interventional cardiology market, this business combination provides the capability to accelerate development of new technologically advanced products. This new business can utilize Cordis' expertise, intellectual property and experience in drug development, coating technology and polymers. Together with Guidant's strength in rapid and innovative development of stent platforms and delivery systems, the combined company will bring superior products to the market faster than either company could on its own.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company, driven by a strong entrepreneurial culture of approximately 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

Johnson & Johnson, with approximately 109,000 employees, is the world's most comprehensive and broadly based manufacturer of health care products, as well as a provider of related services, for the consumer, pharmaceutical, and medical devices and diagnostics markets. Johnson & Johnson has more than 200 operating companies in 57 countries, selling products throughout the world. For more information visit www.jnj.com.

Additional commentary regarding the financial impact will be discussed during the conference call noted below. Johnson & Johnson and Guidant will not be available for further comment until after the conference call has concluded.

## Note to Investors

Johnson & Johnson and Guidant will conduct a conference call with financial analysts to discuss this news release on December 16, 2004 at 9:00 a.m., Eastern Standard Time. A simultaneous webcast of the call for interested investors and others may be accessed by visiting the Johnson & Johnson website at www.jnj.com and clicking on "Webcasts/Presentations" in the Investor Relations section or by visiting the Investor Resources section on the Guidant website at www.guidant.com. A replay will be available at both websites.

(This press release contains "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. These statements are based on current

expectations, forecasts and assumptions that are subject to risks and uncertainties which could cause actual outcomes and results to differ materially from these statements. Risks and uncertainties include the satisfaction of the conditions to closing, including receipt of shareholder and regulatory approval; general industry and market conditions; general domestic and international economic conditions, such as interest rate and currency exchange rate fluctuations; technological advances and patents attained by competitors; challenges inherent in new product development, including obtaining regulatory approvals; domestic and foreign health care reforms and governmental laws and regulations affecting domestic and foreign operations; and trends toward health care cost containment.

A further list and description of these risks, uncertainties and other factors can be found in Exhibit 99(b) of Johnson & Johnson's Annual Report on Form 10-K for the fiscal year ended December 28, 2003 and Exhibit 99 of Guidant's most recent 10-Q. Copies of said 10-K and 10-Q are available online at www.sec.gov or on request from the applicable company. Neither company assumes any obligation to update any forward-looking statements as a result of new information or future events or developments.)

## Additional Information And Where To Find It

This material is not a substitute for the prospectus/proxy statement Johnson & Johnson and Guidant (and a subsidiary thereof) will file with the Securities and Exchange Commission. Investors are urged to read the prospectus/proxy statement which will contain important information, including detailed risk factors, when it becomes available. The prospectus/proxy statement and other documents which will be filed by Johnson & Johnson and Guidant (and a subsidiary thereof) with the Securities and Exchange Commission will be available free of charge at the SEC's website, www.sec.gov, or by directing a request when such a filing is made to Johnson & Johnson, One Johnson & Johnson Plaza, New Brunswick, NJ 08933, Attention: Investor Relations; or by directing a request when such a filing is made to Guidant Corporation, 111 Monument Circle, #2900, Indianapolis, IN 46204-5129, Attention: Investor Relations.

Guidant Corporation, its directors, and certain of its executive officers may be considered participants in the solicitation of proxies in connection with the proposed transactions. Information about the directors and executive officers of Guidant Corporation and their ownership of Guidant stock is set forth in the proxy statement for Guidant Corporation's 2003 annual meeting of shareholders. Investors may obtain additional information regarding the interests of such participants by reading the prospectus/proxy statement when it becomes available.

