IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ADVANCED CARDIOVASCULAR SYSTEMS, INC., and GUIDANT SALES CORPORATION,

Plaintiffs,

v.

MEDTRONIC VASCULAR, INC., and MEDTRONIC USA, INC.,

Defendants.

C.A. No. 98-80-SLR
(Consolidated with
C.A. No. 98-314-SLR
C.A. No. 98-316-SLR)

**MEDTRONIC'S TRIAL MEMORANDUM TO PREVENT ACS FROM RELYING ON THE ATTORNEY-CLIENT PRIVILEGE AS BOTH A SWORD AND A SHIELD**

MORRIS, NICHOLS, ARSHT & TUNNELL
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Attorneys for Medtronic Vascular, Inc. and Medtronic USA, Inc.

OF COUNSEL:
Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
James G. Rizzo
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005

Fay E. Morisseau
Matthew F. Weil
McDERMOTT WILL & EMERY LLP
18191 Von Karman Ave., Ste. 400
Irvine, CA 92612

June 7, 2005

## INTRODUCTION

During discovery in this case, ACS asserted the attorney client privilege to block inquiry into the views and opinions of its attorneys on the patentability of the claims of the Lau patents and to communications with ACS employees concerning those views and opinions. Because Medtronic was precluded from getting full discovery into communications between ACS and its attorneys, ACS's representatives (such as Mr. Lau or Mr. Orth) should not now be permitted to testify to knowledge, opinions, impressions or thoughts based in whole or in part on those communications. To the extent such testimony is permitted, however, ACS should be required to produce its privileged communications so that ACS does not assert the privilege as both a sword and a shield.

## ARGUMENT

### I. BECAUSE ACS CONSISTENTLY ASSERTED THE ATTORNEY-CLIENT PRIVILEGE TO BLOCK DISCOVERY INTO COMMUNICATIONS WITH COUNSEL CONCERNING THE PATENTABILITY OF THE LAU INVENTION, ACS'S REPRESENTATIVES SHOULD NOT NOW BE PERMITTED TO TESTIFY SELECTIVELY TO KNOWLEDGE, OPINIONS, IMPRESSIONS OR THOUGHTS BASED ON SUCH COMMUNICATIONS.

#### A. During Discovery, ACS Invoked The Attorney-Client Privilege To Block Discovery Into Communications With Counsel Concerning The Patentability Of The Lau Inventions.

During the deposition of its patent counsel, Edward Lynch, and others, ACS asserted the attorney-client privilege to prevent witnesses from testifying about counsel's thoughts and impressions concerning the patentability of the Lau patent claims.

For example, ACS invoked the attorney-client privilege to prevent Medtronic from questioning Mr. Lynch concerning his analysis of the Boneau prior art. ACS also blocked Medtronic from discovering the thoughts and impressions Lynch shared with people at ACS. For example, he was instructed not to testify regarding his analysis of the Boneau patent application and not to divulge details of his communications with ACS employees about that analysis. Lynch also purported to testify about his customs and practices (*see* excerpts of Lynch deposition, Ex. A at 38:7-22, 39:18-22, 139:4-9 and 146:13-21). Yet Medtronic could not get any specifics as to whether those so-called customs and practices were followed here because ACS has asserted the privilege as to a report Lynch prepared about the Boneau patent application (*see* Ex. B at 24:12-25:02, 25:20-26:03, 54:21-55:11, 91:1-13, 168:22-169:5, 171:16-172:14).

Other ACS witnesses were similarly cautioned or instructed not to divulge attorney-client communications concerning prior art analyses. These included ACS in-house counsel, Bruce Barclay, ACS co-inventors William Hartigan and Lilip Lau, ACS engineers Farhad Khosravi, and ACS executives Tim Kitchen and Gary Schneiderman.

### B. Testimony Regarding Knowledge, Opinions, Impressions Or Thoughts Based In Whole Or In Part On Communications With Counsel Fall Within The Scope Of Subject Matter As To Which Privilege Was Asserted And Should Be Precluded.

