**EXHIBIT A**

| ACS's Designations | Medtronic's Counter-Designations | Medtronic's Objections[1] |
|---|---|---|
| **B. Jendersee (Anwar v. AVE, 96-05323-M) July 7, 1997** | | |
| 90:16-91:2 | None | B, F, H, O, R |
| 150:14-152:4 | 149:12-150:1 | F, H, O, R |
| 199:15-200:3 | None | F, H, R |
| **B. Jendersee (Anwar v. AVE, 96-05323-M) July 29, 1997** | | |
| 541:18-542:2 | None | F, H, O, R |
| 559:5-560:3 | 560:4-11 | F, H, O, R |
| **B. Jendersee (Anwar v. AVE, 96-05323-M) July 30, 1997** | | |
| 737:5-738:9 | None | F, H, O, S, R |
| **B. Jendersee (Cordis v. ACS, 97-550-SLR) November 3, 1999** | | |
| 43:25-44:5 | 44:7-10 | B, F, H, O, R, S |
| 61:8-22 | None | F, H, O, R |
| **B. Jendersee (Medtronic v. ACS, 98-80-SLR) May 6, 2004** | | |
| 19:16-21 | None | F, O, R |
| 25:4-20 | None | F, O, R, S |
| 62:20-63:6 | 68:10-69:10; 78:17-79:10; 79:21-80:6; 86:3-11; 88:4-14 | F, R, S, O |
| 101:1-18 | 101:19-102:12 | F, H, R, O |
| 131:19-132:8 | None | F, H, R, O, S |
| | 78:17-79:10; 79:21-80:6; 86:3-11; 88:4-14 | |
| **B. Jendersee (Medtronic v. ACS, 98-80-SLR) May 7, 2004** | | |
| 349:12-350:6 | 350:7-9; 351:13-352:2 | F, R, O |
| 375:4-9 | None | F, R, O |
| | 341:20-342:18; 344:15-345:2 | |
| **R. Lashinski (Cordis v. ACS, 97-550-SLR) August 11, 1999** | | |
| 95:4-18 | None | F, H, R, O, S, V |
| **R. Lashinski (Cordis v. ACS, 97-550-SLR) August 12, 1999** | | |
| 58:6-21 | None | F, H, R |
| **R. Lashinski (DiMassa v. Stertzer, 222363) March 21, 2002** | | |
| 53:3-54:5 | 54:6-11; 55:7-14 | F, H, R, O, S |
| **R. Lashinski (Medtronic v. ACS, 98-80-SLR) May 3, 2004** | | |
| 91:15-95:15 | None | F, R, O |
| 125:3-127:19 | None | F, R, O |
| 150:3-160:18 | None | F, R, O |
| 203:16-20 | None | F, R, O |
| | 130:13-131:22 | |
| **R. Lashinski (Medtronic v. ACS, 98-80-SLR) May 4, 2004** | | |
| 403:21-409:15 | None | A, F, H, R, O |

---

[1] Medtronic objects broadly to ACS's use of testimony from prior, unrelated cases. Moreover, Medtronic will use the following codes for its objections:  A = Requires authentication; B = Best evidence rule; F = Lack of foundation; H = Hearsay; O = Improper opinion testimony; R = Not relevant; S = Improper speculation; V = Vague/incomplete/unintelligible.

| 47 :22-472:4 | 472:5-5 | F, H, R, O |
|---|---|---|
|  | 268:7-15; 301:19-302:8 |  |

ORC: 365579-1.052734.0040

**EXHIBIT B**

**8/11/1999  Robert Lashinski**

| 1 | 94 | 21 | |
|---|----|----|--|
| 2 | 94 | 22 | |
| 3 | 94 | 23 | |
| 4 | 94 | 24 | |
| 5 | 94 | 25 | |
| 6 | | | 95 |
| 7 | | | HIGHLY CONFIDENTIAL |
| 8 | 95 | 1 | (The following part of the transcript is |
| 9 | 95 | 2 | non-Attorneys' Eyes Only.) |
| 10 | 95 | 3 | BY MR. TIMMONS: |
| 11 | 95 | 4 | Q    Were there shortcomings in the Micro |
| 12 | Stent | | |
| 13 | 95 | 5 | PL that led to the changes to the Micro Stent stent |
| 14 | 95 | 6 | itself? |
| 15 | 95 | 7 | A    Yes. |
| 16 | 95 | 8 | Q    What were those shortcomings in the PL? |
| 17 | 95 | 9 | A    Based on limited clinical experience, |
| 18 | mind | | |
| 19 | 95 | 10 | you, it was all mostly done through St. Paul's |
| 20 | Hospital | | |
| 21 | 95 | 11 | in Vancouver.  It appeared that the PL stent |
| 22 | sometimes | | |
| 23 | 95 | 12 | was unstable in a vessel that was not adequately |
| 24 | 95 | 13 | predilatated or had nonsymmetrical plaque |
| 25 | distribution. | | |

