IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ADVANCED CARDIOVASCULAR )
SYSTEMS, INC. and GUIDANT SALES )
CORPORATION, )
 ) C. A. No. 98-80 (SLR)
Plaintiffs, ) (Consolidated with C. A.
 ) No. 98-314 (SLR) and C. A.
v. ) No. 98-316 (SLR))
 )
MEDTRONIC VASCULAR, INC. and )
MEDTRONIC USA, INC., )
 )
Defendants. )

### MEDTRONIC'S REPLY BRIEF IN SUPPORT OF ITS
### MOTION FOR NEW TRIAL PURSUANT TO FED. R. CIV. P. 59(a)

MORRIS, NICHOLS, ARSHT & TUNNELL
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Defendants Medtronic Vascular, Inc.
and Medtronic USA, Inc.

OF COUNSEL:
Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
James G. Rizzo
McDERMOTT WILL & EMERY  LLP
600 13th Street, N.W.
Washington, DC  20005

Fay M. Morisseau
Mauricio A. Flores
Matthew F. Weil
Michael R. O'Neill
David M. Stein
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue
Suite 400
Irvine, CA  92612-7107

July 18, 2005

TABLE OF CONTENTS

INTRODUCTION                                                                    1

ARGUMENT                                                                         2

I.    WITH THE FURTHER GUIDANCE OF THE FEDERAL
      CIRCUIT'S *EN BANC* DECISION IN *PHILLIPS*, THE COURT
      SHOULD NOW CONSTRUE ACS'S PATENTS –
      CONSISTENT WITH THE INVENTORS' STATEMENTS IN
      THE SPECIFICATION AND FILE HISTORY – TO REQUIRE A
      COMBINATION OF U'S, Y'S AND W'S.                                          2

II.   NOT ONLY DOES ACS'S OPPOSITION BRIEF FAIL TO
      JUSTIFY THE *EXCLUSION* OF RELEVANT EVIDENCE, IT
      ACTUALLY *UNDERSCORES* WHY THE EVIDENCE SHOULD
      HAVE BEEN ADMITTED.                                                       4

      A.    The Testimony Of Boneau And Others Was Relevant To
            Rebut ACS's Proffered Secondary Considerations Of Non-
            Obviousness.                                                        4

      B.    ACS's Opposition Ignores The True Facts And
            Mischaracterizes The Case Law.                                     7

III.  MEDTRONIC SHOULD HAVE BEEN PERMITTED TO
      PRESENT EVIDENCE OF THE INCORRECT STATEMENTS
      THAT ACS MADE TO THE PATENT OFFICE TO HELP IT TO
      DISCHARGE ITS BURDEN OF PROVING INVALIDITY.                             10

IV.   MEDTRONIC SUBMITTED SUFFICIENT EVIDENCE OF
      ANTICIPATION FOR THE ISSUE TO GO TO THE JURY.                           12

V.    MEDTRONIC SHOULD HAVE BEEN PERMITTED TO RELY
      ON THE COURT'S FINDINGS CONCERNING THE
      OBJECTIVE DISCLOSURE OF THE PALMAZ '337, AND ACS
      SHOULD HAVE BEEN PRECLUDED FROM
      CONTRADICTING THOSE FINDINGS.                                           14

VI.   MEDTRONIC WAS PREJUDICED BY HAVING A KEY
      CLAIM CONSTRUCTION ISSUE TRIED TO THE JURY.                             16

CONCLUSION                                                                     18

TABLE OF CITATIONS

Cases

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
    725 F.2d 1350 (Fed. Cir. 1984)    10, 11

*CFM Corp. v. Dimplex N.Am. Ltd.*,
    2005 WL 331556 (N.D. Ill. 2005)    10, 11

*Cordis Corp. v. Medtronic AVE, Inc.*,
    *Slip Op*. C.A. No. 97-550 (SLR)    12

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988))    4, 5

*Ecolochem, Inc. v. Southern Cal. Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000)    4

*Finnigan Corp. v. Int'l Trade Comm'n*,
    180 F.3d 1354 (Fed. Cir. 1999)    10

*Giora George Angres Ltd. v. Tinny Beauty and Figure, Inc.*,
    116 F.3d 1497, 1997 WL 355479 (Fed. Cir. 1997)    10, 11

*In re '639 Patent Litig.*,
    154 F. Supp. 2d 157 (D. Mass. 2001)    11

*Iron Grip Barbell Co. v. USA Sports, Inc.*
    392 F.2d 1317 (Fed. Cir. 2000)    7

