# EXHIBIT A

```
                    244
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE
CORDIS CORPORATION,  )  Volume II
     Plaintiff,      )
                     )
  v.                 )  No. 97-550-SLR
MEDTRONIC VASCULAR,  )
INC., BOSTON         )
SCIENTIFIC CORP., and)
SCIMED LIFE SYSTEMS, )
INC.,                )
     Defendants.     )
MEDTRONIC VASCULAR, INC., )
                     )
  v.                 )  No. 97-700-SLR
CORDIS CORPORATION, et al.)
     Defendant.      )
          Monday, March 7, 2005
               9:30 a.m.
              844 King Street
           Wilmington, Delaware
     BEFORE: THE HONORABLE SUE L. ROBINSON
          United States District Court Judge
                    245
APPEARANCES:
      ASHBY & GEDDES
      BY:  STEVEN J. BALICK, ESQ.
           -and-
      PATTERSON, BELKNAP, WEBB & TYLER, LLP
      BY:  GREGORY L. DISKANT, ESQ.
      BY:  EUGENE GELERNTER, ESQ.
      BY:  WILLIAM F. CAVANAUGH, JR., ESQ.
      BY:  MICHAEL J. TIMMONS, ESQ.
      BY:  ERIC HARRIS, ESQ.
      BY:  SCOTT HOWARD, ESQ.
           Counsel for the Plaintiff

      MORRIS, NICHOLS, ARSHT & TUNNELL
      BY:  KAREN JACOBS LOUDEN, ESQ.

           -and-

      McDERMOTT, WILL & EMERY, LLP
      BY:  MICHAEL UNDERHILL, ESQ.
      BY:  DONNA M. TANGUAY, ESQ.
      BY:  JAMES G. RIZZO, ESQ.
      BY:  RAYMOND LUPO, ESQ.
      BY:  MARK G. DAVIS, ESQ.

            Counsel for Defendant

                    246
```

THE CLERK: All rise. Please be seated.

THE COURT: I understand that's one issue for this morning. This needs to be addressed.

MR. DAVIS: Your Honor, during the cross-examination of Dr. Fischell depending on what areas that Cordis gets into, it's possible that the issue of product-to-product comparison may come up if they talk about the commercial success of the Palmaz-Schatz stent.

THE COURT: All right. Well, I do have my answer for that. I don't have a time for a lot of debate, so I'll give you my reflections.

MR. DAVIS: Certainly.

THE COURT: I've gone over the Federal Circuit opinion and I've gone over the materials. It seems to me that the Federal Circuit has held by reversing my claim construction by the language it used that wire stents can fall under the rubric of this claim construction.

Therefore, it is my opinion that

Page 247

product-to-product comparisons in this context would be so confusing and prejudicial that I cannot let them in.

Because sharp edges are not, that's an added claim limitation here. And by saying that our products differ from the Palmaz-Schatz because we do not have sharp edges and our products are better because of that, sharp edges are not part of the claim construction here. And so I will not allow it on cross.

MR. DAVIS: Thank you, Your Honor.

THE COURT: All right.

MR. RIZZO: Your Honor, good morning.

THE COURT: Yes.

MR. RIZZO: Quickly with regards to certain exhibits that Cordis would like to use with Dr. Fischell, Medtronic had objected to Document Numbers PX 18, PX 227, and PX 228, primarily hearsay grounds. But pointed out to counsel for Cordis that to the extent they wanted to to use these documents, which where articles from the New England Journal of

Page 248

Medicine under Federal Rule of Evidence 803(18), such learned treatises or medical periodicals such as these articles should be read into evidence but not be received in as exhibits.

There are also some documents that were not included in their production the other night. And we have not seen them. We believe that probably demonstratives. They are PX 2940, PX 2958, PX 3262, PX 3789A and PX 3789C.

MR. CAVANAUGH: I think I can make life easier on the first one, Your Honor. With respect to the three publications, I think that's subject — we can fight about at a later date. We're not going to be using any of these with this witness.

