IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADVANCED CARDIOVASCULAR | ) | |
| SYSTEMS, INC. and GUIDANT SALES | ) | |
| CORPORATION, | ) | |
| | ) | C. A. No. 98-80 (SLR) |
| Plaintiffs, | ) | (Consolidated with C. A. |
| | ) | No. 98-314 (SLR) and |
| | ) | C. A. No. 98-316 (SLR)) |
| v. | ) | |
| | ) | |
| | ) | |
| MEDTRONIC VASCULAR, INC. and | ) | |
| MEDTRONIC USA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEDTRONIC'S REPLY POST-TRIAL BRIEF ON ACS'S INEQUITABLE
CONDUCT BEFORE THE U.S. PATENT AND TRADEMARK OFFICE**

MORRIS, NICHOLS, ARSHT & TUNNELL
Karen Jacobs Louden (#2881)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Attorneys for Defendants Medtronic Vascular, Inc.
and Medtronic USA, Inc.

OF COUNSEL:
Raphael V. Lupo
Donna M. Tanguay
James G. Rizzo
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005

Fay M. Morisseau
Matthew F. Weil
Michael R. O'Neill
David M. Stein
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA 92612-7107

October 7, 2005

## TABLE OF CONTENTS

INTRODUCTION                                                                1

ARGUMENT                                                                    2

I.    ACS CANNOT DISPUTE THAT THE PEOPLE RESPONSIBLE FOR PROSECUTING THE LAU PATENTS HAD INTIMATE KNOWLEDGE OF THE BONEAU PRIOR ART.                                              2

    A.  ACS Cannot Deny That Lau, Lynch, McDermott And Orth Participated In Prosecuting The Lau Patents.                                   2

        1.  Lau, Lynch And Orth All Participated In The Prosecution And Owed A Duty Of Candor.                                         2

        2.  ACS's Contention That Ms. McDermott Did Not Owe A Duty Of Candor Is Contrary To The Evidence.                            3

    B.  ACS Cannot Deny That Lau, Lynch, McDermott and Orth Had Intimate Knowledge Of The Boneau Prior Art.                           3

        1.  Mr. Lynch Analyzed The Boneau Application Twice.           3

        2.  Mr. Lau Had Extensive Exposure To The Boneau Prior Art.    4

        3.  Ms. McDermott Was Deeply Involved In ACS's Review Of The Boneau Prior Art.                                          5

        4.  Mr. Orth Worked Hand-In-Glove With Mr. Lau In Analyzing The Boneau Stent.                                             5

    C.  ACS Does Not Even Attempt To Rebut Medtronic's Showing That ACS Committed Inequitable Conduct When Mr. Barclay Failed To Instruct ACS's Attorneys To Disclose The Boneau Prior Art.                       6

    D.  ACS Cannot Explain Away Its Breach Of The Duty Of Candor By Saying Lynch, Lau, McDermott, Orth, and Barkley Learned About The Boneau Prior Art "Too Late."                                                      6

II.    THE BONEAU PRIOR ART WAS UNDENIABLY MATERIAL.              7

    A.  The Boneau Prior Art Is Not Cumulative And Does Not "Teach Away" From Lau, As ACS Contends.                                    8

        1.  The Boneau Prior Art Is Not Cumulative Of Palmaz.         9

        2.  The Boneau Prior Art Is Not Cumulative Of The Lee Scaffold Member Patent.                                             9

        3.  The Boneau Application Does Not Teach Away From Lau.       9

TABLE OF CONTENTS (continued)

B.  The Supposed Lack Of "Functionality" Of The Boneau Stent Does Not Justify ACS's Failure To Disclose The Boneau Prior Art. ..... 11

C.  The Fact That Later Lau Applications Issued Over The Boneau '331 Patent Is Irrelevant. ..... 11

D.  ACS Cannot Explain Away Its Breach Of The Duty Of Candor By Saying Boneau Was Not Prior Art Before The Boneau Patent Issued. ..... 12

E.  ACS's Attack On Medtronic's Corroboration Is Factually And Legally Baseless. ..... 13

F.  ACS's Arguments Concerning The Materiality Of Boneau Are Fatally Undermined By The Fact That ACS Itself Finally Disclosed The Boneau Patent Shortly Before Bringing This Action. ..... 13

G.  ACS's Suggestion That Its Representatives Did Not Know The Boneau Prior Art Was Material Is Not Credible. ..... 14

III.   THE OVERWHELMING EVIDENCE COMPELS A FINDING OF INTENT ..... 15

A.  Consistent with Controlling Case Law, A Finding Of Intent Is Proper In This Case. ..... 15

B.  ACS's Cat-And-Mouse Game With Mr. Boneau and Dr. Stertzer Is Strong Evidence Of Intent. ..... 16

IV.   ACS HAS NOT OFFERED A SHRED OF EVIDENCE TO REBUT THE INFERENCE IT INTENDED TO DECEIVE THE PTO ..... 17

A.  ACS Offers No Evidence To Negate a Finding of Intent. ..... 17

B.  ACS's Effort To Create Doubt With Made-Up Inconsistencies Is Unavailing. ..... 19

C.  ACS's Gamesmanship Over Mr. Lynch's Report Is Improper. ..... 20

CONCLUSION ..... 21

i.

TABLE OF CITATIONS

Cases

*A.B. Dick  Co. v. Burroughs Corp.*,
    798 F.2d 1392 (Fed.Cir.1986)    12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)    16

*Atofina v. Great Lakes Chem. Corp.*,
    2005 U.S. Dist. LEXIS 7365 (D. Del. Mar. 16, 2005)    11

*Baxter Int'l, Inc. v. McGaw, Inc.*,
    149 F.3d 1321 (Fed. Cir. 1998)    7, 10

*Brasseler, USA I, L.P. v. Stryker Sales Corp.*,
    267 F.3d 1370 (Fed. Cir. 2001)    7

*D.O.C.C., Inc. v. Spintech, Inc.*,
    36 U.S.P.Q.2d 1145 (S.D.N.Y. 1994)    15, 16

*FMC Corp. v. Manitowoc Co.*,
    835 F.2d 1411 (Fed. Cir. 1987)    7, 15

*Gardco Mfg., Inc. v. Herst Lighting Co.*,
    820 F.2d 1209 (Fed. Cir. 1987)    11

*Gilbarco, Inc. v. Octel Comm. Corp.*,
    1996 WL 75304 (N.D. Cal. Feb. 15, 1996)    16

*J.P. Stevens & Co., Inc. v. Lex Tex Ltd.*,
    747 F.2d 1553 (Fed. Cir. 1984)    12, 15

*Life Techs. v. Clontech Labs.*,
    224 F.3d 1320 (Fed. Cir. 2000)    12

*Merck & Co. v. Danbury Pharmacal, Inc.*,
    73 F.2d 141 (Fed.Cir.1989)    12

*Molins PLC v. Textron*,
    48 F.3d 1172 (Fed. Cir. 1995)    12

*Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*,
    984 F.2d 1182 (Fed. Cir. 1993)    16

*Semiconductor Energy Lab. v. Samsung Elecs.*,
    204 F.3d 1368 (Fed. Cir. 2000)    7, 15

*Senior Indus., Inc. v. Thomas & Betts Corp.*,
    2002 WL 3118074 (N.D. Ill. Sept. 30, 2002)    16

ii.

