# EXHIBIT A

CONFIDENTIAL EXHIBIT

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT CARDIOVASCULAR
SYSTEMS INC. and ABBOTT
LABORATORIES INC.,

              Plaintiffs,

vs.

MEDTRONIC VASCULAR, INC. and
MEDTRONIC USA, INC.

              Defendants.

**COPY**

C.A. No. 98-80 (SLR)
(Consolidated with
C.A. No. 98-314 (SLR)
and
C.A. No. 98-316 (SLR))

The Deposition of **JOEL K. KAHN, M.D.** taken by the

Defendants, pursuant to Notice, before Elizabeth A. Tubbert,

RPR, (CSR-4248), a Notary Public within and for the County of

Oakland, State of Michigan, at 900 Wilshire Drive, Suite 202,

Troy, Michigan, on Saturday, September 15, 2007.

APPEARANCES:

    FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
    BY:  ANDREW J. VANCE, Esq.
    901 New York Avenue, NW
    Washington, D.C. 20001-4413
    (202) 408-4000

        Appearing on behalf of the Plaintiffs

    GIBSON, DUNN & CRUTCHER, LLP
    BY:  FREDERICK S. CHUNG, Esq.
    1881 Page Mill Road
    Palo Alto, California 94304
    (650) 849-5392

        Appearing on behalf of the Defendants

2

```
1                        I N D E X

2    WITNESS                 EXAMINER            PAGE

3    JOEL K. KAHN, M.D.      CHUNG                3

4                            VANCE               81

5


6                        -  -  -

7
     EXHIBIT NO.                                 PAGE
8
     Kahn No. 1   Declaration of Joel K. Kahn, M.D.    4
9
     Kahn No. 2   Subpoena in a Civil Case             5
10
     Kahn No. 3   Letter dated September 6, 2007 from  7
11                Anne Shea Gaza, w/attachments

12   Kahn No. 4   Press Release from Boston Scientific  59

13   Kahn No. 5   Medical Device Recalls              62

14   Kahn No. 6   Boston Globe article                64

15   Kahn No. 7   Evaluation of the Medtronic (Driver)  66
                  Cobalt-Chromium Alloy Coronary
16                Stent System

17   Kahn No. 8   "Cardiovascular stent design and     66
                  vessel stresses: A finite element
18                analysis"

19   Kahn No. 9   "Safety and Efficacy of Siolimus     68
                  and Paclitaxel-Eluting Coronary
20                Stents

21   Kahn No. 10  "Long-Term Outcomes with Drug-       70
                  Eluting Stents versus Bare-Metal
22                Stents in Sweden"

23   Kahn No. 11  Expert Report of Joel K. Kahn, MD,   75
                  FACC, FSCAI
24

25
```

3

```
 1                              Troy, Michigan
 2                              Saturday, September 15, 2007
 3                              At or about 9:25 a.m.
 4                         -  -  -
 5                    JOEL K. KAHN, M.D.,
 6          a witness herein, having been duly sworn by the
 7          Reporter/Notary Public, testified as follows:
 8                         -  -  -
 9                         EXAMINATION
10     BY MR. CHUNG:
11     Q     Good morning, Doctor.
12     A     Good morning.
13     Q     Could you please state your name and address for the
14           record.
15     A     Yes.  Joel Kahn, K-A-H-N, and my professional address
16           is 4600 Investment Drive, Troy, Michigan.
17     Q     And what is your residence address?
18     A     2935 Long Ridge Court, West Bloomfield, Michigan.
19     Q     I know that you've been deposed many times before,
20           including in this case, so I won't go through the
21           whole litany, but I just want to make sure you
22           understand that you are testifying under oath today
23           just as you would be in a court of law?
24     A     Yes.
25     Q     And is there any reason you can think of why you would
```

4

| | | |
|---|---|---|
| 1 | | not be able to testify truthfully and accurately |
| 2 | | today? |
| 3 | A | No. |
| 4 | | (A document was marked Kahn Exhibit 1 by |
| 5 | | the reporter.) |
| 6 | Q | Let's go ahead and take a look at what's been marked |
| 7 | | as Exhibit 1. |
| 8 | | Do you recognize this document? |
| 9 | A | Yes. |
| 10 | Q | What is it? |
| 11 | A | It's a five-page report slash -- actually, six-page -- |
| 12 | | I apologize -- report, or declaration, that I prepared |
| 13 | | with Mr. Vance and completed in June, and it has my |
| 14 | | curriculum and then a couple of articles on one aspect |
| 15 | | of the report that I provided Mr. Vance. |
| 16 | Q | Did you prepare this Declaration yourself? |
| 17 | A | I wasn't the person who typed it, but it came as a |
| 18 | | product of telephone conversations, probably in May, |
| 19 | | with Mr. Vance.  Maybe some of it into June. |
| 20 | Q | Did you review the final typed and signed version? |
| 21 | A | Yes. |
| 22 | Q | Is there anything in your Declaration that you would |
| 23 | | like to retract or modify? |
| 24 | A | Maybe clarify one line on page 2, point 7.  The line |
| 25 | | that talks about competing bare-metal stents.  Right |

1   now Cordis, of course, isn't selling the one they had

2   sold, the Bx Velocity. It could be read to imply that

3   they are currently selling a bare-metal stent. They

4   only sell a drug-eluting stent. But other than that

5   comment, no, I would not change or modify or amplify

6   anything else.

7   Q   Do you know when Cordis stopped selling the Bx

8       Velocity stent?

9   A   Actually, I don't know the exact date. I don't.

10  Q   Do you know an approximate date?

11  A   It would be a guess. In my own personal use I've used

12      it but it wasn't a big selection and I don't know when

13      it went off my hospital shelves and off the market.

14  Q   Do you recall when the last time was that you used it?

15  A   It's a rough estimate. Two years ago.

16  Q   Aside from that correction, is there anything else

17      that you would like to change in your report?

18  A   No.

19                      (A document was marked Kahn Exhibit 2 by

20                      the reporter.)

21  Q   Let's go ahead and take a look at what's been marked

22      as Exhibit 2.

23                      Do you know what this document is?

24  A   Yes. It's a subpoena that arrived or was delivered to

25      my office about two weeks ago that is titled "Exhibit

1           example, the tortuousness of the blood vessels, in

2           your determination of which stent to use?

3  A    It's always a factor, but it isn't usually the primary

4           factor.  It still has to be first decision what's the

5           vessel diameter and what's the lesion length and

6           what's on the shelf from the various manufacturers

7           that meet those two requirements.  And if we're

8           talking, again, very currently, multiple manufacturers

9           are providing highly flexible and deliverable

10          bare-metal stents.  So tortuosity is always a factor,

11          but it can be overcome by the current families of

12          bare-metal stents from multiple manufacturers.

13  Q    For a particularly tortuous anatomy, in your

14          experience, what stent or stents have you determined

15          to be more suited to that type of implantation?

16                 MR. VANCE:  Objection.  Vague.

17  A    We're talking current product lines?

18  Q    (By Mr. Chung)  Well, let's talk about your experience

19          generally.

20  A    There's a few factors.  Shorter stents tend to be more

21          deliverable through tortuous anatomy than longer

22          stents, as a characterization.  Smaller stents may be

23          lower profile than larger stents, may be more

24          deliverable, but you still have to pick the right

25          stent for the vessel.  The cobalt-chromium Driver and

44

```
 1              Vision line have on occasion been placed in vessels
 2              that a stainless steel stent couldn't reach.
 3              Although, in my experience, issues like that are
 4              usually overcome with adjustments in the guide
 5              catheter or the guide wire more so than the stent
 6              itself.  Appropriate predilatation of the vessel might
 7              need to be done more aggressively before the stent is
 8              placed.  All these are part of the process of
 9              delivering stents through tortuous coronary arteries.
10      Q       If I could go back to what you said about the
11              cobalt-chromium stents, what is it about those stents
12              that made them easier to deliver to tortuous vessels?
13                      MR. VANCE:  Objection.  Foundation.
14      A       These have been isolated examples where head to head
15              stents in a patient could be compared, but my
16              familiarity would be one aspect is that they are
17              thinner struts, and I can't explain from an
18              engineering standpoint, but that does lead to greater
19              flexibility compared to most of the stainless steel
20              stent lines, but, again, the Liberte I believe is
21              right now down there with the same strut thickness as
22              the Vision and Driver, essentially.  And I can't speak
23              again from an engineer as to the difference in
24              flexibility of stainless steel and cobalt-chromium
25              alloys, but there is the impression that there is
```

45

1        slightly more flexibility to the cobalt-chromium based

2        stents, but it's relatively rare to have great

3        problems delivering a stent nowadays.

4   Q   (By Mr. Chung)  In your experience have you ever

5        started out by trying to implant a particular

6        bare-metal stent and then during the procedure

7        switched to a different bare-metal stent?

8   A   Sure.

9   Q   Under what circumstances does that arise?

10  A   Where stent A can't be delivered, of course.  Could be

11       multiple reasons for it, but simply just doesn't get

12       to where you want it to go.

13  Q   And in your experience, has any particular stent been

14       more likely to be stent A than others?

15  A   Only generally a stainless steel stent is more likely

16       to be stent A than a cobalt alloy, but not a

17       particular brand.

18  Q   So if I understand, in your experience in some

19       cases --

20  A   I'm going to interrupt for a minute.  It's actually a

21       patient call, which I didn't expect.

22           MR. CHUNG:  Let's go off the record.

23           (Whereupon, a recess was held.)

24             - - -

25           (The following question and answer was

51

1  A  Yes, but there are also multiple studies that have

2     indicated in the real world that it isn't being

3     observed with an increased frequency.  It's

4     controversial at the present time.

5  Q  But as a result of that controversy, the relative

6     ratio of bare-metal stents to drug-eluting stents has

7     increased in your practice; correct?

8  A  Right, and particularly in the patient groups or

9     lesion groups that aren't in the original FDA-approved

10    instructions used for drug-eluting stents.

11 Q  In the past did you implant drug-eluting stents in

12    situations where it wasn't FDA approved?

