# EXHIBIT N

CONFIDENTIAL EXHIBIT

# EXHIBIT O

CONFIDENTIAL EXHIBIT

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHNSON & JOHNSON, a New Jersey
Corporation,

              Plaintiff,

        -against-

GUIDANT CORPORATION, an Indiana
Corporation, BOSTON SCIENTIFIC
CORPORATION, a Delaware Corporation,
and ABBOTT LABORATORIES, an Illinois
Corporation,

              Defendants.

Civil Action No.  06 CV 7685 (GEL)

**DEFENDANT ABBOTT LABORATORIES'
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS COMPLAINT
PURSUANT TO RULE 12(b)(6) OF THE
FEDERAL RULES OF CIVIL PROCEDURE**

**Electronically Filed**

1225612.1

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

STANDARD OF REVIEW ............................................................................................... 2

SUMMARY OF THE COMPLAINT............................................................................... 3

I.    The Parties ................................................................................................ 3

II.   The Competing Efforts To Acquire Guidant ........................................... 4

    A.    The Initial J&J-Guidant Merger Agreement............................. 4

    B.    The Revised J&J-Guidant Merger Agreement .......................... 5

    C.    Boston's Superior Proposal And Abbott's Participation In That Proposal................................................................................. 7

III.  The Complaint's Claims For Relief .......................................................... 9

ARGUMENT ..................................................................................................................... 9

I.    J&J's Tortious Interference Claim Is Governed By Either Indiana Or New Jersey Law, And The Claim Fails Under The Law Of Either State ..................... 9

II.   The Complaint Fails To State A Claim For Tortious Interference Against Abbott ..................................................................................................... 11

    A.    The Complaint Fails To Allege A Breach Of The Merger Agreement.............................................................................. 11

    B.    The Complaint Fails To Allege That Abbott Acted With Malice, Or An Absence Of Justification............................................... 15

        1.    Abbott's Conduct Was Plainly Justified By Its Legitimate Business Interest In Obtaining Due Diligence............................. 16

        2.    Abbott's Conduct Is Clearly Justified Under The Standards Set Forth In The Restatement ..................................................... 18

    C.    The Complaint Fails To Allege That Abbott Induced A Breach Of The Merger Agreement.......................................................... 23

III.  The Complaint Should Be Dismissed With Prejudice........................... 24

CONCLUSION................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AroChem Int'l., Inc. v. Buirkle,*
  968 F.2d 266 (2d Cir. 1992) ................................................................................................ 9, 10

*Brady v. Calyon Secs. (USA),*
  406 F. Supp. 307 (S.D.N.Y. 2005) ....................................................................................... 2, 3

*Coast Cities Truck Sales, Inc. v. Navistar Int'l. Transp. Co.,*
  912 F. Supp. 747 (D.N.J. 1995) ............................................................................................ 17

*De Jesus v. Sears, Roebuck & Co.,*
  87 F.3d 65 (2d Cir. 1996) ........................................................................................................ 3

*DiGiorgio Corp. v. Mendez and Co., Inc.,*
  230 F. Supp. 2d 552 (D.N.J. 2002) ........................................................................... 11, 19, 20

*Flintridge Station Assocs. v. American Fletcher Mortg. Co.,*
  761 F.2d 434 (7th Cir. 1985) ................................................................................................. 17

*Geiger & Peters, Inc. v. Berghoff,*
  2006 WL 2425320 (Ind. Ct. App. Aug. 22, 2006) ................................................................. 23

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l., Inc.,*
  241 F. Supp. 2d 246 (S.D.N.Y. 2002) ................................................................................... 10

*Int'l. Audiotext Network, Inc. v. AT&T Co.,*
  62 F.3d 69 (2d Cir. 1995) ........................................................................................................ 3

*Konner v. Hudson United Bank,*
  2005 WL 3954742 (N.J. Super. Ct. App. Div. Apr. 12, 2006) .............................................. 11

*Manufacturer Direct LLC v. DirectBuy, Inc.,*
  2006 WL 2095247 (N.D. Ind. July 26, 2006) ........................................................................ 17

*Masefield AG v. Colonial Oil Indus.,*
  2006 WL 346178 (S.D.N.Y. Feb. 15, 2006) .......................................................................... 23

*Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.,*
  870 F. Supp. 1237 (D.N.J. 1994) ..................................................................................... 19, 20

*R.C.M. Exec. Gallery Corp. v. Rols Capital Co.,*
  1997 WL 27059 (S.D.N.Y. Jan. 23, 1997) ............................................................................ 12

*Smith v. Biomet, Inc.,*
  384 F. Supp. 2d 1241 (N.D. Ind. 2005) ................................................................................. 23

*Tatarian v. Aluf Plastics,*
  2002 WL 1065880 (D.N.J. May 13, 2002) ............................................................................ 17

*Ultraflex Sys., Inc. v. Verseidag-Indutex GmbH,*
  2006 WL 1098181 (D.N.J. Mar. 30, 2006) ............................................................................ 17

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Van Buskirk v. The New York Times Co.,*
    325 F.3d 87 (2d Cir. 2003) ......................................................................... 24

*White Plains Coat & Apron Co, Inc. v. Cintas Corp.,*
    460 F.3d 281 (2d Cir. 2006) .................................................................. 9, 10

**State Cases**

*Bilimoria Computer Sys., LLC v. America Online, Inc.,*
    829 N.E.2d 150 (Ind. Ct. App. 2005) ................................................... 15, 17

*Coleman v. Vukovich,*
    825 N.E. 2d 397 (Ind. Ct. App 2005) ........................................................ 17

*Dello Russo v. Nagel,*
    817 A.2d 426 (N.J. Super. App. Div. 2003) ............................................... 15

*Gatto v. St. Richard Sch., Inc.,*
    774 N.E.2d 914 (Ind. Ct. App. 2002) ........................................................ 11

*Kopp, Inc. v. United Technologies, Inc.,*
    539 A.2d 309 (N.J. Super. Ct. App. Div. 1988) .................................... 16, 17

*McGraw v. Johnson,*
    126 A.2d 203 (N.J. Super. Ct. App. Div. 1956) ......................................... 17

*McLaughlin v. Weichert Co. Realtors,*
    526 A.2d 1119 (N.J. Super. Ct. 1987) ....................................................... 23

*McLinden v. Coco,*
    765 N.E.2d 606 (Ind. Ct. App. 2002) ........................................................ 23

*Morgan Asset Holding Corp. v. CoBank, ACB,*
    736 N.E. 2d 1268 (Ind. Ct. App. 2000) .............................................. 11, 16

