# EXHIBIT R

Case 1:98-cv-00080-SLR   Document 795-6   Filed 11/08/2007   Page 1 of 14

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO DIVISION)

| | |
|---|---|
| MEDTRONIC VASCULAR, INC., MEDTRONIC USA, INC., MEDTRONIC, INC., MEDTRONIC VASCULAR GALWAY, LTD., and EVYSIO MEDICAL DEVICES, ULC,<br><br>Plaintiffs,<br><br>v.<br><br>ADVANCED CARDIOVASCULAR SYSTEMS, INC., ABBOTT LABORATORIES, and ABBOTT XYZ CORPORATION,<br><br>Defendants. | Case No. 06-01066-PJH<br><br>**DECLARATION OF TODD MESSAL IN SUPPORT OF MOTION TO INTERVENE** |

I, Todd Messal, declare and state as follows:

1. I am Patent Counsel for Boston Scientific Corporation ("BSC"), the party seeking to intervene in this action as a counter-claimant. I make this declaration of my own knowledge, and could and would testify competently as to the matters set forth herein if called upon to do so by a court of law.

2. BSC is a medical device company based in Natick, Massachusetts. Advanced coronary stent technology forms a major part of BSC's business.

3. In April 2006, BSC acquired the cardiac rhythm management businesses of Guidant Corporation ("Guidant") for $27.2 billion.

4. Just before BSC's acquisition of Guidant, Abbott Laboratories ("Abbott") purchased Guidant's vascular businesses, including its coronary stents, for $4.1 billion in cash in addition to other consideration.

5. Abbott's Xience V™ stent was originally developed by Guidant.

6. Abbott and BSC have entered into an agreement that requires Abbott to sell BSC a private-label version of the Xience V stent.

7. BSC sells the private-label version of the Xience V stent manufactured by Abbott under the name Promus™.

8. BSC has been selling the Promus stent in Europe since January 2007, and expects to be able to sell it in the United States in the first or second quarter of 2008.

9. BSC is Abbott's only customer for the Promus stent.

10. Abbott and BSC are competitors in the medical device market. BSC makes and sells several other stent products that compete with similar products sold by Abbott. For example, BSC's Taxus™ stent is one of the top-selling drug-eluting stents, both in the United States and worldwide.

11. Abbott markets its Xience V stent as an alternative to Taxus.

12. Attached as **Exhibit A** is a true and correct copy of a March 24, 2007 press release in which Abbott claims that the Xience V stent has "superior" properties to the Taxus stent.

13. Once BSC receives approval to sell the Promus stent in the United States, BSC expects that Promus will compete directly with the identical Abbott Xience V stent here.

14. Attached as **Exhibit B** is a true and correct copy of Medtronic's Amended Preliminary Infringement Contentions in this case that it served in November 2006.

15. Attached as **Exhibit C** is a true and correct copy of a letter sent by Medtronic to Abbott on February 7, 2007 regarding the Promus stent. BSC was not copied on this letter.

16. Attached as **Exhibit D** is a true and correct copy of a letter sent by Abbott to Medtronic on or about March 30, 2007. BSC was copied on this letter. BSC did not learn that Medtronic had raised the issue of its Promus stent in this case until it received this letter.

Executed this 31 day of May, 2007 at Minneapolis, Minnesota.

Todd Messal

# EXHIBIT S

# CONFIDENTIAL EXHIBIT

# EXHIBIT T

Case 1:98-cv-00080-SLR    Document 795-6    Filed 11/08/2007    Page 6 of 14

# CONFIDENTIAL EXHIBIT

Case 1:98-cv-00080-SLR    Document 795-6    Filed 11/08/2007    Page 7 of 14

# EXHIBIT U

```
                - VOLUME F -                    Page 1171

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

                        - - -

ADVANCED CARDIOVASCULAR        :    CIVIL ACTION
SYSTEMS, INC. and GUIDANT      :
SALES CORPORATION,             :
                               :
          Plaintiffs           :
                               :
     vs.                       :
                               :
MEDTRONIC VASCULAR, INC. and   :
MEDTRONIC USA, INC.            :
                               :
          Defendants           :    NO. 98-80 (SLR)

                        - - -

                    Wilmington, Delaware
                    Tuesday, February 15, 2005
                    8:55 o'clock, a.m.

                        - - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

                        - - -

APPEARANCES:

          RICHARDS, LAYTON & FINGER
          BY: FREDERICK L. COTTRELL, III, ESQ.

               -and-


                    Valerie J. Gunning and
                    Leonard A. Dibbs,
                    Official Court Reporters
```

Page 1172

APPEARANCES (Continued):

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
BY: GERALD F. IVEY, ESQ.,
    MICHAEL A. MORIN, ESQ.,
    J. MICHAEL JAKES, ESQ. and
    JAMES BARNEY, ESQ.
    (Washington, D.C.)

