IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS, INC. and ABBOTT LABORATORIES, INC., <br> Plaintiffs, <br><br> v. <br><br> MEDTRONIC VASCULAR, INC. and MEDTRONIC USA, INC. <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 98-80 (SLR) <br> (Consolidated with C.A. No. 98-314 (SLR) and C.A. No. 98-316 (SLR)) <br><br> **REDACTED PUBLIC VERSION** |

### DECLARATION OF RODNEY S. BADGER, M.D., F.A.C.C.

I, Rodney S. Badger, hereby declare as follows:

1. I am an interventional cardiologist at the Central Utah Medical Clinic in Provo, Utah. I graduated from medical school in 1980 at the University of California, San Diego, and I have specialized in cardiology since 1983. From 1997 to 2005, I was the Chairman of Cardiovascular Medicine at the Utah Valley Regional Medical Center, and I am currently an Adjunct Professor of Medicine at the University of Utah. I am Board-certified in Interventional Cardiology, Cardiovascular Disease, and Internal Medicine, and I am a Fellow of the American College of Cardiology.

2. I served on the medical Advisory Board/Scientific Council for Advanced Cardiovascular Systems, Inc. (now Abbott Cardiovascular Systems, Inc.) ("ACS"), from 1986 to 2003, and I am currently on the Scientific Advisory Boards for Biocardia, Inc. and Endomatrix. Attached hereto as Exhibit A is a current copy of my *curriculum vitae*.

3.                                                  **REDACTED**

**REDACTED** I use bare-metal stents in the majority of my patients because most of the PCI procedures I perform are emergent cases that require immediate implantation, such as acute myocardial infarction ("MI") or acute coronary syndrome.  In these types of cases, where an initial successful delivery is vital, I prefer bare-metal stents, which are significantly more deliverable than the currently available drug-eluting stents.  An additional reason why drug-eluting stents are often not appropriate in emergent cases is that there is usually not a sufficient opportunity to determine whether an emergent patient can use an anti-clotting agent, such as Plavix, for an extended period of time, which is required in drug-eluting stent patients because of the risk of late-stent thrombosis.

4. **REDACTED**

I prefer the Driver/Micro-Driver to ACS's Vision stent and the Boston Scientific Liberte stent because Driver's unique modular design and rounded struts make it much easier to deliver in tortuous blood vessels in certain patients.  The Vision and Liberte stents, by contrast, are laser-cut from a metal tube, with square struts, making them less deliverable in patients with challenging anatomies (*e.g.*, patients with large blood vessels and short lesions).

5. Driver also has an "open cell" design that is particularly useful in treating complex, high-risk, bifurcated lesions (*i.e.*, lesions in the shape of a "Y" formed by a side branch emerging from the main artery).  To treat bifurcated lesions,  I use what is known as the "Provisional-T" technique.  With this technique, I place a stent in the main artery and then enter the side branch through the wall of the just-implanted stent.  If the side branch cannot be entered, this can result in myocardial infarction due to occlusion of the side branch.  Driver is the most suitable stent for bifurcated lesions because its open cell modular design allows for the entry of the wire into the side branch of the artery.  In contrast, traditional slotted-tube stents, like Vision and Liberte, have closed cells with sharper edges, which can make it difficult to enter the side branch with the wire.  For this reason, removing Driver from the market would result in some cases where the side branch could not otherwise be accessed, possibly resulting in myocardial injury in these patients.

6.      Another unique attribute of Driver/MicroDriver, which is directly related to its modular construction and open cell design, is its ability to conform to a coronary artery's natural curvature. Driver is unique in this ability. Slotted-tube stents (*i.e.*, all other stents) will always partially straighten any natural curve greater than 45 degrees. In contrast, the Driver stent will conform to an artery's natural curve without "straightening" it. Arteries that are rendered straighter with placement of a slotted tube stent create greater stresses at the stent-"natural" artery junction, as the remaining "natural" artery tries to compensate for the curve removed by the stiffer slotted tube stent. I experienced an example of this effect last week. I deployed an ACS Vision stent in a proximal-mid right coronary artery with a 90 degree bend. After stent deployment, the residual curve was no greater than 45 degrees.

7.      I have had great success with Medtronic's Driver and MicroDriver. In my experience, patients who have been treated with Driver and MicroDriver have very low rates of repeat PCI or target lesion revascularization ("TLR"). This appears to be because Driver/MicroDriver yield a lower rate of restenosis (or the re-narrowing of a blood vessel that the stent was designed to keep open), because their rounded struts, with their lack of sharp edges, cause less trauma on the blood vessel. In contrast, I would expect that patients treated with the Vision and Liberte stents will experience higher levels of restenosis because the square edges of these stents produce traumas that are more likely to lead to restenosis.

8.      I have been asked to describe the effect that an injunction against the sale of Medtronic's bare-metal stents in the United States would have on my patients, as well as on the practice of interventional cardiology generally.

9.      It is my opinion that my patients, as well as a number of other PCI patients around the country, would be adversely affected by the withdrawal of the most deliverable bare-metal stent currently on the market. Medtronic's Driver stent is ideal for certain patients with challenging and tortuous anatomies, and there are instances where ACS's Vision or Boston Scientific's Liberte stents will not be able to be delivered to the same lesions to which a Driver stent could have been delivered. In these instances, patients would have to undergo more invasive surgical procedures to address their conditions, such as cardiac bypass surgery.

10. Below is a clinical example demonstrating the effect that an injunction against the sale of Medtronic's bare-metal stents would have on my patients **REDACTED** **REDACTED** transferred to our hospital with acute coronary syndrome. At coronary angiography, he was found to have a sub-total occlusion of his right coronary artery, which we believed was the "culprit" lesion causing his acute syndrome. Attempts were made to deliver several drug-eluting and bare-metal stents. However, these attempts failed due to an inability to fully advance the stents into the lesion. A Medtronic MicroDriver stent was then successfully deployed within the lesion with an excellent clinical and angiographic outcome. Without the availability of the MicroDriver, this patient would have required coronary bypass graft surgery. Performing surgery on an individual of this weight would have presented a very high risk of peri-operative complications.

11. Over the years, I have developed my own unique stent delivery method (which I call the Hydro-Exchange or "HX" method) with which I am very comfortable, and which works best with the Medtronic Driver and MicroDriver stents. If an injunction were to issue against Medtronic's bare-metal stents, I would not be able to use my preferred method anymore. Although I am well-versed in the other delivery methods used by most physicians – the Rapid Exchange ("RX") or Over-the-Wire methods – they are not my preference.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 30, 2007, at _Provo_, Utah.

_Rodney S. Badger_, M.D., F.A.C.C.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on November 8, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing to Frederick L. Cottrell, III.

I further certify that on November 8, 2007 I served copies of the foregoing to the following counsel in the manner indicated:

**BY HAND & EMAIL**

Frederick L. Cottrell, III
Anne Shea Gaza
Richards Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

**BY EMAIL**

J. Michael Jakes
Michael A. Morin
Finnegan Henderson Farabow Garrett & Dunner LLP
901 New York Avenue, NW
Washington, DC 20001-4413

*/s/ Karen Jacobs Louden*

klouden@mnat.com