With respect to any particular subject matter, privilege is an all-or-nothing proposition. If a litigant waives the privilege during discovery as to a particular communication, courts typically hold that the privilege has been waived as to all communications with counsel regarding the same subject matter. *See, e.g., In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989) (waiver by subsequent disclosure of one document

waives privilege as to all communications on same subject matter); *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988), *cert. denied*, 490 U.S. 1011 (1989) (implied subject-matter waiver as a result of statements by corporation to government in negotiating settlement); *Smith v. Alyeska Pipeline Serv. Co.*, 538 F. Supp. 977, 979 (D. Del. 1982) (finding that by disclosing some privileged communications, client waived privilege as to "the remainder of the communication [sic] which relate to the same subject matter"). Indeed, this Court previously required Guidant to produce its privileged documents in another proceeding because it was using the attorney-client privilege as both a sword and a shield. *Medtronic Inc. v. Guidant Corp.*, 2004 U.S. Dist. LEXIS 23468 (D. Del. 2004).

It is now too late for ACS to waive the privilege. Instead, the Court should require ACS to live within the bounds of the discovery that it has provided. In this case, that means not only that ACS cannot waive the privilege selectively by allowing its attorneys to testify to matters for which it previously claimed privilege. It also means that ACS should not be allowed to use the testimony of non-lawyers to selectively publish information based on attorney-client communications while invoking the privilege to block access to the complete communication. This exclusion relating to all testimony that could reveal even a portion of the attorneys' thoughts or advice follows from the rationale behind the rule requiring consistency with respect to assertion of the privilege:

> The attorney client privilege should not be used as both a sword and a shield. *See United States v. Rylander*, 460 U.S. 752, 758 (1983). The rationale behind this rule is one of fairness. As courts in this district have explained, it is unfair to allow a party to "disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts adverse to its position . . . ." *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 156 (D.

Del. 1977).

*Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 513 (D. Del. 2005). Having now asserted that counsel's impressions and communications on the subject of the Boneau prior art and the Boneau patent application are privileged, ACS should not be allowed to elicit testimony based on those communications from others, but should instead be required to maintain the privilege at trial that it so consistently asserted during discovery.

There can be no question that this court may properly exclude evidence relating to the subject matter as to which ACS previously invoked the attorney-client privilege. For example, Judge Sleet recently excluded evidence that an attorney had been involved at all in a pre-filing investigation because privilege had been invoked during discovery as to the substance of the attorney's opinion. In *Software AG v. BEA Systems*, the Court held:

> . . . . BEA would like to introduce evidence that its pre-litigation correspondence with SAG was handled in part by a patent attorney, while simultaneously asserting privilege as to his private communications with BEA, in an effort to show a lack of intent. In its brief, BEA denies that it will adduce evidence of any opinion that Meyer might have formed, or whether Meyer was asked to form such an opinion (D.I. 188 at 2). And yet, almost in the very next breath, BEA asserts that Meyer's significant participation in the pre-litigation correspondence with SAG is "highly probative" on the issue of willful infringement (*id.* at 3). This is an untenable position because Meyer's involvement can only be highly probative if it somehow reflects BEA's intent. But as discussed above, Meyer's involvement is legally irrelevant to BEA's intent. Therefore, the true value to BEA of this evidence is that it will permit BEA to give the jury a subtle "wink wink," in the hope that the jury will draw the improper inference that the patent attorney's involvement demonstrates BEA's lack of intent. Given the obvious prejudice to SAG, the court will not permit BEA to introduce the fact that Meyer was involved in the pre-

> litigation correspondence with SAG, to the extent he is identified as a patent attorney.

*Software AG v. BEA Sys.*, 2005 U.S. Dist. LEXIS 6021, *6-7 (D. Del. 2005).