**8/11/1999  Robert Lashinski**

| | | | |
|---|---|---|---|
| 1 | 95 | 14 | Q    Was it not stable due to the length of |
| 2 | the | | |
| 3 | 95 | 15 | PL? |
| 4 | 95 | 16 | A    Length, diameter, and surface |
| 5 | interaction | | |
| 6 | 95 | 17 | are phenomenons that made it nonstable in those |
| 7 | 95 | 18 | environments that I spoke of earlier. |
| 8 | 95 | 19 | Q    We have already discussed how you |
| 9 | changed | | |
| 10 | 95 | 20 | the length from the PL to the Micro Stent.  Was the |
| 11 | 95 | 21 | diameter of the PL changed, going to the Micro Stent? |
| 12 | 95 | 22 | A    Diameter?  Can you -- what diameter? |
| 13 | 95 | 23 | Specify. |
| 14 | 95 | 24 | Q    All I'm trying to do is come back and |
| 15 | 95 | 25 | follow up on what you said. |
| 16 | | | 96 |
| 17 | | | HIGHLY CONFIDENTIAL |
| 18 | 96 | 1 | You said diameter was one of the factors |
| 19 | 96 | 2 | that relates to the stability of the PL.  Now my |
| 20 | 96 | 3 | question is, did you change anything in that diameter |
| 21 | 96 | 4 | from the PL to the Micro Stent? |
| 22 | 96 | 5 | A    The diameter I was referring to is the |
| 23 | 96 | 6 | vessel diameter.  And for the Micro Stent the -- |
| 24 | no.  I | | |
| 25 | 96 | 7 | would say they were applicable to approximately the |

**8/11/1999  Robert Lashinski**

| | | | |
|---|---|---|---|
| 1 | 96 | 8 | same diameter vessels. |
| 2 | 96 | 9 | Q    Okay.  And you also mentioned surface |
| 3 | 96 | 10 | interaction as one of the factors that goes into the |
| 4 | 96 | 11 | stability of the stent.  Did you change the surface |
| 5 | 96 | 12 | interaction or try to somehow affect the surface |
| 6 | 96 | 13 | interaction from the PL to the Micro Stent? |
| 7 | 96 | 14 | A    No. |
| 8 | 96 | 15 | Q    So the only change from the Micro Stent |
| 9 | -- | | |
| 10 | 96 | 16 | from the PL to the Micro Stent was the length of the |
| 11 | 96 | 17 | stent itself? |
| 12 | 96 | 18 | MR. MEYER:  Objection; mischaracterization. |
| 13 | 96 | 19 | THE WITNESS:  Could you restate that. |
| 14 | 96 | 20 | BY MR. TIMMONS: |
| 15 | 96 | 21 | Q    Was the only change from the PL to the |
| 16 | 96 | 22 | Micro Stent this change we have already discussed |
| 17 | about | | |
| 18 | 96 | 23 | the functional length of the Micro Stent versus the |
| 19 | PL? | | |
| 20 | 96 | 24 | A    Yes.  To the best of my recollection, |
| 21 | that | | |
| 22 | 96 | 25 | was the fundamental change. |
| 23 | | | 97 |
| 24 | | | HIGHLY CONFIDENTIAL |
| 25 | 97 | 1 | Q    Okay.  You mentioned before the lunch |

**8/11/1999 Robert Lashinski**

| | | | |
|---|---|---|---|
| 1 | 97 | 2 | break that there was a considerable effort to use |
| 2 | 97 | 3 | flexible connectors to connect the elements of the |
| 3 | 97 | 4 | Micro Stent.  Why were flexible connectors considered |
| 4 | 97 | 5 | to connect the Micro Stent? |
| 5 | 97 | 6 | A     When we went from the Micro Stent PL to |
| 6 | 97 | 7 | the Micro Stent, we had suffered a loss in the system |
| 7 | 97 | 8 | flexibility in doing so, from going -- from |
| 8 | completely | | |
| 9 | 97 | 9 | unwelded to welded elements.  And there was also the |
| 10 | 97 | 10 | necessity to have stents offered for full market sale |
| 11 | 97 | 11 | or full market release of even longer variations. |
| 12 | 97 | 12 | So to be able to accommodate those needs |
| 13 | 97 | 13 | and hopefully regain some of the flexibility that we |
| 14 | 97 | 14 | lost due to rigidly connecting these elements, there |
| 15 | 97 | 15 | was a project that was underway to investigate |
| 16 | flexible | | |
| 17 | 97 | 16 | connectors to join the 4-millimeter elements. |
| 18 | 97 | 17 | Q     So two 4-millimeter PL elements placed |
| 19 | 97 | 18 | together would have been more flexible than two |
| 20 | welded | | |
| 21 | 97 | 19 | Micro Stent elements placed together? |
| 22 | 97 | 20 | MR. MEYER:  Objection; hypothetical. |
| 23 | 97 | 21 | THE WITNESS:  A stent system with two unwelded |
| 24 | 97 | 22 | form 4-millimeter elements is inherently more |
| 25 | flexible | | |