*Life Technologies, Inc. v. Clontech Labs, Inc.*,
    224 F.3d 1320 (Fed. Cir. 2000)    5

*Norian Corp. v. Stryker Corp.*,
    363 F.3d 1321 (Fed. Cir. 2004)    10, 11

*Phillips v. AWH Corp.*,
    *Slip Op*. Case No. 03-1269 (Fed. Cir. July 12, 2005)    1, 3

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993)    9

*Standard Oil Co. v. American Cyanamid Co.*,
    74 F.3d 448 (Fed. Cir. 1985)    8

iii

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ................................................................. 3

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ................................................................. 3

*Thomson S.A. v. Quixote Corp.*,
    166 F.3d 1172 (Fed. Cir. 1999) ............................................................. 9, 10

<u>INTRODUCTION</u>

Medtronic's new trial motion highlighted six concerns about the trial in this matter that Medtronic believes implicated its substantial rights: (1) the adoption of a claim construction that improperly expanded the scope of ACS's claims (as the Federal Circuit's recent *Phillips* case confirms); (2) the exclusion of evidence that Medtronic should have been allowed to present to rebut ACS's evidence of purported secondary considerations of nonobviousness (like the fact that ACS had a head start in the stent business and that ACS's own inventors and engineers recognized that they added little to the art); (3) the exclusion of evidence of incorrect information provided to the PTO; (4) the decision to take the issue of anticipation away from the jury; (5) the fact that the Palmaz '337 patent was interpreted one way to find Medtronic's Boneau patents not infringed and another, inconsistent way to uphold the validity of ACS's Lau patents; and (6) the prejudice to Medtronic in trying claim construction on a key infringement issue to the jury.

ACS completely ignores the cumulative effect these various rulings had, which was dramatic. Taken together, for the reasons detailed in Medtronic's JMOL and new trial motions and expanded upon below, these individual errors seriously prejudiced Medtronic's substantial rights.

Had the Federal Circuit come out with its *Phillips* opinion six months earlier, the outcome of the trial in this matter could have been decisively altered. Even before the Federal Circuit handed down its *Phillips* opinion, though, this motion, and Medtronic's JMOL motion, provided ample justification for revisiting these decisions. In view of *Phillips*, the Court's claim construction, coupled with the airing of claim construction evidence before the jury, provides all the more reason for granting this relief. Accordingly, if the Court denies Medtronic's motion for JMOL, it should grant this new trial motion.

<u>ARGUMENT</u>

I.    WITH THE FURTHER GUIDANCE OF THE FEDERAL
CIRCUIT'S *EN BANC* DECISION IN *PHILLIPS*, THE COURT
SHOULD NOW CONSTRUE ACS'S PATENTS –
CONSISTENT WITH THE INVENTORS' STATEMENTS IN
THE SPECIFICATION AND FILE HISTORY – TO REQUIRE A
<u>COMBINATION OF U'S, Y'S AND W'S.</u>

According to ACS, if a stent is flexible and has "cylindrical elements," it falls within the scope of one or more claims of the Lau patents. The Court has defined a "cylindrical element" to be "[a] radially expandable cylindrical segment of a stent having a longitudinal length less than its diameter with a circular undulating pattern. . . ." (D.I. 628 at 24). Accordingly, to infringe the Lau patents, a stent must be made up of elements that are (1) radially expandable, (2) cylindrical, (3) have a length less than their diameter ("L<D"), and (4) have an "undulating pattern." As for the first two of these attributes, all useful stents (both before Lau and since) have been radially expandable and generally cylindrical. As for the third, any expandable ring-shaped structure will shorten as it expands radially and so will, eventually, have a length less than its diameter. Given ACS's view that L<D may be measured in *any* condition, the Court may well ask what expandable, ring-based stent would not at some point expand enough to satisfy the L<D condition. Clearly, therefore, the key feature distinguishing ACS's "cylindrical elements" (and, therefore, ACS's invention as a whole) is the undulating pattern. This makes the definition of "undulating pattern" crucial, not only to this case and the rights of Medtronic, but to the rights of virtually anyone making, using or selling stents in the United States.

Seeking to broaden its claims to the maximum extent, ACS identifies what it contends is the generally accepted, all-purpose definition of "undulating," and defies Medtronic to come up with "evidence of manifest exclusion or restriction [that] represents a clear disavowal of claim scope." (D.I. 673 at 12-13). That is the approach to claim construction laid out in the *Texas*

*Digital* case.  *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002).  The Federal Circuit, sitting *en banc*, has now specifically rejected this approach in *Phillips v. AWH Corp*., Case No. 03-1269, slip op. at 23-24 (Fed. Cir. July 12, 2005).