The list of other exhibits that Mr. Rizzo read off as being objected to, this is the first that we've heard about these objections. And I believe counsel's understanding is that we'd be notified of objections the night before, at least the night before. We didn't get any notice of that. Some of these exhibits were previously admitted in the last trial. They include actual product to

Page 249

natural samples to stents.

And frankly, the list that Mr. Rizzo went so fast without him giving us prior notice of that, I don't know what else is on the list. But I would have appreciated learning it the night before, instead of coming into Court.

THE COURT: All right. So Mr. Rizzo, I obviously don't know what these documents or things are.

What is this evidence that you're objecting to?

MR. RIZZO: Your Honor, excuse me. Your Honor, there is a joint pretrial order in effect. We raised our objections timely. We raised —

THE COURT: You know, I'm just asking you what they are so we can resolve this.

MR. RIZZO: Your Honor, I don't know why they were not included in their production. I don't know what it is that we should be objecting to. We put in our correspondence that we will reserve our right to object upon receipt of the same.

So I don't know how we could have

Page 250

anticipated —

THE COURT: Slowly identify what the exhibit number is.

MR. RIZZO: One moment, please, Your Honor.

THE COURT: Thank you.

MR. RIZZO: Copies of PX 2940. PX 2958.

THE COURT: Wait. 2940. 2958.

MR. RIZZO: 3262.

THE COURT: 3262.

MR. RIZZO: 3789A.

THE COURT: 3789A.

MR. RIZZO: And 3789C.

THE COURT: 3789C. And when you say they were not included in Cordis' production, which production are you talking about?

MR. RIZZO: We're talking about the production of exhibits which Cordis provided to us the other night inconsistent with the PTO.

THE COURT: Their responsibility to give you exhibits forty-eight hours before?

MR. RIZZO: Correct.

Page 251

THE COURT: Okay. Thank you very much. Now, let's see what these are and if there really is an objection.

MR. CAVANAUGH: Let me sort my way through my list. 2940, Your

[22] on November 27, 2000?
[23] **A:** Well, again, you asked me then the [24] same way you're asking me now, and I didn't

Page 405

[1] catch the twist of the question. I don't know [2] what I answered about that.
[3] I came up with it, the placing [4] slots on metal tubes way before I met [5] Mr. Schultz, regardless of what I said here, the [6] way it was interpreted, the way the question was [7] asked.
[8] **Q:** Let me make sure I understand what [9] the twist in the question was, if I could.
[10] **A:** Okay.
[11] **Q:** The question was "And your first [12] idea about how you might make the slotted tube [13] as opposed to expanded metal, they came from Dr. [14] Schultz when you went to talk to him; right?
[15] **A:** That the problem, I was thinking [16] about — I didn't listen to the question as I [17] sometimes did correctly. You were asking me [18] specifically if Mr. Schultz had taught me that [19] in order to make a better expandable stent, I [20] had to make slots in the tube, which was not the [21] case.
[22] I was thinking that you were [23] asking me how to make — how the slots could be [24] made on the balloon, on the stent good.

Page 406

[1] **Q:** But you agree with me that that's [2] not my question, correct?
[3] **A:** That's what it says there. That's [4] in the record.
[5] **Q:** And you were under oath, correct?
[6] **A:** I was under oath, yes.
[7] **Q:** And you were trying your best to [8] answer truthfully, is that true?
[9] **A:** As always, yes.
[10] **Q:** Okay. Now, you don't claim that [11] any ideas that Dr. Schultz gave to you are part [12] of your invention, do you?
[13] **A:** All the ideas that Mr. Schultz [14] gave me about how to make the stent, no, they [15] were not part of the invention.
[16] **Q:** Let's take a look, if we could, at [17] Page 6 of your 1983 monograph, and this is at [18] page, or I'm sorry, it's Exhibit 3573.
[19] So I believe we're back to Volume [20] 1.
[21] **A:** Can you please tell me the [22] exhibit? Number.
[23] **Q:** Which one, sir?
[24] **A:** The exhibit number.