## TABLE OF CONTENTS (continued)

*Trovan, Ltd. v. Sokymat S.A.*,
    299 F.3d 1292 (Fed. Cir. 2002)      13

<u>Statutes</u>

35 U.S.C. §102(a)      12

35 U.S.C. §102(b)      12

35 U.S.C. §102(e)      12

35 U.S.C. §102(f)      12

35 U.S.C. §102(g)      12

INTRODUCTION

The Lau patents should be held unenforceable for inequitable conduct because ACS's representatives who were substantively involved in the prosecution of those patents failed to disclose the known and material Boneau prior art to the PTO with an intent to deceive. The Boneau prior art included the disclosures in Mr. Boneau's patent application and resulting patent and the additional information that Mr. Boneau and Dr. Stertzer disclosed to ACS about Mr. Boneau's invention, including Dr. Stertzer's use of multiple stents in a crown-to-crown configuration and Mr. Boneau's idea of connecting multiple stents.

As to ACS's knowledge of the Boneau prior art, the evidence is overwhelming that at least Mr. Lau (the named inventor), Mr. Lynch (the prosecuting attorney), Ms. McDermott (Mr. Lau's supervisor and ACS's liaison with Mr. Lynch), Mr. Orth (another of Mr. Lau's supervisors), and Mr. Barclay (ACS's in-house patent attorney and another of ACS's liaison's with Mr. Lynch) were substantively involved in the patenting process and had extensive knowledge of the Boneau prior art. Mr. Lynch twice conducted a legal analysis of the Boneau application. Ms. McDermott and Mr. Barclay were made privy to those analyses. Mr. Lau, Ms. McDermott, and Mr. Orth met with Mr. Boneau and Dr. Stertzer and learned everything there was to know about the Boneau prior art. Simply put, ACS's representatives could not have had more knowledge of the Boneau prior art.

As to materiality of the Boneau prior art, Medtronic provided, in its opening brief, claim charts, supported by documents and testimony, showing how the Boneau prior art was material to particular claims of the Lau patents. Medtronic also showed that no other prior art reference before the PTO contained such a clear and complete disclosure of those claims. Given this showing, a reasonable patent examiner certainly would have wanted to review the Boneau prior art in connection with the examination of the Lau applications. In fact, in 1997, just months before this suit was filed, ACS's patent attorney twice represented to the PTO that the Boneau patent was relevant to the examination of the Lau applications. Even beforehand, given ACS's detailed analysis of the Boneau prior art, ACS's representatives must be deemed to have known or should have known that the Boneau prior art was material.

Finally, there can be no question that the law compels a finding that ACS intended to deceive the PTO by failing to disclose the Boneau prior art even though it had saturation knowledge of that art and knew or

should have known that the art was material.  The evidence of intent is further supplied by the deceitful cat-and-mouse game that ACS played with Mr. Boneau and Dr. Stertzer for over a year, in which ACS gathered as much information about the Boneau stent technology as possible.  The only way ACS could have rebutted a finding of intent was to have introduced evidence of the subjective good faith of those substantively involved in the prosecution of the Lau patents.  But ACS completely failed to do so.  Instead, ACS attempted to substitute the opinion of its single testifying technical expert -- fifteen years after the fact -- for the required showing of subjective good faith. ACS has cited no authority, and Medtronic is aware of none, that supports its attempt to avoid a finding of intent by coming forward only with *post hoc* opinions of a technical expert, rather than evidence of its actual subjective good faith. Without evidence of subjective good faith, the conclusion is clear -- there was an intent to deceive the PTO by those involved in the prosecution of the Lau applications, and there was inequitable conduct in connection with the prosecution of all four of the Lau patents in suit.

<u>ARGUMENT</u>

I.    ACS CANNOT DISPUTE THAT THE PEOPLE RESPONSIBLE FOR PROSECUTING THE LAU PATENTS HAD INTIMATE KNOWLEDGE OF THE BONEAU PRIOR ART.

ACS states:  "There is no evidence that Mr. Lau – or *anyone* at ACS who was substantively involved in the Lau prosecution – had knowledge of the Boneau patent application."  (D.I. 686 at 37 (emphasis in original)).  This statement is demonstrably, and indeed, spectacularly, false.  The facts overwhelmingly establish that Mr. Lau, Mr. Lynch, Ms. McDermott, Mr. Orth, and Mr. Barclay were substantively involved in the patenting process, and that they had extensive knowledge of the Boneau prior art, including the Boneau application.  Knowledge on the part of any one of these ACS representatives would be sufficient to support a finding of inequitable conduct.  The combined knowledge of all five -- all of whom had a duty of candor -- is devastating.

A.    ACS Cannot Deny That Lau, Lynch, McDermott And Orth All Participated In Prosecuting The Lau Patents.

1.    Lau, Lynch And Orth All Participated In The Prosecution And Owed A Duty Of Candor.

Mr. Lau was the lead inventor and signed an oath acknowledging the duties he owed to the PTO.  (Fact 52).  Mr. Lynch reviewed the Boneau application, which he referred to in his invoice as "prior

art," and prepared and prosecuted the first Lau application from September 1990 to October 1992. (Facts 35-38).[1]  Mr. Orth was Mr. Lau's supervisor whose duties included patenting ACS's intellectual property, reviewing the Lau application, and providing information to ACS's patent counsel. (Fact No. 54). Given this level of involvement, these individuals clearly came within the duty of candor owed to the PTO.

> ### 2.  ACS's Contention That Ms. McDermott Did Not Owe A Duty Of Candor Is Contrary To The Evidence.

ACS contends that "Medtronic has provided no evidence that Ms. McDermott was involved in any substantive way in the Lau patent prosecution." (D.I. 686 at 11).   ACS, however, ignores Ms. McDermott's own testimony.  Ms. McDermott testified that her duties included meeting with Mr. Lau regarding his stent work, patenting ACS's intellectual property, and communicating with Mr. Lynch on the prior art. (Facts 13, 53). This level of involvement clearly gives rise to a duty of candor to the PTO.

> ### B.  ACS Cannot Deny That Lau, Lynch, McDermott And Orth Had Intimate Knowledge Of The Boneau Prior Art.

> ### 1.   Mr. Lynch Analyzed The Boneau Application Twice.

ACS points out that Mr. Lynch "testified that he did not recall thinking about the [Boneau] application when [he] prepared [the Lau] application," and then ACS argues there is "no evidence that Mr. Lynch had contemporaneous knowledge of the [Boneau] application when he prepared and filed the Lau patent application." (D.I. 686 at 19-20). This argument is logically and factually incorrect. The fact is, Mr. Lynch testified that he did not remember anything of any importance having to do with his preparation of the Lau application. He did not remember meeting with the inventors in connection with the application (D.I. 671, Tr. at 535:23-536:1) or ever talking to anyone at ACS about any prior art. (D.I. 670, Tr. at 248:7-24). He recalled the drafting of the application only "vaguely" (D.I. 671, Tr. at 534:21-535:3) and did not even have a "specific recollection of filing the application." (D.I. 670, Tr. at 228:1-19). Clearly, Mr. Lynch's professed lack of recollection proves nothing.