13 A  Where that patient type wasn't FDA approved, yes, like

14    a heart attack patient.

15 Q  And within the last year that has changed?

16 A  Right.  Reverted back towards largely bare-metal stent

17    use.

18 Q  Do you know about cardiologists generally, whether

19    that has been the case, or is it just your practice?

20 A  No, I believe -- and I obviously can't speak to all

21    cardiologists, but there has been a trend that I've

22    heard of from sales representatives, from our

23    literature, from meetings, that is similar and that

24    there being a drop in the percentage of drug-eluting

25    stents used in the last six months.

1    A    Well, aspirin lifelong is recommended for both, while

2         a bare-metal stent generally requires about a month of

3         dual antiplatelet drugs, and the recommendation has

4         until recently been that for the Cypher stent three

5         months of dual therapy and for the Taxus stent six

6         months of dual therapy was recommended.  Although

7         recently, 12 months, and even before that some were

8         saying 9 to 12 months was the recommendation.  Now

9         it's pretty much agreed upon 12 months if possible for

10        all these drug-eluting stents is recommended, and the

11        optimal duration is very controversial right now.

12   Q    In your practice what is the duration that you most

13        commonly prescribe antiplatelet therapy?

14   A    For a drug-eluting stent?

15   Q    Yes.

16   A    For probably more than a year, aspirin lifelong, and

17        the second agent, which is almost always Plavix, for a

18        year, and I would, until about a year ago, stop Plavix

19        in most patients nine to 12 months out.  And I have

20        not observed a problem with that in my own patients.

21        I am now extending it beyond a year unless there is a

22        major bleeding, bruising or cost issue to the patient.

23   Q    Does long-term antiplatelet drug therapy pose issues

24        for some patients?

25   A    Yes.

54

1    Q    What are those issues?  I think you've mentioned a
2         couple of them but I just want to make sure I've got
3         them.
4    A    Cost and bleeding would be the two, and then in the
5         need for either an elective or urgent surgical
6         procedure can be problematic in terms of stopping the
7         antiplatelet drug safely.
8    Q    When you say stopping it safely, does that involve
9         something other than stopping the bleeding?
10   A    No.  Stopping the drug.  If an emergency gall bladder
11        needs to be done and somebody is on the two agents,
12        the issue of stopping the antiplatelet drugs to allow
13        the surgeon to operate and the risk of a stent
14        thrombosing are real life issues that come up and are
15        more problematic in drug-eluting stent patients.
16   Q    Have you ever started a PCI procedure with a
17        drug-eluting stent but during the procedure switched
18        to a bare-metal stent?
19   A    Yes.
20   Q    Under what circumstances has that arisen?
21   A    Just failure despite all methods to deliver the
22        drug-eluting stent to the target lesion.
23   Q    Is that because the bare-metal stents that you have at
24        your disposal are more deliverable than the
25        drug-eluting stents that you have at your disposal?

55

| | | |
|---|---|---|
| 1 | A | Generally there is no difference because the success |
| 2 | | rate is very high implanting drug-eluting stents, but |
| 3 | | there will be isolated patients with a unique anatomy |
| 4 | | where that appears to be the case, yes. |
| 5 | Q | In those instances you've switched from a stainless |
| 6 | | steel platform drug-eluting stent to a cobalt-chromium |
| 7 | | bare-metal stent; is that correct? |
| 8 | A | That would generally be the type of switch, yes. |
| 9 | Q | And your experience has been that those bare-metal |
| 10 | | stents are more deliverable in those particular |
| 11 | | situations? |
| 12 | A | Yes.  Isolated examples that's true. |
| 13 | Q | Have you ever had the situation where a drug-eluting |
| 14 | | stent has been implanted and you've had to augment the |
| 15 | | therapy with a bare-metal stent? |
| 16 | A | Ever?  Probably, yes.  Infrequently. |
| 17 | Q | Under what circumstances can you recall that having |
| 18 | | arisen? |
| 19 | A | It would almost always be a -- again, a dissection at |
| 20 | | the distal end of the drug-eluting stent and the |
| 21 | | difficulty of getting a second stent through the |
| 22 | | already-implanted stent and a cobalt stent being the |
| 23 | | easiest or possibly only stent to be delivered to that |
| 24 | | target lesion. |
| 25 | Q | Is it true that drug-eluting stents are more expensive |

|    |   |                                                             |
|----|---|-------------------------------------------------------------|
| 1  |   | than bare-metal stents?                                     |
| 2  | A | Yes.                                                        |
| 3  | Q | Do you know how much more expensive?                        |
| 4  | A | I think my hospital pays about $2,200 for a                 |
| 5  |   | drug-eluting stent and I'm going to say about 800- to       |
| 6  |   | $900 for a bare-metal stent.                                |
| 7  | Q | If there were only one bare-metal stent on the market       |
| 8  |   | or one brand of bare-metal stent, would you consider        |
| 9  |   | that to be sufficient choice in your practice?              |
| 10 | A | Yes.                                                        |
| 11 | Q | If that one brand were Boston Scientific's bare-metal       |
| 12 |   | stent, would you consider that to be sufficient choice      |
| 13 |   | in your practice?                                           |
| 14 | A | I'll preface, I have not memorized the range of stent       |
| 15 |   | sizes for the Liberte, for example.  I don't think          |
| 16 |   | they have a small vessel stent and I don't think they       |
| 17 |   | have a very long stent and a larger vessel stent, so        |
| 18 |   | the answer would become no.  It would be a good             |
| 19 |   | workhorse stent but it wouldn't be sufficient to            |
| 20 |   | address all the needs of my patients.                       |
| 21 | Q | If the one brand of bare-metal stent on the market          |
| 22 |   | were a Medtronic brand, would that be a sufficient          |
| 23 |   | choice for you?                                             |
| 24 | A | A great workhorse stent but not sufficient for the          |
| 25 |   | same reasons:  Both the sizing of stents from the           |

57

1       smallest to largest and length. I would have to

2       compromise my decision making if that were the sole

3       stent line available to me, but that would be a

4       relatively small number of patients that that would

5       affect.

6   Q   A smaller number of patients would be affected than if

7       it were the Boston Scientific bare-metal stent line?

8   A   Yes. I'm quite sure that the Driver product line

9       covers a wider range of sizes in diameter. I think

10      similar in length, but wider in diameter. So I would

11      be more pleased to only have the Medtronic Driver and

12      Mini-Driver line on my product shelf if I were forced

13      to limit it to one provider than the previous one we

14      discussed, but it still would leave me with a few

15      examples that would be suboptimal.

16  Q   Do you know of any other hospitals or doctors who

17      predominantly use one of the bare-metal stent lines

18      other than ACS in their practice?

19  A   I have partners that like over-the-wire platforms and

20      like the Driver and I believe might approach more than

21      50 percent use compared to the Vision line, for

22      example. I'm sure there are others around the country

23      and the city, because I have at least one within my

24      own practice, but I've not done any research or had

25      any recent conversations with anybody to give you a

1       feel for how often that is.

2    Q    So I understand that you haven't done any research on

3       this but just in your general awareness and experience

4       there are doctors elsewhere who prefer other

5       bare-metal stents to the ACS bare-metal stent; is that

6       right?

7    A    Again, I have no doubt we could find examples, given

8       that there is a whole host of product line, product

9       features, relationships with industry, relationships

10      with sales representatives.  All these things do

11      factor into real-life choices.  There probably are

12      examples, like you say.

13    Q    And you mentioned that some of your partners within

14      the Michigan Heart Group prefer the Medtronic

15      bare-metal stent and delivery system to the ACS

16      system?

17    A    I know of one that tries to use as much Medtronic as

18      possible as a goal.  It's based partly, as far as I

19      know, on his preference for over the wire.  I think

20      it's partly based on his relationship with the

21      Medtronic Corporation and the sales representative in

22      terms of both professional and social issues, and

23      that's just common.

24    Q    And this partner practices at the Beaumont Hospital as

25      well?

59

1    A    Right.

2    Q    Have you ever had to deal with recalls of stents?

3    A    Yes.

4    Q    If there were a recall of ACS and Boston Scientific's

5         bare-metal stents, isn't it the case that patients

6         would be harmed if there were no Medtronic bare-metal

7         stent on the market?

8    A    If, hypothetically, their entire product line had a

9         recall with the current market lineup and there were

10        no Medtronic stents, that would be a detriment to

11        patients in this hypothetical.

12   Q    In your past experience what has been the impact --

13        well, let me withdraw that question and start over.

14                   What specific recalls of stents can you

15        remember?

16   A    The ones I'm thinking about are the ones from Boston

17        Scientific in various NIR -- N-I-R -- stent lines that

18        were recalled.  I think one with something called Sox

19        -- S-O-X -- and that wasn't the only one.  I think

20        probably about six or seven years ago there was a

21        string of recalls they were experiencing.  I don't

22        think I can recall another stent recall.

23                   (A document was marked Kahn Exhibit 4 by

24                   the reporter.)

25   Q    Please take a look at what's been marked as Exhibit 4

1             other company besides Medtronic?

2      A     Cypher was the other arm, and it was only 113 patients

3             nationwide.

4      Q     Have you had any experience with ACS's drug-eluting

5             stents?

6      A     No.

7      Q     Do you know Dr. David Pearle?

8      A     I've never heard that name that I know of.

9      Q     Do you know of the Georgetown University Medical

10            Center in Washington D.C.?

11     A     Yes.

12     Q     What has been your experience, if any, with them?

13     A     Clinically and training in courses.  None -- just

14            general reputation of a big academic center.

15     Q     What's their reputation in the medical community?

16     A     Fine academic center, but it's a very general comment.

17            I have no firsthand knowledge.

18     Q     Do you know what tissue prolapse is?

19     A     In terms of stenting, I'm familiar with it, yes.

20     Q     What is it?

21     A     It is the extrusion or presence of some of the intima

22            of the artery through most classically the

23            Palmaz-Schatz gap in the stent, but possibly in other

24            stents through a stent cell into the artery.  It's not

25            desirable.