*Paramount Commc'ns. Inc. v. QVC Network, Inc.,*
    637 A.2d 34 (Del. 1994) ............................................................................ 21

*Winkler v. V.G. Reed & Sons, Inc.,*
    638 N.E. 2d 1228 (Ind. 1994) ...................................................... 19, 20, 22

**Federal Rules**

Federal Rules of Civil Procedure, 12(b)(6)........................................................ 2

**Other Authorities**

1 Gary M. Lawrence, *Due Diligence in Business Transactions*  §1.01 (2006) ............................ 13

Restatement (Second) of Torts § 767................................................................ 18, 19

## INTRODUCTION

Eight months after it lost a bidding war to acquire Guidant Corporation (and pocketed a $705 million termination fee as consolation for its low bid), Johnson & Johnson ("J&J") has charged Guidant with having breached its Merger Agreement with J&J by disclosing due diligence information about Guidant's businesses to Abbott Laboratories ("Abbott") in response to an unsolicited takeover proposal from Boston Scientific ("Boston"). J&J also charges Boston and Abbott with having tortiously interfered with the agreement by inducing the supposed breach. J&J's own allegations reveal its complaint to be nothing more than a spite suit to help J&J save face in the marketplace after it lost the takeover battle for Guidant.

J&J's tortious interference claim against Abbott should be dismissed for at least three independent reasons. *First,* Guidant's disclosure of due diligence to Abbott in response to Boston's unsolicited proposal was not a breach of the Merger Agreement. The Merger Agreement permitted Abbott to receive Guidant's information as one of Boston's "Representatives" because – as J&J expressly alleges – Abbott's participation in Boston's proposal was necessary for Boston to be able to consummate its proposed transaction. *Second,* Abbott's receipt of information in connection with its due diligence of Guidant's businesses was indisputably justified and therefore protected from tortious interference liability. Abbott had a legitimate business reason for obtaining Guidant's information before agreeing to purchase Guidant business units and did not commit any illegal or independently tortious acts in connection with Guidant's purported breach. The fact that any company in Abbott's position would have acted on its legitimate interest in obtaining due diligence – a fact that J&J does not and cannot deny – alone establishes Abbott's justification and negates J&J's tortious interference claim. What is more, even if there is a balancing of the parties' respective interests, the complaint's express allegations make it clear that the balance weighs entirely in Abbott's favor.

1

Abbott's interests in competing in the cardiovascular business and society's interests in fostering

such competition under federal antitrust laws, facilitating financial transactions, and maximizing

the value of shareholders' investments all outweigh the only contractual interest that J&J

conceivably can assert here: an interest in preventing Guidant from disclosing its *own*

information in response to an unsolicited, bona fide takeover proposal to an entity (in this case,

Abbott) whose participation in that proposal is necessary to consummate the transaction and

maximize the return to Guidant shareholders. *Third,* J&J's tortious interference claim fails

because the complaint does not allege that Abbott did anything to induce Guidant to breach the

Merger Agreement.

J&J has pled itself out of a tortious interference claim by stating facts that affirmatively

establish that there was no underlying breach and that Abbott's conduct was justified. These

deficiencies cannot be cured with an amended complaint, and J&J's claim against Abbott should

be dismissed with prejudice.

### STANDARD OF REVIEW

This motion is governed by the familiar standards of Rule 12(b)(6). If, after considering

the complaint's *well-pleaded* allegations, the Court determines that it "appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim that would entitle him to relief[,]"

the complaint must be dismissed. *Brady v. Calyon Secs. (USA)*, 406 F. Supp. 2d 307, 311

(S.D.N.Y. 2005).

In this case, there are two important corollaries to the rule that the Court considers only

the complaint's *well-pleaded* allegations. *First,* the Court is *not* required to accept conclusory

allegations or conclusions of law. "[B]ald assertions and conclusions of law will not suffice" to

survive a motion to dismiss. *Id.* "A complaint which consists of conclusory allegations

unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Id.* (quoting

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)). On a number of important issues, such as whether J&J has pleaded (as it must) an absence of justification for Abbott's conduct, the complaint substitutes conclusory assertions for the required factual allegations.

*Second*, in considering the complaint's allegations, the Court may consider those documents that are referenced in and integral to the complaint. *Id.* at 312. J&J's complaint relies upon (and indeed quotes) the terms of the Merger Agreement, which forms the basis of and therefore is integral to, J&J's claims for relief. The Court is not required to accept the complaint's conclusory allegations regarding the construction of the Merger Agreement. *See Int'l. Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995). The Court also may consider the publicly available proposals from Boston to Guidant on December 5, 2005 and January 8, 2006. These documents are referenced in and relied upon by the complaint, and their authenticity is not subject to dispute. Compl. ¶¶ 38-39.

## SUMMARY OF THE COMPLAINT

### I.   The Parties

The complaint describes a "highly publicized takeover battle," which ended almost a year ago, to acquire Guidant, an Indiana corporation that designs, develops and sells a variety of health care devices for cardiovascular treatment. Compl. ¶¶ 1, 16. The battle was waged between two competitors who also make health care devices, J&J, the international conglomerate headquartered in New Jersey, and Boston, which is located in Massachusetts. *Id.* ¶¶ 15, 17. The ultimate winner was Boston, with a final bid of $80 per share, or $27 billion in total, for Guidant. *Id.* ¶¶ 50-51. J&J had initially offered to buy Guidant for $76 per share (or $25.4 billion total) in December 2004, reneged and renegotiated for a lower offer after problems with Guidant's products surfaced, and ultimately stopped its bidding at $71 per share. *Id.* ¶¶ 23, 28, 50.

Abbott Laboratories, which also makes and sells health care devices, played an integral role in Boston's bid for Guidant. *Id.* ¶¶ 8, 18. Boston's proposal to acquire Guidant included an agreement to divest Guidant's vascular intervention and endovascular businesses to Abbott. *Id.* ¶ 39. The complaint confirms that the sale to Abbott by Guidant of these businesses was critically necessary to the deal, "in order to facilitate prompt antitrust review and approval[.]" *Id.* Indeed, the complaint makes it clear that, without the sale to Abbott, "Boston Scientific could not have made a proposal that would have been acceptable to Guidant's Board of Directors or shareholders[.]" *Id.* ¶ 8. Abbott's involvement in the transaction was not limited to its purchase of the Guidant business units. The complaint also expressly alleges that Abbott agreed to make a substantial loan to Boston as part of the overall Guidant transaction. *Id.* ¶ 39.