    Counsel for Plaintiffs Advanced
    Cardiovascular Systems, Inc. and
    Guidant Sales Corporation


MORRIS, NICHOLS, ARSHT & TUNNELL
BY: KAREN JACOBS LOUDEN, ESQ.

       -and-

McDERMOTT, WILL & EMERY
BY: MAURICIO FLORES, ESQ.,
    FAY MORISSEAU, ESQ.,
    MICHAEL R. O'NEILL, ESQ.,
    JAMES G. RIZZO, ESQ. and
    MATTHEW WEIL, ESQ.
    (Washington, D.C.)

    Counsel for Defendants Medtronic
    Vascular, Inc. And Medtronic USA, Inc.

                --- 

Page 1173

PROCEEDINGS

(Proceedings commenced at 8:55 a.m., and the following occurred without the presence of the jury.)

MR. RIZZO: Good morning, your Honor.

THE COURT: Good morning.

MR. RIZZO: James Rizzo, for Medtronic.

Your Honor, the time, our time with the Court is quickly winding down, so we thought we would address with the Court some housekeeping issues that are before us over the next couple of days with regards to witnesses and the course of the trial and then discuss things related to the jury charge and a conference to discuss that.

Let me just lay out for you quickly some of the witness issues that we'd like to bring to the Court's attention this morning.

First of all, we received the Court's order with regards to the testimony of Michael Boneau. Mr. Morisseau is going to address the Court's order and provide the Court, if your Honor has not already received it, an amended proffer related to Mr. Boneau's testimony.

My colleague, Michael O'Neill, intends to

Page 1174

discuss ACS's objections with regards to the proposed testimony of one of the inventors, William Hartigan, and this morning, Medtronic filed an objection to the testimony of, or the introduction of the testimony of former Medtronic executives Robert Lashinski and Mr. Jendersee.

Mr. O'Neill can discuss that this morning. Otherwise, we can table that to tomorrow morning.

As far as some evidentiary issues that were raised, that we'd like to raise with the Court, last week, first of all, during counsel's cross-examination of Dr. Vito, you may recall that deposition testimony was put up on the screen with the intention of impeaching testimony of Dr. Vito during the cross.

We would just ask that counsel provide us, before putting the testimony up on the screen, a copy of the testimony that's going to be used for impeachment purposes so that we can take a look at it, see what it says, see what deposition it relates to, whether it's testimony he gave here or elsewhere, including providing us the date of the testimony, the page and the line number.

We've discussed that with counsel for ACS. They don't believe that's necessary. We do.

With regards to Dr. Segal's testimony, you

Page 1219

1  I can't respond without speaking --
2       THE COURT: Well, that's true. If you want
3  to pursue this line of questioning, we need to have a
4  sidebar, then.
5       MR. MORISSEAU: This is the last question I
6  have in that line, if that helps the Court.
7       THE COURT: No, not necessarily, because
8  there's an objection to this question.
9       MR. MORISSEAU: All right, your Honor.
10            - - -
11      (Sidebar conference, out of the hearing of
12 the jury, as follows.)
13      MR. MORISSEAU: Your Honor, the relevancy on --
14 I expected they were going to, he and his wife's
15 contracts on cross, so I'm touching that in direct and
16 to show that his wife, I imagine the argument is going to
17 be, this is a lot of money for nothing. I wanted to show
18 that his wife and he do perform services and his wife is
19 a recognized professional in the area.
20      THE COURT: I think you've done that. I
21 think the question is what she had done for Guidant in
22 the past. I don't see the relevance that has to this
23 area of questioning.
24      MR. MORISSEAU: Just builds her up a little
25 bit more, your Honor.