This is consistent with this Court's stated view that litigants cannot take affirmative steps to restrict the scope of discovery by invoking the attorney-client privilege, but then seek to get evidence in beyond those restrictions. In *Arthrocare Corporation v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638 (D. Del. 2004), for example, the Court excluded testimony of a witness because he did not discuss the substance of that testimony in his deposition (which had take place approximately one week before the start of trial) because Smith & Nephew's counsel instructed him not to divulge the subject of his expected testimony citing attorney-client privilege and the work product doctrine. *Id.* at 668. Similarly, in the *Lucent Technologies* trial, Judge Farnan precluded Newbridge Networks from offering evidence relating to the same subject matter as to which it had invoked the privilege during discovery. The Court later upheld that ruling and denied Newbridge the new trial it sought based upon the supposed error of excluded the proffered evidence. *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 262 (D. Del., 2001) (Farnan, J.) ("In light of Newbridge's claims of attorney-client privilege which limited Lucent's discovery on Newbridge's investigation into the patents, and Newbridge's subsequent voluntary redaction of these documents to overcome Lucent's objection, the Court cannot conclude that Newbridge was unduly prejudiced by the exclusion of this evidence such that a new trial is warranted.").

If, however, such testimony is permitted, ACS should be required to produce its privileged documents so as to preclude ACS from relying on the privilege as both a sword and a shield.

CONCLUSION

For the foregoing reasons, Medtronic asks that the Court restrict ACS's factual presentation at trial to matters consistent with its decision to invoke attorney client privilege during discovery. In particular, Medtronic asks that the Court preclude ACS from seeking to elicit testimony as to knowledge, opinions, impressions or thoughts based to any degree whatsoever on communications with attorneys whose impressions and work have been shielded by assertion of the attorney-client privilege. In the alternative, the Court should deem the privilege waived and order ACS to produce its privileged documents.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Leslie A. Polizoti

Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Attorneys for Medtronic Vascular, Inc. and Medtronic USA, Inc.

OF COUNSEL:
Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
James G. Rizzo
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005

Fay E. Morisseau
Matthew F. Weil
McDERMOTT WILL & EMERY LLP
18191 Von Karman Ave., Ste. 400
Irvine, CA 92612

June 7, 2005

# EXHIBIT A

A. Prior art? Is this what you're referring to?
Q. Yes, sir.
A. Okay. The duty to disclose prior art is -- if the prior art references a material reference, then you have an obligation. And if it's truly a prior-art reference, then you have an obligation to submit that to the Patent Office for consideration.
Q. And, sir, during that same time period, 1989 to 1991, what was your understanding in terms of the standard of assessing materiality?
A. I'm not sure exactly what the specific criteria was. But generally speaking, if you believe that the reference would be of interest to the examiner in considering the application, generally you submitted it.

**10. PAGE 38:07 TO 38:22 (RUNNING 00:00:43.392)**

Q. Back in the 1989 to 1991 time frame, what was your practice to make sure that you satisfied the duty of disclosure?
A. I'm not sure what you mean by "your practice." But generally speaking, you know, if I was aware of the reference, if I felt that it was a material reference to the application that I was involved with, I would submit it to the Patent Office.
Q. Would you tell your clients about the duty of disclosure?
A. Yes.
Q. Would you tell your client that they had a duty to disclose all material prior art to the Patent Office?
A. Yes.

**11. PAGE 39:18 TO 39:22 (RUNNING 00:00:13.000)**

Q. Sir, back during the 1989 to 1991 time frame, was it your practice to perform prior-art searches in connection with the applications that you were prosecuting?
A. Not usually.

**12. PAGE 40:15 TO 41:04 (RUNNING 00:00:31.436)**

Q. Sure. You had told us what your understanding of the duty of disclosure was back in the 1989 to 1991 time period. I'm asking you now, in 1992 and the years following, what was your understanding of the duty of disclosure?
A. I think it's basically the same.
Q. And was your understanding in 1992 and the years following regarding the standard for materiality -- was that also basically the same as what you'd already told us?
A. Fundamentally it was as far as what I considered to be material.