# EXHIBIT C

Page 1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SONOMA

---oOo---

RODOLFO DI MASSA, M.D.,
and KARL NIGG, INDIVIDUALLY
and on behalf of Stenticor
International, Inc.,

            Plaintiff,

        vs.                           No. 222363

SIMON STERTZER, M.D.; MICHAEL
BONEAU, AND MEDTRONIC ARTERIAL
VASCULAR ENGINEERING, INC., a
Delaware corporation, and DOES
- 25 and ROES 26-50,

            Defendants.

and

STENTICOR INTERNATIONAL, INC.,
a California Corporation.

            Nominal Defendant.

_____/

DEPOSITION OF ROBERT LASHINSKI
Thursday, March 21, 2001
(Pages 1 through 116)

Reported by:
DEBORAH E. JILKA
CSR. No. 5942

HIGHLY CONFIDENTIAL                                    AVEA696698

ROBERT LASHINSKI                                                                    3/21/2002

Page 50

1      Q.  Was it your understanding that when you met
2  with Michael Boneau in 1992, he was associated with ESS?
3      A.  I don't specifically recall that at that time.
4      Q.  At some point in time, you learned that
5  Michael Boneau was associated with ESS in the 1992 time
6  frame, correct?
7      A.  That's probably correct.
8      Q.  And the purpose of the meeting with Michael
9  Boneau in 1992 was for you and the other members of AVE
10  to evaluate the stent known as the Boneau stent; is that
11  correct?
12      A.  Those were the early discussions of the
13  evaluation of the Boneau stent.
14      Q.  Why don't you tell me what the purpose of the
15  first meeting was with Michael Boneau in 1992.
16      A.  Well, we discussed some of the manufacturing
17  issues and challenges and materials, and probably
18  properties, to the best of my recollection.
19      Q.  And the purpose of these discussions was to
20  determine whether or not AVE wanted to somehow invest or
21  take an ownership interest in the stent known as the
22  Boneau stent; is that correct?
23      A.  From my perspective, I was not in that
24  decision-making capacity.  I was -- I was there just to
25  learn more about the stent.

Page 51

1      Q.  But was it your understanding that that's why
2  the meeting was set up with Michael Boneau?
3      MR. SILBERFELD:  At that time?
4      MS. ROSS:  Right.
5      MR. SILBERFELD:  Okay.  If you had an
6  understanding.
7      A.  I would say it was to see if there was a
8  relationship.  You know, I don't remember exactly what
9  the terms of your last question were, but I would say to
10  see if there was a relationship between Michael Boneau
11  and PET.
12      Q.  And that relationship would center around the
13  stent known as the Boneau stent; is that correct?
14      A.  That is correct.
15      Q.  Mr. Kulas has described in his deposition that
16  Michael Boneau walked into that meeting with a shoe box
17  containing all of the items related to the Boneau stent.
18  Do you remember that?
19      A.  I remember he came with a shoe box.  I don't
20  know if they were all of the items related to the Boneau
21  stent.
22      Q.  After walking in with this shoe box, can you
23  tell me what went on from that point in time?
24      MR. SILBERFELD:  You mean that day?
25      MS. ROSS:  That day.

Page 52

1      MR. SILBERFELD:  Okay.
2      A.  Yes.
3      MS. ROSS:  Q.  Go ahead.
4      A.  Well, first we had discussions related to
5  things that I mentioned before, like material properties
6  or compositions of the stainless steel that he thought
7  were important for the stent; forming, some of the
8  issues related to the forming that he had come across,
9  and polishing; mechanical and electric polishing; some
10  of the short falls of the stent.  Talked a little bit
11  probably about the relationship of the unsymmetrical
12  crowns and segment lengths, just a general discussion.
13  It was pretty limited.  My estimation as to what he knew
14  or what he was able to contribute about the stent at
15  that point.
16      And from there, he said that he could make a
17  stent.  So based on our conversation, I didn't have a
18  lot of faith in it.  And so I turned him loose in our
19  laboratory to take his shoe box and try to make a stent.
20  And for the better part of an afternoon.  Sort of looked
21  in on him now and then to see if he was still at the
22  bench doing his manufacture of his element.
23      And at the end of the day, what -- when I came
24  back, I met with him, he was able to produce a very
25  crude stent element and had a bunch of different reasons