As Medtronic explained in its reply JMOL brief (Section I of which it hereby incorporates by reference), the *Phillips* case has largely resolved the conflict this Court experienced in attempting to reconcile the claim language of the Lau patents with ACS's statements in the specification and prosecution history.  The *Phillips* court made it clear that a district court must construe the claims as they would be viewed through the eyes of one skilled in the art in light of statements made in the specification and prosecution history.  *Phillips*, slip op. at 9-10, 12.  Rejecting the approach urged by ACS, the Federal Circuit has made it clear that the specification is the "single best guide to the meaning of a disputed claim."  *Id.*

Here, the ACS inventors conceived of their invention as having spaced apart cylindrical elements comprised of a plurality of U-shaped, Y-shaped and W-shaped members, described it that way, and claimed it with words that can and should be construed to mean just that.  ACS's attempt to broaden the claims now based on general dictionary definitions should be rejected, and "undulating pattern" should once again be construed to mean "a pattern that includes any combination of U-shaped, W-shaped and Y-shaped members."

If the Court denies Medtronic's JMOL motion, it should grant a new trial based on this claim construction, now confirmed to be the proper one in view of *Phillips*.

II.     NOT ONLY DOES ACS'S OPPOSITION BRIEF FAIL TO
        JUSTIFY THE *EXCLUSION* OF RELEVANT EVIDENCE, IT
        ACTUALLY *UNDERSCORES* WHY THE EVIDENCE SHOULD
        HAVE BEEN ADMITTED.

ACS's arguments concerning the excluded testimony of Michael Boneau, Lilip Lau, William Hartigan, and Farhad Khosravi are based on factual and legal errors. Because the evidence concerning Mr. Boneau's invention and his contacts with ACS, and what ACS did with and thought about its own information was relevant, the testimony should have been allowed.

A.     The Testimony Of Boneau And Others Was Relevant To
       Rebut ACS's Proffered Secondary Considerations Of Non-
       Obviousness.

ACS argues that the proffered testimony of how ACS really developed its stent was properly excluded as irrelevant to obviousness, which must be assessed from the standpoint of a hypothetical person skilled in the art. (D.I. 674 at 7-8). While ACS's statement of the law on this narrow point is correct, it misunderstands Medtronic's argument, and therefore misapplies the law in this case.

The excluded testimony was not proffered for the purpose of suggesting that ACS's development is relevant to what was in the prior art, or whether there was a motivation to combine prior art elements. Rather the evidence was admissible to rebut the alleged secondary considerations of nonobviousness that *ACS* introduced through its own evidence and testimony. Indeed, it is black letter law that a defendant may rebut commercial success by showing that the success is due to factors other than the invention (in this case, for example, the head start ACS had over other companies). (D.I. 628 at 38-39; *Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000); *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851

F.2d 1387, 1393 (Fed. Cir. 1988)).[1]

Had ACS limited its argument to an analysis of the Section 103 prior art references, including Boneau, and a discussion of whether the prior art contained a suggestion to combine those references, Mr. Lau's and ACS's knowledge of the Boneau stent may have been of little or no probative value. But ACS went far beyond this. In closing argument, ACS presented a one-sided picture of commercial success to the jury, arguing that "ACS has brought to the market through these patents . . . a significant advance in cardiovascular treatment of heart disease and people are alive today who would not be in that state except for the fact these technologies have been brought and used by clinicians across the country." (Tr. at 1757:10-15). By further stating, "[t]he issue of these [Boneau] prototypes, which may or may not exist in smaller ranges than 4 millimeters, is of no concern, ladies and gentlemen, because they were never given to the public" (Tr. 1848:25-1849:3), counsel incorrectly implied that no one, including ACS, did or could make use of the Boneau disclosure.

Counsel also directly raised the issue of "cross-fertilization" of ideas, and directly charged that Medtronic had copied ACS (implying that ACS did not copy any part of Medtronic's technology):

> The fact of the matter is, ladies and gentlemen, the first Lau patent, the first ACS patent, was filed for in 1991 and it contained figures and elements with regard to connecting elements and welds that were demonstrated from the very beginning. This is not a matter of us rushing to them. As we will show in a moment, it's a matter

---

[1]    ACS argues that Medtronic's argument should be ignored because its expert, Dr. Saigal, did not proffer an opinion on secondary considerations. ACS made the same failed argument at trial. It was ACS's burden, not Medtronic's, to offer evidence of secondary considerations if it wished to rely on them. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324-1325 (Fed. Cir. 2004). Medtronic then should have been permitted to rebut that evidence with any competent evidence, which is not limited to expert testimony.