Page 407

[1] **Q:** Yes, sir. It's 3573.
[2] **A:** Okay.
[3] **Q:** And this is a paper that you wrote [4] in 1983; correct?
[5] **A:** That's correct.
[6] **Q:** Could we have it up on the screen, [7] please. And I would like to direct you, if I [8] could, to page six —
[9] **MR. UNDERHILL:** I apologize, may I [10] move it into evidence first?
[11] **MR. HOWARD:** No objection, Your [12] Honor.
[13] **MR. UNDERHILL:** Thank you. Now, [14] may I have it on the screen, please.
[15] Could we go to page six? And I'm [16] interested in the second paragraph.
[17] **BY MR. UNDERHILL:**
[18] **Q:** And I hope not to have to spend a [19] lot of time on this, Dr. Palmaz, but my question [20] here on this paragraph, is in this paragraph you [21] describe the bars of the slotted tube stent as [22] twisting when the stent is expanded; correct?
[23] **A:** Yes, that's correct.
[24] **Q:** And so what we're talking about

Page 408

[1] when we talk about the stent members twisting, [2] we're talking about this part right here [3] twisting and turning out of the plane; is that [4] correct?
[5] **A:** That's correct.
[6] **Q:** When it's expanded. So then you [7] get a projecting edge when it turns; is that [8] correct?
[9] **A:** That's correct.
[10] **Q:** And as a result of that, that [11] twisting that we were just talking about, the [12] effective wall thickness of the stent will [13] increase as a result; is that correct?
[14] **A:** After balloon expansion, yes.
[15] **Q:** When it twists out of plane, and [16] you have the projecting edges?
[17] **A:** Yes.
[18] **Q:** Okay. Thank you. [19] Now, at the time you wrote the [20] monograph, you were aware it did this, because [21] you had looked at expanded metal; correct?
[22] **A:** No, actually that observation came [23] from my cardboard models. I made — since I [24] couldn't manufacture this in my house, I made

Page 409

[1] large cardboard models, and then I cut out the [2] slots with scissors.
[3] I would tape them together with [4] Scotch tape, and I would put my hands inside [5] simulating a balloon, and I would pull them out.
[6] And I noticed that the ribbons in [7] between the slots actually tended to twist. And [8] since I didn't have the ability to do that with [9] the real thing which would be, you know, dead [10] soft soluble metal, then the assumption was this [11] thing was going to behave like this once it [12] became a real medical device.
[13] That was my assumption when I [14] wrote this monograph after my visit with [15] Mr. Schultz.
[16] **Q:** So it wasn't based on your [17] observations of expanded metal, is that correct?
[18] **A:** No.
[19] **Q:** Let's look at your prior [20] testimony, if we could. Let's go back to Volume [21] 2, please, and let's look at February 9, 2001, [22] if you don't mind, please.
[23] **A:** What's the exhibit number?
[24] **Q:** It's February 9, 2001. Oh,

Page 410

[1] Exhibit 2.
[2] **A:** I'm sorry —
[3] **Q:** Volume 2. Volume 2.
[4] **A:** Volume 2?.
[5] **Q:** Yes.
[6] **A:** And the number?
[7] **Q:** Page number, sir, is 646, Line 13.
[8] **A:** You know the tabs are indicated by [9] TT and then a date.
[10] **Q:** I beg your pardon, sir. [11] Sir, may I ask my colleague to [12] come up and assist? Would that help —
[13] **A:** Yes.
[14] **Q:** Thank you.
[15] **A:** — to save time?
[16] **MR. UNDERHILL:** Jim, I think I [17] gave the wrong page number. Instead of 614, [18] it's 646.
[19] **BY MR. UNDERHILL:**
[20] **Q:** 646, beginning at Line 13, and [21] actually the person asking questions here is [22] Mr. Cavanaugh, who is Mr. Diskant's partner.
[23] Mr. Cavanaugh is here in court [24] today?

Page 411

[1] **A:** Yes.
[2] **Q:** And Mr. Cavanaugh is doing the [3] question?
[4] **A:** Yes.
[5] **Q:** And he's Cordis' attorney?
[6] **A:** Yes.
[7] **Q:** And let me read this to you. The [8] Cordis lawyer asked you: We're looking at the [9] same passage here, and the question is:
[10] "Question: You write there" — [11] could we go back to the language on the —