At the same time, the evidence is overwhelming that Mr. Lynch actually knew about the Boneau application. He reviewed and analyzed the Boneau application in January 1990, which he referred to in his

---

[1] The "Facts" refer back to the numbered facts set forth in Medtronic's opening brief, D.I. 683.

invoice as "prior art"; he wrote a report about the Boneau application in January 1990; he discussed the Boneau application with Mr. Boneau's attorney, James Eakin, in March 1990; he reviewed the Boneau application again in March 1990; and he discussed the Boneau application with Ms. McDermott in March 1990. (Facts 16-18, 22-24). Mr. Lynch clearly had knowledge of the Boneau application when he started preparing the Lau application only months later in September 1990.[2]

ACS creates more excuses, suggesting that Mr. Lynch passed the Lau file to Mr. Nagy before the first Information Disclosure Statement ("IDS") was filed (D.I. 686 at 19-20), as if to argue that the left hand didn't know what the right hand was doing. The problem for ACS is that Mr. Lynch did not have any problem acknowledging that he had a continuing duty of candor that did not end when he transferred the file (Facts 49), and Mr. Nagy, who filed the IDS, admitted years later that the Boneau patent was "relevant." (Facts 43).

2.    Mr. Lau Had Extensive Exposure To The Boneau Prior Art.

Mr. Lau prepared the Bronco report, setting forth many of the details of the Boneau stent's structure and operation and ranking the Boneau stent in terms of 17 separate stent attributes. (Facts 25-29). Mr. Lau testified that he had no recollection of how or where he obtained that information. (Fact 27). However, there was no publicly available information about the Boneau stent structure at that time.[3] (Id.). Mr. Lau could have obtained the detailed information in his Bronco report only directly or indirectly from the application that

---

[2]    ACS complains about a lack of direct evidence concerning the exact nature of Mr. Lynch's contemporaneous knowledge, but here, ACS is improperly trying to use the attorney-client privilege as both a shield and a sword. It was ACS that asserted the privilege and refused to produce Mr. Lynch's files, which would have been the best direct evidence on this point. (D.I. 686 at 20, 36 & 38).

[3]    According to ACS, this assertion flies in the face of admissions in the *DiMassa* case that "work on the Boneau stent was *open and obvious*" and that "Boneau and Stertzer's work on Boneau was *no secret.*" D.I. 686 at 13 (emphasis in original). Medtronic repeatedly warned that ACS should not be permitted to cite small snip-its of the record from prior, unrelated cases because there would be a significant risk that statements would be taken grossly out of context and misrepresented to the Court. That is exactly what ACS has done. The *DiMassa* case was a shareholder derivative suit in which the knowledge of the plaintiff shareholders of Mr. Boneau's stent work at his prior company, called Stenticor, was relevant to a statute of limitations defense. The brief that is referenced in the requests for admissions that ACS cites makes perfectly clear that Mr. Boneau's work was "open and obvious" and "no secret" *within Stenticor*, not to the public. (D.I. 434, Exh. 15 at 9-10, 18, 20, 22). Moreover, the brief's reference to disclosures made at American Heart Association meetings in 1990 and 1991 (in fact, the 1990 meeting was held in *November, after* Lau completed his report) merely refers to the fact that Mr. Boneau and Dr. Stertzer publicized that they were clinically testing a stent known as the "Boneau stent." (*Id.*). There is no reference at all to any public disclosures of any details of the structure and operation of the Boneau stent, let alone details that Mr. Lau included in his Bronco report. (*Id.*).

Mr. Boneau had provided to ACS.[4]  (Fact 27).  Mr. Lau also met and had discussions with Mr. Boneau and Dr. Stertzer regarding the Boneau stent, Dr. Stertzer's implantation of multiple Boneau stents in a crown-to-crown configuration, and Mr. Boneau's idea of using sutures to connect multiple Boneau stents.  (Facts 31-32).  Mr. Lau also obtained prototypes of Boneau stents and conducted testing on those prototypes.  (Facts 31-34).  Thus, Mr. Lau clearly had knowledge of all aspects of the Boneau prior art – the Boneau application, the crown-to-crown concept, and the use of connectors.

       3.       Ms. McDermott Was Deeply Involved In ACS's Review Of
               The Boneau Prior Art.

Ms. McDermott met with Dr. Stertzer to discuss the Boneau stent; she was involved in at least Mr. Lynch's second review of the Boneau application, and thus had access to the application; she attended Mr. Boneau's and Dr. Stertzer's formal presentation on the Boneau stent, which included Dr. Stertzer's clinical use of the stent; and she had discussions with Mr. Orth regarding his subsequent meetings with Mr. Boneau and his review and testing of Mr. Boneau's prototypes.  (Facts 11, 22-23, 31, 34).  Thus, Ms. McDermott indisputably had knowledge of at least the Boneau application and Dr. Stertzer's use of multiple Boneau stents in a crown-to-crown configuration.  In the face of testimony of Mr. Boneau, Dr. Stertzer, Mr. Lynch, and Mr. Orth, who placed her not only "at the scene," but in charge of patent prosecution, Ms. McDermott's videotaped testimony that she did not even remember the name "Michael Boneau" is not only incredible, but it also casts serious doubt on the veracity of ACS and its witnesses.  (D.I. 670, Tr. at 269:13-20).

       4.       Mr. Orth Worked Hand-In-Glove With Mr. Lau In Analyzing
               The Boneau Stent.

Mr. Orth had knowledge of all aspects of the Boneau prior art.  He met with Dr. Stertzer to discuss the Boneau stent; he supervised Mr. Lau in the preparation of the Bronco report (which included a detailed analysis of the Boneau stent); he attended Mr. Boneau's and Dr. Stertzer's presentation on the Boneau

---

[4]    ACS says the Boneau stent described in Mr. Lau's Bronco report differed in minor respects from the Boneau stent prototypes Mr. Boneau provided to ACS and disclosed in the Boneau application.  This, ACS claims, proves that Mr. Lau did not have access to the Boneau application.  D.I. 686 at 12.  This, however, proves only that Mr. Boneau's patent application disclosed a broad range of stent sizes, far broader than the limited prototypes that Mr. Boneau later provided to ACS.  The fact is that Mr. Lau had an opportunity to explain where he got his information about the Boneau stent; he claimed to not know or remember.  (D.I. 671, Tr. at 428:18-23; 505:2-11; 506:18-507:2; & 507:8-24).

stent (at which Dr. Stertzer discussed his clinical use of the stent); he attended ACS's subsequent meetings with Mr. Boneau; and participated in Mr. Lau's review and testing of the Boneau prototypes. (Facts 11, 31-32, 34). At trial, Mr. Orth also claimed to have had "little to no information on the Boneau stent," though it was included in the Bronco report. (D.I. 671, Tr. at 403:6-12). This testimony, however, does not overcome the testimony of both Mr. Boneau and Dr. Stertzer relating to Mr. Orth's involvement and knowledge.

      C.      ACS Does Not Even Attempt To Rebut Medtronic's Showing That ACS Committed Inequitable Conduct When Mr. Barclay Failed To Instruct ACS's Attorneys To Disclose The Boneau Prior Art.

Mr. Barclay's duties included reviewing Mr. Lau's invention disclosures, deciding whether to file for patents on those disclosures, monitoring the work of ACS's patent counsel on the prosecution of the Lau applications, and communicating with patent counsel about the Boneau prior art. (Fact 55) Mr. Barclay was involved in Mr. Lynch's first review of the Boneau application, and he received Mr. Lynch's written report related to that first review. (Facts 16-18). Mr. Barclay plainly had both knowledge of the Boneau prior art and direct, supervisorial involvement in the prosecution of the Lau patents. Medtronic detailed these facts in its opening brief. Yet, ACS does not mention Mr. Barclay anywhere in its forty-page opposition. With its silence, ACS admits that it simply has no response to the charge that ACS committed inequitable conduct when Mr. Barclay failed to instruct ACS's attorneys to disclose the Boneau prior art to the PTO.