 1    Q    Is there -- just so I understand, is there a
 2         connection between stent cell size and tissue
 3         prolapse?
 4    A    I don't have an opinion.  I've not really done any
 5         studies on that.  I mean, there is common sense that
 6         says yes, but that's not much of an expert opinion.
 7    Q    Well, aside from your expert opinion, in your
 8         experience, what would you say about that?
 9    A    Well, in the most extreme being the millimeter gap in
10         a Palmaz-Schatz that sometimes is more than a
11         millimeter when you placed it on a bend, yes, that was
12         a fairly large gap and was a situation where one could
13         identify tissue protrusion with some regularity, and
14         with most stents having cell sizes much less than
15         that, you see it much less.  So there is probably a
16         relationship to size, which just makes sense.
17    Q    Is there a relationship between tissue prolapse and
18         restenosis that you're aware of?
19    A    Not that I'm aware of.
20    Q    Is there a common-sense connection between those two?
21    A    Again, I don't have an opinion on that.
22                   MR. CHUNG:  Let's go off the record for
23         one minute.
24                   (There was a discussion off the record,
25                   and a brief recess was held.)

81

1                        - - -

2    Q        (By Mr. Chung)  As far as you know, are there any

3             other makers of bare-metal stents in the United States

4             besides ACS, Medtronic and Boston Scientific at

5             present?

6    A        Not at the present.  It's anticipated Cordis will have

7             a bare-metal stent soon, but not at present.  You've

8             identified all the coronary stent manufacturers.

9    Q        Do you know when Cordis is anticipated to have a new

10            bare-metal stent?

11   A        No.  I hear of negotiations with the Israeli company

12            Medinol -- M-E-D-I-N-O-L -- but that's something

13            anyone could read about in the newspaper.

14   Q        The Medinol stent is not currently sold in the United

15            States; is that right?

16   A        That's right.

17                   MR. CHUNG:  Okay.  I have no further

18            questions.  Thank you very much.

19                   MR. VANCE:  I just have a couple.

20                        - - -

21                   EXAMINATION

22   BY MR. VANCE:

23   Q        Dr. Kahn, comparing the two cobalt-chromium stents

24            available in the U.S. market, the Driver line of

25            stents by Medtronic and the Vision line by ACS, is

1    A      In my opinion, no.

2                   MR. VANCE:  That's all the questions I

3    have.

4                   MR. CHUNG:  I just want to put a standing

5    objection about -- to the extent that this line of

6    questioning goes outside the scope of the Declaration,

7    I object.

8                   (Signature reserved by the deponent.)

9                   (At approximately 11:58 A.M., the

10    deposition was concluded.)

11                       -  -  -

12

13

14    _____

15              JOEL K. KAHN, M.D.

16

17

18

19    Subscribed and sworn to before me this

20    _15th_ day of _October_____, 2007

21    _Heather R Corns_____

22    Notary Public, _Oakland_ County, Michigan

23    My commission expires: _1-9-09_____

24

25

HEATHER R. CORNS
Notary Public, Oakland County, MI
My Commission Expires Jan. 6, 2009

## CERTIFICATE OF NOTARY PUBLIC

STATE OF MICHIGAN )
                  )    SS.
COUNTY OF OAKLAND )

I, Elizabeth A. Tubbert, do hereby certify that the witness whose attached testimony was taken before me in the above-entitled matter, was by me first duly sworn to testify to the truth, the whole truth; that the testimony contained herein was by me reduced to writing in the presence of the witness by means of stenography; afterward transcribed; and that this is the true and complete transcript of the testimony given by the witness.

I further certify I am not connected by blood or marriage with any of the parties, their attorneys or agents; and that I am not interested, directly or indirectly, in the matter of controversy.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal.

*Elizabeth A. Tubbert*

Elizabeth A. Tubbert, CSR-4248
Notary Public, Oakland County, Michigan
My Commission Expires:  October 25, 2011

## E R R A T A   S H E E T

| Page | Line | Reads | Should read |
|---|---|---|---|
| 16 | 10 | competitor. Design | competitor designed |
| 21 | 3 | more safer | safer |
| 21 | 5 | presentation | position |
| 24 | 18 | Cordises | Cordis's |
| 32 | 23 | anginen | angina |
| 38 | 7 | hire | higher |
| 46 | 17 | think also | think I also |
| 50 | 5 | graph | graft |
| 53 | 10 | stents is | stents it is |

(Witness Signature)

# EXHIBIT C

CONFIDENTIAL EXHIBIT

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IMX, INC.,                          )
                                    )
            Plaintiff,              )
                                    )
    v.                              )  Civ. No. 03-1067-SLR
                                    )
LENDINGTREE, LLC,                   )
                                    )
            Defendant.              )


**MEMORANDUM ORDER**

At Wilmington this 25th day of April, 2007, having reviewed plaintiff's motion for

reconsideration and the papers filed in connection therewith;

IT IS ORDERED that said motion (D.I. 295) is granted in part and denied in part,

for the reasons that follow:

1.  The purpose of a motion for reconsideration is to "correct manifest errors of

law or fact or to present newly discovered evidence." Max's Seafood Cafe ex-rel. Lou-

Ann, Inc. v. Quinteros, 176 F. 3d 669, 677 (3d Cir. 1999).  Therefore, a court may

exercise its discretion to alter or amend its judgment if the movant demonstrates one of

the following:  (1) a change in the controlling law; (2) a need to correct a clear error of

law or fact or to prevent manifest injustice; or (3) availability of new evidence not

available when judgment was granted.  See id.

2.  Plaintiff argues that its motion for reconsideration is justified under the above

standard because defendant "has recently identified new evidence - its alleged

workaround and the 'months of design work and pilot testing' that preceded it - that was not previously made available to IMX." (D.I. 296 at 2-3) Plaintiff also identifies a series of district court opinions from other districts where permanent injunctions were issued prior to a conclusion of the appeal process. (Id. at 6) Finally, plaintiff requests an opportunity to pursue discovery and attaches to its motion some exhibits which purport to demonstrate that defendant has experienced a "significant revenue growth that will continue unabated" absent the imposition of an injunction. Plaintiff argues in this regard "that it has already become nearly impossible for [it] to compete or otherwise continue its present business practices as a result of [defendant's] ongoing, infringing conduct." (Id. at 4)

3. I find the above arguments less than persuasive and, therefore, I decline as a matter of discretion to grant plaintiff's request for the imposition of a permanent injunction at this juncture. In the first instance, it is nonsensical for plaintiff to use, as its justification for filing a motion for reconsideration, defendant's representation of a workaround, and then argue (with no supporting evidence of record) that it cannot compete with and, therefore, is suffering irreparable harm because of defendant's "ongoing, infringing conduct." Either defendant is no longer infringing, in which case the imposition of a permanent injunction is not necessary, or defendant has not changed its conduct, in which case there is nothing new of record that justifies this motion for reconsideration.

4. With respect to the cited cases from other jurisdictions, for the most part, the facts of these cases are distinguishable from those at bar.

a. For instance, none of the cases apparently involves a situation in

2

which the judge has determined that the question of infringement was a close one, as I have here.  (D.I. 291 at 40)

      b.  Some of the courts cite as their paramount consideration the fact that the parties were direct competitors in a developing market with a small customer base. See, e.g., Tivo Inc. v. Echostar Communications Corp., 446 F. Supp. 2d 664 (E.D. Tex. 2006); Transocean Offshore Deepwater Drilling, Inc. v. Global Santafe Corp., 2006 WL 3813778 (S.D. Tex. Dec. 27, 2006).  Plaintiff has presented no specific evidence relating to the health or character of the relevant market, but certainly the record supports a description of the customer base as significant.

      c.  Several of the courts cite as support for their decision to impose an injunction the fact that a defendant's cessation of the infringing conduct will not drive a defendant out of business or otherwise work any specific hardship.  See e.g. Wald v. Mudhopper Oilfield Services, Inc., 2006 WL 2128851 (W.D. Okla. July 27, 2006); Black & Decker Inc. v. Robert Bosch Tool Corp., 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006).  Given plaintiff's argument that the LendingTree Exchange is responsible for the capture of market share and increased revenues, and without any specific evidence relating to this issue, it is not clear to me whether the cessation of the infringing conduct (assuming it is on-going) would result in significant hardships to defendant or the public.

      d.  Finally, there are cases in which the courts cite to specific evidence presented by plaintiff relating to such factors as plaintiff's loss of market share, impact on customer relations, etc.  See e.g. Rosco v. Mirror Lite Co., 2006 WL 2844400 (E.D.N.Y. Sept. 29, 2006).  Although plaintiff has presented argument relating to these factors, plaintiff has not submitted any evidence within its own control concerning its

3

financial situation; instead, it has belatedly requested discovery from defendant.  In my estimation, plaintiff has provided too little information to justify the relief requested.

5.  I agree with plaintiff, however, that the damages award should take into consideration defendant's admission that it continued the conduct examined during trial until September 14, 2006.  Therefore, **on or before May 14, 2007**, defendant shall produce an accounting of the number of qualification forms it has transmitted between November 20, 2005 and September 14, 2006.  The judgment entered in this case shall be amended accordingly to award damages commensurate with the amended record of defendant's infringing activities.


United States District Judge

4

# EXHIBIT E

CONFIDENTIAL EXHIBIT

# EXHIBIT F

CONFIDENTIAL EXHIBIT

# EXHIBIT G

# Morgan Stanley

**MORGAN STANLEY RESEARCH**
**NORTH AMERICA**

Morgan Stanley & Co. Incorporated    **Glenn Reicin**
Glenn.Reicin@morganstanley.com
+1 (1)212 761 6494

**Matt Miksic**
Matt.Miksic@morganstanley.com
+1 (1)212 761 6261

**Anthony Yik**
+1 (1)212 761 3788

**David H Roman**
+1 (1)212 761 0071

July 1, 2007

Industry View
**Attractive**

# Hosp. Supplies & Medical Technology

## Lau Patent Update: Noose Tightening on Medtronic

**Quick Comment:** Abbott's move for permanent injunction against Medtronic's Endeavor could put Medtronic's U.S. DES launch at risk. Medtronic and Abbott (Guidant) have been in ongoing litigation since January of 2005 on the Lau patent (see p. 2 for background). Medtronic has been unsuccessful in defending itself against Abbott and has few remaining options, in our view. These include: 1) a patent office re-examination and 2) a pending request for an appeal. Making matters worse, Abbott has been adamant that it has no desire to negotiate on IP with Medtronic, as Medtronic has little to offer at this time. With Friday's filing, we think this legal issue could hamper Medtronic's efforts to enter the U.S. DES market. That said, a sizeable royalty could be an alternative to injunction. While we cannot put odds on an injunction, we do not think that the market is discounting this probability at all.