## II.    The Competing Efforts To Acquire Guidant

### A.    The Initial J&J-Guidant Merger Agreement

J&J and Guidant entered into an initial merger agreement in December 2004 (the "Initial Merger Agreement"). Compl. ¶¶ 21, 23. Obtaining antitrust clearance was a formidable obstacle to the deal, because the market for arterial medical devices known as a "drug-eluting stents" ("DES") was highly concentrated.[1] *Id.* ¶ 19. Just two companies – J&J (through a subsidiary) and Boston – marketed DES devices in the United States. *Id.* ¶ 20. Three other companies – including Abbott and Guidant – were trying to obtain regulatory approval to market DES devices in the United States (the third company is Medtronic). *Id.* Because the DES market was concentrated, the Federal Trade Commission ("FTC") objected to the merger "on the ground that a merger between one of two actual competitors in the DES market [J&J] with one of the three potential competitors [Guidant] would lessen competition in that market." *Id.* ¶ 27.

---

[1] A DES is "a mechanical scaffold to keep the vessel open while a drug is slowly released from the stent to prevent the build-up of new tissue that re-clogs the artery." Compl. ¶ 19.

To clear this regulatory hurdle, J&J found it necessary to involve another party in its offer to acquire Guidant. That party was Abbott. Specifically, J&J and Abbott entered into a license agreement, which provided that if J&J was able to acquire Guidant, J&J would grant Abbott a non-exclusive license to certain patents in the DES field. *Id.* J&J alleges this agreement "increase[d] the likelihood" that Abbott would successfully enter the DES market, and that it allayed the FTC's concerns about the effect on competition in that market. *Id.* J&J does *not* allege that the license agreement in any way prevented Abbott from participating in competing proposals with respect to Guidant generally or Guidant's DES business in particular.

### B.    The Revised J&J-Guidant Merger Agreement

Although the FTC conditionally approved J&J's acquisition of Guidant in November 2005, the merger was far from a done deal. Indeed, even before the FTC's action, regulatory and legal problems involving Guidant caused J&J to consider backing out of the transaction. Compl. ¶ 28. On November 7, 2005, Guidant sued J&J in this court, claiming that J&J had breached the Initial Merger Agreement. *Id.* J&J and Guidant thereafter entered into an Amended and Restated Agreement and Plan of Merger on November 14, 2005 (the "Merger Agreement," attached as Exh. A to the accompanying Declaration of Stephen M. Juris ("Juris Decl.")). Under the Merger Agreement, J&J would pay $21.5 billion in cash and stock to acquire Guidant -- $4 billion *less* than the purchase price originally agreed to by J&J. Compl. ¶¶ 23, 28.

The Merger Agreement contains a number of conditions to closing and does *not* preclude Guidant from considering competing acquisition offers, or from having discussions with (or providing due diligence information to) other parties in connection with competing bids. In fact, the Merger Agreement provides explicit procedures allowing for Guidant to receive and pursue competing offers. Merger Agreement § 4.02(b), 7.01(f); Compl. ¶¶ 32, 37. The complaint

admits that such procedures are essential for Guidant's directors to be able "to meet their fiduciary obligations to Guidant's shareholders[.]" Compl. ¶ 32.

The pertinent procedures are contained in Section 4.02 of the Merger Agreement, entitled "No Solicitation." Section 4.02(a) provides as a general rule that neither Guidant nor its "Representatives" shall "(i) solicit, initiate or knowingly encourage ... any Takeover Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person any information, or otherwise cooperate in any way with, any Takeover Proposal." Merger Agreement § 4.02(a); Compl. ¶ 30. A "Takeover Proposal" is "any inquiry, proposal or offer from any person" that "could reasonably be expected to lead to" the purchase of 15% or more of Guidant's assets or business. Merger Agreement § 4.02(a); Compl. ¶ 31. In the event of a breach of the "No Solicitation" requirements, Guidant "shall ... immediately cease and cause to be terminated all existing discussions or negotiations with any person conducted heretofore with respect to any Takeover Proposal and request the prompt return or destruction of all confidential information previously furnished." Merger Agreement § 4.02(a).

The "No Solicitation" provision's general requirements are subject to an important exception. Specifically, "in response to a bona fide written Takeover Proposal" that Guidant's board reasonably determines "constitutes or is reasonably likely to lead to a Superior Proposal," Guidant *may* "furnish information with respect to [Guidant] and its subsidiaries to the person making such Takeover Proposal (*and its Representatives*)." *Id.*; Compl. ¶¶ 32-33 (emphasis added). A "Superior Proposal" is any offer that, if consummated, would result in a transfer of 80% or more of Guidant's stock, and that Guidant's board reasonably determines to be (1) "more favorable to the shareholders of [Guidant] from a financial point of view" than J&J's proposal, and (2) "reasonably capable of being completed." Merger Agreement § 4.02(a); Compl. ¶ 35.

"Representatives" means, "collectively," a party's "Subsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant *or other advisor, agent or representative*[.]" Merger Agreement § 4.02(a); Compl. ¶ 34 (emphasis added). The Merger Agreement provided J&J with a number of procedural protections in the event of a competing Takeover Proposal, including the right to be informed of that proposal, to be able to bid against it, and to obtain a substantial "Termination Fee" in the event Guidant accepted a Superior Proposal. *See* Merger Agreement §§ 4.02(a)-(c), 5.06(b).

C.    **Boston's Superior Proposal And Abbott's Participation In That Proposal**

On December 5, 2005, Boston publicly announced that it had submitted a proposal to Guidant's Board. Compl. ¶ 38; *see* Boston Scientific's Corporation Form 8-K (filed Dec. 5, 2005), Exhibit 99.1 (Juris Decl. Exh. B) (hereinafter "December 5 Proposal"). Boston proposed to acquire Guidant for $72 per share, or $25 billion; this was more than $4 billion *higher* than J&J's offer in the Merger Agreement. Compl. ¶ 38. J&J does not dispute the December 5 Proposal was a "Takeover Proposal." Like J&J's own proposal, Boston's December 5 Proposal required the involvement of a partner to obtain antitrust approval, because Boston (like J&J) was one of the only two participants actually marketing DES devices in the United States. Compl. ¶¶ 6, 20, 45. Boston's December 5 Proposal thus called for the divestiture of Guidant's vascular intervention and endovascular business units (which included DES). *See id.* ¶ 41; Dec. 5 Proposal at 4.