Page 1220

1       THE COURT: All right. I'm going to sustain
2  the objection.
3       (End of sidebar conference.)
4            - - -
5  BY MR. MORISSEAU:
6  Q. Mr. Bonneau, we're going to move off from your wife
7  and Hyland Consulting. I just have a couple of more
8  questions about your patent.
9       I'm going to put back on the Elmo Exhibit 18
10 and reduce that for a second and just focus on a couple
11 of things. Actually, one thing.
12      You did not write this patent application on
13 your own did you, sir?
14 A. No, I did not.
15 Q. All right. You had an attorney that helped you out?
16 A. Yes.
17 Q. And the patent was filed on what day, sir?
18 A. August of 1989.
19 Q. Okay. And specifically it says right there, it says
20 so right on the face of that. It says August 24th, '89?
21 A. Yes.
22 Q. All right.
23      MR. MORISSEAU: Pass the witness, your Honor.
24      THE COURT: All right. Cross-examination, Mr.
25 Ivey.

Page 1221

1       MR. IVEY: Thank you, your Honor.
2       Your Honor, if I could approach with a couple
3  of witnesses' depositions, to get that out of the way...
4       THE COURT: Yes.
5       (Mr. Ivey handed deposition transcripts to the
6  witness.)
7       MR. IVEY: Okay.
8            CROSS-EXAMINATION
9  BY MR. IVEY:
10 Q. Mr. Bonneau, we may have reason to refer to those,
11 and perhaps not.
12      I heard you say on direct, sir, that you have
13 spent --
14 A. I'm sorry. I can't hear you.
15 Q. Okay. I heard you say on your direct that you
16 have spent some of your time over the past 60 months or
17 so doing what you can to help Medtronic out.
18      Did I hear that correctly?
19 A. Yes.
20 Q. And that includes testifying on occasion? You
21 testified in cases where Medtronic was one of the
22 parties?
23 A. No. I've not -- I've been deposed. I have not --
24 is that what you mean?
25 Q. Yes. You've given testimony under oath with regard

Page 1222

1  to the '331 patent and --
2  A. Yes, I have.
3  Q. Okay.
4  A. Yes.
5  Q. And on one occasion, you have given a false
6  statement with regard to your testimony; is that right?
7       MR. MORISSEAU: Objection, your Honor.
8  Sidebar.
9            - - -
10      (Sidebar conference, out of the hearing of
11 the jury, held as follows.)
12      MR. MORISSEAU: Your Honor, the Court has
13 entered motions in limine that anything along these lines
14 should be -- should have been revealed and discussed with
15 the Court before the witness was put on the stand. I
16 would like to know where Mr. Ivey is going on this.
17      MR. IVEY: Well, your Honor, we're entitled
18 to impeach any time a witness has given inconsistent or
19 false testimony under oath on prior occasions where the
20 witness was sworn. He has so admitted previously. And
21 during the direct examination, he testified that he
22 had -- he does what he can to help Medtronic out. That
23 certainly includes his testimony in court. We think it's
24 relevant.
25      MS. LOUDEN: Your Honor, this was specifically

Page 1223

1 raised in a motion in limine pretrial. We specifically
2 raised the issue of this sanction and the prior
3 testimony. Your Honor granted that motion in limine.
4         MR. IVEY: I have not raised the sanction. I
5 asked whether he testified falsely. And that I don't
6 believe was covered by that order. It's certainly
7 admissible under the rules, under 607, impeaching a
8 witness with prior inconsistent testimony.
9         THE COURT: We're not saying it's irrelevant.
10 The question is whether your coming out with this
11 statement that you did, whether it should have been
12 passed by the Court first.
13        I frankly, don't know what you are referring
14 to. I don't know whether you've given any notice as to
15 what you are referring to.
16        I'm going to excuse the jury. We're going to
17 discuss this. All right?
18        MR. IVEY: All right.
19        (End of sidebar conference.)
20        - - -
21        THE COURT: Members of the jury, I apologize.
22 We're going to take a few minutes and discuss this. I'm
23 going to let you wait in the jury room rather than in.
24        (At this point the jury then left the
25 courtroom, and the following took place without the

Page 1224

1 presence of the jury.)
2         THE COURT: And, Mr. Bonneau, you may step
3 down.
4         (Witness temporarily excused)
5         THE COURT: All right. First of all, I guess --
6 I don't know that I have copies of my motion in limine to
7 make sure that we're all being consistent with it, but
8 maybe I will have that momentarily.
9         And, Mr. Ivey, perhaps you would like to make
10 a proffer as to what testimony you are referring to --
11 you were going to refer to.
12        MR. IVEY: All right, your Honor. The
13 testimony comes specifically from this case, April 22,
14 2004, where in response to a series of questions --
15        MR. MORISSEAU: Could we have a page number,
16 your Honor?
17        MR. IVEY: Yes. I'm sorry.
18        MR. MORISSEAU: And could you give us a second
19 to get the deposition?
20        MR. IVEY: Sure.
21        MR. MORISSEAU: Which day is it, sir?
22        MR. IVEY: April 22, 2004.
23        (Pause.)
24        MR. MORISSEAU: We are having trouble finding
25 it. Thank you, sir.