**13. PAGE 41:05 TO 41:22 (RUNNING 00:01:00.200)**

Q. Sir, has it ever been your custom and practice to disclose prior-art references that you believed were not material?
A. Yes.
Q. And when was that?
A. If I received a search report on a

permission to disclose the E.S.S. application to the Patent Office in connection with any of the patent prosecution work you were doing for ACS?
A. I had no -- I had no recollection of contacting Mr. Eakin for anything.

**82. PAGE 130:03 TO 130:07 (RUNNING 00:00:12.000)**

Q. Do you recall ever contacting anyone outside of Mr. Eakin and asking for permission to disclose the E.S.S. application to the Patent Office?
A. No.

**83. PAGE 131:03 TO 131:07 (RUNNING 00:00:25.700)**

MR. O'NEILL: We have marked as Exhibit 13-B a copy of the file history for Application 07/783, 558 which bears Bates labels ACS 231211 through to ACS 231334. It's a double-sided copy.

**84. PAGE 132:06 TO 132:09 (RUNNING 00:00:08.200)**

Q. Sir, the application portion of 13-B, is this what we've been referring to as the Lau application?
A. It's my understanding that's correct.

**85. PAGE 132:10 TO 132:16 (RUNNING 00:00:14.500)**

Q. And this is the application where you -- you reviewed the application -- I'm sorry. Let me start over.
I think you had told us earlier that you had one of your associates prepare the application; is that correct?
A. They drafted the application.

**86. PAGE 132:22 TO 133:03 (RUNNING 00:00:06.300)**

Q. And you reviewed the application?
A. Yes, I did.
Q. You approved it for filing?
A. I revised it.

**87. PAGE 134:08 TO 134:10 (RUNNING 00:00:05.000)**

Q. Sir, if you look down at the bottom of that page, is that your signature?
A. I believe so, yes.

**88. PAGE 134:11 TO 134:22 (RUNNING 00:00:43.400)**

Q. Sir, do you recall when your involvement in the prosecution of the Lau application came to an end?
A. I don't have a recollection of when that occurred. I remember it occurring, but I'm not sure what time frame. My -- it appears that, based upon the fact that the -- that the Information Disclosure Statement was submitted by the Fulwider people, it would appear that the file had been transferred sometime between the filing date and the date that the IDS was filed by the Fulwider people.

**89. PAGE 139:04 TO 139:09 (RUNNING 00:00:21.400)**

Q. Sir, in drafting the Lau application, do you remember whether you used any part of the

E.S.S. application that Mr. Eakin had sent you?
A. I have no recollection of preparing that application, but -- it's not likely, but I have no specific recollection of that.

**90. PAGE 139:22 TO 140:06 (RUNNING 00:00:15.200)**

Q. Do you remember having a meeting with Mr. Lau and the other named inventors or anyone else at ACS in terms of helping you to at least give Mr. Thompson some guidance in putting this application together?
A. I don't recall meeting Mr. Lau with respect to his application.

**91. PAGE 140:07 TO 140:13 (RUNNING 00:00:15.800)**

Q. Do you recall meeting with anyone at ACS -- them giving you information that assisted in putting this application together?
A. No. I don't have any recollection of meeting -- of either receiving the instructions or talking with ACS personnel with respect to this application.

**92. PAGE 140:14 TO 140:19 (RUNNING 00:00:14.000)**

Q. So if I'm understanding you, sir, am I correct in saying that you don't have any recollection of receiving any written or oral instructions from anyone at ACS regarding this Lau application?
A. That's correct.

**93. PAGE 140:20 TO 141:07 (RUNNING 00:00:26.000)**

Q. Sir, do you have any recollection of the people -- withdraw the question.
Do you have any recollection of speaking with Ms. McDermott about anything that pertained to the Lau application?
A. No.
Q. Do you have any recollection of talking with Will Samson about anything that pertained to the Lau application?
A. No.

**94. PAGE 141:16 TO 141:19 (RUNNING 00:00:08.000)**

Q. Do you recall having any contacts with Mr. Simpson regarding anything having to do with the Lau application?
A. Don't recall that.