Page 53

1  as to why he wasn't able to perfect it.  That's to the
2  best of my recollection how that day went.
3      Q.  Okay.
4      So is it your testimony that the Boneau stent
5  was in a very crude state at that point in time in 1992,
6  when you were first evaluating it as part of AVE?
7      MR. SILBERFELD:  You're talking about the one that
8  he was shown at the end of that day?
9      MS. ROSS:  Q.  I'm talking about the Boneau stent
10  in general, not just the one that was produced that day.
11      A.  Yes.
12      Q.  And the one that was produced that day, was
13  that a stent that took several hours for Mr. Boneau to
14  produce?
15      A.  Yes.
16      Q.  And after several hours, he was only able to
17  produce one Boneau stent that day; is that correct?
18      A.  I believe that's the case.  He may have tried
19  to form some others that broke or completely didn't
20  work, but I think he had an element.  I believe that's
21  right.
22      Q.  And was that element one that you thought
23  could be used in a human artery?
24      A.  I wouldn't put that in my dog.
25      Q.  Why is that?

14 (Pages 50 to 53)

DEBORAH E. JILKA, CSR 5942          (800) 547-4441          Calnorth Reporting Service
                                                            6a9fe7a3-4546-11d6-9f03-444553540000

HIGHLY CONFIDENTIAL                                                      AVEA696711

ROBERT LASHINSKI                                      3/21/2002

Page 54

1   A. Because it was far from actually being safe or
2   effective, quite frankly. It had terrible recoil
3   properties, no radial strength, no means of putting in a
4   balloon catheter. Poor surface. Was assured of
5   thrombose.
6   Q. Did you believe that the stent that was
7   produced by Michael Boneau that day was representative
8   of the other Boneau stents that he had previously
9   produced?
10   MR. SILBERFELD: If you know.
11   A. I hadn't seen his other stents.
12   MS. ROSS: Q. At any point in time, did you see
13   any other Boneau stents produced by Michael Boneau?
14   A. After that time I'd seen some other stents
15   that he produced earlier.
16   Q. Were they in a better condition than the one
17   that he produced on the day that he visited in 1992?
18   A. Maybe slight.
19   Q. Were any of them of a quality that you
20   would -- that would be appropriate to insert into a
21   human artery?
22   A. Not in my opinion.
23   Q. What was Michael Boneau's excuses on that day
24   in 1992 for only being able to come up with a very crude
25   stent element?

Page 55

1   MR. SILBERFELD: Objection. Assumes facts not in
2   evidence, that there were excuses or excuses given.
3   A. He himself admitted that it was in very early
4   development and needed to be finished engineered and
5   have more sophisticated equipment to -- more accurately
6   produce them.
7   Q. Did Mr. Boneau explain to you that for some
8   reason on that day he was having particular problems, or
9   did he seem to indicate that this was as good of a stent
10   as he could produce at that point in time?
11   A. I don't remember specifically, but I know he
12   was outside of his own laboratory. He was in our
13   laboratory, so he may not have had all his tools
14   available to him.
15   Q. Did he tell you that? Gee, this one's not
16   quite as good as normal because I don't have all my
17   tools?
18   A. No.
19   Q. Do you think that was, in fact, a problem that
20   that stent he produced that day wasn't as good as the
21   others because he didn't have all his tools?
22   MR. SILBERFELD: Objection. Calls for speculation.
23   MS. ROSS: Q. You can answer.
24   A. I don't know that.
25   Q. He did have his own forming device that day;

Page 56

1   is that correct?
2   A. I'm not sure, but I believe that's the case,
3   yes.
4   Q. You testified a few minutes ago that you did
5   not have a lot of faith in the Boneau stent based on
6   your conversations with Mr. Boneau. Why was that?
7   A. That's not what I testified to. If I did, it
8   was wrong. I didn't have a lot of faith in him in his
9   tech transfer, his discussion of the stent and its
10   ability to be produced.
11   Q. Why not?
12   A. He just didn't have the mechanical engineering
13   background to understand material properties or the
14   potential physical limitations of stainless steel or
15   machining. The concept was there, but the execution was
16   lacking.
17   Q. What was your impression of Michael Boneau
18   based on this meeting in 1992?
19   MR. SILBERFELD: Impression of what?
20   MS. ROSS: Q. Your impression of Michael Boneau in
21   general.
22   MR. SILBERFELD: As a human being?
23   MS. ROSS: Q. No, not was he a nice guy, but was
24   this guy capable of working on these type of stent
25   devices that he was presenting to you?