> of them rushing to us. [] . . . They came to us.  It wasn't the other
> way around.

(Tr. at 1856:5-11; 1859:18-19).  Finally, counsel recounted the testimony of Ms. Huss, that for

"all but one quarter of 1997 until 2003, ACS was the leader in the coronary stent market.  That

testimony is unrefuted.  [¶]  That is evidence of commercial success."  (Tr. 1861:11-15).

The implicit theme that ran through these and other arguments ACS advanced (as ACS

candidly admitted in its JMOL answering brief) is this: "if ACS's connected-ring design were so

obvious in 1991, why didn't anyone else do it?"  (*See* D.I. 673 at 37).  By inviting the jury to

conclude that ACS's early release of and commercial success with the MultiLink were evidence

of the nonobviousness of the design, ACS invited a response.  Medtronic should have been

permitted to make that response.

Similarly, the proffered testimony of Lillip Lau, William Hartigan, and Farhad Khosravi

would have been relevant to the issue of "nexus."  That testimony would have shown the lack of

novelty of ACS's invention over the prior art, thus rebutting that ACS's success was due to its

invention.  ACS's own arguments opened the door to testimony concerning the value of the

Boneau invention to ACS and how ACS accomplished its invention using Boneau as a

springboard.  The jury should have been told why ACS achieved the success it did, apparently

(for all the jury knew) without advance access to Boneau technology.  Logic dictates that

Medtronic should have been able to walk through that door once ACS opened it.

ACS's fall-back position is that, even if relevant, the evidence was properly excluded

under Evidence Rule 403, but ACS provides no analysis on this point, convincing or otherwise.

(D.I. 674 at 6).  It is true the evidence ACS fought successfully to exclude was damning, but it

was damning precisely because of its relevance to the issue of obviousness.  Admission of such

evidence would not have been "unduly prejudicial."

B.    ACS's   Opposition   Ignores   The   True   Facts   And
      Mischaracterizes The Case Law.

In an effort to defend the exclusion of clearly relevant evidence, ACS misstates both the facts and the applicable law.

As an initial matter, ACS mischaracterizes the evidence it sought to have excluded.  It continues to refer to "*alleged* meetings with ACS in which Mr. Boneau *allegedly* disclosed certain stent technology to ACS, also testimony by Mr. Lau regarding his *alleged* knowledge of the Boneau stent."  (D.I. 674 at 5).  During the inequitable conduct trial in this case, however, Medtronic offered uncontested proof of elaborate dealings between Mr. Boneau and ACS's engineers, top management, and lawyers in the 1989 to 1990 timeframe.  No one disputes that Mr. Boneau provided ACS with at least one copy of his patent application.  Mr. Boneau testified that he first gave a copy to ACS's Dr. Schneiderman 1989.  (6/7/05 Tr. at 116).  It is undisputed, that in 1990 ACS management conferred with outside patent counsel, Mr. Lynch, who contacted Mr. Boneau's counsel to get a copy of Mr. Boneau's patent application.  (6/7/05 Tr. at 214-215, 231-233, 239-243; DTX-1012 (03/09/90 Letter to E. Lynch from J. Eakin enclosing Boneau patent application), DTX 1011 (Lynch billing records); 6/8/05 Tr. at 554-555).  There also is no dispute that Mr. Lynch prepared a report on the Boneau application (which ACS withheld in this litigation on the basis of attorney-client privilege), and that he did so about the same time he began drafting the Lau application.  (6/7/05 Tr. at 221-222, 229-230 & 236-237; DTX 1008 & DTX 1009 (Lynch billing records) & DTX 1163 (privilege log)).  ACS itself also offered proof of Mr. Lau's July 1990 feasibility report, which included information on the Boneau stent.  (6/8/05 Tr. at 389-393, 461-462, 469, 474-475 & 503-506; DTX 1014 (07/31/90 Bronco Product Reviews, Feasibility Review) & AX 268 (same)).  Thus, there was nothing "alleged" about the fact that ACS – but no one else – had access to Boneau's invention.