      D.      ACS Cannot Explain Away Its Breach Of The Duty Of Candor By Saying Lynch, Lau, McDermott, Orth, and Barkley Learned About The Boneau Prior Art "Too Late."

In its response, ACS suggests that no one at ACS had any real knowledge of the Boneau prior art until Mr. Boneau and Dr. Stertzer gave their first "substantive presentation" in August/September 1990, months after Mr. Lau allegedly conceived his invention in March 1990. (D.I. 686 at 8 & 10). ACS's suggestion is both incorrect and irrelevant.

First, the evidence of record established that ACS had detailed knowledge of the Boneau stent and the Boneau patent application before Lau made his alleged invention. The following facts are undisputed: In the Spring of 1989, Dr. Stertzer started meeting with senior ACS executives regarding the Boneau stent, including Ms. McDermott and Mr. Orth. (Fact 11). In May 1989, Mr. Boneau also started meeting with senior ACS executives regarding the Boneau stent. (Fact 12). In August 1989, Mr. Boneau provided ACS with a copy of

his patent application, and at least Ms. McDermott and Mr. Barclay had access to the application. (Facts 14, 16-17, 22-23). In January 1990, after ACS told Mr. Boneau it was not interested in the Boneau stent, ACS had Mr. Lynch review and provide a written report to Mr. Barclay about the Boneau application. (Facts 16-19). These events all occurred well before Mr. Lau allegedly conceived his invention in March 1990.

Other evidence establishes that ACS had even more information before the "substantive presentation." It is undisputed, for example, that in March 1990, ACS again had Mr. Lynch review and report on the Boneau application and that Ms. McDermott participated in that process. (Facts 22-24). It is also undisputed that beginning in mid-1990, Mr. Lau and Mr. Khosravi started preparing their Bronco report, which included a detailed analysis of the Boneau stent, a stent which Mr. Khosravi conceded that, if manufactured by laser cutting, would "effectively be" a Lau stent. (Facts 25-29). These events, too, all occurred before the "substantive presentation" in August/September 1990.

More importantly, however, the only timing issue relevant to this case is the undisputed fact that Mr. Boneau conceived and constructively reduced his invention to practice when he filed his patent application in August 1989, before Lau even began his stent work. Thus, the Boneau application is prior art to Lau regardless of when ACS learned of it. To the extent ACS had any doubts as to whether Boneau's stent, or his related work, was prior art, ACS had a duty to conduct a reasonable inquiry by at least asking Mr. Boneau about the timing of his inventions and the use of those inventions. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987); *see also* MPEP §2001.02 (1989). ACS, and particularly its counsel, could not avoid its duty to disclose the Boneau prior art by remaining silent and cultivating ignorance. *Brasseler, USA I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1383 (Fed. Cir. 2001).

## II.    THE BONEAU PRIOR ART WAS UNDENIABLY MATERIAL.

An undisclosed prior art reference is material when it discloses a number of relevant features or suggests a combination of some of the elements of the claimed invention, *Semiconductor Energy Lab. v. Samsung Elecs.*, 204 F.3d 1368, 1374 (Fed. Cir. 2000); *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998), or is simply a "more complete combination of relevant features, even if those features are before the patent examiner in other references." *Semiconductor Energy*, 204 F.3d at 1374. In its opening brief, Medtronic established that the Boneau prior art was material to the Lau application. (D.I. 683 at 25-29).

Medtronic even attached a claim chart to its brief detailing just how the Boneau application disclosed each and every one of the limitations of one of the original claims of the Lau patent application (claim 23, later cancelled) save for the "plurality of generally parallel connecting elements." (*See* id., Exh. C). Medtronic's showing of materiality here left nothing to speculation, nothing to a judgment call, and nothing to debate. Exhibit C spells out in black and white (and blue and red), and with great clarity, why a reasonable PTO examiner would have wanted to consider the Boneau prior art when examining the Lau claims.

The proper inquiry regarding materiality is to consider the position of a reasonable Examiner in 1991 and ask, simply, "would the Examiner have wanted to consider this art?" Medtronic's claim chart (Exhibit C to its brief) makes it absolutely clear that the answer to that question would be "yes." In the face of this clear and convincing showing, the raft of *post hoc* rationalizations ACS offers up to justify its failure to disclose are simply unpersuasive.

> A.     The Boneau Prior Art Is Not Cumulative And Does Not "Teach Away" From Lau, As ACS Contends.

Medtronic's opening brief detailed why the Boneau prior art is not cumulative to either the Lee patent or the Palmaz patent. (D.I. 683 at 29-30). Medtronic also showed that there are claims in each of the Lau patents in suit for which the Boneau prior art is the closest prior art to Lau with the greatest combination of relevant features. (*Id.* at 30-31). In an effort to come up with a *post hoc* justification for its failure to disclose the Boneau prior art, ACS casts around for other art that disclosed some of the same elements as the Boneau prior art. Specifically, ACS now argues that the Boneau prior art was cumulative to the Lee '917 patent and the Palmaz '417 patent, also known as the Spiral Palmaz.[5] D.I. 686 at 31-36. This argument lacks merit.[6]

---

[5]     During the June trial, ACS claimed that it wished to present evidence of several other prior art references for purposes of showing cumulativeness. (D.I. 671, Tr. at 297:12-13; 315:14-316:4). The parties agreed to allow ACS to address those references in its post-trial brief. (*Id.* at 316:6-12; 560:7-14). ACS's response, however, does not mention any additional references.

[6]     Notably, ACS does *not* contend this *post hoc* justification was actually in the minds of ACS's representatives when they decided not to disclose Boneau to the PTO. Indeed, ACS did not offer any testimony or evidence that any of these arguments ever occurred to anyone other than its single expert, much less to the people prosecuting the Lau patents. For example, no one testified that the Boneau application was not disclosed to the PTO because Mr. Lynch or Mr. Lau believed that Palmaz or Lee was a more complete disclosure of the elements in Lau.

### 1.     The Boneau Prior Art Is Not Cumulative Of Palmaz.

ACS points out that, at the liability trial, Medtronic argued that the Palmaz patent anticipates certain claims of the Lau patents.  According to ACS, even though Medtronic did not prevail on this argument, it nevertheless prevents Medtronic from now arguing that the Boneau prior art is material.  (D.I. 686 at 3).  ACS argues that if Palmaz had all of the elements of Lau, then the Boneau prior art could not have been a more complete reference.

Medtronic has already shown why this is wrong. (D.I. 683 at 26-27).  In addition, however, ACS should not be permitted to play fast and loose with the facts.  ACS cannot, on the one hand, vehemently (and successfully) argue at the liability trial that Palmaz did not contain all of the elements of the Lau claims, but argue in its response to a charge of inequitable conduct that the Boneau prior art is cumulative of Palmaz because Palmaz does in fact contain all of the elements of the Lau claims.  Moreover, this argument takes Medtronic's anticipation argument out of context.  At the liability trial, Medtronic responded to ACS's specific infringement case as of February 2005 and pointed out that to the extent ACS argued that it need only show L<D in the expanded state, then the Palmaz patent anticipated certain claims of the Lau '154 patent which were alleged to be infringed.  Medtronic also did not address other claims which it is now addressing.  For example, the Boneau prior art was material to cancelled claim 23 of the Lau '154 patent.  (*See* D.I. 683, Exh. C).  Cancelled claim 23 was not addressed during the liability trial.