**What's New:** On Friday evening, Abbott filed a motion for permanent injunction against Medtronic on the Driver bare metal stent and the Endeavor drug eluting stent. The motion cites both Driver (BMS) and Endeavor (DES), whereas previous litigation was limited to BMS. Judge Sue Robinson (Delaware) will be responsible for reviewing the motion and rendering a decision.

**Implications:** We continue to model for a year-end 2007 Endeavor launch in the U.S. Our estimates call for U.S. Endeavor sales of $226MM in F2008 growing to $476MM in F2011. Assuming a 70% incremental margin on sales, this would translate into $0.10 in EPS in F2008 (4%) and $0.19 in F2011 (6%). Absent of a U.S. Endeavor launch, we estimate that our 5-year projected sales and EPS CAGRs would be reduced by 70 bps and 150 bps, respectively, to 9.0% and 9.8%. The next major data point will be the release on Endeavor IV data (expected this month). It is hard to peg the timing of a Court ruling. Overall, we remain Overweight-rated ABT and Underweight-rated MDT.

Morgan Stanley does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Morgan Stanley in the U.S. can receive independent, third-party research on the company covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.morganstanley.com/equityresearch or can call 1-800-624-2063 to request a copy of this research.

**For analyst certification and other important disclosures, refer to the Disclosure Section.**

# Morgan Stanley

**MORGAN STANLEY RESEARCH**

**July 1, 2007**
**Hosp. Supplies & Medical Technology**

### Ongoing Stent Litigation between Abbott and Medtronic

**Lau patent dispute:** Guidant sued Medtronic, claiming that Medtronic's S-7 and Driver stents infringed on Guidant's Lau patent ('133 ).  In January of 2005, Judge Sue Robinson in the U.S. District Court of Delaware ruled that the S-7 and Driver did infringe on certain of the claims pertaining to the Lau patent. This could be meaningful since Driver is the platform for the company's Endeavor Drug Eluting stent program.  Shortly after Judge Robinson's ruling, Medtronic filed a motion of inequitable conduct, claiming that the ways in which Guidant had obtained the Lau patents were not appropriate.  Medtronic also tried to get Judge Robinson to grant another trial.

Since the January 2005 ruling, Medtronic filed claims with the U.S. Patent and Trade Mark Office (PTO) related to the validity of the thirteen claims of the Lau patent Medtronic was found to infringe.  In late December, the PTO made the decision to strike these claims and allow for a re-examination of the Lau patents.

In April of 2007, the Judge ruled that it would deny Medtronic's request for judgment as a matter of law (JMOL), rejecting Medtronic's motion for a new trial.  In April, Judge Robinson denied Medtronic's claim for inequitable conduct (see our note *Lau Patent Update: Options Diminishing for MDT* –dated 4/24/07).  The last outstanding issues are 1) for the U.S. patent office will rule on its re-examination of the Lau patents, already having stricken several claims on which Medtronic was found to infringe back in December of 2006, 2) for Judge Robinson to rule on whether or not she will hear Medtronic's appeal and 3) for the Judge to decide whether to grant Abbott's Friday motion for preliminary injunction.

**evYsio lawsuit:** evYsio is a private Canadian medical device company that licensed several stent patents to Medtronic. These patents were licensed to Medtronic after it appeared that there was a chance the Guidant would be able to block Endeavor from the U.S. market with the Lau patents. Medtronic has filed suit against Guidant in several jurisdictions related to the evYsio patents, including the United States, Ireland, the United Kingdom, Germany, and France.  An outstanding ruling against Abbott in France does grant evYsio the right to enjoin Xience, but Guidant/Abbott management has maintained that these developments will not alter the expected 2H07 launch for Xience in France, as this decision will be appealed and the injunction will be lifted during the appeals process.  As a back-up plan, Abbott has also designed a variation of the Xience stent that has gained CE Mark approval and should not infringe on these patents.  Abbott views the next step to commercialization as gaining reimbursement.

Over the summer, there are several court dates set on eVysio: 1) Abbott's appeal in Vision in France (May), 2) eVysio vs. Xience in the UK (June), 3) Ireland (July), and Germany (August).  Domestically, a Markman hearing is scheduled for August in California with a trial slated to begin about 12 months from now in Texas.

_____

*Morgan Stanley & Co. Incorporated ("Morgan Stanley") is acting as financial advisor to Abbott Laboratories ("Abbott") in its announced proposed sale of its core laboratory diagnostics business included in the Abbott Diagnostics Division and Abbott Point of Care to General Electric Company.*

*Abbott has agreed to pay fees to Morgan Stanley for its financial services, including transaction fees that are subject to the consummation of the proposed transaction.*

*Please refer to the notes at the end of this report*

# Morgan Stanley

**MORGAN STANLEY RESEARCH**

**July 1, 2007**
**Hosp. Supplies & Medical Technology**



**Morgan Stanley ModelWare is a proprietary analytic framework that helps clients uncover value, adjusting for distortions and ambiguities created by local accounting regulations.** For example, ModelWare EPS adjusts for one-time events, capitalizes operating leases (where their use is significant), and converts inventory from LIFO costing to a FIFO basis. ModelWare also emphasizes the separation of operating performance of a company from its financing for a more complete view of how a company generates earnings.

# Disclosure Section

The information and opinions in this report were prepared by Morgan Stanley & Co. Incorporated and its affiliates (collectively, "Morgan Stanley").

## Analyst Certification

The following analysts hereby certify that their views about the companies and their securities discussed in this report are accurately expressed and that they have not received and will not receive direct or indirect compensation in exchange for expressing specific recommendations or views in this report: Glenn Reicin.

Unless otherwise stated, the individuals listed on the cover page of this report are research analysts.

## Global Research Conflict Management Policy

This research has been published in accordance with our conflict management policy, which is available at www.morganstanley.com/institutional/research/conflictpolicies.

## Important US Regulatory Disclosures on Subject Companies

As of May 31, 2007, Morgan Stanley beneficially owned 1% or more of a class of common equity securities of the following companies covered in this report: Abbott Laboratories, Baxter International, Beckman Coulter, Boston Scientific, Dade Behring, Edwards Lifesciences, Gen-Probe Inc., Kyphon, St. Jude Medical.

As of May 31, 2007, Morgan Stanley held a net long or short position of US$1 million or more of the debt securities of the following issuers covered in this report (including where guarantor of the securities): Abbott Laboratories, Baxter International, Beckman Coulter, Becton Dickinson, Boston Scientific, Dade Behring, Edwards Lifesciences, Gen-Probe Inc., Hospira, Johnson & Johnson, Medtronic.

Morgan Stanley & Co. Incorporated and/or their officers own options, rights or warrants to purchase securities of NuVasive.

Within the last 12 months, Morgan Stanley managed or co-managed a public offering of securities of Abiomed, Hansen Medical, Inc..

Within the last 12 months, Morgan Stanley has received compensation for investment banking services from  Abbott Laboratories, Abiomed, Beckman Coulter, Biomet, CYTYC Corporation, Dade Behring, Edwards Lifesciences, Hansen Medical, Inc., Hospira, Medtronic.

In the next 3 months, Morgan Stanley expects to receive or intends to seek compensation for investment banking services from Abbott Laboratories, Abiomed, Baxter International, Beckman Coulter, Becton Dickinson, Biomet, Boston Scientific, CYTYC Corporation, Dade Behring, Edwards Lifesciences, Gen-Probe Inc., Hansen Medical, Inc., Hospira, Johnson & Johnson, Kyphon, Medtronic, NuVasive, St. Jude Medical, Stryker Corporation, Zimmer Holdings, Inc..

Within the last 12 months, Morgan Stanley & Co. Incorporated has received compensation for products and services other than investment banking services from Abbott Laboratories, CYTYC Corporation, Edwards Lifesciences, Hospira, Medtronic.

Within the last 12 months, Morgan Stanley has provided or is providing investment banking services to, or has an investment banking client relationship with, the following companies covered in this report: Abbott Laboratories, Abiomed, Baxter International, Beckman Coulter, Becton Dickinson, Biomet, Boston Scientific, CYTYC Corporation, Dade Behring, Edwards Lifesciences, Gen-Probe Inc., Hansen Medical, Inc., Hospira, Johnson & Johnson, Kyphon, Medtronic, NuVasive, St. Jude Medical, Stryker Corporation, Zimmer Holdings, Inc..

Within the last 12 months, Morgan Stanley has either provided or is providing non-investment banking, securities-related services to and/or in the past has entered into an agreement to provide services or has a client relationship with the following companies covered in this report: Abbott Laboratories, Beckman Coulter, CYTYC Corporation, Edwards Lifesciences, Hospira, Johnson & Johnson, Medtronic.

The research analysts, strategists, or research associates principally responsible for the preparation of this research report have received compensation based upon various factors, including quality of research, investor client feedback, stock picking, competitive factors, firm revenues and overall investment banking revenues.

Morgan Stanley & Co. Incorporated makes a market in the securities of Abiomed, CYTYC Corporation, Dade Behring, ev3, Inc., Foxhollow Technologies, Gen-Probe Inc., Hansen Medical, Inc., Kyphon, NuVasive, Respironics, Inc..

Certain disclosures listed above are also for compliance with applicable regulations in non-US jurisdictions.