On January 8, 2006, Boston submitted a definitive offer (and a Boston-executed merger agreement) to Guidant. *See* Compl. ¶ 39; Boston Scientific's Corporation Form 8-K (filed Jan. 8, 2006), Exhibit 99.1 (Juris Decl. Exh. C hereto). J&J alleges that Boston, in announcing this offer, stated that as part of its proposal to acquire Guidant, Boston had agreed with Abbott (i) to divest Guidant's vascular intervention and endovascular businesses to Abbott "in order to

facilitate prompt antitrust review and approval[,]" and (ii) for Abbott to loan Boston a $700 million.[2]   Compl. ¶ 39.   The complaint further alleges that, in the course of a January 9, 2006 analysts call, Boston's chief financial officer discussed Boston's divestiture agreement with Abbott and said Abbott had obtained information about Guidant's businesses in the course of conducting due diligence related to that proposed transaction.   *Id.* ¶¶ 41-43.   J&J does *not* allege that Guidant disclosed any J&J confidential information to Abbott.

J&J claims that Guidant's provision of diligence information to Abbott breached the "No Solicitation" requirements.   J&J also asserts that Guidant's entire consideration of the Boston proposal was part of a nefarious effort by Guidant to "keep[] J&J contractually bound while it facilitated" the Boston proposal.   *Id.* ¶ 9.   The former claim is untenable under the Merger Agreement, as discussed below.   The latter assertion is simply implausible.   If, as J&J contends, Guidant's actions constituted a breach of the Merger Agreement, then *nothing* kept J&J "contractually bound" after the January 8 and 9 statements; J&J could have instituted proceedings to terminate that Agreement.   *See* Merger Agreement § 7.01(c)(i).

But J&J did not terminate the Merger Agreement.   Instead, although not contractually obligated to do so, J&J proceeded to engage in a bidding war with Boston.   On January 11, J&J raised the price of its offer to $68.06 per share.   Compl. ¶ 50.   Boston countered with an increase in the price of its own offer to $73 per share.   *Id.*   J&J responded again by raising its offer the following day.   *Id.*   After Boston raised its offer to $80 per share, J&J did not counter.   *Id.*

On January 17, Guidant's Board announced that Boston's bid was a "Superior Proposal," and that it was terminating the Merger Agreement with J&J, which the complaint acknowledges

---

[2] In fact, as J&J knows, Abbott's loan to Boston was increased to $900 million.   The difference between $700 and $900 million is not material to the salient point that the complaint concedes: that Abbott was a significant source of funding for Boston's proposal.

Guidant "was entitled to do." *Id.* ¶ 51. Pursuant to the protections of the Merger Agreement,

J&J walked away from the proposed transaction with a $705 million Termination Fee. *Id.*

### III.    The Complaint's Claims For Relief

J&J filed this complaint more than eight months after the termination of the Merger

Agreement. Invoking the Court's diversity jurisdiction, Compl. ¶ 12, J&J claims that Guidant

breached the Merger Agreement and its duty of good faith and fair dealing by furnishing

information about Guidant's businesses to Abbott. *Id.* ¶¶ 53-64. J&J also alleges that Boston

and Abbott tortiously interfered with the Merger Agreement by inducing Guidant to disclose this

information to Abbott. *Id.* ¶ 67. As discussed below, J&J's claim against Abbott fails.

### ARGUMENT

### I.    J&J's Tortious Interference Claim Is Governed By Either Indiana Or New Jersey Law, And The Claim Fails Under The Law Of Either State

In this diversity case, New York's choice of law rules determine which law governs

J&J's tortious interference claim against Abbott. *See White Plains Coat & Apron Co, Inc. v.*

*Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006). New York courts apply the "governmental

interest" test – "a flexible choice of law approach" that "seek[s] to apply the law of the

jurisdiction with the most significant interest in, or relationship to, the dispute." *Id.* (quotations

omitted). "In deciding which state has the prevailing interest, we look only to those facts or

contacts that relate to the purpose of the particular laws in conflict. Under this formulation, the

significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort."

*AroChem Int'l., Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992) (quotations omitted).

The complaint's allegations, including the Merger Agreement, point to Indiana as having

the most (if not the only) significant interests in this litigation. Guidant – which is both the

merger target and the party that allegedly breached the agreement by providing due diligence

information to Abbott – is an Indiana corporation based in Indiana. Compl. ¶ 16. The Merger

Agreement itself chooses Indiana law for contractual disputes, *see* Merger Agreement § 8.08, a

choice that is significant to the tortious interference claim both because it reflects J&J's

willingness to avail itself of protection under Indiana's laws and because the existence of a

breach (which must be resolved according to Indiana law) is an essential element of the tort

claim. Indiana, moreover, has a significant interest in regulating allegedly tortious conduct with

respect to contracts formed under its laws. *See White Plains Coat & Apron*, 460 F.3d at 284

(treating as relevant, though not dispositive, factor in the interest analysis the question of which

state's law governed the underlying contracts in a tortious interference claim).

The only other state that conceivably could be said to have an interest in this dispute is

New Jersey, where J&J is based. Some decisions within this District (and elsewhere in the

Circuit) look to the law of the state where the plaintiff alleges it suffered injury under the "last

event" test. *See, e.g., Hidden Brook Air, Inc. v. Thabet Aviation Int'l., Inc.*, 241 F. Supp. 2d 246,

277 (S.D.N.Y. 2002) (tortious interference occurs in state where the "last event necessary to

make the actor liable occurred") (quotations omitted) (citing cases). The Second Circuit,

however, has held that the "last event" test is not determinative where (as here) another state's

interests are greater. *See AroChem*, 968 F.2d at 271-72 (declining to apply the law of the state

where the injury allegedly occurred where another state had greater interests). *Cf. White Plains

Coat & Apron*, 460 F.3d at 285 ("[H]ere, where not only the vast majority of the conduct

supporting the claim occurred in New York, but also the damages were suffered at [plaintiff's]

New York headquarters, New York has the most significant interest and its laws apply.").

Although Indiana's interests in this dispute are greater than New Jersey's, J&J's claim

against Abbott fails under the law of either state, as we explain below.

II.    **The Complaint Fails To State A Claim For Tortious Interference Against Abbott**

A plaintiff claiming tortious interference with a contract must plead and prove all of the following elements: (i) existence of a valid and enforceable contract; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional inducement of breach of the contract; (iv) absence of justification for the defendant's conduct; and (v) damages resulting from defendant's wrongful inducement of the breach. *See, e.g., Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E. 1268, 1272 (Ind. Ct. App. 2000); *Konner v. Hudson United Bank*, 2005 WL 3954742, *4 (N.J. Super. Ct. App. Div. Apr. 12, 2006).