Page 1225

1         MR. IVEY: The page, your Honor, is Page 275
2 in this transcript, April 22, 2004, and the passage
3 specifically as I was interested in or more was, you
4 admit, sitting here today, in fact, you did make a false
5 statement in a judicial proceeding?
6         He said ultimately, the blame goes on me, yes.
7         Now, that's in this case. It is my question
8 as to whether he has made a false statement with regard
9 to this litigation. I think it's relevant and a proper
10 question under Rule 607 as I mentioned at the sidebar.
11 It does not raise the sanction order which followed
12 from that false statement or series of false statements
13 and I did not intend to use the sanction order, as I would
14 consider that outside the Court's scope of allowing
15 cross-examination in an extrinsic matter.
16        THE COURT: All right.
17        MS. LOUDEN: Your Honor, we specifically
18 addressed this in our motion in limine just to avoid
19 exactly this kind of situation and, as we described at
20 length in our motion in limine, the order to which Mr.
21 Ivey was referring was vacated an appeal court. The
22 appeal court found that there was no false statement,
23 that there was -- that there are different ways of
24 understanding the testimony, and this was exactly why
25 we went to the trouble of specifically briefing this

Page 1226

1 issue in a motion in limine. The Court addressed it and
2 granted the motion.
3         And this is just simply in violation of that
4 order.
5         THE COURT: Now --
6         MR. IVEY: First of all, your Honor, I don't
7 think this order was vacated. I believe that the
8 sanction and penalty was actually paid by Mr. Bonneau.
9         THE COURT: All right. Let me start from
10 the beginning.
11        The motion we are talking about is the motion
12 to preclude testimony, evidence, briefs, rulings, orders
13 and judgments from other proceedings; correct?
14        MS. LOUDEN: No, your Honor. It was our
15 Motion in Limine No. 2.
16        THE COURT: Oh. To exclude certain irrelevant
17 and unduly prejudicial evidence?
18        MS. LOUDEN: Yes, your Honor.
19        THE COURT: All right. So, Mr. Ivey, explain
20 to me again how -- and, of course, I just have my order.
21 I don't have the actual motion in front of me.
22        MR. IVEY: Nor do I, your Honor.
23        My recollection of this was that there was
24 concern over the sanction, order or other penalties or
25 judgments that Mr. Bonneau may have been involved with

Page 1227

 1  and specific reference to, I guess, some of his personal
 2  dealings in a marriage situation.
 3         As I say, I did not ask any of that, and I
 4  don't intend to ask him any of that.
 5         THE COURT: So what is the false statement
 6  that you are talking about?
 7         MR. IVEY: Well, I don't know that I can go
 8  into what the false statement was with the jury.
 9         THE COURT: Well, no. I am on step two and
10  you're on step twenty. So take this through step by step.
11         You now have the groundwork as far as my legal
12  ruling goes. Tell me exactly what your thoughts were in
13  addressing this situation without notice to the opposing
14  party.
15         MR. IVEY: All right, your Honor.
16         THE COURT: I need to know what the false
17  statement was, when it was made, and how it plays into
18  this ruling that I made.
19         MR. MORIN: Your Honor, may I step in and
20  speak with regard to that?
21         THE COURT: Yes.
22         MR. MORIN: Thank you, your Honor.
23         The issue that Ms. Jacobs Louden, I think she
24  was perhaps confused on, is that when he had been found
25  to give a different date of invention, the issue that

Page 1228

 1  went to the Supreme Court was not the issue of the
 2  sanction order. The issue that went to the California
 3  Supreme Court was whether that was a judicial estoppel
 4  against him for the date of invention.
 5         THE COURT: Now, see, you are jumping ahead.
 6  You are not answering the question I asked.
 7         MR. MORIN: Right.
 8         THE COURT: The question I asked was what
 9  false statement are we talking about, and then you can
10  give me the procedural history of the false statement
11  after that, to see if it violates my ruling.
12         MR. MORIN: I apologize for not answering
13  your question, your Honor.
14         The false statement had to do with the fact
15  that in a deposition in another case, when asked why his
16  wife ended up with a certain amount of stock in the
17  divorce, he said it was a gift. It turned out that the
18  truth was, he didn't reveal this at his deposition, that
19  in a prior marital dissolution settlement that he did not
20  refer to, that the stock had been divvied up that way
21  because he had given a false date of invention in that
22  paper.
23         But the bottom line is the sanction came
24  after all of that for him kind of misleading during the
25  deposition, and that's what was said about what he had