**95. PAGE 142:10 TO 142:15 (RUNNING 00:00:13.200)**

Q. And do you recall speaking -- well, I know what your answer's going to be, sir, but just so the record is clear, do you have any recollection of speaking with Mr. Orth regarding anything having to do with the Lau application?
A. No.

**96. PAGE 143:03 TO 143:18 (RUNNING 00:00:23.200)**

You have no recollection of meeting with Mr. Lau to discuss his inventions?
A. I don't have a recollection of that, no.
Q. Do you have any recollection of

meeting with Mr. Hartigan to discuss the inventions?
A. No, I don't.
Q. Do you recall ever meeting Mr. Hartigan?
A. I may have, but I don't have any recollection of it.
Q. Do you have any recollection of ever speaking with Mr. Hartigan?
A. I have no specific recollection of that, no.

**97. PAGE 144:12 TO 144:16 (RUNNING 00:00:10.000)**

Q. But do you have any recollection of speaking with Mr. Lau at any time in the 1989 to 1990 time period?
A. I don't have a recollection of that, no.

**98. PAGE 144:21 TO 145:03 (RUNNING 00:00:09.200)**

Q. Do you have any recollection of ever speaking with Mr. Frantzen regarding the inventions that are disclosed in the Lau application?
A. No, I don't.

**99. PAGE 145:06 TO 145:20 (RUNNING 00:00:35.500)**

Do you have any recollection of ever discussing -- having any discussions with Mr. Lau regarding the prior art or what he believed was the prior art with respect to the Lau application?
A. As I mentioned before, you know, I have no recollection of meeting with or having discussions with Mr. Lau about anything.
Q. Do you have any recollections of speaking with or meeting with anyone at ACS regarding the prior art to the Lau application?
A. I may have, but I have no recollection of that.
Q. You have no general recollection at all?
A. No.

**100. PAGE 146:03 TO 146:12 (RUNNING 00:00:26.900)**

Q. Do you remember having any discussions with the named inventors or anyone at ACS with respect to the duty of disclosure?
A. With respect to the Lau application?
Q. Yes, sir.
A. I don't have any recollection of speaking with anyone at ACS with respect to the Lau application. And I'm sure that would include prior art about the Lau application. Now that's, you know -- well, that's correct.

**101. PAGE 146:13 TO 146:21 (RUNNING 00:00:22.900)**

Q. Sir, do you recall any steps that you took to ensure that the inventors complied with the duty to disclose?
A. With respect to what now?
Q. The Lau application.
A. The Lau application? I don't recall taking any specific steps. However, it would be my practice to make sure the inventors knew that

they had an obligation to disclose.

**102. PAGE 147:17 TO 147:21 (RUNNING 00:00:11.200)**

Q. So if I understand you, sir, it was your position that when the file got transferred back to the Fulwider firm you really had no more involvement in it?
A. That's correct. Yeah.

**103. PAGE 149:17 TO 149:19 (RUNNING 00:00:08.100)**

Sir, did you submit prior art to the Patent Office with respect to the Lau application?
A. I don't believe so, no.

**104. PAGE 149:20 TO 150:08 (RUNNING 00:00:42.300)**

Q. Do you recall whether there was a reason for that?
A. The application was filed in -- I think in October, if that's correct, and it's my understanding that at the time my normal practice would be to file the IDS after the application was filed. And usually I think you had until the first office action to file the prior art before it was considered by the office. And I transferred the file to Fulwider before that date occurred.

**105. PAGE 154:21 TO 155:03 (RUNNING 00:00:14.100)**

Q. Did anybody tell you while you were working on the Lau application that Mr. Lau had actually conducted a study of some of the prior-art stents?
A. I don't have a recollection of that.

**106. PAGE 155:08 TO 155:13 (RUNNING 00:00:16.400)**

Q. Sir, at any time did you or anyone working under you prepare a -- perform a prior-art search in connection with the Lau application?
A. I don't recall doing a prior-art search nor someone under me doing a prior-art search.