Page 57

1   MR. SILBERFELD: Objection. Vague. If you
2   understand the question, go ahead and answer.
3   MS. ROSS: Q. You can answer.
4   A. Sure, he was capable, but he didn't have the
5   technical expertise to perfect it.
6   Q. Lee Kulas testified that Michael Boneau did
7   not seem to have a lot of knowledge about the stent
8   referred to as the Boneau stent during that visit.
9   Would you agree with that?
10   MR. SILBERFELD: Assumes that that's what his
11   testimony was. Is that what you want him to do?
12   MS. ROSS: Yes.
13   A. You have to be more specific. I can't answer
14   that.
15   MS. ROSS: Q. Did Michael Boneau seem very
16   knowledgeable about the stent product that he was
17   showing to you on that day during this visit in 1992 at
18   AVE?
19   A. He knew what he had visioned, but I don't
20   believe that he knew how to manufacture one.
21   Q. Did he tell you who had been manufacturing
22   them up to that point in time?
23   A. I believe it was himself, which is why they
24   were such a disaster.
25   Q. After Michael Boneau left, is it true that

15 (Pages 54 to 57)

HIGHLY CONFIDENTIAL                                      AVEA696712

**EXHIBIT D**

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

298TH JUDICIAL DISTRICT

**CERTIFIED**

**COPY**

AZAM ANWAR, M.D., Individually          )
and on behalf of ENDOVASCULAR          )
SUPPORT SYSTEMS, INC., and             )
BENITO HIDALGO, Individually           )
and on behalf of ENDOVASCULAR          )
SUPPORT SYSTEMS, INC., a               )
California Corporation,                )
                                       )
              Plaintiffs,              )
                                       )
vs.                                    )
                                       )
                                       )
ARTERIAL VASCULAR ENGINEERING,         )
INC., a Delaware Corporation,          )
SIMON H. STERTZER, M.D., GERALD        )
DORROS, M.D., JOHN MILLER and          )
BRADLY JENDERSEE,                      )
                                       )
              Defendants.              )
                                       )
                                       )

NO. 96-05323-M

C O N F I D E N T I A L

DEPOSITION OF

BRADLY A. JENDERSEE

Monday, July 7, 1997

VOLUME I
Pages  1-231

Attorneys' Eyes Only
Pages 153-158,175-176
Under Separate Cover

Reported by:
Joyce D. Long, CSR
Certification No. 8620

HARRY A. CANNON, INC

*Certified Reporters and Notaries*

SACRAMENTO STREET TOWER
550 CALIFORNIA STREET, SUITE 640
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 391-7421
FAX (415) 391-4978

CONFIDENTIAL
AVEA 441290

1   vice-president of regulatory clinical affairs.

2       Q.   The first page of Exhibit 285 at the very

3   top, it's titled "Design Checklist - Original Phase

4   Summary." Underneath that it says, "Date:

5   Development occurred between Q1-Q3 of 1993."

6       Do you see that?

7       A.   Yes, I do.

8       Q.   Are you aware of any development of the

9   Boneau Stent that AVE undertook in the first

10   quarter of 1993?

11       A.   Of the Boneau Stent?

12       Q.   Yes, sir. Or the Boneau II Stent.

13       A.   I'm not familiar with exactly what those

14   descriptions entail, but we were working on a

15   version of the Boneau concept at that time.

16       Q.   How would you refer to the type of stent

17   that was in existence at the time that AVE acquired

18   the assets of ESS?

19       A.   I think in general, it was --

20       MR. MONACH: Objection. Objection. Vague as

21   to time.

22       A.   At the time that Mike Boneau came up to

23   the company, I believe that his concept consisted

24   of a stent that was approximately seven to eight

25   millimeters in length that was a single device

CONFIDENTIAL
AVEA 441379

1 mounted on a delivery system for the treatment of

2 abrupt or threatened closure.

3     MR. RASCH:  Q.  Are you familiar with the

4 distinction between the Boneau Stent and the Boneau

5 II Stent?

6     A.   No, I am not.

7     Q.   Have you ever heard of the Boneau II

8 Stent?

9     A.   I've seen the name.  I'm not familiar

10 with exactly what that entails.

11     Q.   Are you aware of any development

12 undertaken by AVE in the first quarter of 1993 with

13 respect to the stent that embodied the Boneau

14 concept?

15     A.   I believe I've testified in my last

16 deposition that Mike Boneau came to the company to

17 give us some idea of how he produced and

18 manufactured the Boneau or the Boneau II -- I'm not

19 certain which one -- device, and we set up a lab to

20 start to evaluate the potential development of that

21 based on -- excuse me -- our understanding that

22 there was a pending agreement between AVE and ESS.