In laying out the applicable law, ACS relies principally on *Life Technologies, Inc. v. Clontech Laboratories, Inc.*, 224 F.3d 1320 (Fed. Cir. 2000). ACS's reliance, however, is misplaced. *Life Technologies* was an ***inequitable conduct*** case. The language ACS quotes concerns the materiality of an inventor's knowledge of prior art in the context of actual disclosures of that prior art to the PTO *during prosecution. Id.* at 1324-25. *Life Technologies* stands for the quite correct proposition that an inventor need not disclose to the PTO the manner in which he or she came up with the invention. The case sheds absolutely no light at all on the question presented here: when the patent-holder puts the commercial success of the invention at issue.[2]

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985), which ACS also cites, is similarly inapposite. Here, Medtronic does not contend (as did the defendant in *Standard Oil*) that Mr. Lau's decision to combine the rings taken from Mr. Boneau and the connectors already well known in the art is itself evidence of obviousness. Rather, Medtronic contends that when ACS: (1) donned the cloak of industry leader and innovator, (2) offered evidence of the wide commercial success and purported superiority of ACS's "strong but flexible" design, and (3) challenged Medtronic to explain why others had not come up with the "strong but flexible" stent first. Medtronic should have been allowed to demonstrate that ACS's early market success was do to the leg up and head start it had by getting access to the Boneau technology years before its competitors.

---

[2]    Indeed, there may well be instances when even the PTO would be interested to know about the sort of head start ACS had in developing these stents. For example, if an applicant argues that its success over competitors is evidence of commercial success or long-felt need (and, therefore, non-obviousness), the Examiner might well consider it relevant that the success could, instead, be attributed to a head start with the subject technology.

ACS also gets the law all wrong as concerns its oft-repeated contention that Mr. Boneau's testimony concerning his early work was properly excluded because it was "uncorroborated."  While there certainly is a "corroboration rule," it appears that it most often arises in disputes over derivation and priority:

> [T]he case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof.  Throughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence.

*Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993).  Here, Medtronic did not seek to use Mr. Boneau's testimony to invalidate the Lau patents on a claim of derivation or priority of Mr. Boneau's invention.  The prior art status of his invention was already plainly established.  Rather, in the context of this trial (restricted, as it was, to its infringement and validity issues), Medtronic offered Mr. Boneau's testimony to establish the state of the art and efforts by others to address the need allegedly met by the patented invention.  The Federal Circuit has explicitly held, however, in affirming a Delaware district court opinion of Judge Longobardi, that the corroboration rule:

> is needed only to counterbalance the self-interest of a testifying inventor against the patentee. We therefore hold that corroboration is required only when the testifying inventor is asserting a claim of derivation or priority of his or her invention and is a named party, an employee of or assignor to a named party, or otherwise is in a position where he or she stands to directly and substantially gain by his or her invention being found to have priority over the patent claims at issue.

*Thomson S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999).  Medtronic was prepared to point to documentary and other evidence (including sales receipts, correspondence, and, of course, his own patent) that corroborated key aspects of Mr. Boneau's testimony.  Under

*Thomson S.A.*, therefore, Mr. Boneau should have been permitted to testify about his early work in stent design and testing, including his design and testing of his "suture stent."[3]  *See also Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999); *Norian Corp. v. Stryker Corp.*, 252 F. Supp. 2d 945, 956 (N.D. Cal. 2002) ("At a minimum, these statements by the Federal Circuit [from the *Thomson* case] demonstrate that corroboration is not uniformly required for any and all invalidity challenges, much less for each element thereunder."), *rev'd in part on other grounds*, 363 F.3d 1321 (Fed. Cir. 2004).

III.  MEDTRONIC SHOULD HAVE BEEN PERMITTED TO PRESENT EVIDENCE OF THE INCORRECT STATEMENTS THAT ACS MADE TO THE PATENT OFFICE TO HELP IT TO DISCHARGE ITS BURDEN OF PROVING INVALIDITY.