### 2.     The Boneau Prior Art Is Not Cumulative Of The Lee Scaffold Member Patent.

The Lee patent -- which does not even disclose a stent of the sort conceived by Mr. Boneau and, later (purportedly), by Mr. Lau -- is not cumulative of the Boneau prior art for the several reasons detailed in Medtronic's opening brief.  (*See* D.I. 683 at 29-30).  In addition, the Lee patent is not even prior art to the Lau patents because Mr. Lau could have sworn behind the Lee filing date.  37 C.F.R. §1.131(a).  ACS's only response is that Mr. Lau did not, in fact, swear behind Lee.  (D.I. 686 at 34).  The fact that Mr. Lau could have sworn behind the Lee patent means that the Lee patent is not prior art to Lau.

### 3.     The Boneau Application Does Not Teach Away From Lau.

ACS next argues that the Boneau application is not material because it purportedly teaches away from

the connected rings of Lau, an argument that it bases solely on the opinions of its expert, Dr. Segal.  (D.I. 686 at 1, 7, 28-29).  ACS's argument, however, is nothing more than an effort to draw the Court's attention to its claim construction of the Boneau patents, where the Court ruled that Mr. Boneau disclaimed connected stents by statements he made *during prosecution*.  Indeed, during the June trial, ACS made several references to the Court's claim construction ruling, and it now cites the claim construction ruling in its response.  (D.I. 541, 542; D.I. 686 at 29).  However, statements that Mr. Boneau made during prosecution years after he disclosed his application to ACS, and the Court's claim construction based on those statements made many years after that, are not relevant to this analysis here.  The only thing that is relevant is the scope and teaching of the disclosure of the Boneau application.  It is the scope and teaching of that disclosure that defines the prior art, not the Court's finding that limiting statements were subsequently made during prosecution.  In that light, ACS's argument lacks merit because it does not square with either the legal authorities or the facts.

More fundamentally, the Boneau application does not teach away from connected rings as ACS argues.  "'[I]n general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant.'"  *Baxter Int'l*, 149 F.3d at 1328 (citation omitted).  ACS states that "Boneau shows only unconnected stents."  (D.I. 686 at 29). As an initial matter, this disregards the fact that Mr. Boneau expressly disclosed connected Boneau stents to various ACS's representatives, including Mr. Lau and Mr. Orth.  (Fact 32).  Moreover, the fact that the application does not expressly teach connected Boneau stents does not mean that it necessarily teaches away from connected stents.  The application clearly discloses the use of multiple Boneau stents and uses "comprising" claim language, which alerts the reader that undisclosed structures may be added.  ACS does not and cannot cite to any language from the application that in any way suggests that connecting multiple Boneau stents should be avoided, would not work, or would not likely achieve a desired result.

Unable to point to language in the Boneau patent itself, ACS turns to the opinions of its expert, Dr. Segal, who testified that "one of the primary principles of the Boneau patent is that you don't connect these stents together."  D.I. 686 at 6.  Dr. Segal's opinion, however, finds no support in the Boneau application.  Dr. Segal completely fails to tie his opinions to any specific language in the Boneau application or patent or otherwise cite evidence for his suggestion that a user would not or should not connect multiple Boneau stents,

that doing so would not work, or that doing so would produce an undesired result. Moreover, Dr. Segal's opinion stands in contrast with the Court's ruling that Mr. Boneau disclaimed connecting multiple Boneau stents. The Court presumably could not have found that Mr. Boneau had disclaimed connected Boneau stents unless the disclosure of the Boneau patent contemplated at least the possibility of connections.

  B.  The Supposed Lack Of "Functionality" Of The Boneau Stent Does Not Justify ACS's Failure To Disclose The Boneau Prior Art.

  ACS also argues that the short Boneau stents expressly disclosed in the Boneau application are not material because they purportedly would not be functional. (D.I. 686 at 6). This position, too, is based solely on the opinions of ACS's expert, Dr. Segal. ACS does not contend that anyone at ACS actually had in his or her mind that ACS did not have to disclose the Boneau prior art because Boneau stents of certain dimensions were not "functional." ACS certainly did not offer any testimony or evidence that during the prosecution of the Lau patents anyone believed that the Boneau prior art was not material for this reason. Like ACS's other *post hoc* arguments for why the Boneau prior art was supposedly not material, this is a pure after-thought, cooked up just for purposes of this litigation.

  When discussing the fact that the Boneau patent supposedly "teaches away" from Lau, ACS and Dr. Segal invite the Court to read words and limitations into the Boneau application about functional requirements that it does not contain. Now, however, ACS and Dr. Segal invite to Court to do just the opposite: to completely ignore the words and disclosures that are expressly stated in the application. It is the scope and teaching of the Boneau application that defines the prior art. However much it may want to do so, ACS cannot ignore those express teachings. The Boneau application indisputably discloses a stent that satisfies the Lau L<D limitation. (Facts 5). To the extent ACS genuinely believed that short Boneau stents would not be functional (and there is no evidence that it did), ACS should have disclosed the Boneau prior art and proffered its opinions to the PTO during the prosecution of Lau applications, not during an inequitable conduct trial.

  C.  The Fact That Later Lau Applications Issued Over The Boneau '331 Patent Is Irrelevant.

  ACS argues that the Boneau prior art is not material because, once ACS finally got around to disclosing part of it – the Boneau '331 patent – in August 1997, it never formed the basis for an actual rejection of a Lau claim. (D.I. 686 at 29). Although ACS accuses Medtronic of misstating the law, it is

actually ACS that has it backwards.  It is established that a reference does not have to provide the basis for an <u>actual</u> rejection to be material.  *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed. Cir. 1987) (a reference is material even if it would not have actually led to a rejection of any claims); *Atofina v. Great Lakes Chem. Corp.*, 2005 U.S. Dist. LEXIS 7365 (D. Del. Mar. 16, 2005).

The cases that ACS cites, *J.P. Stevens & Co., Inc. v. Lex Tex Ltd.*, 747 F.2d 1553, 1562 (Fed. Cir. 1984) and *Life Techs. v. Clontech Labs.*, 224 F.3d 1320, 1327 (Fed. Cir. 2000), do not support its position. (D.I. 686 at 29).  In *Molins PLC v. Textron*, 48 F.3d 1172 (Fed. Cir. 1995), which is cited in the *Life Techs.* case, the Federal Circuit held that the lack of an actual rejection does not mean that a reference is not material:

> Nor is a reference immaterial simply because the claims are eventually deemed by an examiner to be patentable over it.  *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed.Cir.1989) ('That the claimed invention may have been superior ... to both the cited and withheld prior art may be a basis for patentability;  it cannot serve automatically to render the withheld prior art either cumulative or immaterial.'); *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1396 (Fed.Cir.1986) (that the claims may be patentable over the withheld prior art is not the test for materiality).  Thus, the fact that the examiner did not rely on Wagenseil to reject the claims under reexamination or the '410 method claims is not conclusive concerning whether the reference was material.