# Morgan Stanley

**MORGAN STANLEY RESEARCH**

**July 1, 2007**
**Hosp. Supplies & Medical Technology**

## STOCK RATINGS

Different securities firms use a variety of rating terms as well as different rating systems to descr be their recommendations. For example, Morgan Stanley uses a relative rating system including terms such as Overweight, Equal-weight or Underweight (see definitions below). A rating system using terms such as buy, hold and sell is not equivalent to our rating system. Investors should carefully read the definitions of all ratings used in each research report. In addition, since the research report contains more complete information concerning the analyst's views, investors should carefully read the entire research report and not infer its contents from the rating alone.  In any case, ratings (or research) should not be used or relied upon as investment advice. An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations.

### Global Stock Ratings Distribution

*(as of June 30, 2007)*

For disclosure purposes only (in accordance with NASD and NYSE requirements), we include the category headings of Buy, Hold, and Sell alongside our ratings of Overweight, Equal-weight and Underweight. Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, and Underweight are not the equivalent of buy, hold, and sell but represent recommended relative weightings (see definitions below). To satisfy regulatory requirements, we correspond Overweight, our most positive stock rating, with a buy recommendation; we correspond Equal-weight and Underweight to hold and sell recommendations, respectively.

| Stock Rating Category | Coverage Universe | | Investment Banking Clients (IBC) | | |
|---|---|---|---|---|---|
| | Count | % of Total | Count | % of Total IBC | % of Rating Category |
| **Overweight/Buy** | **892** | **39%** | **316** | **43%** | **35%** |
| **Equal-weight/Hold** | **1017** | **45%** | **320** | **44%** | **31%** |
| **Underweight/Sell** | **356** | **16%** | **94** | **13%** | **26%** |
| **Total** | **2,265** | | **730** | | |

Data include common stock and ADRs currently assigned ratings. An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations. Investment Banking Clients are companies from whom Morgan Stanley or an affiliate received investment banking compensation in the last 12 months.

### Analyst Stock Ratings

Overweight (O). The stock's total return is expected to exceed the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Equal-weight (E). The stock's total return is expected to be in line with the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Underweight (U). The stock's total return is expected to be below the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

More volatile (V). We estimate that this stock has more than a 25% chance of a price move (up or down) of more than 25% in a month, based on a quantitative assessment of historical data, or in the analyst's view, it is likely to become materially more volatile over the next 1-12 months compared with the past three years. Stocks with less than one year of trading history are automatically rated as more volatile (unless otherwise noted). We note that securities that we do not currently consider "more volatile" can still perform in that manner.

Unless otherwise specified, the time frame for price targets included in this report is 12 to 18 months.

### Analyst Industry Views

Attractive (A): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be attractive vs. the relevant broad market benchmark, as indicated below.

In-Line (I): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be in line with the relevant broad market benchmark, as indicated below.

Cautious (C): The analyst views the performance of his or her industry coverage universe over the next 12-18 months with caution vs. the relevant broad market benchmark, as indicated below.

Benchmarks for each region are as follows: North America - S&P 500; Latin America - relevant MSCI country index or MSCI Latin America Index; Europe - MSCI Europe; Japan - TOPIX; Asia - relevant MSCI country index.

*Stock price charts and rating histories for companies discussed in this report are available at www.morganstanley.com/companycharts or from your local investment representative.  You may also request this information by writing to Morgan Stanley at 1585 Broadway, (Attention: Equity Research Management), New York, NY, 10036 USA.*

# Morgan Stanley

## Other Important Disclosures

For a discussion, if applicable, of the valuation methods used to determine the price targets included in this summary and the risks related to achieving these targets, please refer to the latest relevant published research on these stocks. Research is available through your sales representative or on Client Link at www.morganstanley.com and other electronic systems.

This report does not provide individually tailored investment advice. It has been prepared without regard to the individual financial circumstances and objectives of persons who receive it. The securities discussed in this report may not be suitable for all investors. Morgan Stanley recommends that investors independently consider particular investments and strategies, and encourages investors to seek the advice of a financial adviser. The appropriateness of a particular investment or strategy will depend on an investor's individual circumstances and objec ives. The securities, instruments, or strategies discussed in this report may not be suitable for all investors, and certain investors may not be eligible to purchase or participate in some or all of them.

This report is not an offer to buy or sell or the solicitation of an offer to buy or sell any security or to participate in any particular trading strategy. The "Important US Regulatory Disclosures on Subject Companies" section lists all companies mentioned in this report where Morgan Stanley owns 1% or more of a class of common securities of the companies. For all other companies mentioned in this report, Morgan Stanley may have an investment of less than 1% in securities or derivatives of securities of companies mentioned in this report, and may trade them in ways different from those discussed in this report. Employees of Morgan Stanley not involved in the preparation of this report may have investments in securities or derivatives of securities of companies mentioned in this report, and may trade them in ways different from those discussed in his report. Derivatives may be issued by Morgan Stanley or associated persons.

Morgan Stanley and its affiliate companies do business that relates to companies covered in its research reports, including market making and specialized trading, risk arbitrage and other proprietary trading, fund management, commercial banking, extension of credit, investment services and investment banking. Morgan Stanley sells to and buys from customers the securities/instruments of companies covered in its research reports on a principal basis.

With the exception of information regarding Morgan Stanley, reports prepared by Morgan Stanley research personnel are based on public information. Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We have no obligation to tell you when opinions or information in this report change apart from when we intend to discontinue research coverage of a subject company. Facts and views presented in this report have not been reviewed by, and may not reflect information known to, professionals in other Morgan Stanley business areas, including investment banking personnel.

Morgan Stanley research personnel conduct site visits from time to time but are prohibited from accepting payment or reimbursement by the company of travel expenses for such visits.

The value of and income from your investments may vary because of changes in interest rates or foreign exchange rates, securities prices or market indexes, operational or financial conditions of companies or other factors. There may be time limitations on the exercise of options or other rights in your securities transactions. Past performance is not necessarily a guide to future performance. Estimates of future performance are based on assumptions that may not be realized. Unless otherwise stated, the cover page provides the closing price on the primary exchange for the subject company's securities.

To our readers in Taiwan: Information on securities hat trade in Taiwan is distributed by Morgan Stanley Taiwan Limited ("MSTL"). Such information is for your reference only. The reader should independently evaluate he investment risks and is solely responsible for their investment decisions. This publication may not be distributed to the public media or quoted or used by the public media without the express written consent of Morgan Stanley. Information on securities that do not trade in Taiwan is for informational purposes only and is not to be construed as a recommendation or a solicitation to trade in such securi ies. MSTL may not execute transactions for clients in these securities.

To our readers in Hong Kong: Information is distributed in Hong Kong by and on behalf of, and is attributable to, Morgan Stanley Asia Limited as part of its regulated activities in Hong Kong. If you have any queries concerning this publication, please contact our Hong Kong sales representatives.

This publication is disseminated in Japan by Morgan Stanley Japan Securities Co., Ltd.; in Hong Kong by Morgan Stanley Asia Limited (which accepts responsibility for its contents); in Singapore by Morgan Stanley Asia (Singapore) Pte. (Registration number 199206298Z) and/or Morgan Stanley Asia (Singapore) Securities Pte Ltd (Registration number 200008434H), regulated by the Monetary Authority of Singapore, which accepts responsibility for its contents; in Australia by Morgan Stanley Australia Limited A.B.N. 67 003 734 576, holder of Australian financial services licence No. 233742, which accepts responsibility for its contents; in Korea by Morgan Stanley & Co International plc, Seoul Branch; in India by JM Morgan Stanley Securities Private Limited; in Canada by Morgan Stanley Canada Limited, which has approved of, and has agreed to take responsibility for, the contents of this publication in Canada; in Germany by Morgan Stanley Bank AG, Frankfurt am Main, regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin); in Spain by Morgan Stanley, S.V., S.A., a Morgan Stanley group company, which is supervised by the Spanish Securities Markets Commission (CNMV) and states that this document has been written and distributed in accordance with he rules of conduct applicable to financial research as established under Spanish regulations; in the United States by Morgan Stanley & Co. Incorporated, which accepts responsibility for its contents. Morgan Stanley & Co. International plc, authorized and regulated by Financial Services Authority, disseminates in the UK research that it has prepared, and approves solely for the purposes of section 21 of the Financial Services and Markets Act 2000, research which has been prepared by any of its affiliates. Private U.K. investors should obtain the advice of their Morgan Stanley & Co. International plc representative about the investments concerned. In Australia, this report, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act.

The trademarks and service marks contained herein are the property of their respective owners. Third-party data providers make no warranties or representations of any kind relating to the accuracy, completeness, or timeliness of he data they provide and shall not have liability for any damages of any kind relating to such data. The Global Industry Classification Standard ("GICS") was developed by and is the exclusive property of MSCI and S&P.

This report or any portion hereof may not be reprinted, sold or redistributed without he written consent of Morgan Stanley.

Morgan Stanley research is disseminated and available primarily electronically, and, in some cases, in printed form.