J&J fails to allege at least three elements of this claim: *First*, J&J fails to allege facts that establish a breach of the Merger Agreement. *Second*, J&J fails to allege that Abbott's conduct was not justified, and in fact alleges facts that *establish* Abbott's justification for obtaining due diligence information from Guidant. *Third*, J&J fails to allege facts indicating that Abbott induced Guidant to breach the Merger Agreement.

A.    **The Complaint Fails To Allege A Breach Of The Merger Agreement**

The complaint fails at the outset for failing to allege a cognizable breach of contract. Without an actual breach, there can be no tortious interference claim. *See, e.g., Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 922 (Ind. Ct. App. 2002); *DiGiorgio Corp. v. Mendez and Co., Inc.*, 230 F. Supp. 2d 552, 566 (D.N.J. 2002).

J&J's complaint is striking for what it does not (because it cannot) allege to be a breach of the Merger Agreement. J&J does not claim that Boston's December 5 Proposal failed to qualify as a Takeover Proposal. J&J does not claim that Guidant breached any portion of the Merger Agreement in conducting discussions with Boston in response to that proposal, or in deeming Boston's final offer to be a Superior Proposal. And J&J does not claim that it was deprived of any of the numerous protections afforded to it under the Merger Agreement,

including the requirements that (i) J&J be advised of the existence and terms of a Takeover

Proposal; (ii) J&J be provided the opportunity to bid against the Takeover Proposal; (iii) Guidant

provide any due diligence information under confidentiality restrictions at least as strict as those

governing J&J's receipt of diligence information (thereby protecting the confidentiality of any

information J&J might ultimately acquire were its bid to be accepted); and (iv) Guidant pay J&J

a termination fee in the event Guidant consummates the transaction contemplated by a Takeover

Proposal. *See* Merger Agreement §§ 4.02(a)-(c); 5.06(b).

J&J instead alleges that Guidant breached the Merger Agreement solely by providing

information about Guidant's businesses to Abbott. J&J insists that the "No Solicitation"

provision limited the persons to whom Guidant could disclose information, and that Abbott is

outside this class of persons. In particular, J&J alleges that the disclosure was a breach because

"Abbott was neither a person making a Takeover Proposal nor a Representative of Boston

Scientific, but only a third-party divestiture candidate[.]" Compl. ¶ 55.

J&J's *ipse dixit* allegation about the scope of "Representatives" does not follow

reasonably from the complaint's allegations (including the Merger Agreement) and the Court

does not have to take it as true. *See, e.g., R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 1997

WL 27059, *8 (S.D.N.Y. Jan. 23, 1997) (court is "not bound to accept conclusory allegations

concerning the legal effect of what happened which do not reasonably follow from the facts that

are alleged."). Based on all the complaint's allegations, it is clear that "Representatives" must

include any entity whose participation may be necessary to enable a party making a Takeover

Proposal to consummate the transaction. Abbott plainly fits within this definition, because (as

the complaint expressly alleges) Boston *could not* have effected its Takeover Proposal without

the participation of a party such as Abbott.

"Representatives" include any entity's "[s]ubsidiaries or any of their respective directors, officers or employees or any investment banker, financial advisor, attorney, accountant or other advisor, agent or representative." Merger Agreement § 4.02(a); Compl. ¶ 34. Although the Merger Agreement does not further define "other advisor, agent or representative," the examples that precede this "catch-all" clause show that "Representatives" include all entities whose participation may be necessary for the party making a Takeover Proposal to be able to consummate the transaction. The fact that the Merger Agreement makes express allowance for any "Representative" to be able to review Guidant's confidential information is not surprising, given that due diligence is a simple fact of life in any large scale corporate transaction. *See, e.g.*, 1 Gary M. Lawrence, *Due Diligence in Business Transactions* §1.01 (2006) ("[T]he due diligence review is one of the most important and risk-fraught elements of any transaction."). And any interest that J&J has in securing the confidentiality of information that it might acquire through a completed acquisition is protected by the requirement that Guidant disclose due diligence information under confidentiality restrictions. *See* Merger Agreement § 4.02(a).

The complaint's allegations demonstrate that Abbott's participation in Boston's Takeover Proposal was at least as necessary (if not more so) to the consummation of the deal than the participation of any of the enumerated examples of "Representatives." The complaint expressly alleges that Boston would not have been able to make a viable proposal to acquire Guidant without some agreement with another party, such as Abbott, to resolve antitrust issues. *See* Compl. ¶¶ 8, 45, 48. The complaint further alleges that J&J itself had entered into a licensing agreement with Abbott in anticipation of closing its Merger Agreement with Guidant, and that Boston needed to enter into a more extensive agreement with Abbott – to divest part of Guidant's business – to facilitate antitrust approval of Boston's proposed merger. *Id.* ¶ 48. The complaint

also alleges that Abbott agreed to provide Boston with a substantial loan as part of the Takeover Proposal. *Id.* If the Merger Agreement precluded a party in Abbott's position from receiving due diligence from Guidant in response to a merger proposal from Boston – yet the participation of such a party was necessary for Boston to make a proposal that could be consummated – then the Merger Agreement effectively would preclude Boston from making its own Takeover Proposal for Guidant. Any such interpretation would undermine what the complaint concedes to have been the purpose underlying the Takeover Proposal provision, specifically, "to allow Guidant's directors to meet their fiduciary obligations to Guidant's shareholders[.]" *Id.* ¶ 32.

The complaint does not allege any basis in fact (or common sense) that justifies such an absurd reading of the Merger Agreement. What the complaint instead alleges to support its construction of "Representatives" is that Abbott cannot be one because it dealt with Boston at "arms' length" regarding the acquisition of Guidant assets. *Id.* ¶ 47. But the fact of "arms' length" dealings between two parties cannot put one outside the list of "Representatives" without contradicting the terms of the Merger Agreement itself. "Investment bankers" or "financial advisers" – expressly mentioned in the Merger Agreement's enumeration of examples "Representatives" – are necessary to the consummation of a transaction, because (among other things) they help to secure capital for the deal. Notwithstanding the fact that they may deal with the person making the Takeover Proposal at "arms length" to finance the deal, such entities are among those who may be considered "Representatives."