Page 1229

 1  done previously and what the circumstances were around
 2  that gift.
 3         THE COURT: But basically, basically, what
 4  you all have done was you've introduced information to
 5  the jury, indicating that there was a false statement.
 6  Because I've precluded all of that evidence from coming
 7  in, what you want to get in is just the fact it was false
 8  without any of the background, without any of the
 9  procedural history afterwards.
10         I find that untenable, and so that evidence
11  will be stricken, and I'm not confident I'm going to
12  allow you to cross-examine this witness any more.
13         Truly, I find that untenable.
14         At the very least, you should have given
15  notice to the opposing counsel before you did this.
16         Now, my only question is whether I let you
17  cross-examine any more. If you want to address that
18  point, I will let you proceed. Otherwise, I might just
19  have you sit down and have Mr. Bonneau not resume the
20  stand after I give the jury an instruction to totally
21  disregard that question.
22         MR. IVEY: Your Honor, I apologize, given
23  the Court's ruling with regard to the line of
24  questioning. We believe that we should be able to follow
25  up with regard to certain aspects of the '331 testimony

Page 1230

 1  that was given by the witness and simply draw out that
 2  there are points with regard to the witness' testimony
 3  concerning multiple stent segments, as he testified to
 4  on direct, and the successful working of his tests of
 5  these particular stents within the length and range
 6  we're talking about in the patent that he has testified
 7  to. We ought to be able to explore that with him.
 8         THE COURT: Well, certainly, you should have
 9  been able to. The question is whether I will let you be
10  able to.
11         Mr. Morisseau?
12         MR. MORISSEAU: Your Honor, you think it's
13  untenable, you can imagine how I feel.
14         We specifically addressed this in our motions
15  in limine. You entered an order saying you can't do this.
16         The first thing he did was do it. He did not
17  even follow your suggestion from a half an hour ago,
18  which was to let us know which depositions he was hauling
19  up and giving to him. Okay?
20         I do not believe ACS is following this
21  Court's order and, in view of that, isn't it -- he asked
22  him whether he made a false statement. That rings in
23  the jurors ears and it rings inappropriately and the
24  only appropriate relief I think is to strike the
25  testimony, not allow this attorney to question this

Page 1231

1 witness any more unless we know every question he's
2 going to ask beforehand, because he has proven not to
3 be one who follows the Court orders, your Honor.
4     I think you had it right. What you ought
5 to do, if I may be so bold to suggest it, is to do what
6 you said. Don't let this attorney question this man
7 about something that you said he shouldn't be able to
8 do. Anything else, and with that, striking the
9 testimony, striking the question. Anything else will
10 appear that somehow he has received the Court's
11 sanction and approval to go ahead and ask whatever
12 questions.
13     I don't know what the next question is
14 going to be. And I think that you should couple that
15 with an instruction that what Mr. Ivey said was improper
16 and in violation of a court order.
17     MR. IVEY: Your Honor, I understood that the
18 Court will give an instruction and I will be admonished.
19 I apologize to the extent that I misunderstood the scope
20 of the order in that regard.
21     If I can say this, as a matter of good faith,
22 there are plenty of times, your Honor, where a specific
23 kind of order is not allowed into evidence, particularly,
24 for example, in criminal proceedings, but a witness is
25 questioned about whether, in fact, a certain crime or

Page 1232

1 certain event occurred.
2     - - -
3     MR. IVEY (Continuing): And the lawyer has
4 to live with the answer as given and is considered to be
5 extraneous, outside the scope of cross-examination.
6     That's how I understood this order to be
7 applied as well. As a result, we believe that since he
8 has testified in this case, that he gave a false
9 statement. That was a proper question.
10     I understand now that is the ruling that I'm
11 on the wrong side of. The jury would be so instructed.
12     - - -