**107. PAGE 160:20 TO 161:04 (RUNNING 00:00:24.200)**

Q. Sir, I want to ask you a couple more questions about the E.S.S. application. Do you recall putting a copy of Mr. Eakin's March 9, 1990, letter attaching the E.S.S. application into the file that related to the Lau prosecution?
A. I don't have a recollection of doing that.

**108. PAGE 161:15 TO 161:22 (RUNNING 00:00:22.500)**

Q. Sir, after you went to the Crosby firm, and the Lau application, the prosecution work, got sent back to the Fulwider firm, did you think -- did you make copies of all your files and send them back to the Fulwider firm?
A. No, I sent the actual files.
Q. Did you maintain copies for yourself?
A. No, I did not.

# EXHIBIT B

**Case Clip(s) Detailed Report**
**Monday, June 06, 2005, 8:20:35 PM**

## Medtronics - Hearing - June 2005

**Lynch, Edward (Vol. 01) - 05/20/2005** **1 CLIP (RUNNING 00:39:43.718)**

### Lynch Clips

**LYN02** **129 SEGMENTS (RUNNING 00:39:43.718)**

**1. PAGE 7:18 TO 8:08 (RUNNING 00:00:18.700)**

Q. Sir, could you state your full name for the record.
A. Edward Joseph Lynch.
Q. Mr. Lynch, good morning. You're an attorney, correct?
A. Yes. Correct.
Q. Sir, when did you become licensed to practice law?
A. 1968.
Q. And, sir, you've been registered to practice before the Patent Office since 1967, correct?
A. That's correct.

**2. PAGE 24:12 TO 25:02 (RUNNING 00:00:24.000)**

Q. Mr. Lynch, I want to get back to some of the documents that we were talking about that you reviewed in preparation for today's deposition.
I want to talk to you about the report. I think you said that there was a 1990 report that you had prepared. Do you remember who you had sent that report to?
A. I believe it was Bruce Barclay.
Q. And do you remember the subject matter of that report?
A. I believe it was the E.S.S. application.

**3. PAGE 25:20 TO 26:03 (RUNNING 00:00:12.200)**

Q. Sir, could you tell us what was in that report?
MR. JAKES: I'm going to object on the grounds of attorney-client privilege. The contents of the communication are privileged. Instruct you not to answer.

**4. PAGE 28:03 TO 28:14 (RUNNING 00:00:25.500)**

Q. And you worked for the law firm of Fulwider, Patton, Lee & Utecht from 1984 to 1991, correct?
A. That's correct.
Q. Sir, do you recall what month in 1991 you left the Fulwider firm?
A. I think it was June or July. I'm not sure which.
Q. And, sir, part of the work that you did at the Fulwider firm was preparing and prosecuting patent applications, correct?
A. That's correct.

**5. PAGE 28:15 TO 28:19 (RUNNING 00:00:09.500)**

Q. And, sir, part of the work that you

that report?
A. I don't recall getting the instructions for it, but I assume that it would be from Mr. Barclay.

**20. PAGE 54:08 TO 54:12 (RUNNING 00:00:20.600)**

Q. And, sir, did you -- do you know why you prepared the report?
A. It seemed to me that -- that Advanced Cardiovascular System was talking to people that were involved with the E.S.S. application.

**21. PAGE 54:13 TO 54:20 (RUNNING 00:00:15.100)**

Q. And do you have any recollection of what those discussions were about as far as you were concerned?
A. As far as I was concerned, I was not involved in those discussions.
Q. Do you remember any details about the purpose and scope of those discussions?
A. No, I don't.

**22. PAGE 54:21 TO 55:11 (RUNNING 00:00:24.500)**

Q. Sir, did your report cover the scope of the claims of the E.S.S. application?
00055:01 MR. JAKES: I'm going to object on the grounds of attorney-client privilege. The contents of the report are privileged, and Mr. Lynch -- I don't think he can answer that question.
BY MR. O'NEILL:
Q. Sir, did your report cover the scope of the disclosure of the E.S.S. application?
MR. JAKES: I'm going to make the same objection. Instruct the witness not to answer.