23     MR. TERRELL:  Counsel, we're about to end now.

24     MR. RASCH:  Sure.

25     MR. TERRELL:  This marks the end of tape four

CONFIDENTIAL
AVEA 441380

150

1    us on that learning curve a little bit sooner.

2        Q.    Looking back in hindsight, Mr. Jendersee,

3    do you see any benefit that AVE received as a

4    result of purchasing the ESS stent technology other

5    than starting on the learning curve about the

6    regulatory process a little sooner?

7        MR. MONACH:  I believe that mischaracterizes

8    the witness's prior testimony.  Would you read back

9    the last answer, please?

10       A.    Not starting on the regulatory process --

11       MR. RASCH:  Q.  I'm sorry?

12       A.    -- but becoming familiar with what was

13   involved in the regulatory process.

14       Q.    Let me rephrase the question.  Looking

15   back in hindsight, sitting here today, do you see

16   any benefit at all that AVE received from

17   purchasing the ESS stent technology other than

18   becoming familiar with the regulatory process

19   sooner than AVE might have otherwise become

20   familiar with it?

21       A.    I mentioned regulatory, manufacturing,

22   documentation, the functional and physical

23   characteristics and features, performance

24   characteristics.  All of those were starting to be

25   defined at that early development phase in the

CONFIDENTIAL
AVEA 441439

150

1    company.  And aside from that, at this time, I

2    can't think of any additional benefit, no.

3        Q.   Would another potential benefit be that

4    AVE might not be able to market and manufacture any

5    of its stent products today without -- if some

6    other company had the Boneau Stent patent?

7        A.   I don't believe that's the case, no.

8    There are over 40 stents in Europe right now that

9    are commercially marketed by a variety of different

10   companies.  So clearly, the opportunity to exist --

11   the opportunity existed for a company to develop

12   technology that in no way related to the Boneau

13   concept.

14       Q.   Are you aware of any of those 40 stents

15   that are being manufactured and sold abroad that

16   you believe would violate or infringe the Boneau

17   Stent patent if they were marketed in the United

18   States?

19       A.   That would be speculation on my part.  I

20   have nothing concrete to base my decision on and my

21   answer on.

22       Q.   Would it also be speculation to suggest

23   that AVE could have come up with its own stent

24   design without receiving the Boneau Stent

25   technology?

CONFIDENTIAL
AVEA 441440

152

1    A.   No.

2    Q.   Why is that?

3    A.   Because we essentially developed a

4   product from scratch as it was.

5        (Pages 153 through 158 are designated

6   Confidential - Attorneys' Eyes Only and are sealed

7   under separate cover)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HARRY A. CANNON, CSR, INC.
(415) 391-7421  FAX (415) 391-4978

152

CONFIDENTIAL
AVEA 441441

199

1    Q.   So again, you're unable to give us any

2  rationale as to why 3,600 was selected, as opposed

3  to, say, 4,600?

4    MR. MONACH:  Objection.  I think that's

5  argumentative and mischaracterizes the testimony.

6    MR. RASCH:  Q.  You can answer.

7    A.   I don't recall specifically.  It could

8  have been a number of things.

9    Q.   What other things could it have been?

10   MR. MONACH:  Objection.  Calls for

11 speculation.  If you have a recollection of

12 something, Mr. Jendersee, you should describe it.

13 If you don't, don't guess.

14   A.   All right.

15   MR. RASCH:  Q.  You said it could have been a

16 number of things, and I'm just wondering are there

17 other factors that you believe may have come into

18 play here?

19   A.   It may have been based on balloon

20 revenues at that time and the fact that we had

21 signed a very large contract with our Japanese

22 distributor and the company was selling a lot of

23 balloon product.  And at that time, we had no

24 success with the stent product, and as a matter of

25 fact, we had pulled our first attempt at

CONFIDENTIAL
AVEA 441480

1    commercializing the stent on the market.  So that

2    may have been a factor.  I don't recall

3    specifically.

4         Q.   And the deal with the Japanese

5    distributor that you just mentioned, that was the

6    deal that was entered into in December of 1993; is

7    that correct?

8         A.   That's correct.

9         Q.   And you're saying that the deal with the

10   Japanese distributor on balloon catheters that was

11   entered in December of 1993 may have come into play

12   in selecting the number of 3,600 shares to

13   Dr. Dorros, as opposed to some other number that

14   was less than 20,000?