As explained in detail in Medtronic's opening brief (D.I. 653 at 17-23), Medtronic should have been permitted to present evidence of the misstatements ACS made to the Patent Office regarding the Palmaz '417 patent.  In particular, Medtronic should have been permitted to show that, in an attempt to distinguish these same features of the '154 patent, ACS incorrectly told the Patent Office that Palmaz's stent did not have outwardly projecting edges and that it appreciably shortened.  Such evidence was plainly relevant under *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984), and later cases, which hold that a party may partially, if not wholly, discharge its burden of proving invalidity by pointing out new prior art or other invalidating evidence not before the PTO.  *Id.  See also CFM Corp. v. Dimplex N.Am. Ltd.*, 2005 WL 331556, at *8 (N.D. Ill. 2005)*; Giora George Angres Ltd. v. Tinny Beauty and Figure*,

---

[3]  The *Thomson* court particularly noted that the subject of the testimony permitted in that case was an "unpatented" invention.  *Id.* at 1176.  Mr. Boneau never sought patent protection on his "suture stent," in part because he considered connecting Boneau rings to be obvious.

*Inc.,* 116 F.3d 1497, 1997 WL 355479, at *2 (Fed. Cir. 1997) (unpublished).  *American Hoist* also holds that production of such new evidence "eliminate[s], or at least reduce[s], the element of deference due to the PTO." 725 F.2d at 1360; *see also CFM Corp.,* 2005 WL 331556 at *8 (Because the '921 patent was not considered during prosecution of the '580 patent, "there is no requirement of deference to the PTO's decision."); *In re '639 Patent Litig.,* 154 F. Supp. 2d 157, 172 (D. Mass. 2001) (finding that the PTO decision was due less deference, among other reasons, because "the PTO's decision was based at least in part on incorrect information.").

Notably, ACS does not even address *American Hoist* in its brief.  Instead, it continues to assert a plainly overbroad reading of *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004), and continues to cite general statements from that case, ignoring its actual holding.  (D.I. 674 at 13).  What the *Norian* court actually said (and, indeed, said only in dicta) was that: "the district court erred in instructing the jury that the *presumption of validity varied* with the jury's view of whether the examiner believed the applicant's misstatements."  *Norian,* 363 F.3d at 1429.  The *Norian* court did not even address *American Hoist* or its progeny, let alone overrule it.[4]  Nor did it hold the fact that information was not before the Patent Office is irrelevant to validity, as ACS suggests.  Medtronic did not seek to introduce the excluded evidence to argue that there was no presumption of validity; rather it sought to use that evidence to help it meet its burden in rebutting the presumption.

ACS also suggests Medtronic's argument should be disregarded in view of the testimony of ACS's own expert witness, Dr. Segal, who testified that the Palmaz '417 patent discloses a

---

[4]     Indeed, courts have continued to follow *American Hoist* even after *Norian* issued.  *See, e.g., CFM Corp.,* 2005 WL 331556.  In contrast, we have not found any case which cites *Norian* for ACS's proposition that inaccurate statements to the PTO have no relevance to validity.

stent that is "relatively smooth" and has appreciable shortening. (Tr. at 1537-1541). While ACS

is free to make that argument, it is by no means uncontroverted. (Dr. Palmaz himself testified in

the recent Cordis trials that his stent did have projecting edges. (*Cordis Corp. v. Medtronic AVE,

Inc.*, C.A. No. 97-550 (SLR), 3/7/05 Tr. at 408:6-9).) (Ex. A) Medtronic should have been

permitted to introduce contrary evidence.

IV.    MEDTRONIC SUBMITTED SUFFICIENT EVIDENCE OF
       ANTICIPATION FOR THE ISSUE TO GO TO THE JURY.

ACS argues that JMOL of anticipation was proper because Medtronic's expert did not

explicitly use the word "wavelike" to describe the Spiral Palmaz. (D.I. 674 at 16-17). ACS's

argument fails for at least two reasons.

First, Dr. Saigal did in fact testify that the expanded, or after-implantation, Spiral Palmaz

could be viewed both as a combination of U's *and* as having U's, Y's and W's. (Tr. at 1295:23-

1296:18; 1299:7-1300:4; 1374:18-1375:4). Based on this testimony, a reasonable jury could

conclude that the requisite "wavelike" pattern was present, and that the Spiral Palmaz anticipated

Lau.

Second, it does not take a rocket scientist (or even a Ph.D. in engineering) to determine if

something is "wavelike." It would certainly be within the ability of the average juror to look at

Spiral Palmaz and discern wavelike elements, as indicated, for example in the area shaded on

Figure 10 from the '417 patent (below):[5]

---

[5]    This was the Court's construction of the expanded Figure 2B embodiment of the Palmaz
'337 patent, cited during prosecution of the Boneau patents. Though Medtronic disagrees
with this interpretation of Palmaz (and, indeed, that the Spiral Palmaz should be analyzed
in its expanded state), it accepts the Court's ruling and ACS's position for purposes of
this argument.