*Molins*, 48 F.3d at 1179-80.  Further, in *Life Techs.*, the PTO *expressly stated* that the withheld prior art had no bearing on the patents.  224. F.3d at 1327.  That clearly is not the case here.  Finally, this is not a case, like *Life Techs.*, where the patentee ultimately came clean and made a full disclosure to the PTO.  Here, even when ACS finally disclosed the Boneau '331 patent, it still withheld material information about the Boneau prior art, including Dr. Stertzer's implantation of multiple Boneau stents in a crown to crown configuration and Mr. Boneau's idea of connecting multiple stents together.

D.    ACS Cannot Explain Away Its Breach Of The Duty Of Candor By Saying Boneau Was Not Prior Art Before The Boneau Patent Issued.

Although ACS does not say so directly, it hints that its failure to disclose may be excusable because the Boneau application purportedly only became prior art retroactively when the Boneau '331 patent issued in 1994.  D.I. 686 at 1, 27-28 (citing 35 U.S.C. §102(e)).  That is wrong.  There can be no question that the Boneau application was prior art at all times for purposes of ACS's duty of disclosure because it is undisputed that Mr. Boneau conceived his inventions in 1988 and reduced them to practice in 1989 with the filing of his patent application, all well before Mr. Lau allegedly conceived his inventions in March 1990, and indeed, well

before Mr. Lau even began his stent work.  As a result, the Boneau prior art, including the Boneau application and European application, was always prior art to Lau under 35 U.S.C. §§102(a), (b), (e), (f), and (g).

      E.      <u>ACS's Attack On Medtronic's Corroboration Is Factually And Legally Baseless.</u>

ACS's contention that Dr. Stertzer's implantation of multiple Boneau stents in a crown-to-crown configuration and Mr. Boneau's idea of connecting multiple Boneau stents together are not prior art because they are uncorroborated (D.I. 686 at 1, 25-27) is mistaken, this time on both the facts and the law.

In suggesting that Medtronic has failed to meet some threshold level of "corroboration" (a proposition for which ACS offers no relevant authority), ACS is confusing the standards that apply for purposes of validity and for purposes of inequitable conduct.  The cases that ACS cites about the need for corroboration all relate to validity claims, not to inequitable conduct claims.  The remaining cases that ACS cites relating generally to inequitable conduct claims all involve situations in which the patentee had only some vague knowledge, if that, relating to the prior art.  These cases are easily distinguishable from this case, where Dr. Stertzer and Mr. Boneau provided a full formal presentation to ACS, which included clinical data and angiogram photographs, and where Mr. Boneau met extensively for days with at least Mr. Lau and Mr. Orth and told them everything there possibly was to know about the Boneau technology.  (Facts 11-14; 30-32).

As a factual matter, moreover, at the very least, Dr. Stertzer's implantation of multiple Boneau stents in a crown-to-crown configuration was corroborated by the testimony of Mr. Boneau and Dr. Stertzer.  The testimony of two witnesses constitutes corroboration.  *Trovan, Ltd. v. Sokymat S.A.*, 299 F.3d 1292, 1303 (Fed. Cir. 2002).  Further, Dr. Stertzer testified as to the types of photographs that he showed to ACS, providing at least one as an example.  (D.I. 670, Tr. at 66:22-67:12).  It is no surprise that neither Mr. Boneau nor Dr. Stertzer would still have the exact angiogram photographs that they showed to ACS fifteen years ago.

      F.      <u>ACS's Arguments Concerning The Materiality Of Boneau Are Fatally Undermined By The Fact That ACS Finally Disclosed The Boneau Patent Shortly Before Bringing This Action.</u>

In 1997, six years into the prosecution of the Lau patents, ACS twice disclosed to the PTO a part of the Boneau prior art – the Boneau '331 patent – and twice admitted to the PTO that the Boneau patent was relevant to the inventions claimed in Lau.  ACS tries to parse words, arguing that its patent attorney's use of the term "relevant" in describing the Boneau patent to the PTO was not the same as material.  (D.I. 686 at 31).

ACS also argues that ACS disclosed the Boneau patent in an IDS under 37 C.F.R. § 1.97, which purportedly did not constitute an admission that the Boneau patent was material.  *Id.*

      The initial problem with ACS's argument is that its patent attorney did not initially describe the Boneau patent to the PTO as being relevant prior art in an IDS but rather initially made that representation at an in-person meeting with the examiner.  AX-2586, LJA at 1790.  "When an applicant states that something is prior art, it is taken as being available as prior art against the claims."  M.P.E.P. §2129.  Moreover, ACS's argument ignores the very purpose of an IDS – for patentees to disclose to the PTO all of the prior art references they believe may be material.  If ACS did not believe that the Boneau patent was material, it begs the question:  Why did ACS ever disclose it to the PTO?  ACS never answers that question.  Common sense dictates that ACS's patent attorney did not personally travel to the PTO to tell the examiner about worthless prior art that he did not believe was really material.  ACS submitted the Boneau patent because it knew that it was material prior art, and knew the time to disclose it was before it sued Medtronic on the Lau patents.

      G.     **ACS's Suggestion That Its Representatives Did Not Know The Boneau Prior Art Was Material Is Not Credible.**

      In its opening brief, Medtronic showed that ACS must have known that the Boneau prior art was material, especially given the timing of ACS's review of the Boneau prior art.  Medtronic showed that ACS must have had some interest in, or concern about, the Boneau prior art in January 1990 when it first sent a copy of the Boneau application to Mr. Lynch for his review and opinion.  (Facts 16-18).  Medtronic also showed that ACS must have had a heightened interest in the Boneau prior art again in early March 1990 when Ms. McDermott had Mr. Lynch, for the second time, review and opine on the Boneau application only days after Mr. Lau reached the conception point of his invention on March 2, 1990.  (Facts 22-24).

      ACS responds that there was nothing about Mr. Lau's work on March 2, 1990 that made that day a "bombshell" or "watershed event."  (D.I. 686 at 10).  ACS's position is belied by the record.  Mr. Lau was clear that March 2, 1990 was the date of his final conception of his invention.  He testified that as of that date, he could have "dropped dead" and ACS would have been able to take his lab notebook and practice his invention.  (D.I. 671, Tr. at 451:25-456:16).  Thus, that certainly was a bombshell event, and he would have had every reason to report that event to his immediate supervisor, Ms. McDermott, who in turn ran to Mr.

Lynch for an opinion about the Boneau application within just several days.

ACS also responds that its actions in having Mr. Lynch review the Boneau prior art in January and March 1990 were consistent with the fact that Mr. Boneau was "shopping" his invention. (D.I. 686 at 5, 10-11). This response is absolutely false. As an initial matter, ACS is precluded from even taking this position since it asserted the privilege, and thus blocked Medtronic from pursing discovery and testimony related to the actual reasons for Mr. Lynch's reviews of the Boneau application. ACS cannot use the privilege as both a shield and a sword. Moreover, ACS's position is belied by the record. It is undisputed that in September 1989, ACS told Mr. Boneau it was not interested in pursuing the Boneau stent technology, and, indeed, ACS had no interest in pursuing any metal stent technology. (Fact 15). It is also undisputed after September 1989, ACS had no further contact with Mr. Boneau until July 1990. (Fact 30) Thus, ACS cannot legitimately contend that Mr. Lynch's early 1990 reviews were in any way related to Mr. Boneau "shopping his stent" because, by that time, Mr. Boneau's "shopping" was over; ACS had rejected his technology. ACS's position is also belied by Mr. Lynch's March 1990 invoice in which he describes his work as "[C]onference with Ms. McDermott regarding the prior art and the scope of the claims." DTX 1010. Mr. Lynch's description of the Boneau application as "prior art" is most telling. If Mr. Lynch was reviewing the Boneau application as "prior art," it begs the question: Prior art to what? The only plausible explanation is that Mr. Lynch was asked to review the Boneau application from the perspective of being prior art to Mr. Lau's alleged invention.