**Additional information on recommended securities is available on request.**

# Morgan Stanley

**M O R G A N   S T A N L E Y   R E S E A R C H**

| The Americas | Europe | Japan | Asia/Pacific |
|---|---|---|---|
| 1585 Broadway | 25 Cabot Square, Canary Wharf | 4-20-3 Ebisu, Sh buya-ku | Three Exchange Square |
| New York, NY 10036-8293 | London E14 4QA | Tokyo 150-6008 | Central |
| **United States** | **United Kingdom** | **Japan** | **Hong Kong** |
| Tel: +1 (1) 212 761 4000 | Tel: +44 (0) 20 7 425 8000 | Tel: +81 (0) 3 5424 5000 | Tel: +852 2848 5200 |

## Industry Coverage: Hosp. Supplies & Medical Technology

| Company (Ticker) | Rating (as of) | Price (06/29/2007) |
|---|---|---|
| **David R. Lewis** | | |
| Abiomed (ABMD.O) | O-V (06/01/2007) | $10.78 |
| Beckman Coulter (BEC.N) | NA (04/05/2007) | $64.68 |
| CYTYC Corporation (CYTC.O) | ++ | $43.11 |
| Dade Behring (DADE.O) | E (12/20/2006) | $53.12 |
| Foxhollow Technologies (FOXH.O) | E (12/20/2006) | $21.24 |
| Gen-Probe Inc. (GPRO.O) | O (12/20/2006) | $60.42 |
| Haemonetics Corporation (HAE.N) | E (12/20/2006) | $52.61 |
| ev3, Inc. (EVVV.O) | E (12/20/2006) | $16.88 |
| **Matt Miksic** | | |
| Biomet (BMET.O) | ++ | $45.72 |
| Hospira (HSP.N) | O (03/01/2007) | $39.04 |
| Kyphon (KYPH.O) | E (12/05/2006) | $48.15 |
| NuVasive (NUVA.O) | O (10/16/2006) | $27.01 |
| Respironics, Inc. (RESP.O) | E (06/28/2007) | $42.59 |
| Stryker Corporation (SYK.N) | E (10/28/2005) | $63.09 |
| Zimmer Holdings, Inc. (ZMH.N) | O (04/28/2006) | $84.89 |
| **Glenn Reicin** | | |
| Abbott Laboratories (ABT.N) | O (11/15/2006) | $53.55 |
| Baxter International (BAX.N) | O (06/23/2004) | $56.34 |
| Becton Dickinson (BDX.N) | E (06/23/2004) | $74.5 |
| Boston Scientific (BSX.N) | E (09/22/2006) | $15.34 |
| Edwards Lifesciences (EW.N) | U (03/08/2007) | $49.34 |
| Hansen Medical, Inc. (HNSN.O) | O-V (01/03/2007) | $18.89 |
| Johnson & Johnson (JNJ.N) | E (01/30/2006) | $61.62 |
| Medtronic (MDT.N) | U (05/21/2007) | $51.86 |
| St. Jude Medical (STJ.N) | O (11/20/2006) | $41.49 |

Stock Ratings are subject to change. Please see latest research for each company.

© 2007 Morgan Stanley

# EXHIBIT H



901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

**ANDREW J. VANCE**
202.408.4197
andrew.vance@finnegan.com

September 14, 2007

Matthew A. Hoffman, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197                    *__VIA EMAIL__*

Re:    *Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*
       *C.A. No. 98-80-SLR (consolidated)*

Dear Matt:

       We write to follow up on our recent telephone conversation concerning Medtronic's discovery requests.

       With respect to topic no. 9 of Medtronic's 30(b)(6) notice, Abbott designates Adria Spano to testify on questions relating to communications with an advisory board concerning bare-metal stents. Additionally, for topic no. 13, Abbott designates Adria Spano to testify on questions relating to Abbott's alleged recruitment of employees from Medtronic's stent business.

       With respect to Medtronic's discovery requests concerning "Public or non-public statements, comments, communications, or marketing materials concerning this action since February 2007, including but not limited to those with Morgan Stanley that relate to this action," however, we fail to understand how these requests fall within the scope of discovery permitted by the Court. While Medtronic has asserted that these requests pertain to an "unclean hands" defense to Abbott's request for a permanent injunction, we do not understand how their subject matter could possibly relate to any cognizable "unclean hands" defense, particularly since the Court has stayed proceedings relating to Medtronic's Endeavor. Moreover, given that Abbott has been requesting a permanent injunction in public papers for nearly a decade, we do not see how any alleged announcements concerning Abbott's injunction motion could possibly amount to "unclean hands." If Medtronic still wishes to pursue discovery related to this topic, please explain both Medtronic's "unclean hands" defense and how the desired discovery relates to it

       As discussed, we look forward to continuing to work together to resolve any discovery and scheduling issues in the case.

                                   Sincerely,

                                   *Andrew J. Vance*

                                   Andrew J. Vance

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo



FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

901 New York Avenue, NW ▪ Washington, DC  20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

ANDREW J. VANCE
202.408.4197
andrew.vance@finnegan.com

September 18, 2007

Matthew A. Hoffman, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197                                    ***VIA EMAIL***

        Re:   *Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*
              C.A. No. 98-80-SLR (consolidated)

Dear Matt:

        We write in response to your letter of September 14, 2007.

        With respect to your assertions that Abbott has an obligation to identify the bates numbers of documents that had been produced to Medtronic during pre-trial discovery, we disagree. Medtronic has had these documents for the better part of a decade, and it is just as easy for Medtronic to search through these documents as it would be for Abbott. Indeed, it is more efficient for Medtronic to search since it has propounded the requests. Moreover, these documents were produced in electronic form, and so Medtronic could easily search for desired documents using its electronic database tools. Accordingly, Abbott will not agree to identify bates numbers of documents already produced.

        With respect to the license agreements involving Boston Scientific and Cordis, as explained to you, while Abbott itself has no objection to the production of these agreements, Abbott may not disclose them, or their contents, to Medtronic without permission of the other party to the agreement. Abbott does not have permission to disclose these documents to Medtronic. However, we note that there is a publicly available SEC filing dated June 30, 2000, which includes a redacted version of the Cordis agreement. Attached is a copy, which was provided to Medtronic previously.

        With respect to Dr. Kahn, we have not withheld any substantive documents reviewed by Dr. Kahn in preparation of his declaration. With respect to communications concerning drafts of his declaration, however, as explained to you, the parties have an agreement that documents relating to drafts of expert reports are not discoverable. Medtronic took advantage of this agreement during discovery, and withheld all communications between it and its experts. It is unfair for Medtronic to attempt to renege on this agreement after taking advantage of it.

        With respect to RFP No. 8, you are correct that Abbott has not withheld non-privileged, responsive documents.

Matthew A. Hoffman, Esq.
September 18, 2007
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

        With respect to RFP No. 12, you are correct that Abbott has not withheld documents related to advisory boards related to bare-metal stents.

        With respect to 30(b)(6) topic no. 3, subject to our prior objections, Dr. Schneiderman will answer questions on the topic. However, Dr. Schneiderman will not reveal any information that would violate a confidentiality agreement.

        With respect to 30(b)(6) topic no. 4, Abbott stands by its prior objections. Based on our telephone conference, however, we understand that, through this request, Medtronic essentially seeks information concerning the consideration relating to the agreements with Boston Scientific and Cordis referenced in topic no. 3. As such, this request appears to be substantially duplicative of no. 3. As explained, Dr. Schneiderman will answer questions concerning these agreements to the extent his answers would not violate a confidentiality agreement.

        With respect to 30(b)(6) topic no. 5, despite Abbott's request, Medtronic has failed to identify any cognizable theory that could possibly lead to unclean hands. Accordingly, topic no. 5 is beyond the scope of permissible discovery.

        With respect to 30(b)(6) topic no. 13, Abbott's argument concerning recruitment focuses on Medtronic's recruitment of employees from Abbott's stent business and/or recruitment of Abbott employees for use in Medtronic's stent business. Accordingly, we agree to forego discovery regarding Medtronic's recruitment of Abbott employees that have had no connection to Abbott's stent business, and were not recruited to work for Medtronic's stent business.

        With respect to David Pacitti's declaration, Abbott will have Adria Spano sign a substitute declaration that adopts the substantive paragraphs of Dave Pacitti's declaration, which should resolve the issue.

                                Sincerely,

                                *Andrew J. Vance*

                                Andrew J. Vance

Enclosure

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

ABBOTT LABORATORIES and          )
ADVANCED CARDIOVASCULAR          )
SYSTEMS, INC.,                   )          Civil Action No.
                                 )
        Plaintiffs,              )
                                 )
    v.                           )          **JURY TRIAL DEMANDED**
                                 )
JOHNSON AND JOHNSON, INC. and    )
CORDIS CORPORATION,              )
                                 )
        Defendants.              )

## COMPLAINT FOR DECLARATORY JUDGMENT
## OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Abbott Laboratories and Advanced Cardiovascular Systems, Inc. (collectively

"Abbott") bring this Complaint against Defendants Johnson and Johnson, Inc. and Cordis

Corporation (collectively "J&J"). This is an action for a declaratory judgment and injunctive

relief that United States Patent No. 6,585,764 entitled "Stent With Therapeutically Active

Dosage Of Rapamycin Coated Thereon" (the "Wright '764 patent"), United States Patent No.

6,808,536 entitled "Stent Containing Rapamycin Or Its Analogs Using A Modified Stent" (the

"Wright '536 patent"), and United States Patent No. 6,776,796 entitled "Antiinflammatory Drug

Delivery Device" (the "Falotico '796 patent") are invalid and not infringed by Abbott. The

Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent are attached as Exhibits

A – C, respectively. Abbott alleges as follows:

### THE PARTIES

1.      Abbott Laboratories is a corporation organized under the laws of the State of

Illinois and has a principal place of business at 100 Abbott Park Road, North Chicago, Illinois.

2.    Advanced Cardiovascular Systems, Inc. ("ACS") is a corporation organized under the laws of the State of California and has a principal place of business at 3200 Lakeside Drive, Santa Clara, California. ACS is a subsidiary of Abbott Laboratories.

3.    On information and belief, Johnson and Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

4.    On information and belief, Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida. Cordis is a subsidiary of Johnson and Johnson, Inc.

## JURISDICTION AND VENUE

5.    This action arises under the Patent Laws of the United States (35 U.S.C. § 1 *et seq.*).

6.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.    This Court has personal jurisdiction, general and specific, over J&J.

8.    On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.    On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.    On information and belief, J&J regularly transacts business within this judicial district.

11.    On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

2

12.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

13.    J&J, and in particular Cordis, directly competes with Abbott in the field of intravascular stents used to treat coronary artery disease.

14.    The coronary stent industry is highly litigious. J&J, and in particular Cordis, has a well-known history of suing competitors in this field for patent infringement.

15.    On three occasions within the last ten years, Cordis sued ACS in this district, alleging patent infringement. (*Cordis Corporation, et al v Advanced Cardiovascular Systems, Inc, et al.*, C.A. No. 97-550-SLR; *Cordis Corporation, et al v. Advanced Cardiovascular Systems, Inc, et al*, C.A. No. 97-635-SLR; and *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al*, C.A. No. 98-065-SLR).