The same is clearly true of Abbott under the circumstances that J&J itself alleges. Guidant disclosed information to Abbott in response to an *unsolicited*, bona fide merger proposal from Boston where the divestiture of business to Abbott was needed to close the deal contemplated by Boston's proposal. Such disclosure is consistent with the "No Solicitation"

provision, which J&J expressly alleges was "designed to prevent Guidant from using the Merger

Agreement to solicit higher offers," Compl. ¶ 4 – something Guidant did not do. There is no

allegation that Guidant took the Merger Agreement and shopped it around in order to elicit

higher offers from other bidders. Based on the complaint's own allegations, Guidant did not

breach the Merger Agreement by disclosing due diligence information to Abbott.

> **B.     The Complaint Fails To Allege That Abbott Acted With Malice, Or An Absence Of Justification**

Even if there was a breach, J&J's tortious interference claim against Abbott fails because

J&J has not pleaded that Abbott acted without a justification for its conduct (or, as some cases

call it, "with malice."). *See, e.g., Bilimoria Computer Sys., LLC v. America Online, Inc.*, 829

N.E.2d 150, 156 -157 (Ind. Ct. App. 2005); *Dello Russo v. Nagel*, 817 A.2d 426, 434 (N.J.

Super. App. Div. 2003). J&J's tortious interference claim is premised on the same activity in

which any prospective purchaser of corporate assets engages prior to closing: obtaining due

diligence regarding the assets to be acquired. *See* Compl. ¶¶ 44-45. J&J makes the entirely

conclusory allegation that Abbott received this due diligence "maliciously." *Id.* ¶ 68. But the

complaint does not allege any facts to support this boilerplate contention. Indeed, the allegations

that *are* in the complaint confirm that Abbott acted for entirely legitimate justifications,

specifically, to acquire the diligence information necessary to make a decision about Guidant's

vascular intervention and endovascular businesses.

These justifications, in and of themselves, are sufficient to entitle Abbott to judgment at

the pleading stage under cases holding that a defendant's pursuit of a legitimate interest through

means that are not improper is justified conduct. Other cases apply a balancing of the respective

interests of the plaintiff and defendant under the factors set forth in the Restatement (Second) of

Torts. Even under the Restatement, it is clear from the complaint's own allegations that J&J does not and cannot plead the justification/malice element.

### 1. Abbott's Conduct Was Plainly Justified By Its Legitimate Business Interest In Obtaining Due Diligence

A defendant's alleged inducement is justified if the defendant's conduct was motivated by a legitimate interest and was not effected through illegal or independently tortious means. *See Morgan Asset Holding*, 736 N.E. 2d at 1272 ("[T]he existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability."); *Kopp, Inc. v. United Technologies, Inc.*, 539 A.2d 309, 316 (N.J. Super. Ct. App. Div. 1988) ("[I]ntended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means [is not] actionable.").

In *Morgan Asset Holding*, the tortious interference plaintiff (Morgan) was an assignee of subordinated debts owed by a utility company, and the defendant (CoBank) was a creditor of the utility under a different loan agreement. Morgan alleged that CoBank's amending of its agreement with the utility – pursuant to which the utility agreed to reduce the amount of a requested increase in its rates – intentionally interfered with Morgan's ability to enforce its rights under its own separate agreement with the utility. The court of appeals affirmed the dismissal of Morgan's tortious interference claim because CoBank had legitimate reasons for executing an amendment to its loan agreement with the utility and CoBank did not act exclusively to harm Morgan. 736 N.E. 2d at 1272. The appellate court explained that Morgan's conclusory allegation that "[n]o justification exists" for CoBank's action was insufficient, because the amendment itself made clear that CoBank had a legitimate reason for requesting the modification and because CoBank did not have "the *exclusive* purpose" to injure Morgan. *Id.*

Likewise, in *Kopp*, the court held that the plaintiff's conduct was not malicious because it was motivated by a higher competing offer. *See* 539 A.2d at 315. The defendant had sold its property to a third party – rather than to the plaintiff (the initial purchaser) – after the third party made a higher offer. *Id.* at 312. The plaintiff alleged interference with its contractual rights and prospective economic advantage from the sale of the property. *Id.* The court ruled that the defendant's action "was not based on any malice toward plaintiff, but was motivated by the simple fact that [the second buyer] was offering $300-400,000 more for the same property." *Id.* at 315. The defendant's conduct "was not legally actionable." *Id.* Numerous Indiana and New Jersey cases make it clear that a defendant acts with justification where it has a legitimate reason for its conduct and does not effect that conduct by illegal or independently tortious means.[3]

---

[3] *See Bilimoria Computer Sys.*, 829 N.E.2d at 156-57 (absence of justification not established because "there existed a legitimate business purpose for the communication" that harmed the plaintiff and that "was not exclusively directed to the injury and damage of [the plaintiff]"); *Manufacturer Direct LLC v. DirectBuy, Inc.*, 2006 WL 2095247, *7 (N.D. Ind. July 26, 2006) (no tortious interference claim stated where plaintiff had "not alleged that [defendant's] conduct was intended for the *sole purpose* of causing injury and damage to [the plaintiff]") (emphasis added); *Flintridge Station Assocs. v. American Fletcher Mortg. Co.*, 761 F.2d 434, 440 (7th Cir. 1985) (describing unjustified conduct as "disinterested malevolence" and a "malicious one unmixed with any other and exclusively directed to injury and damage of another"); *Coleman v. Vukovich*, 825 N.E. 2d 397, 404 (Ind. Ct. App 2005) (defendant's actions justified because he was "motivated by his own business interest"); *Ultraflex Sys., Inc. v. Verseidag-Indutex GmbH*, 2006 WL 1098181, *8 (D.N.J. Mar. 30, 2006) (defendant's refusal to ship product to plaintiff, thereby preventing plaintiff from fulfilling its contracts with customers and sub-distributors, was not malicious because the defendant "had a justification or excuse for its actions in discontinuing shipments"); *Tatarian v. Aluf Plastics*, 2002 WL 1065880, *12 (D.N.J. May 13, 2002) (no malice where defendant had used contact information developed in course of prior employment to lure customers away from former employer, where the defendant's conduct did not cross the line of "fraudulent, dishonest, or illegal" conduct); *Coast Cities Truck Sales, Inc. v. Navistar Int'l. Transp. Co.*, 912 F. Supp. 747, 774 (D.N.J. 1995) (defendant did not act "maliciously in simply offering better financing terms to competitors seeking the same deal"); *McGraw v. Johnson*, 126 A.2d 203, 207 (N.J. Super. Ct. App. Div. 1956) (plumber's refusal to do further work, preventing completion of contractor's construction agreement with homeowner, was not malicious because he "was merely pursuing what he thought was his legal right" to be paid for his past work).