Page 1233

1
2     MR. IVEY (Continuing): And I think further,
3 a sanction with regard to that, I would respectfully
4 submit, your Honor, is beyond what is necessary to cure
5 the issue.
6     And, again, we apologize to the extent that
7 we have gone beyond the scope of your order.
8     MR. MORISSEAU: Your Honor, let me put this in
9 context.
10     The first thing I addressed the Court this
11 morning was, I wanted to make sure that I followed your
12 orders. I wanted to make sure that when we got this
13 witness on the stand, I wasn't going to violate any
14 orders, and I was as open as I could be and as candid as
15 I could be about that.
16     I did not know he was going to jump up and
17 violate your order by asking questions on things that you
18 specifically excluded. You had it right to begin with,
19 your Honor. Don't let the ACS attorneys question Mr.
20 Bonneau any more.
21     (Pause.)
22     THE COURT: I am trying to decide whether I
23 don't allow any more questions or whether I make you, Mr.
24 Ivey, write out the few questions that you will be
25 allowed to make sure that they are approved by the

Page 1234

1 opposing counsel. I think that's actually a worse -- I
2 am going to instruct the jury not to -- to disregard
3 that last question and I am going to have Mr. Bonneau
4 not retake the stand.
5     MR. IVEY: All right, your Honor.
6     (Witness excused)
7     - - -
8     THE COURT: All right. Is Medtronic ready to
9 go forward with the next witness?
10     MR. MORISSEAU: Yes, your Honor, we are.
11     THE COURT: All right.
12     (At this point the jury entered the courtroom
13 and took their seats in the box.)
14     THE COURT: Thank you, ladies and gentlemen.
15     I'm going to instruct you that the last
16 question posed to Mr. Bonneau was improper, and you are
17 to entirely disregard that question, and don't speculate
18 on anything about that question or any response to that
19 question. I'm going to have it stricken from the record.
20     I don't know which of you to address in terms
21 of calling your next witness. Mr. Morisseau? All right.
22     MR. MORISSEAU: Thank you, your Honor.
23     Dr. Segal, please.
24     - - -
25

Page 1503

So if the Court rules that U's, Y's and W's are not part of undulating pattern and thereby cylindrical element, I don't think there's any connect on infringement as well.

We have other infringement issues which we can put in our papers, but I'd like to bring that one to your attention.

THE COURT: All right. I appreciate that.

All right. We're working on the jury instructions, which include claim construction. As I said, we will get that to you first thing in the morning.

What kind of schedule are we looking at at this point?

MR. JAKES: Your Honor, we did submit about six additional jury instructions today based on the evidence that has been presented, so I wanted to alert your attention to that. They are very short. Most of them are one sentence and they address specific things that were said in this case, such as independent development.

We've included an instruction from the Stambler case, which was affirmed last week, for example.

As to our procedure for tomorrow, I think maybe Mr. Ivey can tell you.

THE COURT: All right. Thank you.

Page 1504

MR. IVEY: Your Honor, I believe we have potentially one rebuttal witness and two excerpts from videotapes, which we're going to be working through this evening. I believe that's it for us. That would be it.

THE COURT: In terms of time, what are we talking? Just so I know what to expect in terms of when we'll be meeting about jury instructions, et cetera.

MR. IVEY: Your Honor, as of this morning, I believe we were thinking about this part of the case taking -- all of it taking about an hour and 45 minutes or thereabouts.

One of the things we're going to be looking at this evening is whether we need all of the things tomorrow that we thought we needed today. And hopefully my anticipation is that all of that is going to be a short amount of time.

THE COURT: So perhaps by lunchtime, the jury will be gone and we'll be conferring.

MR. IVEY: I think that's probably right, your Honor.

THE COURT: All right. Anything else we can helpfully address?

MR. MORISSEAU: One last point, your Honor.

THE COURT: Yes?

MR. MORISSEAU: We filed a claim construction

Page 1505

brief this afternoon. We wanted to bring that to the Court's attention.

THE COURT: All right. Hopefully, all of these things will float up to my desk during the evening. I appreciate it. Thank you.

MR. MORISSEAU: Thank you.

(Court recessed at 4:40 p.m., to reconvene on Wednesday, February 16, 2005.)

- - -

Page 1506

INDEX

DEFENDANTS' TESTIMONY
    CONTINUED                    DIRECT  CROSS  REDR  RECR

Michael Bonneau ----------------  1207   1221   ----  ----

Sunil Saigal -------------------  1235   1381   1446  ----

PLAINTIFFS' REBUTTAL TESTIMONY

Beverly Huss,
    Resumed ------------         1457   1476   1492  ----

- - -