**23. PAGE 57:10 TO 57:13 (RUNNING 00:00:09.300)**

When -- did you review the E.S.S. application before you were involved in preparing and reviewing the Lau application?
A. I believe so, yes.

**24. PAGE 63:19 TO 64:04 (RUNNING 00:00:15.600)**

Q. The Lau application, was that the first patent application that you prepared for ACS?
A. Oh, no.
00064:01 Q. How many had you prepared before that?
A. Oh, I don't know. 15 maybe. 30. I don't know the number.

**25. PAGE 83:03 TO 83:05 (RUNNING 00:00:12.800)**

Q. This is a document that starts with a cover letter dated March 9, 1990, and it bears Bates labels ACS 426579 through to -597.

**26. PAGE 84:22 TO 85:03 (RUNNING 00:00:12.700)**

Q. Sir, do you recall receiving these
00085:01 documents that we've marked as Exhibit 7, around the March 9, 1990, time period?
A. I have no recollection of that.

have other reference materials which discuss the Gianturco stent and its eventual abandonment. I can provide these to you if you wish."

**35. PAGE 90:13 TO 90:15 (RUNNING 00:00:06.200)**

Do you recall ever following up with Mr. Eakin to discuss the Gianturco patent?
A. No, I don't.

**36. PAGE 90:16 TO 90:22 (RUNNING 00:00:18.600)**

Q. Do you have any recollection, as you sit here today, of the Gianturco patent or the Gianturco stent?
A. I have some recollection of the Gianturco stent, but I'm not sure what time frame that relates to or whether it involves this particular activity.

**37. PAGE 91:01 TO 91:13 (RUNNING 00:00:31.624)**

Q. And what is your recollection of the Gianturco stent?
A. I know that it exists.
Q. Do you recall anything about it?
A. Well, I know, based upon reading the report, I apparently --
MR. JAKES: Mr. Lynch, I'm going to -- before you go down that road, I don't want you to reveal the communications in your report. So if you have a recollection of what was in Gianturco, I think that's perfectly fair game; but otherwise, let's stay away from what was in your report.

**38. PAGE 100:22 TO 101:03 (RUNNING 00:00:08.700)**

Q. Sure. Have you ever had an understanding that a stent that is less than four millimeters long wouldn't be considered in the industry as a stent?

**39. PAGE 101:06 TO 101:07 (RUNNING 00:00:04.500)**

THE WITNESS: I have no knowledge one way or the other on that.

**40. PAGE 102:12 TO 102:15 (RUNNING 00:00:18.127)**

MR. O'NEILL: Mark as Exhibit 9 a one-page document titled "Billing Preview for Edward J. Lynch, Richard A. Bardin." It bears Bates label ACS 53-3022.

**41. PAGE 103:03 TO 103:06 (RUNNING 00:00:06.900)**

Q. Do you recall review- -- do you recall seeing this document outside of your review with counsel?
A. I don't have a recollection of it.

**42. PAGE 103:11 TO 103:13 (RUNNING 00:00:03.200)**

Q. Can you tell us what this document is?
A. It's a prebill.

**43. PAGE 103:20 TO 104:07 (RUNNING 00:00:25.800)**

Q. And, sir, am I correct in saying that

**109. PAGE 163:07 TO 163:10 (RUNNING 00:00:11.300)**

Q. Sir, do you agree that your involvement in the Lau application triggered a duty of disclosure on your part?
A. Sure.

**110. PAGE 168:11 TO 168:21 (RUNNING 00:00:23.900)**

Q. Do you recall having any discussions with anyone at ACS, not ACS' attorneys, regarding the differences between the stent that was disclosed in the E.S.S. application and the stent that was disclosed in the Gianturco stent -- Gianturco patent?
A. Prior to my discussions with counsel, no.
Q. No, you didn't, or no, you don't remember?
A. I don't remember.