15        A.   It's possible that at that time, based

16   on -- I believe we had shipped over five million

17   dollars of balloon product to our Japanese

18   distributor sometime in mid to late 1994, and based

19   on the fact that the MicroStent PL was not a viable

20   product and was not a product that we could

21   commercialize and we essentially had to go back to

22   the drawing board with respect to any future

23   designs to effectively create any opportunity in

24   the coronary stent market, that it's possible that

25   that would have been a consideration for the

CONFIDENTIAL
AVEA 441481

**EXHIBIT E**

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

298TH JUDICIAL DISTRICT

**CERTIFIED**

**COPY**

| | |
|---|---|
| AZAM ANWAR, M.D., Individually<br>and on behalf of ENDOVASCULAR<br>SUPPORT SYSTEMS, INC., and<br>BENITO HIDALGO, Individually<br>and on behalf of ENDOVASCULAR<br>SUPPORT SYSTEMS, INC., a<br>California Corporation,<br><br>        Plaintiffs,<br><br>vs.<br><br>ARTERIAL VASCULAR ENGINEERING,<br>INC., a Delaware Corporation,<br>SIMON H. STERTZER, M.D., GERALD<br>DORROS, M.D., JOHN MILLER and<br>BRADLY JENDERSEE,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NO. 96-05323-M

DEPOSITION OF

BRADLY A. JENDERSEE

Tuesday, July 29, 1997

VOLUME III
Pages 479-699

CONFIDENTIAL
AVEA 441760

Reported by:
Joyce D. Long, CSR
Certification No. 8620

HARRY A. CANNON, INC.
*Certified Reporters and Notaries*

SACRAMENTO STREET TOWER
550 CALIFORNIA STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 391-7421
FAX (415) 391-4978

541

1   for stent sales as early as June 30, 1994?

2        A.   Not specifically, no.

3        Q.   What about generally?

4        A.   I think I testified previously that there

5   may have been some stent royalties accrued based on

6   some limited clinical evaluation samples of the

7   MicroStent PL, and as you know and I believe I've

8   testified to, that some of that product was sent

9   out in late '93.  So it's entirely possible.  But

10  as I mentioned also, that product was never

11  commercialized, and it was removed from the

12  market.

13       Q.   So it's your belief that if this document

14  is accurate and it reflects royalties that had

15  accrued as of June 30, 1994, those would have been

16  royalties from the sales of the MicroStent PL?

17       A.   Absolutely.

18       Q.   Are you aware of any sales of the

19  MicroStent PL that took place after December of

20  1993?

21       A.   I would assume there were some limited.

22  Again, we never commercialized that product.  That

23  product was in clinical evaluations for a number of

24  months, and ultimately, we determined that it was

25  not a safe or effective product and we removed it

CONFIDENTIAL
AVEA 441822

1    from the market.  I believe that happened in early

2    to mid 1994.

3        Q.   So it would be your recollection that

4    whatever sales of the MicroStent PL stent occurred

5    would have been between December of '93 and when

6    the product was discontinued in early to mid 1994?

7        A.   I think that's correct, yes.

8                    (Document more particularly

9                    described in the index marked

10                   for identification Plaintiffs'

11                   Exhibit No. 350)

12       Q.   Let me show you, Mr. Jendersee, what's

13   been marked as Exhibit No. 350 to your deposition

14   and ask if you've ever seen this document before.

15       A.   No, I have not.

16       Q.   This is another document that's been

17   produced by Coopers & Lybrand.  Also, it's titled

18   at the top "AVE Stent Royalty Calc," presumably

19   calculations, "6/30/94."  In the grid starting in

20   the left-hand column at the top it says, "FY94

21   Stent Revenue," and then it says, "Product Code,"

22   and then there are some numbers and letters

23   underneath "Product Code."

24       Do you see that?

25       A.   Um-hum.

CONFIDENTIAL
AVEA 441823

1    weaknesses, and that's why we started our

2    development of the MicroStent II shortly after

3    receiving that type of feedback from the early use

4    of the MicroStent.

5         Q.    And when did you first receive that

6    feedback about the weaknesses of the MicroStent?

7         A.    We knew that by the end of 1994.

8         Q.    How did you receive that feedback?

9         A.    Well, we knew from the evaluation of the

10   MicroStent PL that that product had a tendency to

11   migrate in the vessel.  It wasn't a stable stent,

12   due to the length of that particular design, and we

13   knew that the MicroStent, being eight millimeters

14   in length and having two eight-millimeter segments

15   consisting of a 16-millimeter overall stent length

16   that was not connected in the middle, knowing that

17   the procedure involved the positioning of the stent

18   at the midpoint of the lesion in the artery in

19   deploying that stent, that there was a tendency for

20   those two eight-millimeter segments to separate

21   because they were not connected, thereby in effect,

22   severely limiting the overall impact that the stent

23   would have at supporting the lesion in that

24   midpoint region between those two unconnected stent

25   segments, and that was a severe limitation.