The Spiral Palmaz was in evidence. (Exh. AX-160). That is all Medtronic needed.

ACS says Dr. Saigal "did not (and could not) opine that [Spiral Palmaz] discloses a stent made of structures that could not function independently as stents." (D.I. 674 at 17). In fact, Dr. Saigal testified (Tr. at 1329:1-16):

> Q. … Okay. This is a picture on the first page of the '417 patent.
>
> A. Right.
>
> MR. MORISSEAU: For the record, this is AX-160.
>
> BY MR. MORISSEAU:
>
> Q. Okay. How many elements do you see there?
>
> A. The first one, the second one and the third one. Three elements.
>
> Q. Three of them. . . . Now, in looking, in all the study and all the research that you did, sir, did you ever see anyone use one of those elements as a stand-alone stent?
>
> A. No, I did not.

None of the Palmaz patents disclose the use of a single-slotted Palmaz element as a stand-alone stent. ACS points out that the element is referred to in patents as a "graft" (Tr. at 386-387, 392, 1543), but ACS is also firmly on record as saying just because a patent calls a thing by a certain name (for example "a one millimeter stent") does not mean that is what the thing actually is. (Tr. at 1565:20-1566:4, 1567:18-1568:5). Given Dr. Saigal's extensive study

of and familiarity with the stent literature, a reasonable juror could have concluded the absence of any mention anywhere in the prior art of use of the individual one-slot segments of the Palmaz stent as a "stand alone stent" is evidence that it was not used for that purpose. At a minimum, there was a factual dispute which should not have been resolved as a matter of law.

Finally, ACS admits that Dr. Saigal testified that the Spiral Palmaz was longitudinally flexible, but says this testimony does not count because it was only a "summar[]y conclu[sion]." (D.I. 674 at 18). ACS's argument concerning Dr. Saigal's testimony is simply that: argument. It may go to the weight of Dr. Saigal's opinions; but the jury should have been accorded the opportunity to evaluate that for itself. Longitudinal flexibility was never defined in terms of a strict numerical threshold; it was a relative measure (relative, principally, to the inflexible Palmaz stent). The Palmaz '417 patent *itself* describes the invention as "adjacent grafts . . . *flexibly* connected by at least one connector member." (Exh. AX-160, Abstract). This issue should have gone to the jury.

> V.     MEDTRONIC SHOULD HAVE BEEN PERMITTED TO RELY ON THE COURT'S FINDINGS CONCERNING THE OBJECTIVE DISCLOSURE OF THE PALMAZ '337, AND ACS SHOULD HAVE BEEN PRECLUDED FROM CONTRADICTING THOSE FINDINGS.

In ruling on the scope of the Boneau patents, the Court made *objective findings* about the disclosure of the Palmaz '337 patent. (D.I. 545).[6] The Court applied those objective findings to

---

[6]     ACS casts the Court's rulings as subjective findings about how the Examiner "perceived" the Palmaz disclosure. (D.I. 674 at 20). The Court, however, did not refer to the Examiner's findings at all; rather, it made its own findings as to what the Palmaz patent discloses. For example, the Court ruled that "the Palmaz stent is made up of straight segments 78 that are connected at their ends 79 to form a circular band . . . These circular bands are then connected to two straight segments 75 that attach adjacent circular bands." (D.I. 545 at 16). While the Court is in the best position to know what it meant, its Opinion certainly does not indicate that the Court was making anything other than objective findings as what the Palmaz '337 patent discloses to one skilled in the art.

hold that Mr. Boneau had disclaimed those "Palmaz elements" in his own patents. The Court thus held that prosecution history estoppel applied and drastically narrowed the scope of the Boneau claims accordingly. Based on its prosecution history estoppel ruling, the Court also granted ACS's motion for summary judgment of noninfringement of the Boneau patents. Because Medtronic was precluded from mentioning the Court's Opinion (or having its expert address it), the jury had no knowledge of this ruling, and ACS was free to – and did – take an inconsistent position during the Lau trial on the crucial question of what the Palmaz patent disclosed.

As a consequence, Medtronic was put in an untenable position, having the same prior art patent interpreted one way to severely narrow the scope of its Boneau claims (which result in a finding of noninfringement) and another (inconsistent) way to uphold the validity of the Lau patents. There is no dispute that, had the Palmaz disclosure been applied consistently in both actions, the Lau patents would have been found invalid and Medtronic could not have been held liable for infringing them.