The chain of events just outlined, as well as the fact that ACS spent so much time and effort assessing the Boneau prior art, compels the conclusion that ACS knew that the Boneau prior art was material.

III.     THE OVERWHELMING EVIDENCE COMPELS A FINDING OF INTENT

A.     Consistent With Controlling Case Law, A Finding Of Intent Is Proper Here.

ACS accuses Medtronic of misstating the law regarding intent and burden shifting. (D.I. 686 at 37-38). ACS, however, is the one that is mistaken.

It is well settled that an inference of intent is warranted when an applicant or his agents knew or should have known that an undisclosed prior art reference would be material to the PTO's consideration. *Semiconductor Energy*, 204 F.3d at 1375; *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n.7 (Fed. Cir. 1987); *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1564 (Fed. Cir. 1984); *D.O.C.C., Inc. v. Spintech,*

16

*Inc.*, 36 U.S.P.Q.2d 1145, 1153 (S.D.N.Y. 1994) (intent to deceive can be inferred from an applicant's inexplicable failure to disclose a known and material prior art reference). It is equally well settled that upon a *prima facie* showing of inequitable conduct, the burden shifts to the patentee to present evidence that would negate a finding of inequitable conduct. *Paragon Podiatry Lab., Inc. v. KLM Lab., Inc.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993); *Senior Indus., Inc. v. Thomas & Betts Corp.*, 2002 WL 31180745, *16 (N.D. Ill. Sept. 30, 2002); *Gilbarco, Inc. v. Octel Comm. Corp.*, 1996 WL 75304, *3 (N.D. Cal. Feb. 15, 1996); *D.O.C.C.*, 36 U.S.P.Q.2d at 1153-54. Contrary to ACS's view, the fact that some of these cases were resolved on summary judgment, as opposed to trial, is of no moment. Courts apply the same substantive evidentiary standards on summary judgment that apply at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."). In addition, ACS's apparent view that the burden of proof never shifts to the patentee clearly is mistaken. *See FMC*, 835 F.2d at 1416 (holding that upon a finding of materiality and intent (upon an inference), the patentee is afforded "an effort to convince the fact finder that the failure to disclose was nonetheless not due to an intent to mislead the PTO . . . .").

ACS mischaracterizes Medtronic's position when it suggests that Medtronic believes that a finding of materiality shifts the burden to ACS to prove a lack of intent. Medtronic recognizes that it bears the burden of proving knowledge, materiality, and intent. Here, however, Medtronic has proven with objective evidence that the ACS representatives substantively involved in the prosecution of the Lau patents knew of the Boneau prior art and also knew or should have known that the Boneau prior art was material. Thus, an inference of intent is well warranted on that basis alone. Moreover, Medtronic has proven up more than just a *prima facie* case of inequitable conduct. Thus, under the authorities cited above, the burden of proof did shift to ACS to come forward with evidence of a lack of intent. Plainly, ACS failed to meet that burden.

        B.    ACS's Cat-And-Mouse Game With Mr. Boneau and Dr. Stertzer Is Strong Evidence Of Intent.

The following facts are undisputed: In 1989, Mr. Boneau and Dr. Stertzer met with ACS executives to discuss the Boneau stent, and Mr. Boneau provided ACS with a copy of his patent application. In September

1989, ACS unequivocally told Mr. Boneau that ACS was not interested in pursuing his stent technology.  In January 1990, despite ACS's stated rejection of Mr. Boneau months earlier and at a time when Mr. Lau was making strides toward developing his stent concept, ACS specifically requested that Mr. Lynch review and provide an opinion about the Boneau application.  In March 1990, despite ACS's prior rejection of Mr. Boneau's stent concepts, and only days after Mr. Lau conceived his alleged inventions, ACS had Mr. Lynch again review and provide an opinion on the Boneau application.  Afterward, ACS flip-flopped and contacted Mr. Boneau expressing a renewed interest.  ACS's representatives then proceeded to meet with Mr. Boneau not once, but four times, and deliberately sought and gathered everything there possibly was to know about the Boneau prior art.  Finally, after draining Mr. Boneau dry of information, ACS once again told Mr. Boneau that it was not interested in pursuing his stent technology.  The only conclusion that can be drawn from this transparent sequence of events is that ACS knew Mr. Boneau's inventions were material to what Mr. Lau was doing, and it duped Mr. Boneau into coming back over and over again so that ACS could gather more information for use in the development of Mr. Lau's stent or to evaluate it from an infringement perspective. The fact that ACS then failed to disclose the Boneau prior art is further evidence that ACS was engaged in a course of deceptive conduct regarding the Boneau technology, including an intent to deceive the PTO.

ACS's present story that its second round of discussions with Mr. Boneau and Dr. Stertzer was an effort to give the Boneau prior art a "fair and thorough review" just does not add up.  It disregards the fact that by that time, ACS had already met with Mr. Boneau, reviewed his technology, and firmly rejected the Boneau prior art.  ACS's present story also does not square with the fact that ACS later met with Mr. Boneau not once, but four times.  ACS cannot seriously contend that after Mr. Boneau provided ACS with prototypes, ACS needed to meet with him that many times to make a "fair and thorough review."  Interestingly, ACS did not offer any evidence that it met with anyone else other than Mr. Boneau regarding a prior art stent to give their stent a "full and fair review," let alone meeting with anyone else to the same extent as ACS met with Mr. Boneau.  ACS's flimsy, *post hoc* explanations are unbelievable and are contradicted by the record.

IV.   ACS HAS NOT OFFERED A SHRED OF EVIDENCE TO REBUT THE INFERENCE THAT IT INTENDED TO DECEIVE THE PTO

A.   ACS Offers No Evidence To Negate a Finding of Intent.

ACS did not offer any evidence that anyone substantively involved in the patenting process believed that the Boneau prior art was not prior art or not material to the inventions claimed in the Lau applications. Similarly, ACS did not offer any evidence of what anyone substantively involved in the patenting process was told or understood about the concept of materiality. ACS also blocked all evidence of the discussions between ACS and both Mr. Lynch and Mr. Nagy regarding the Boneau application and the materiality of that application.[7] Instead, ACS merely offered the testimony of Mr. Lau and Mr. Orth that they believed that the Boneau prototypes – not the Boneau prior art (a significant distinction) – were "different" than Mr. Lau's stent. This "it was different" position is completely meaningless for a number of reasons.

First and foremost, neither Mr. Lau nor Mr. Orth testified that the Boneau prior art was not disclosed to the PTO because of their alleged belief that the Boneau stent prototypes were somehow "different." Thus, Mr. Lau's and Mr. Orth's testimony, standing alone, is not relevant to the inequitable conduct analysis. Second, Mr. Lau's and Mr. Orth's testimony relating to Boneau stent prototypes disregards the remaining Boneau prior art. ACS does not even address the broader disclosure set forth in Mr. Boneau's patent application to which at least Mr. Lynch, Mr. Lau, Ms. McDermott, and Mr. Barclay had access. Finally, ACS did not offer testimony from any of the other people who were substantively involved in the patenting process, including Mr. Lynch, Mr. Nagy, Ms. McDermott, and Mr. Barclay, that they thought that some aspect of the Boneau prior art was "different." Just because two out of all of the people involved in the prosecution allegedly believed that some aspect of the prior art was "different" certainly does not spill over to, or expunge, the remaining people in the group.