16.    In early 2006, J&J and Boston Scientific Corporation ("BSC") each were bidding to acquire assets of Guidant Corporation ("Guidant"), which at the time was the parent corporation of ACS. In conjunction with BSC's bid, ACS would be acquired by Abbott Laboratories, which was the ultimate result.

17.    One of the key assets of ACS was the XIENCE V drug eluting stent system ("XIENCE V"), which elutes a proprietary drug known as everolimus. ACS holds an exclusive patent license to use everolimus for drug eluting stents. In clinical trials, everolimus has proven superior to other drugs.

18.    On information and belief, J&J believed in early 2006 that the XIENCE V would be launched within a few months.

**J&J's Public Threats To Sue For Patent Infringement By XIENCE V**

19.    On information and belief, J&J undertook a public campaign to cast a cloud over the launch of the XIENCE V.

20.    On information and belief, as a main thrust of this public campaign, J&J alleged that the XIENCE V would infringe patents allegedly owned by J&J and that J&J would sue Abbott for infringement by the XIENCE V following its launch.  On information and belief, J&J's allegations related to at least the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

21.    On information and belief, J&J broadcasted threatening statements to industry analysts regarding alleged infringement by XIENCE V, for publication in furtherance of J&J's public campaign.

22.    For example, the Prudential Equity Group, LLC published a report on January 20, 2006, titled "JNJ: Takes Off The Gloves In Its Fight With Boston Scientific For Guidant," attached as Exhibit D ("the Prudential report").  In the Prudential report, parties are identified by their stock symbols:  ABT for Abbott, GDT for Guidant, JNJ for J&J, and BSX for BSC.

23.    On information and belief, the Prudential report relied on information provided in pertinent part by J&J.

24.    Among other things, the Prudential report stated:

JNJ claims that 2 of its patents may be infringed if a company tries to launch a

drug-eluting stent coated with a rapamycin derivative such as . . . GDT's

everolimus.  The potential for JNJ to prevent ABT and BSX from marketing the

Xience-V DES, could give the GDT board pause for approving a BSX-GDT

merger.

4

\* \* \*

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI)

business, including shared rights to GDT's promising everolimus-coated stent,

Xience-V, to ABT.    Although JNJ's patents have never been litigated, JNJ

believes it has a strong intellectual property (IP) position with regard to the use of

rapamycin derivatives on a stent.    JNJ could pursue a preliminary injunction if

ABT and BSX try to launch an everolimus-coated . . . stent. . . . According to

JNJ, the key patents are the Falotico (6,776,796) and Wright (6,585,764) patents.

    25.    On information and belief, J&J anticipated and intended that Abbott and others

would become aware of threatening statements made by J&J to Prudential analysts.

    26.    On January 23, 2006, A.G. Edwards & Sons, Inc. published a report titled

"Healthcare Industry Note: The Game May Be Far From Over," attached as Exhibit E ("the AG

Edwards report").

    27.    On information and belief, the AG Edwards report relied on information provided

in pertinent part by J&J.

    28.    Among other things, the AG Edwards report stated:

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific

(BSX) and others recently that lead us to believe that the Guidant (GDT) game is

far from over.

\* \* \*

We were also reminded by JNJ that it had three patents related to '-limus'

compounds that it thought precluded any other company from using such a

compound on a stent. We were only given two patent numbers (6776796 [the

Falotico '796 patent] and 6585764 [the Wright '764 patent]) . . . .

29. On information and belief, the third patent referenced in J&J's threatening

statements was the Wright '536 patent.

30. On information and belief, J&J anticipated and intended that Abbott and others

would become aware of threatening statements made by J&J to AG Edwards analysts.

31. On January 23, 2006, the International Herald Tribune published an article

headlined "J&J works to discredit rival offer for Guidant," attached as Exhibit F ("the

International Herald article").

32. On information and belief, the International Herald article relied on information

provided in pertinent part by J&J.

33. Among other things, the International Herald article stated:

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for

Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with

Prudential in New York, said in a note to clients sent on Friday.

* * *

Johnson & Johnson's campaign consists of telling analysts and shareholders that

Boston Scientific is in over its head and is tempting patent litigation that may

undercut Boston Scientific's plans.

"They're trying to tell all of us that there are patents out there that they have that

they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G.

Edwards. Wald said he had been called by a Johnson & Johnson employee,

whom he declined to name.

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential.

\* \* \*

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design. At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

\* \* \*

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said. "J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with" . . . Guidant's everolimus, he wrote.

34.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to analysts and others.

35.    On information and belief, J&J made additional threatening statements to industry analysts, asserting that J&J could prevent Abbott from making or selling the XIENCE V by suing for infringement of the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent. On information and belief, J&J anticipated and intended that Abbott and others would become aware of these threatening statements.

36.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, following the launch of the XIENCE V, asserting that the

7

XIENCE V allegedly infringes the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

37.    In March 2006, Guidant publicly announced that the XIENCE V launch would be delayed due to an issue related to manufacturing.

38.    As of the date of this Complaint, the XIENCE V launch is imminent.  On information and belief, J&J is aware that the XIENCE V launch is imminent and is preparing to sue Abbott for infringement by the XIENCE V of the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

39.    On information and belief, J&J has never withdrawn or retracted any of its threatening statements that, following the launch of the XIENCE V, J&J would sue Abbott for infringement of the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

**J&J's Assertions In The Patent Office Of Infringement By XIENCE V**

40.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("Wright Petition") with the United States Patent and Trademark Office in the matter of United States Application Serial No. 10/951,385 ("Wright '385 application").  The Wright '385 application is related to the Wright '764 patent and the Wright '536 patent.  A copy of the Wright Petition is attached as Exhibit G.

41.    In the Wright Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '385 application as a patent.  Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3).  Abbott has announced that it intends to launch the XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

8

* * *

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of at least claims 103 and 130 on file in this application.

* * *

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of at least claims 103 and 130 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

42.    The subject matter of at least claim 103 of the Wright '385 application overlaps with subject matter claimed in the Wright '764 patent and the Wright '536 patent.

43.    On information and belief, J&J is preparing to assert one or more patents in the Wright family, including at least the Wright '764 patent and the Wright '536 patent, against the XIENCE V following its imminent launch.

44.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("Falotico Petition") with the United States Patent and Trademark Office in the matter of United States Application Serial No. 10/829,074 ("Falotico '074 application"). The Falotico '074 application is related to the Falotico '796 patent. A copy of the Falotico Petition is attached as Exhibit H.

45.    In the Falotico Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Falotico '074 application as a patent. Among other things, counsel for J&J asserted:

9

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch the XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

\* \* \*

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases and other publicly available documents, with the claims of the instant application.   In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 15 to 30 on file in this application.

\* \* \*

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 15 to 30 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

46.    The subject matter of at least claim 15 of the Falotico '074 application overlaps with subject matter claimed in the Falotico '796 patent.

47.    On information and belief, J&J is preparing to assert one or more patents in the Falotico family, including at least the Falotico '796 patent, against the XIENCE V following its imminent launch.

### J&J Has Recently Sued Abbott In An Attempt To Interfere With The XIENCE V Launch

48.    On September 25, 2006, J&J filed a complaint in the District Court for the Southern District of New York.   Among other things, J&J alleges that Abbott Laboratories tortiously interfered with J&J's intended acquisition of Guidant.  The complaint seeks no less than $5.5 billion in damages.  A copy of the complaint is attached as Exhibit I.

RLFI-3065255-1

49.     Although the events cited in the complaint occurred over eight months ago, J&J timed the lawsuit, on information and belief, in anticipation of the imminent launch of XIENCE V. Both the timing of the lawsuit and the amount of the damages claimed manifest J&J's intent to cast a cloud over Abbott and interfere with the imminent launch of the XIENCE V.

**The XIENCE V Launch Is Imminent**

50.     As of the date of this Complaint, Abbott will have manufactured, at its facilities in the United States, thousands of XIENCE V products to support its imminent launch.

51.     Abbott will continue to manufacture XIENCE V at its facilities in the United States following the launch.

52.     Abbott has a reasonable apprehension that J&J intends to sue Abbott for infringement of the Wright '764 patent, the Wright '536 patent, and Falotico '796 patent by XIENCE V following its imminent launch.

## CLAIM I
## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 6,585,764

53.     Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-52.

54.     J&J's actions have placed Abbott in reasonable apprehension that it will be sued for infringement of the Wright '764 patent by XIENCE V.

55.     On information and belief, the claims of the Wright '764 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

56.     The XIENCE V does not infringe any valid claim of the Wright '764 patent.

57.     An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '764 patent.

11

## CLAIM II

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 6,808,536

58.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-57.

59.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for infringement of the Wright '536 patent by XIENCE V.

60.    On information and belief, the claims of the Wright '536 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

61.    The XIENCE V does not infringe any valid claim of the Wright '536 patent.

62.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '536 patent.

## CLAIM III

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 6,776,796

63.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-62.

64.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for infringement of the Falotico '796 patent by XIENCE V.

65.    On information and belief, the claims of the Falotico '796 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

66.    The XIENCE V does not infringe any valid claim of the Falotico '796 patent.

67.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Falotico '796 patent.

RLF1-3065255-1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor that:

(a)    each and every claim of U.S. Patent No. 6,585,764 is invalid;

(b)    each and every claim of U.S. Patent No. 6,808,536 is invalid;

(c)    each and every claim of U.S. Patent No. 6,776,796 is invalid;

(d)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 6,585,764;

(e)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 6,808,536;

(f)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 6,776,796;

(g)    Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of any of U.S. Patent Nos. 6,585,764, 6,808,536, and 6,776,796 against Plaintiffs, their suppliers, customers, distributors or users of their products;

(h)    Defendants pay to Plaintiffs the costs and reasonable attorneys fees incurred by Plaintiffs in this action; and

(i)    Plaintiffs be granted such other and further relief as this Court deems just and proper.