J&J does not and cannot meet this standard. J&J asserts that Abbott "maliciously" interfered with the Merger Agreement, Compl. ¶ 68, but J&J fails to allege facts to support this conclusory assertion. The facts that J&J *does* allege actually *confirm* Abbott's obvious justification for wanting to obtain due diligence from Guidant. J&J alleges that obtaining due diligence was necessary for Abbott "to make a 'decision to move forward'" with its participation in the Boston-Guidant transaction, *id.* ¶ 45, which included both an agreement to acquire Guidant's entire vascular intervention and endovascular businesses as well as providing Boston a multi-million dollar loan. *Id.* ¶ 39. J&J also alleges that Abbott would not have agreed to so participate in the Boston transaction without being able to conduct due diligence. *Id.* ¶¶ 8, 45, 57, 69. J&J's express allegation that "Abbott emerged" from conducting due diligence "with a clear picture of Guidant's businesses that enabled it to proceed expeditiously with a divestiture agreement," *id.* ¶ 69, is a recognition of the fundamental business reality that *no* corporation would enter into a sizeable transaction – this one comprised of a multi-billion dollar agreement to acquire whole business units and a loan of hundreds of millions of dollars – without having an opportunity to obtain information about the underlying business. It is clear from the face of the complaint that this unquestionably legitimate interest – and no other – motivated Abbott's conduct, which was not effected by any illegal, fraudulent or otherwise independently tortious means. J&J's claim against Abbott can and should be dismissed on this basis alone.

## 2. Abbott's Conduct Is Clearly Justified Under The Standards Set Forth In The Restatement

J&J's complaint also fails the justification/malice element under those cases that compare the defendant's interests against the plaintiff's under the standards set forth in the Restatement (Second) of Torts § 767. *See Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E. 2d 1228,

1235 (Ind. 1994); *Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F. Supp. 1237, 1248

(D.N.J. 1994). Section 767 directs the justification inquiry to:

   (a)   the nature of the defendant's conduct;

   (b)   the defendant's motive;

   (c)   the interests of the plaintiff with which the defendant's conduct interferes;

   (d)   the interests sought to be advanced by the defendant;

   (e)   the social interests in protecting the freedom of action of the defendant and
         the contractual interests of the plaintiff;

   (f)   the proximity or remoteness of the defendant's conduct to the interference;
         and

   (g)   the relations between the parties.

Restatement (Second) of Torts § 767. J&J's own allegations make it clear that Abbott's conduct

was plainly justified under the Restatement factors.

   **The Nature of Abbott's Conduct, Motive, and Relationship to J&J in the Market for**

**DES All Justify Abbott's Conduct.** The relationship between Abbott and J&J is (and is alleged

to be) one of competition. The complaint expressly alleges that J&J participates in, and Abbott

seeks to enter, the DES market. Compl. ¶ 20. The competitive nature of the relationship

between plaintiff and defendant is one that "tend[s] to justify interference." *Matrix Essentials*,

870 F. Supp. at 1248. Moreover, the complaint does not allege anything wrongful about

Abbott's conduct *independent of* the alleged interference. For example, J&J does not allege that

Abbott made any misrepresentation or physical threats, or applied unfair economic pressure to

induce the alleged breach of the Merger Agreement. *See Winkler*, 638 N.E. 2d at 1235

("[Plaintiff] does not contend that defendants made any misrepresentations, applied unfair

economic pressure, or threatened litigation ...."); *DiGiorgio*, 230 F. Supp. 2d at 565 ("There are

no allegations of physical violence, misrepresentations, abuse of legal process, unlawful conduct,

1225612.1                              19

or unwarranted economic pressure[.]"). And Abbott had a legitimate business interest in

obtaining due diligence, as discussed above. *See Winkler*, 638 N.E. 2d at 1236 (noting that the

plaintiff "does not suggest that defendants' motive was a willful or spiteful intent to injure him");

*DiGiorgio*, 230 F. Supp. 2d at 565 (desire for potential profits "a legitimate and indeed

encouraged motivation"). Hence, the nature of and motive for Abbott's obtaining due diligence

indisputably justifies Abbott's conduct.

**The Social Interest In Increasing Competition In The DES Market Justifies**

**Abbott's Conduct**. Abbott's receipt of information furthered its interest in entering the vascular

intervention market, which had the social benefit of increasing competition in that market. The

complaint itself alleges that the FTC was concerned that a proposed merger between one of two

actual competitors in the DES market and a potential competitor, Guidant, would lessen

competition. Compl. ¶ 27. Abbott's likely entrance into the vascular intervention business

would tend to alleviate this concern, as the complaint itself confirms when it alleges the FTC

consented to a proposed J&J-Guidant transaction that included an agreement to license DES

technology to Abbott. *See id.* Even if Abbott's receipt of due diligence information somehow

"interfered" with J&J's interests, this interference was clearly justified by Abbott's legitimate

interest in entering the DES market. *See Matrix Essentials*, 870 F. Supp. at 1248-49 (defendant's

"interest ... in engaging in the free sale of goods" is not "transgressive of generally accepted

standards of morality, but instead is encouraged") (quotations omitted).

**Abbott's (And Society's) Interests In Facilitating The Exchange Of Due Diligence**

**Information Justifies Abbott's Conduct**. Protecting the freedom of parties to receive due

diligence information before they agree to merge with a corporation or purchase its assets

furthers the important social interest of facilitating welfare-enhancing transactions. It is typical

1225612.1                                    20

for parties to exchange information in order to "explor[e] a possible negotiated business arrangement," as J&J and Guidant did before their proposed merger. Compl. ¶ 22. Potential bidders could be deterred from making offers or entering into transactions if they had to do so blindly without the benefit of due diligence and without knowing what they would be getting for their bargain. If would-be suitors were deterred from coming forth with bids, the target corporation's shareholders would be deprived of the opportunity to get the best value reasonably available for their shares, and potential buyers would miss opportunities to acquire assets that could enhance the value for their shareholders.