**111. PAGE 168:22 TO 169:05 (RUNNING 00:00:11.000)**

Q. Was the Gianturco stent something that you had discussed in your report to Mr. Barclay?
MR. JAKES: Objection. That's attorney-client privilege, and I'll instruct you not to answer that one.

**112. PAGE 169:18 TO 170:15 (RUNNING 00:00:45.800)**

Q. Sir, at the time that you were working on the Lau application, did you believe that the stent that was disclosed in the E.S.S. application was material?
A. I don't recall ever making that conclusion.
Q. Do you recall ever thinking about that?
A. No.
Q. At the time that you were working on the Lau application, did you remember the work that you were doing that you had done on the E.S.S. application?
A. No.
Q. You don't remember, or are you saying you definitively didn't remember?
A. I don't recall the E.S.S. application at all. And I don't recall whether I did not recall it at the time I was preparing the -- or reviewing the drafts of the Lau application.

**113. PAGE 170:21 TO 171:07 (RUNNING 00:00:18.100)**

Q. Is there a reason why you didn't disclose the E.S.S. application to the Patent Office in connection with your work on the Lau application?
A. Yes.
Q. Why is that?
A. I had -- the file had been transferred to another firm. I no longer had any responsibility for it.

**114. PAGE 171:16 TO 172:14 (RUNNING 00:00:26.000)**

Q. Sir, would you agree with me that the E.S.S. application was material to the Lau

application?
THE WITNESS: I don't --
MR. JAKES: Before you answer, I just want to make sure. Are you asking about what he remembers, if he remembers thinking about that? I think you've already answered that question.
MR. O'NEILL: I have already asked that question.
MR. JAKES: If you're asking him for his opinion today, he's not going to give those opinions.
MR. O'NEILL: I'm not asking for his opinion. I'm just asking for what he thinks.
MR. JAKES: That's the same thing.
THE WITNESS: What time frame?
BY MR. O'NEILL:
Q. Right now.
MR. JAKES: I object to that. You don't have to answer that, Mr. Lynch.

**115. PAGE 183:04 TO 183:14 (RUNNING 00:00:26.500)**

Q. Sir, are you aware that ACS filed a number of continuations, continuations in part, and divisional applications that came off of the Lau application that you worked on? Were you aware of that, sir?
A. Yes, I am aware of that.
Q. Sir, did you participate in any way at all with respect to the preparation or prosecution of any of those applications?
A. I don't believe I did, but I can't guarantee that.

**116. PAGE 187:17 TO 188:03 (RUNNING 00:00:19.701)**

Q. Sir, after you left the Crosby firm and you went to Heller Ehrman, did you continue to do work for ACS?
A. Yes, I did.
Q. And what percentage of your practice was devoted to doing work for ACS while you were at Heller Ehrman?
A. It remained substantial, but a less percentage than what it was at Crosby.

**117. PAGE 196:14 TO 196:16 (RUNNING 00:00:11.077)**

MR. O'NEILL: Two more. Mark as Exhibit 23 the file history for United States Patent 5,728,158.

**118. PAGE 196:20 TO 196:22 (RUNNING 00:00:07.307)**

Q. And, again, sir, if you can please take a look at this document. Take your time. Let us know whether you've ever seen this before.

**119. PAGE 197:01 TO 197:11 (RUNNING 00:00:22.100)**

A. I don't recall having any contact with the application.
Q. Sir, do you recall playing any role in the preparation or prosecution of the application that's at issue in this file history?
A. No, I don't.
Q. Do you recall having any discussions with anyone regarding what prior art should be disclosed to the Patent Office in connection with

CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2005, I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing to Frederick L. Cottrell, III.

I further certify that on June 7, 2005, I caused to be served copies of the foregoing document on the following in the manner indicated:

**BY HAND**
Frederick L. Cottrell, III
Anne Shea Gaza
**Richards Layton & Finger**
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

/s/ Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
lpolizoti@mnat.com