CONFIDENTIAL
AVEA 441840

1    Clearly, a stent has to mechanically support the

2    tissue.  That's why a stent is implanted in the

3    first place.

4         Q.   And did you receive that feedback from

5    some sort of clinical trials that were ongoing?

6         A.   From the early testing, yes.  But again,

7    we knew that it still had some clinical benefits,

8    but we knew that there would be a short-term -- or

9    a long-term effect of having that separation occur

10   within those two eight-millimeter segments, that it

11   would not provide the best long-term outcome.

12        Q.   Where were those clinical trials taking

13   place that were providing that feedback to you?

14        A.   Throughout Europe.

15        Q.   Were they taking place in the Netherlands

16   at that time?

17        A.   I would have to review the documents.  We

18   did some clinical evaluation at another live

19   demonstration course in Rotterdam in December.  So

20   there was some product usage in the Netherlands in

21   late 1994.

22        Q.   And what was the result of the live

23   demonstration that you did in Rotterdam in late

24   1994?

25        A.   It was along the same lines as what we

CONFIDENTIAL
AVEA 441841

# EXHIBIT F

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

298TH JUDICIAL DISTRICT

**CERTIFIED**

**COPY**

AZAM ANWAR, M.D., Individually )
and on behalf of ENDOVASCULAR )
SUPPORT SYSTEMS, INC., and )
BENITO HIDALGO, Individually )
and on behalf of ENDOVASCULAR )     NO. 96-05323-M
SUPPORT SYSTEMS, INC., a )
California Corporation, )
)
Plaintiffs, )
)
)
vs. )
)
)
ARTERIAL VASCULAR ENGINEERING, )
INC., a Delaware Corporation, )
SIMON H. STERTZER, M.D., GERALD )
DORROS, M.D., JOHN MILLER and )
BRADLY JENDERSEE, )
)
Defendants. )
)
)
_____)

DEPOSITION OF

BRADLY A. JENDERSEE

Wednesday, July 30, 1997

VOLUME IV
Pages  700-752

Confidential Pages
      743-748
Under Separate Cover

Reported by:
Joyce D. Long, CSR
Certification No. 8620

**HARRY A. CANNON, INC**
*Certified Reporters and Notaries*

SACRAMENTO STREET TOWER
550 CALIFORNIA STREET, SUITE ~~
SAN FRANCISCO, CALIFORNIA 941: 6
TELEPHONE (415) 391-7421
FAX (415) 391-4978

CONFIDENTIAL
AVEA 441981

737

1    to PET, do you have any opinion as to how that

2    would affect the operations of AVE?

3        A.    I'm not going to speculate on that

4    either.

5        Q.    Mr. Jendersee, do you have any opinion in

6    terms of dollars and cents as to what the value was

7    of the stent technology that was transferred from

8    ESS to AVE at the time of the approval of the

9    transaction by the ESS board on August 5, 1993?

10       A.    Approval by the shareholders?

11       Q.    What I was referring to is the approval

12   by the board of directors of ESS on August 5,

13   1993.

14       A.    Oh, on August 5?  I don't recall

15   specifically.

15       Q.    Do you have any general opinion as to

17   what the value of the stent technology was at that

18   time in terms of dollars and cents?

19       MR. MONACH:  Objection.  Vague.

20       A.    The value of the stent technology?

21       MR. RASCH:  Q.  Yes, sir.

22       A.    In August of 1993?

23       Q.    Yes, sir.

24       A.    It was of no value.

25       Q.    Your opinion is that the value of the

CONFIDENTIAL
AVEA 442018

1    stent technology was zero?

2         A.   I think that it's been demonstrated that

3    ESS tried to sell that technology to a number of

4    companies and nobody was interested.  The company

5    had accumulated debt.  They had a letter from the

6    FDA, a cease and desist.  They had implanted

7    devices without product-liability insurance.  I

8    think we've been through all of this before, and

9    no, sir, I don't think that there was value.

10        Q.   Mr. Jendersee, what is your approximate

11   net worth?

12        MR. MONACH:  You don't need to answer that,

13   Mr. Jendersee.

14        MR. RASCH:  Andy, I would urge you to

15   reconsider.  I think under Texas law that

16   information's clearly discoverable at this point.

17        MR. MONACH:  Under California law it clearly

18   is not, unless and until you make some prima facie

19   showing that you're going to be entitled to

20   punitive damages, and what I would suggest under

21   the circumstances, since this does affect two

22   cases, is that if you are, in fact, absolutely

23   entitled to it at this time under Texas law, we'll

24   provide you something in writing, a declaration,

25   whatever, that would only be admissible in Texas,

CONFIDENTIAL
AVEA 442019