ACS's answer to this is to repeat that it did not participate in the Boneau prosecution. (D.I. 674 at 21). That is simply beside the point, however, for at least two reasons. As noted above, the Court's ruling was an objective one about the teachings of the Palmaz disclosure, notwithstanding it arose in the context of interpreting the Boneau patents. Indeed, this only makes sense, given that the Palmaz patent can have but one disclosure. Secondly, ACS *did* participate in the briefing that resulted in the drastic narrowing of the scope of the Boneau claims, raising no objection as Boston Scientific and Medinol urged the view of Palmaz that ACS later categorically rejected.

ACS also argues that the Lau and Boneau cases are separate, and therefore, law of the case does not apply. (D.I. 674 at 21). This, of course, is simply incorrect. The Lau and Boneau "cases" were thoroughly intermingled as claims and counterclaims in this single, consolidated case. Moreover, whether the cases are separate or not, ACS fully participated in the claim construction and summary judgment proceedings and had its opportunity to address the proper interpretation of the Palmaz patent. ACS did not dispute the Court's interpretation of Palmaz, presumably because it was not in its interest to do so (wanting, as it did, to avoid infringement of the Boneau patents). For that reason, too, ACS should be bound by the Court's ruling.

Moreover, whether law of the case or not, Medtronic should have been permitted to amend its expert reports to address this new development. Because it did not have this opportunity, it was put in the untenable position of having the same disclosure interpreted different ways to result in two adverse judgments against it. There can be no question of the prejudice to Medtronic. A new trial should be granted.

## VI. MEDTRONIC WAS PREJUDICED BY HAVING A KEY CLAIM CONSTRUCTION ISSUE TRIED TO THE JURY.

Notably, ACS does not even attempt to dispute that Medtronic was prejudiced by the Court's decision to have the parties present their claim construction positions to the jury, or that the Court implicitly (albeit undoubtedly unintentionally) telegraphed to the jury who was right and who was wrong. Instead, ACS devotes its entire argument to asserting that the Court had the discretion to defer its claim construction decision. ACS's half-hearted argument misses the point. While the Court certainly has the discretion (in some circumstances) to delay ruling on claim construction, ACS has pointed to no case, and Medtronic has not been able to find one, in which witnesses *testified* about claim construction (as opposed to just the facts underlying infringement).

Regardless of whether the Court may have discretion under some circumstances to delay construing patent claims, in this case, the decision prejudiced Medtronic.  The question whether the undulating pattern of the cylindrical elements of the Lau patents is comprised of a plurality of Y-, W- and U-shaped members, as Medtronic contends, or simply a wavelike pattern, as ACS contends, was a *central, key* issue on infringement.  And in the circumstances of this case, not only did the parties have to present alternate infringement positions to the jury, but they also had to present their proofs in support of their respective claim constructions (which was an issue for the Court, not the jury, to decide).  After hearing extensive evidence about W-, Y- and U- shaped members, and whether the claims should be construed to require them, the jury received the Court's instructions which contained no mention of those letter-shaped elements.  (D.I. 628 at 24).  The jury thus knew that the Court disagreed with Medtronic's experts, who had advocated such a construction, and agreed with ACS's experts.  On a key issue such at this, it is hard to imagine how the jury was not tainted on this, and perhaps other, issues.  For these and the other reasons set forth in this brief, a new trial should be granted.

## CONCLUSION

For the foregoing reasons, Medtronic's motion for new trial should be granted.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Karen Jacobs Louden*
Karen Jacobs Louden (#2881)
klouden@mnat.com
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Defendants Medtronic Vascular, Inc. and Medtronic USA, Inc.

OF COUNSEL:

Raphael V. Lupo
Donna M. Tanguay
Mark G. Davis
James G. Rizzo
McDERMOTT WILL & EMERY  LLP
600 13th Street, N.W.
Washington, DC  20005

Fay M. Morisseau
Mauricio A. Flores
Matthew F. Weil
Michael R. O'Neill
David M. Stein
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA  92612-7107


July 18, 2005

474681

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on July 18, 2005 I electronically filed the foregoing with

the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Frederick L. Cottrell, III
Anne Shea Gaza
**Richards Layton & Finger**
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

I further certify that on July 18, 2005 I served copies of the foregoing to the following counsel

in the manner indicated:

<u>By Hand</u>

Frederick L. Cottrell, III
Anne Shea Gaza
**Richards Layton & Finger**
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

/s/ Karen Jacobs Louden