In addition to being completely meaningless, ACS's position is totally irrelevant. Prior art is almost always somehow "different" from the inventions claimed in a patent application. Otherwise, the application should not even be filed, let alone prosecuted.

---

[7]     ACS repeatedly criticizes Medtronic for not deposing Mr. Nagy. As Medtronic pointed out during the trial, however, ACS asserted the privilege with respect to any and all communications its representatives had with Mr. Nagy. Thus, as ACS knows full well, it would have been a complete waste of time and money for Medtronic to depose Mr. Nagy only to hear objections asserted. Medtronic deposed Mr. Lynch only after ACS identified him as a trial witness. Medtronic would have deposed Mr. Nagy if ACS had identified him as a trial witness.

Moreover, during the prosecution of the Lau application, ACS clearly was not using the "different" standard of disclosing prior art to the PTO. ACS makes much of the fact that in his Bronco report, Mr. Lau ranked his stent number one and the Boneau stent number ten. What ACS does not say, however, is that ACS disclosed many of the other stents listed in the Bronco report to the PTO, even the stent that Mr. Lau ranked as number 9, the Gianturco-Roubin stent. ACS cannot seriously contend that the stent Mr. Lau ranked as number 10 was too "different" to disclose, yet the stent that Mr. Lau ranked as number 9 was not too "different." Such a position is implausible, to say the least. Finally, as proof positive that ACS was not using the "it's different" standard of disclosing prior art to the PTO, ACS disclosed an ear wick patent. ACS cannot possibly argue in good faith that it believed that an ear wick patent was more material to Mr. Lau's alleged invention than was the Boneau prior art. ACS's "different" argument is yet another manufactured argument, cooked up solely for this litigation, rather than based in any fact.

**B.    ACS's Effort To Create Doubt With Made-Up Inconsistencies Is Unavailing.**

Fully aware of the weakness in its substantive case, ACS resorts to personal attacks on Mr. Boneau and Dr. Stertzer. ACS twice points out that Mr. Boneau testified that in the Spring of 1989, he showed Mr. Sampson of ACS a prototype Boneau stent, but that in a prior, unrelated case, Mr. Boneau testified that after he signed an NDA with ACS, he did not provide a prototypes to ACS until 1990. (D.I. 686 at 1, 4). ACS refers to this as a "blatant" inconsistency. Again, however, ACS is taking snip-its of the record from prior, unrelated cases. As an initial matter, it is not clear that Mr. Boneau did, in fact, contradict his prior testimony. Mr. Boneau signed NDAs with ACS in May 1989 and August 1989. In the prior case, if Mr. Boneau was being asked whether he showed ACS a prototype after signing the August 1989 NDA, then he would have answered correctly. Moreover, Mr. Boneau correctly testified that between this case and other prior cases, he has about 3,500 pages of deposition testimony. The fact that ACS was able to find one possible and slight inconsistency between Mr. Boneau's trial testimony and about 3,500 pages of prior testimony does not suggest that Mr. Boneau is untrustworthy. To the contrary, it shows that Mr. Boneau has been amazingly consistent, which in turn suggests that his testimony is especially credible. Finally, ACS's repeated attacks on Mr. Boneau are a red herring. It does not matter whether Mr. Boneau showed ACS prototypes at their first meeting or at a subsequent meeting. It is undisputed that he showed ACS prototypes before ACS filed the first

Lau application. (Facts 32, 34). That is all that matters.

ACS also tries to make some hay out of the fact that Dr. Stertzer corroborated some, but not every single statement made by Mr. Boneau. (D.I. 686 at 4). This, however, is based on ACS's apparent misunderstanding that Mr. Boneau and Dr. Stertzer both attended all of the same meetings with all of the same ACS representatives. That is not the case. It was made clear that in 1989, Dr. Stertzer was meeting with certain ACS executives, and Mr. Boneau was meeting with other ACS executives. (Facts 11-12). It was similarly made clear that in 1990, Mr. Boneau and Dr. Stertzer both attended one meeting, but that Mr. Boneau attended several other meetings by himself. (Facts 31-32). In view of the facts, there were no inconsistencies between Mr. Boneau's and Dr. Stertzer's testimony, and it was not surprising that Mr. Boneau and Dr. Stertzer did not have the same knowledge of every event and conversation that occurred.

### C.    ACS's Gamesmanship Over Mr. Lynch's Report Is Improper.

ACS's desperate scheme with Mr. Lynch's report provides compelling evidence of its intent to deceive. As this Court will recall, ACS steadfastly refused to produce any part of Mr. Lynch's files to Medtronic, including his January 1990 report to Mr. Barclay about the Boneau application, and it steadfastly refused to allow any inquiry into the contents of those files. In what can be seen only as the epitome of gamesmanship, shortly before its response was due, ACS wrote Medtronic a letter asking for permission to show the Court the Lynch report *in camera*. ACS did not, however, offer to show the report to Medtronic. Medtronic quickly responded, asking ACS to cite authority that it would be appropriate to submit substantive evidence to the Court, which is acting as the fact finder, on an *in camera* basis, months after the close of evidence and without any right of cross-examination. Exh. A. ACS presumably had no such authority as it did not respond (and cites none in its brief).

ACS hopes to persuade the Court that the contents of the report are not harmful and that it would have given the report to the Court but Medtronic prevented it from doing so. ACS's offer to show the report to the Court (the fact finder in this case) should be rejected as gamesmanship. ACS must have known that Medtronic would reject the offer as improper. ACS played this calculated game of judicial "chicken" in an attempt to blunt the devastating impact of its decision not to reveal the contents of Mr. Lynch's report. It does not take much to see through this tactic.

<u>CONCLUSION</u>

Based on the applicable law, the facts established by evidence in the trial record, and the reasons discussed in Medtronic's briefing, Medtronic respectfully requests this Court enter an Order finding that the Lau '154, '167, '168 and '133 patents are unenforceable due to ACS's inequitable conduct before the U.S. Patent & Trademark Office.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ *Karen Jacobs Louden*
Karen Jacobs Louden (#2881)
klouden@mnat.com
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
Attorneys for Attorneys for Defendants Medtronic Vascular, Inc. and Medtronic USA, Inc.

OF COUNSEL:
Raphael V. Lupo
Donna M. Tanguay
James G. Rizzo
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005

Fay M. Morisseau
Matthew F. Weil
Michael R. O'Neill
David M. Stein.
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue
Suite 400
Irvine, CA 92612-7107

October 7, 2005
486553

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on October 7, 2005 I electronically filed the foregoing with

the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Frederick L. Cottrell, III
Anne Shea Gaza
**Richards Layton & Finger**
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

I further certify that on October 7, 2005 I served copies of the foregoing to the following counsel

in the manner indicated:

<u>By Hand</u>

Frederick L. Cottrell, III
Anne Shea Gaza
**Richards Layton & Finger**
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

**<u>By Federal Express</u>**

Michael A. Morin
Finnegan Henderson Farabow Garrett & Dunner
901 New York Ave., N.W.
Washington, DC  20001


*/s/  Karen Jacobs Louden*
Karen Jacobs Louden
klouden@mnat.com