13

RLF1-3065255-1

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Donald J. Pochopien
Sandra A. Frantzen
Christopher J. Buchko
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
RICHARDS, LAYTON & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFFS ABBOTT
LABORATORIES and ADVANCED
CARDIOVASCULAR SYSTEMS, INC.

Date: September 29, 2006

RLF1-3065255-1

# EXHIBIT J

```
                                        - VOLUME G -              Page 1507
 1

 2               IN THE UNITED STATES DISTRICT COURT

 3                IN AND FOR THE DISTRICT OF DELAWARE

 4                         - - -

 5    ADVANCED CARDIOVASCULAR      :         CIVIL ACTION
      SYSTEMS, INC. and GUIDANT    :
 6    SALES CORPORATION,           :

 7               Plaintiffs        :

 8         vs.                     :

 9    MEDTRONIC VASCULAR, INC. and :
      MEDTRONIC USA, INC.          :
10
                 Defendants        :
11                                         NO. 98-80 (SLR)

12                         - - -

13                         Wilmington, Delaware
                           Wednesday, February 16, 2005
14                         9:20 o'clock, a.m.

15                         - - -

16    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

17                         - - -

18    APPEARANCES:

19               RICHARDS, LAYTON & FINGER
                 BY:  FREDERICK L. COTTRELL, III, ESQ.
20

21                    -and-

22

23                         Valerie J. Gunning and
                           Leonard A. Dibbs,
24                         Official Court Reporters

25
```

```
 1   APPEARANCES (Continued):                    Page 1508

 2

 3   FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER,
     LLP
 4   BY:  GERALD F. IVEY, ESQ.,
          MICHAEL A. MORIN, ESQ.,
 5        J. MICHAEL JAKES, ESQ. and
          JAMES BARNEY, ESQ.
 6       (Washington, D.C.)

 7       Counsel for Plaintiffs Advanced
         Cardiovascular Systems, Inc. and
 8       Guidant Sales Corporation

 9

10   MORRIS, NICHOLS, ARSHT & TUNNELL
     BY:  KAREN JACOBS LOUDEN, ESQ.
11

12            -and-

13   McDERMOTT, WILL & EMERY
     BY:  MAURICIO FLORES, ESQ.,
14        FAY MORISSEAU, ESQ.,
          MICHAEL R. O'NEILL, ESQ.,
15        JAMES G. RIZZO, ESQ. and
          MATTHEW WEIL, ESQ.
16       (Washington, D.C.)

17       Counsel for Defendants Medtronic
         Vascular, Inc. And Medtronic USA, Inc.
18
              - - -
19

20

21

22

23

24

25
```

---

Page 1509

1

2              P R O C E E D I N G S

3

4         (Proceedings commenced at 9:20 o'clock a.m.,

5    and the following occurred without the presence of the

6    jury.)

7

8         THE COURT: Good morning. I believe we have

9    some issues that we still need to resolve before the

10   jury comes in?

11        MR. MORISSEAU: Good morning, your Honor.

12        We have filed a curative instruction regarding

13   the questioning of Michael Bonneau yesterday. The ACS

14   attorneys have agreed to this curative instruction, so

15   it's agreed to, and we wanted to point that out to you.

16        Our preference would be for it to be read

17   this morning because the jury is going to get a bunch of

18   instructions tomorrow.

19        THE COURT: Yes. That's fine. I will do

20   that first thing.

21        MR. MORISSEAU: Thank you your Honor.

22        THE COURT: Do we still have any issues with

23   respect to deposition designations?

24        MR. O'NEILL: Yes, your Honor. May I be

25   heard?

---

Page 1510

1         THE COURT: Yes.

2         MR. O'NEILL: Good morning, your Honor.

3         We still have objections to the designated

4    portions of the depositions of Mr. Jendersee and Mr.

5    Lashinski for the reasons we set forth in our papers and

6    for the reasons that I articulated yesterday.

7         I also wanted to point out something else

8    that I'm concerned about, your Honor. These papers were

9    just handed to me about four or five minutes ago, but

10   it's readily apparent to me that all of our counter-

11   designations are not even in here. So that causes me

12   some concern. And, your Honor, we just don't think that

13   any of this is appropriate, especially in light of your

14   Honor's rulings with respect to Mr. Lau and Mr. Hartigan.

15        THE COURT: All right. I still -- I mean,

16   generally, when folks want me to review deposition

17   designations, they highlight things for me so I can

18   actually see.

19        Let me hear from ACS's counsel, whoever wants

20   to speak on behalf of ACS, in terms of why any of this is

21   appropriate, given the limited testimony given by all of

22   these folks.

23        And I'm not exactly sure what it is I'm

24   looking at because no one has given me anything that's

25   helpful.

Page 1711

1  objections to Claim 3 and Claim 5. That was never
2  contradicted in any way by the applicant.
3      To the contrary, the applicant encouraged
4  the examiner and the examiner's belief that this is a
5  part of the normal serpentine pattern.
6      And that, your Honor, I think amounts to a
7  very clear and express surrender of that subject matter.
8      THE COURT: It well could be. I have to
9  admit, I think both parties stated absolutely
10 appropriate constructions in this case. I just felt it
11 was more important for me under the latest iteration of
12 what the Federal Circuit looks at to make the claim
13 language consistent rather than trying to make the
14 specification, prosecution history consistent with the
15 claim language.
16     So that's where I went, but good argument.
17 We'll let the Federal Circuit -- what can I say? I
18 don't have a clue which way the Federal Circuit will go
19 on this. I wish I did. But I get paid the big bucks
20 for drawing the final line -- not the final line. The
21 final line for the purposes of this jury. And the
22 Federal Circuit will certainly review it.
23     MR. FLORES: Thank you, your Honor, for
24 attention to this issue.
25     THE COURT: All right. On Page 26 --

Page 1712

1      MR. JAKES: I'm sorry, your Honor?
2      THE COURT: Yes?
3      MR. JAKES: Where did it leave us on the S7
4  and the Driver with respect to those three patents?
5      THE COURT: As far as I'm concerned,
6  infringement goes to the jury.
7      MR. JAKES: Those were the products that did
8  not have the issue of L less than D.
9      THE COURT: Right. And I'm not sure where we
10 stood.
11     I am not ready to go through the record and
12 make these determinations on my own when we are so close
13 to sending it to the jury. So unless it's absolutely
14 clear to me that there's not sufficient evidence in the
15 record, the motions will be denied, the instruction will
16 go forward and we will have the jury decide in the first
17 instance.
18          - - -
19     THE COURT (Continuing): On Page 26, I'm
20 going to review Dr. Segal's testimony to see whether he
21 presented sufficient evidence for it to go to the jury.
22 That highlighted language will stay for the moment.
23          - - -
24
25

Page 1713

1
2      THE COURT: Yes?
3      MS. LOUDEN: Your Honor?
4      THE COURT: Yes.
5      MS. LOUDEN: One comment on that. By having
6  direct infringement there, it perhaps would be confusing,
7  since indirect --
8      THE COURT: I agree. We'll take out
9  references to direct. Thank you.
10     And there are lots of them in there, are
11 there not?
12     All right. Anything else on that page?
13     On Page 27, I see another reference to
14 directly infringed. And I will take that out in the
15 first paragraph, which will remain highlighted until I
16 make a decision on equivalents.
17     Anything else on Page 27 with respect to
18 how a jury should be instructed on literal infringement?
19     MR. JAKES: Your Honor, we did have one
20 additional proposed instruction that we submitted and
21 that has to do with process limitations. And we had
22 proposed the instruction, a claim to a product is not
23 limited by the process used to make the product without
24 an express recitation of that process in the claims. I
25 may not have worded that particularly well, but the idea

Page 1714

1  was that simply because Medtronic makes their product
2  differently, they shouldn't be able to argue that it does
3  not infringe the product claims.
4      We heard in Mr. Morisseau's opening that
5  AVE had developed its own method of connecting these
6  stents together. They talked about fusion welding and
7  they said that's how we connect it. That's why we're
8  different.
9      There's not a single limitation in any of
10 these patents that has to do with the method by which
11 they are made.
12     THE COURT: All right. Let's hear from
13 Medtronic's counsel on that.
14     MS. LOUDEN: Your Honor, we think that that
15 proposed instruction would be confusing and unnecessary.
16     In this case, while we're not -- these
17 aren't process claims, the testimony that was offered
18 about the process explains why it is that the apparatus
19 does not have a connector that extends between the
20 rings. So it is very relevant. It explains in the way
21 the jury can understand why it is that the apparatus
22 doesn't have these -- the limitation at issue.
23     So to have that kind of instruction will
24 just be confusing.
25     And along that line, the instruction -- I

CondenseIt™

Page 1735

1  out as early as we can.
2          Do we have e-mail addresses for everyone?
3          MR. MORISSEAU:  One quick question.  We can
4  show both the jury charge and the verdict form to the
5  jury?
6          THE COURT:  Yes.  And the verdict form will
7  go back and try to send that out.  I mean, my
8  understanding was that you were in agreement on the form.
9  There was just substance that we have to conform to what
10  we have here.
11          MR. JAKES:  That's right.
12          THE COURT:  Is that correct?
13          With respect to the Segal documents, I went
14  through all of this and I am satisfied that there was
15  sufficient testimony on the product specification and
16  on the handbooks and I will accept the reduction of the
17  RFAs as suggested by ACS that only RFAs 90, 91, 92 and
18  111 should be admitted.
19          MR. JAKES:  Thank you, your Honor.
20          MR. RIZZO:  Thank you, your Honor.
21          THE COURT:  All right.  Thank you very much,
22  counsel.  I appreciate it.
23          (Court recessed at 3:45 p.m., to reconvene
24  on Thursday, February 17, 2005, at 9:03 a.m.)
25                  - - -

Page 1736

1
2              I N D E X
3
4  PLAINTIFFS' REBUTTAL TESTIMONY
5      CONTINUED          DIRECT CROSS REDR RECR
6
7  Jerome Segal,
8      Recalled -----------  1529  1605 1666 ----
9
10              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25