Protecting Abbott's freedom to conduct due diligence in the circumstances here without the specter of tortious interference liability furthers these important social interests. J&J expressly alleges that Abbott's ability to conduct due diligence was necessary for Boston's proposal to be consummated, and Guidant's board of directors deemed Boston's proposal to be a Superior Proposal – *i.e.*, the proposal was "more favorable to the shareholders of [Guidant] from a financial point of view than the Merger" between Guidant and J&J, Compl. ¶ 51; Merger Agreement § 4.02(a) – a conclusion J&J does not dispute. Hence, according to J&J's own allegations, Abbott's due diligence enabled Guidant's directors to fulfill their fiduciary duty (also acknowledged by J&J) to maximize shareholder value for the sale of Guidant. *See* Compl. ¶ 32. *Cf. Paramount Commc'ns. Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994).

**J&J's "Interests" In Preventing Abbott From Obtaining Due Diligence Information Are Insubstantial**. The Merger Agreement specifically protects J&J's interests in several respects, and J&J does not allege a breach of *any* of these provisions. Hence, J&J does *not* allege (i) that Guidant failed to notify J&J of Boston's proposal or the material terms of the same; (ii) that Guidant failed to require Abbott to treat any diligence information with the same

degree of confidentiality that J&J was required to observe for such information; (iii) that Guidant

disclosed any of J&J's confidential information; (iv) that Guidant failed to give J&J access to the

same information about Guidant's businesses provided to either Abbott or Boston; (v) that J&J

was deprived of the opportunity to counter Boston's bid; or (vi) that Guidant failed to pay J&J a

significant "Termination Fee" as the price of accepting what Guidant's board concluded (without

contradiction) was a Superior Proposal.

     J&J's asserted "interest" instead is in precluding a party in Abbott's position from

receiving due diligence information to determine whether to purchase assets in a divestiture

notwithstanding that the divestiture is part of an *unsolicited*, bona fide Takeover Proposal and is

allegedly necessary to obtain antitrust approval of the deal. This boils down to an "interest" in

preventing Guidant from pursuing *any* deal with Boston – regardless of whether the deal was

better for Guidant's shareholders – because J&J alleges that Boston could not have made a viable

proposal without Abbott's participation and receipt of due diligence. Compl. ¶ 8. To the extent

this qualifies at all as a relevant cognizable "interest" – and it should not, because it is obviously

inconsistent with the Guidant board's admitted duty to accept a deal in the best interests of

Guidant shareholders – this interest is outweighed by (i) Abbott's legitimate interests in entering

the DES market, (ii) the greater social interests in facilitating welfare-enhancing transactions,

and (iii) Guidant's interests in maximizing its shareholders' value. *See Winkler*, 638 N.E.2d at

1235-36 (plaintiff's contractual interests did not merit greater protection than defendants'

interests in acquiring third party's business and attempting to put it on sound financial footing).

     **Abbott's Conduct Was Remote From The Alleged Interference**. Finally, Abbott did

not engage in any conduct proximate to the interference. The complaint alleges that Guidant

disclosed confidential Guidant information to Abbott in breach of the Merger Agreement, but it

does not allege anything that Abbott said or did to induce this alleged disclosure. The absence of any proximity between Abbott's conduct and the alleged interference is yet another factor that weighs against J&J under the Restatement.

For the foregoing reasons, the complaint's own allegations show that J&J does not and cannot allege the justification/malice element against Abbott. This failure is itself an independent basis for dismissing the complaint.

### C.    The Complaint Fails To Allege That Abbott Induced A Breach Of The Merger Agreement

J&J's tortious interference claim also fails for the independent reason that the complaint does not allege any conduct on the part of Abbott to cause Guidant to allegedly breach the "No Solicitation" provision. The fact that Abbott benefited from the alleged breach and received due diligence information from Guidant does not establish that Abbott induced the alleged breach. *See McLinden v. Coco,* 765 N.E.2d 606, 617-18 (Ind. Ct. App. 2002); *McLaughlin v. Weichert Co. Realtors,* 526 A.2d 1119, 1121 (N.J. Super. Ct. 1987). The absence of any allegations of inducing conduct by Abbott warrants dismissal. *See Masefield AG v. Colonial Oil Indus.,* 2006 WL 346178, *4 (S.D.N.Y. Feb. 15, 2006) (holding that counterclaim against the plaintiffs for tortious interference with contract "fails because [the counterclaimant] has alleged no specific action on the part of [one of the plaintiffs] to cause [the third party] to breach the Contract.").[4]

---

[4] J&J has not brought a cause of action for tortious interference with prospective business opportunity. Rather, J&J's only cause of action against Abbott is entitled "Tortious Interference with Contract." Compl. ¶¶ 65-70. Under that cause of action, however, J&J alleges: "As a result of Guidant's breaches and Boston Scientific's and Abbott's tortious interference with J&J's Merger agreement and *prospective business opportunity,* J&J was damaged." *Id.* ¶ 70 (emphasis added). To the extent this is a covert attempt to state a claim for tortious interference with prospective business relations, the attempt fails because there is no allegation that Abbott acted for the sole purpose of inflicting harm on J&J, or that Abbott committed any illegal or independently tortious acts. *See Geiger & Peters, Inc. v. Berghoff,* 2006 WL 2425320, *9 (Ind. Ct. App. Aug. 22, 2006); *Smith v. Biomet, Inc.,* 384 F. Supp. 2d 1241, 1249 (N.D. Ind. 2005); *McLaughlin,* 526 A.2d at 1121.

### III.    The Complaint Should Be Dismissed With Prejudice

J&J's complaint against Abbott should be dismissed with prejudice on the ground that any amendment would be futile. *See Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 92 (2d Cir. 2003). The essence of J&J's claim – that any party in Abbott's position could not obtain due diligence in evaluating whether to participate in the divestiture of business units as part of Boston's proposal – will not change with further pleading. That claim is untenable and should be dismissed without leave to amend.

### CONCLUSION

For the foregoing reasons, Abbott respectfully requests that the Court dismiss J&J's tortious interference claim against Abbott, without leave to replead.

Dated:  November 15, 2006                     Respectfully submitted,

                                         MORVILLO, ABRAMOWITZ, GRAND,
                                         IASON, ANELLO & BOHRER, P.C.

                                         By: _____s/_____
                                             Cyrus R. Vance, Jr. (CV 2770)
                                             Stephen M. Juris (SJ 3488)
                                         565 Fifth Avenue
                                         New York, NY  10017
                                         (212) 880-9475

                                         MUNGER, TOLLES & OLSON LLP
                                         Jeffrey I. Weinberger
                                         Kelly M. Klaus
                                         Andrew W. Song
                                         355 South Grand Avenue, 35th Floor
                                         Los Angeles, California 90071-1560
                                         (213) 683-9100

                                         *Attorneys for Defendant*
                                         *Abbott Laboratories*