IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ABBOTT CARDIOVASCULAR SYSTEMS INC. and ABBOTT LABORATORIES INC.,     ) ) ) Plaintiffs,     ) ) v.     ) ) MEDTRONIC VASCULAR, INC. and MEDTRONIC USA, INC.,     ) ) ) Defendants     ) ) ) | Civil Action No. 98-80 (SLR) (Consolidated with C.A. No. 98-314 (SLR) and C.A. No. 98-316 (SLR)) **REDACTED - PUBLIC VERSION** |

## ABBOTT'S REPLY IN SUPPORT OF ITS MOTION FOR A PERMANENT INJUNCTION

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7509
*Attorneys for Plaintiffs Abbott Cardiovascular Systems Inc. and Abbott Laboratories Inc*

OF COUNSEL:
J. Michael Jakes
Gerald F. Ivey
Michael A. Morin
FINNEGAN, HENDERSON, FARABOW
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000
(202) 408-4400

November 21, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT ................................................................................................... 1

    A.   Abbott Has Proven Irreparable Harm and That Money Damages Will Not
        Adequately Compensate It for Medtronic's Infringement .................................. 1

        1.   Abbott's Loss of Market Share Has Caused Irreparable Harm in
             the Past and Will Continue to Cause Irreparable Harm in the
             Future ................................................................................................. 1

        2.   Abbott's Vision and Medtronic's Driver Compete Head-to-Head
             As the Only Two Cobalt-Chromium Stents on the Market ..................... 3

        3.   The Supreme Court's Decision in *eBay* Requires Abbott to Prove
             That it "Has Suffered" Irreparable Harm ............................................... 3

        4.   Medtronic's Infringement Has Irreparably Harmed Abbott's
             Goodwill in the Eyes of Investors ......................................................... 4

        5.   Medtronic's Infringement Has Irreparably Harmed Abbott's
             Ability ████████████████████████ ............................................... 6

        6.   Medtronic's Infringement Has Irreparably Harmed Abbott's
             Ability ████████████████████████ ............................................... 6

    B.   Medtronic Has Failed to Rebut Abbott's Showing of Irreparable Harm .............. 7

        1.   Abbott's Settlement Agreements Involving the Lau Patents Do Not
             Negate the Irreparable Harm Caused by Medtronic's Infringement ......... 7

        2.   Abbott Requested a Permanent Injunction at the Appropriate Time ......... 8

        3.   Medtronic's Allegations Concerning the Validity of the Patents-in-
             Suit Are Irrelevant to Abbott's Motion for a Permanent Injunction ........ 10

        4.   The Reexamination Proceeding Is Irrelevant ........................................ 11

    C.   The Public Interest Favors a Permanent Injunction .......................................... 12

        1.   The Public Interest Favors Enforcement of Patent Rights, Not
             Compulsory Licenses for Recidivist Infringers ..................................... 12

        2.   Mere Preference for Medtronic's Infringing Stents Does Not Show
             Harm to the Public Interest or Reason to Deny an Injunction ............... 13

i

          3.     The Public Will Have Adequate Choice and Supply of Stents if
                 Medtronic's Infringing Stents Are Removed from the Market ............... 17

    D.    The Balance of Hardships Favors an Injunction .......................................... 18

    E.    Medtronic Has Not Established Unclean Hands.............................................. 19

III.   CONCLUSION ............................................................................................................. 20

RLF1-3226749-1

# TABLE OF AUTHORITIES

## Cases

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
  2006 U.S. Dist. LEXIS 79589 (D. Minn. Oct. 30, 2006) ............................................. 12

*800 Adept, Inc. v. Murex Securities, Ltd.*,
  505 F. Supp. 2d 1327 (M.D. Fla. 2007) ........................................................... 5, 9

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
  480 U.S. 531 (1987) .................................................................................. 10, 11

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  106 F. Supp. 2d 696 (D. N.J. 2000) ......................................................................... 16

*Brooktrout, Inc. v. Eicon Networks Corp.*,
  2007 WL 1730112 (E.D. Tex. June 14, 2007) ......................................................... 5

*Commonwealth Sci. and Indus. Res. Organisation v. Buffalo Tech. Inc.*,
  492 F. Supp. 2d 600 (E.D. Tex. 2007) ................................................................. 6, 7

*eBay Inc. v. MercExchange, L.L.C.*,
  126 S .Ct. 1837 (2006) ................................................................................... 4, 7

*Eli Lilly and Co. v. Medtronic Inc.*,
  7 U.S.P.Q. 2d 1439 (E.D. Pa. 1988) ..................................................................... 12

*Hoechst Celanese Corp. v. BP Chem. Ltd.*,
  78 F.3d 1575 (Fed. Cir. 1996) ............................................................................ 11

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
  398 F. Supp. 2d 305 (D. Del. 2005) ..................................................................... 19

*Johns Hopkins Univ. v. Datascope Corp.*,
  2007 WL 2682001 (D. Md. Aug. 9, 2007) ......................................................... 3, 19

*Martek Biosciences Corp. v. Nutrinova Inc.*,
  2007 WL 3181307 (D. Del. Oct. 30, 2007) ......................................................... 3, 4

*MercExchange, L.L.C. v. eBay, Inc.*,
  500 F. Supp. 2d 556 (E.D. Va. 2007) ............................................................ 9, 10, 12

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  2007 WL 3227684 (C.D. Cal. Oct. 16, 2007) .......................................................... 4

*Muniauction, Inc. v. Thomson Corp.*,
  502 F. Supp. 2d 477 (W.D. Pa. 2007) ...................................................................... 2

*Odetics, Inc. v. Storage Tech. Corp.*,
  14 F. Supp. 2d 785 (E.D. Va. 1998) ................................................................. 9

*Phillips Petroleum Co. v. Hunstsman Polymers Corp.*,
  157 F. 3d 866 (Fed. Cir. 1998) ............................................................. 15, 17

*Quad Envtl. Tech. Corp. v. Union Sanitary Dist.*,
  946 F.2d 870 (Fed. Cir. 1991) ............................................................. 11, 12

*Sanofi-Synthelabo v. Apotex Inc.*,
  492 F. Supp. 2d 353 (S.D.N.Y. 2007) ...................................................... 5, 6

*Schneider (Europe) AG v. Scimed Life Sys., Inc.*,
  852 F. Supp. 813 (D. Minn. 1994)............................................................ 14

*Scimed Life Sys., Inc. v. Johnson & Johnson*,
  2001 WL 652027 (D. Del. Mar. 29, 2001) ................................................. 7

*Shiley, Inc. v. Bentley Labs., Inc.*,
  601 F. Supp. 964 (C.D. Cal. 1985) .......................................................... 14

*Smith & Nephew, Inc. v. Synthes*,
  466 F. Supp. 2d 978 (W.D. Tenn. 2006) ................................................. 13

*Stand. Havens Prods., Inc. v. Gencor Indus., Inc.*,
  897 F.2d 511 (Fed. Cir. 1990) ................................................................ 11

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
  2007 WL 37742 (E.D. Mich. Jan. 4, 2007) .............................................. 10

*T.J. Smith & Nephew, Ltd. v. Consol. Med. Equip., Inc.*,
  821 F.2d 646 (Fed. Cir. 1987) ................................................................. 9

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
  782 F.2d 995 (Fed. Cir. 1986) ................................................................ 18

iv

## I.    INTRODUCTION

In accusing Abbott of delay and unclean hands, Medtronic ignores that it is infringing Abbott's patents and has been for nearly ten years now   Over the past decade, Medtronic's infringing business has irreparably harmed Abbott by taking its market share, damaging its goodwill, ██████████████████████████████████████████████████████ Despite the jury's verdict nearly three years ago and the Court's entry of judgment earlier this year, moreover, Medtronic shows no signs of stopping its infringing ways.  Rather than pursuing a noninfringing stent, Medtronic is instead taking a calculated risk that this Court will give it a compulsory license.  To the extent Medtronic's infringing business will be harmed by an injunction, Medtronic has only itself to blame, for it has had years to develop a noninfringing stent, yet instead elects to continue infringing Abbott's patents.  Furthermore, Medtronic's arguments that the public will be harmed without Medtronic's Driver on the market have no factual support and indeed are contrary to objective evidence in the record   For the reasons below and in Abbott's opening brief, the Court should issue an injunction

## II.    ARGUMENT

### A.    Abbott Has Proven Irreparable Harm and That Money Damages Will Not Adequately Compensate It for Medtronic's Infringement

#### 1.    Abbott's Loss of Market Share Has Caused Irreparable Harm in the Past and Will Continue to Cause Irreparable Harm in the Future

Medtronic does not—and cannot—dispute that it took market share from Abbott when it began releasing infringing stents in 1997, and that, by releasing stent after infringing stent over the last decade, Medtronic continues to maintain a significant share of the bare-metal stent market. Indeed, within months after Medtronic released its first infringing stent, Abbott's market share dropped from 64% to 39%, while Medtronic's market share rose to 45%.  (D.I. 727 at 5-6.)  This undisputed shift in market share from Abbott to Medtronic, as well as testimony explaining how

1

Medtronic's infringing stents have taken market share from Abbott, prove that Abbott's loss of market share was a direct result of Medtronic's infringement. (D.I. 727 at 7-8, 16; Ex. 24, Pacitti Dep. at 85:7-13.[1]) Medtronic has presented no evidence to the contrary.

Although Abbott eventually recovered a portion of the market share initially taken by Medtronic's infringing stents, Abbott has never regained the majority of it. (Ex. 24, Pacitti Dep. at 90:3-13.) As shown by Morgan Stanley research, Medtronic has maintained a significant share of the bare-metal stent market ever since its decade of infringement began. (D.I. 726, Ex. 21 at 5.) For example, Medtronic's market share was 29% in 2000, 25% in 2001, 14% in 2002 and 2003, 20% in 2004, 15% in 2005, and 17% in 2006. (*Id.*) While Medtronic alleges that its market share is "relatively small" and does not harm Abbott (D.I. 781 at 8-9), the objective data belies Medtronic's allegations, for a substantial portion of the market share Abbott initially lost to Medtronic was lost permanently. (D.I. 726, Ex. 21 at 5; D.I. 727 at 5-8.) *See Muniauction, Inc. v Thomson Corp.*, 502 F. Supp. 2d 477, 482-83 (W.D. Pa. 2007) (holding permanent loss of market share "is a harm that cannot be compensated for solely with monetary damages").

Significantly, moreover, while Abbott is currently the leader in the bare-metal stent market, Morgan Stanley predicts that Medtronic will take additional share from Abbott in the coming years with its infringing stents, estimating that Medtronic's share will increase from 17% to 33% by 2010, and that Abbott's share will decrease from 63% to 56% in that same period. (D.I. 726, Ex. 21 at 5.) This evidence undermines Medtronic's unsupported argument that "it is highly unlikely that Medtronic's stents will have any significant continuing effect on ACS's market share," and that "the mature (rather than developing) nature of the stent market militates against a finding of irreparable harm." (D.I. 781 at 8-10.) It is well-settled that Abbott's loss of market

---

[1] References to "Ex. __" refer to exhibits to the declaration of Anne Shea Gaza filed herewith.

2

share in the past, and its continuing loss of market share in the future, constitutes irreparable harm that cannot be adequately addressed by money damages. *Martek Biosciences Corp v Nutrinova Inc.*, 2007 WL 3181307, at *15 (D. Del. Oct. 30, 2007) ("Martek will continue to suffer such [irreparable] harm if Lonza is not enjoined from infringing the '594 and '281 patents, as it is likely to lose market share that it may not be able to recapture.").

### 2. Abbott's Vision and Medtronic's Driver Compete Head-to-Head As the Only Two Cobalt-Chromium Stents on the Market

As Medtronic points out, Abbott's Vision and Medtronic's Driver are the only stents on the market made of a cobalt-chromium alloy, and thus compete directly against one another for physicians that prefer a cobalt-chromium stent. (D.I. 781 at 27 n 18.) ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ As such, physicians who use Medtronic's Driver due to its cobalt-chromium alloy would likely use Abbott's Vision if the Driver were removed from the market.[2] *Johns Hopkins Univ. v Datascope Corp*, 2007 WL 2682001, at *6 (D. Md. Aug. 9, 2007) (finding irreparable harm where the infringing product "competes directly with the Plaintiffs' product").

### 3. The Supreme Court's Decision in *eBay* Requires Abbott to Prove That it "Has Suffered" Irreparable Harm

Medtronic inaccurately accuses Abbott of focusing solely on its loss of market share in the past as opposed to the harm from Medtronic's infringement likely to occur in the future, alleging that Abbott has not provided "evidence of a loss of current or future market share, as a result of continuing sales of Medtronic's [infringing] products . . . ." (D.I. 781 at 6-12.) While Medtronic's

---

[2] ████████████████████████████████████████████████████████

████████████████████████████████

allegations are factually incorrect inasmuch as Abbott has presented evidence that, absent an injunction, Medtronic is expected to take additional market share from Abbott in the future (*see, e.g.,* Morgan Stanley research *supra*), Medtronic's focus solely on future infringement misapprehends the Supreme Court's ruling in *eBay*. Contrary to Medtronic's arguments, the Supreme Court's ruling requires courts to assess irreparable harm based on harm suffered from the infringer's past infringement, holding that the patentee must show "that it has suffered an irreparable injury " *eBay Inc v MercExchange, L L C*, 126 S .Ct. 1837, 1839 (2006) (emphasis added). Analyzing the Supreme Court's decision in *eBay*, one court noted that "harm suffered in the past may frequently be the best method for determining how future harm would impact Plaintiffs," and that, "[h]ad the Supreme Court wanted district courts to analyze the irreparable harm that might flow from future infringements, it could have easily said so." *Metro-Goldwyn-Mayer Studios, Inc. v Grokster, Ltd.*, 2007 WL 3227684, at *13 n.18 (C.D. Cal. Oct. 16, 2007).

While irreparable harm cannot be established solely based on past infringement, *Metro-Goldwyn-Mayer*, 2007 WL 3227684, at *13, the Supreme Court's decision in *eBay* requires courts to focus on harm that the patentee "has suffered" to assess potential harm in the future. Consistent with these views, this Court recently granted an injunction, holding that "Martek has suffered irreparable harm because of Lonza's infringement of Martek's right to exclude others from practicing the '594 and '281 patents." *Martek*, 2007 WL 3181307, at *15 (emphasis added). Accordingly, the Court should not ignore the irreparable harm Abbott has suffered from Medtronic's past infringement.

### 4.    Medtronic's Infringement Has Irreparably Harmed Abbott's Goodwill in the Eyes of Investors

By taking market share from Abbott, Medtronic has irreparably harmed Abbott's goodwill. While Medtronic contends that Abbott "does not explain the meaning of 'goodwill in the eyes of

4

investors' and fails to cite to any court that has granted permanent injunctive relief based on such a theory" (D.I. 781 at 14), Medtronic is wrong, for Abbott's opening papers established irreparable harm from loss of goodwill, both legally (D.I. 727 at 16-17) and factually (D.I. 726, Ex. 6 at ¶ 10, Ex. 21; D.I. 727 at 9).

As explained in *800 Adept, Inc. v. Murex Securities, Ltd.*, 505 F. Supp. 2d 1327 (M.D. Fla. 2007), for example, "where a company pioneers an invention in the marketplace, irreparable harm flows from a competitor's attempts to <u>usurp the pioneering company's market position and goodwill</u>." *Id.* at 1337 (emphasis added). Similarly, in *Sanofi-Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353 (S.D.N.Y. 2007), the court granted a permanent injunction, holding that "Sanofi has shown that it is likely to suffer irreparable price erosion, <u>loss of goodwill</u>, and a negative impact on the amount of research devoted to developing other medical uses for Plavix®." *Id.* at 397 (emphasis added). Likewise, in *Brooktrout, Inc. v. Eicon Networks Corp.*, 2007 WL 1730112 (E.D. Tex. June 14, 2007), the court granted an injunction, holding that "absent an injunction, Brooktrout will <u>lose goodwill</u>, potential revenue, and the very right to exclude that is the essence of the intellectual property at issue." *Id.* at *2 (emphasis added).

Moreover, ███████████████████████████████████████████████ Abbott's loss of market share damaged its goodwill (i.e., value) in the eyes of investors, since investors place substantial emphasis on market share when valuing a medical device business. (D.I. 726, Ex. 6 at ¶ 10; D.I. 727 at 9.) Additionally, a May 7, 2007, Morgan Stanley report establishes that investors rely heavily on market share when calculating the value of medical device companies, such as Abbott. (D.I. 726, Ex. 21 at 2-14; D.I. 727 at 9.)

When valuing Abbott's stock, for example, Morgan Stanley estimates that every $100 million in stent sales equates to about four cents in earnings per share. (D.I. 726, Ex. 21 at 2.)

5

Based on estimates of earnings per share and expected future market share, Morgan Stanley determines how much investors should pay for Abbott's stock. (*Id.* at 14; *see also* D.I. 790, Ex. G at 1 (Morgan Stanley analysts noting that "we do not think that the market [for Abbott and Medtronic stock] is discounting this possibility [that Medtronic will be enjoined] at all").) Accordingly, by taking Abbott's market share and damaging its earnings with infringing products, Medtronic has irreparably harmed Abbott's goodwill (*e.g.*, stock value).

> **5.    Medtronic's Infringement Has Irreparably Harmed Abbott's Ability** ██████████████████

Aside from loss of market share and goodwill, Medtronic's infringement also has been irreparably harming Abbott's ability ████████████████████ (D.I. 727 at 8-9, 17.) While Medtronic contends that the damage to Abbott's ████████████ is "vague" and "highly speculative" (D.I. 781 at 12), that simply is untrue. ████████████████

████████████████████████████████████████████████████

████████████████████████ By taking Abbott's market share, therefore, Medtronic irreparably harmed Abbott's ability ████████████████ *Sanofi-Synthelabo*, 492 F. Supp. 2d at 397 (holding patentee "is likely to suffer irreparable price erosion, loss of goodwill, and <u>a negative impact on the amount of research</u>" (emphasis added)); *Commonwealth Sci. and Indus. Res. Organisation v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 604 (E.D. Tex. 2007) (granting permanent injunction based on damage to research and development).

> **6.    Medtronic's Infringement Has Irreparably Harmed Abbott's Ability** ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ██ ████████████████████

███████████████████████████████   ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

**B.    Medtronic Has Failed to Rebut Abbott's Showing of Irreparable Harm**

      **1.    Abbott's Settlement Agreements Involving the Lau Patents Do Not Negate the Irreparable Harm Caused by Medtronic's Infringement**

Medtronic asks the Court to adopt essentially a *per se* rule against permanent injunctions for patentees who have licensed their patents, arguing that Abbott's cross-licensing of its patents as part of two settlement agreements "is simply inconsistent with its claim that it will be irreparably harmed absent an injunction against Medtronic's stents." (D.I. 781 at 17.) The Supreme Court, however, rejected that *per se* approach, holding that patentees that license their patents may still satisfy the traditional four-factor test and be entitled to an injunction.[3] *eBay*, 126 S. Ct. at 1840. Indeed, applying *eBay*, one court recently granted an injunction to a patentee that exploits its patent solely through licensing. *Commonwealth*, 492 F. Supp. 2d at 608. In that case, the court rejected arguments that a licensing company should not be entitled to a permanent injunction, holding that "[a] compulsory license would not contain the negotiated business terms typically used by patent holders to control their inventions," and that the patentee "has a right to control its licensing program and to choose to whom to license and on what terms." *Id.* at 605.

████████████████████████████████████████████████

---

[3] Medtronic's reliance on overruled, pre-*eBay* cases, holding that irreparable harm cannot be shown when the patentee has licensed the patent-in-suit, such as *Scimed Life Sys., Inc. v. Johnson & Johnson*, 2001 WL 652027, at *1 (D. Del. Mar. 29, 2001), is misplaced.

7



Based on public policy grounds, moreover, the Court should decline Medtronic's invitation to grant a compulsory license. Parties should not be discouraged from settling their disputes out of fear that such settlement agreements would result in a *de facto* compulsory license being granted to all subsequent infringers.

### 2.     Abbott Requested a Permanent Injunction at the Appropriate Time

Medtronic's arguments that Abbott improperly delayed filing its motion for permanent injunction are both incorrect and internally inconsistent[4] On the one hand, Medtronic argues that Abbott waited too long, because Abbott "never attempted to enjoin Medtronic's accused devices in the seven years prior to the jury trial," and only requested an injunction after the Court denied Medtronic's post-trial motions and entered judgment in favor of Abbott. (D.I. 781 at 18 ) On the other hand, however, Medtronic inconsistently argues that Abbott's "motion is premature at best," since Abbott requested an injunction prior to completion of Medtronic's appeal on liability. (D.I. 781 at 22 (emphasis added).) Neither argument is correct.

As a threshold matter, while "delay" may be relevant in the context of a *preliminary* injunction, Medtronic's unfounded allegations of delay are irrelevant to Abbott's request for a

---

[4] Medtronic's allegation that Abbott engaged in delay based on the parties' stipulated stay in 2000 (D.I. 781 at 18) is improper and should be disregarded by the Court, as Medtronic expressly agreed that it would not rely on the stay to oppose any substantive claim. (D.I. 245 at ¶ 5(b).)

*permanent* injection.[5] *800 Adept*, 505 F. Supp. 2d at 1336 (noting "the argument of the Murex-Targus Parties concerning 800 Adept's delay is much more persuasive in the context of a preliminary injunction"); *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D. Va. 1998) (holding "simply because Odetics did not seek redress for its injury at the first available opportunity does not necessarily mean that such injury will not continue in the future and that it will not be irreparable"). Moreover, Medtronic's assertion that Abbott cannot show irreparable harm because it "failed to seek a preliminary injunction" (D.I. 781 at 19) is incorrect, for there is no requirement that, in order to seek a permanent injunction, a patentee must first seek a preliminary injunction. Otherwise, patentees would have little choice but to seek preliminary injunctions in *all* patent cases. This is not the law, however, as recognized by Medtronic in both this case (on the Boneau patents) and other cases (D.I. 726, Ex. 19 at 6), where it has sought permanent injunctions without first seeking preliminary injunctions.

Moreover, Medtronic's reliance on the district court's decision in *eBay* is unavailing. There, the district court found that MercExchange—whose business involved using litigation to induce others to take licenses to its patented technology—had always intended to license its patents to *eBay*, and that MercExchange's decision not to seek a preliminary injunction was consistent with the court's finding that it never wanted an injunction because "enjoining eBay from conducting infringing sales during the pendency of the litigation would reduce the royalties recovered by MercExchange both immediately and thereafter." *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 573 (E.D. Va. 2007). Indeed, the *eBay* court acknowledged that a plaintiff's failure to seek a preliminary injunction generally is irrelevant to the permanent

---

[5] Medtronic's reliance on *T.J. Smith & Nephew, Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646 (Fed. Cir. 1987), as allegedly showing that delay is relevant to Abbott's request for a permanent injunction is inapposite, as that case involved only a preliminary injunction.

injunction analysis, but that, on the particular facts there, the patentee's decision not to seek a preliminary injunction was consistent with its statement that "it did not seek to shut down eBay, but merely wanted to obtain a reasonable royalty and sell off its intellectual property rights." *Id.* at 573 n.14. Since Abbott is in the business of selling stents, and has never had any interest in licensing its patents to Medtronic, the facts of *eBay* have no application to this case.[6]

Furthermore, Medtronic's conduct during the two-year period between the jury's verdict and the Court's judgment weighs strongly in favor of an injunction. While Medtronic alleges that Abbott delayed filing its injunction for two years after the jury rendered its verdict, during that period, Medtronic made no effort to design a noninfringing stent or to cease infringing Abbott's patents. Rather, Medtronic has taken a calculated risk that the Court will not issue an injunction and instead will award Medtronic a compulsory license to Abbott's patents. Medtronic's conduct since the trial thus demonstrates the substantial need for an injunction.

### 3. Medtronic's Allegations Concerning the Validity of the Patents-in-Suit Are Irrelevant to Abbott's Motion for a Permanent Injunction

Despite the Court's judgment of infringement, no invalidity, and no inequitable conduct, Medtronic alleges that "[a] finding of irreparable harm to ACS is especially inappropriate at this stage of the litigation in light of the uncertainty surrounding the outcome of the case on appeal, as well as the validity of the patents themselves." (D.I. 781 at 20.) Medtronic's argument, however, confuses the standard for a permanent injunction with that for a preliminary injunction. While likelihood of success on the merits must be shown for a preliminary injunction, actual success (e.g., judgment) must be shown for a permanent injunction. *Amoco Prod. Co. v. Village of*

---

[6] Medtronic also relies on *Sundance, Inc. v. DeMonte Fabricating Ltd*, 2007 WL 37742 (E.D. Mich. Jan. 4, 2007). As in *eBay*, however, this case involved a patentee that exploited its patents solely through licensing and previously offered a license to the infringer. *Id.* at *2.

*Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). Here, the Court already found that Abbott has succeeded on the merits and thus entered judgment in Abbott's favor. (D.I. 719.) Medtronic's allegations that "the claim construction decisions prior to and during trial were a close call" and that it hopes to overturn the judgment on appeal, while lacking in merit, are legally irrelevant to the Court's analysis of Abbott's motion for a permanent injunction. The Federal Circuit confirmed this fact, holding that the Court must resolve Abbott's motion for permanent injunction on its merits before Medtronic can appeal the Court's judgment on liability.[7] (Ex. 27.)

### 4.    The Reexamination Proceeding Is Irrelevant

Medtronic's belated attempt to challenge the validity of the patents-in-suit in a reexamination proceeding—filed nearly nine years after the litigation began and a year after the jury returned its verdict of infringement and validity—should not impact the Court's analysis of Abbott's motion for permanent injunction.[8] As explained in *Hoechst Celanese Corp. v. BP Chem Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996), "the grant by the examiner of a request for reexamination is not probative of unpatentability." *Id.* at 1584. Moreover, "[t]he courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without deference to the rulings of the patent examiner." *Quad Envtl. Tech. Corp. v. Union Sanitary Dist.*, 946 F.2d

---

[7] Likelihood of success on appeal is relevant to whether to stay a permanent injunction pending appeal, but not to whether to grant the injunction in first place. *See, e.g., Stand. Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512-13 (Fed. Cir. 1990).

[8] Based on its pace, it appears that the reexamination could easily drag on for several more years. Of course, if Medtronic had acted earlier, the reexamination could have been completed by now.

870, 876 (Fed. Cir. 1991). Here, the Court has already resolved Medtronic's validity challenge, entering judgment that the patents are not invalid. (D.I. 719.) The PTO's decision to reexamine the patents (which is commonplace) should have no impact on the Court's validity judgment. *3M Innovative Props. Co. v. Avery Dennison Corp.*, 2006 U.S. Dist. LEXIS 79589, at *4 (D. Minn. Oct. 30, 2006) (refusing to reconsider entry of permanent injunction based on PTO's issuance of a first office action in reexamination that rejected all claims of patent-in-suit).

Medtronic relies on the district court decision in *eBay*, arguing that reexamination proceedings tend to weigh against irreparable harm, even though the facts of *eBay* do not remotely resemble this case. (D.I. 781 at 23.) In *eBay*, the district court focused on the fact that the patent at issue there was a <u>business-method</u> patent, such that "the nature of the patent cause[d] the court pause." *MercExchange*, 500 F. Supp. 2d at 574. In contrast, Abbott's patents, which Medtronic infringes, are pioneering medical-device patents that dramatically changed the landscape of interventional cardiology. Accordingly, the district court's reasoning in *eBay* does not apply.

## C.    The Public Interest Favors a Permanent Injunction

### 1.    The Public Interest Favors Enforcement of Patent Rights, Not Compulsory Licenses for Recidivist Infringers

Medtronic alleges that "[a]n injunction also would be improper here given the strong public interest in competition in the stent market" (D.I. 781 at 31); however, "Congress has determined it better for the nation in the long run to afford inventors of novel, useful and non-obvious products short-term exclusivity on such products rather than to permit free competition in the goods." *Eli Lilly and Co. v. Medtronic Inc.*, 7 U.S.P.Q. 2d 1439, 1445 (E.D. Pa. 1988).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Given Abbott's significant investments in research and development of the stent technology at issue (D.I. 636 at 1459), the issuance of a "permanent injunction will further consumer access to more competitive, and thus presumably better, products by allowing [Abbott] the benefit of its patents and the ability to gain greater brand recognition." *Smith & Nephew, Inc. v. Synthes*, 466 F. Supp. 2d 978, 985 (W.D. Tenn. 2006). If Medtronic's infringing behavior were rewarded with a compulsory license, it would harm the public's interest in a strong patent system and encourage others to infringe with the expectation that they will, at worst, receive a compulsory license.

### 2.    Mere Preference for Medtronic's Infringing Stents Does Not Show Harm to the Public Interest or Reason to Deny an Injunction

Under the guise of public interest, Medtronic argues for effectively a *per se* rule against injunctions in medical device cases, contending that an injunction will damage the public health because some physicians prefer Medtronic's Driver to other stents on the market, such as those made by Abbott, Boston Scientific, and Cordis.[9] (D.I. 781 at 29.)

First of all, Medtronic's "public interest" arguments are not well taken, given that Medtronic itself has repeatedly pursued injunctions against Abbott's stents, and continues to do so today. For example, Medtronic pursued an injunction against Abbott and others in this Court on the Boneau patents, which, if successful, would have left Medtronic as the only stent provider on the market. And Medtronic is currently pursuing injunctions against Abbott both in the U.S. and abroad on its "Evysio" patents. (Ex. 33.) Indeed, Evysio obtained an injunction in France against Abbott's Xience stent, forcing Abbott to cease promotion of the original version of that stent, to halt plans to introduce it into the French market, and to redesign it to avoid any possibility of

---

[9] Medtronic's public-interest arguments are limited to its Driver and thus have no impact on whether to enjoin Medtronic's other infringing stents. (Ex. 25, Pearle Dep. at 80:18-81:6.)

13

infringement.[10] (Ex. 34.) After seeking and obtaining injunctions against Abbott, Medtronic's false concern about harming competition in the stent industry rings hollow. (D.I. 781 at 31.)

Moreover, when asked to identify objective evidence (*e.g.*, clinical studies, peer-reviewed publications, or journal articles) supporting Medtronic's position that patients would be worse off without the Driver, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  For that reason, mere preference for a medical device, particularly when expressed by paid experts having no objective support for their opinions, does not equate to a public harm sufficient to overcome the public's interest in protecting patent rights. *Shiley, Inc. v. Bentley Labs., Inc.*, 601 F. Supp. 964, 970 (C.D. Cal. 1985) (granting injunction despite evidence that some physicians preferred infringing medical device and finding "that no credible evidence in the trial record supports any finding that either [plaintiff's or defendant's product] is objectively superior in performance or that either is defective or unsafe in any way or does not properly perform as intended and required in the operating room.") Furthermore, "Congress has not seen fit to differentiate between what might be referred to as lifesaving devices and those of more trivial or less important nature." *Schneider (Europe) AG v. Scimed Life Sys., Inc.*, 852 F. Supp. 813, 861 (D. Minn. 1994) (rejecting argument "that an injunction is not warranted because the products in issue are life-saving medical devices").

Nevertheless, Medtronic contends that, if an injunction issues, "[t]hose patients with the

---

[10] Although Abbott redesigned this product in respect of the French court's judgment, Abbott believes that its original product does not infringe and has appealed the judgment.

14

most tortuous arteries, whose conditions require a highly deliverable Medtronic stent, may be forced to undergo riskier and more invasive procedures (such as coronary bypass surgery) to treat their heart disease." (D.I. 781 at 30.) When asked about support for this contention, however,

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████  Moreover, when asked about comparative performance data, such as restenosis rates, scaffolding ability, and radial strength, ████████████████████████████████

████████████████████████████████████  Indeed, in a journal article written by investigators for Medtronic's Driver, Medtronic's own investigators concluded that the Vision and Driver have essentially the same restenosis rates, and clinical and angiographic outcomes. (Ex. 28 at 12.) Medtronic's declarations thus are nothing more than unsupported arguments, which are not entitled to any weight. *Phillips Petroleum Co. v. Hunstsman Polymers Corp.*, 157 F. 3d 866, 876 (Fed. Cir. 1998) (rejecting expert declarations that were "wholly conclusory, devoid of facts upon which the affiant[s'] conclusions, as experts, were reached")

Furthermore, objective evidence shows that, if anything, Medtronic's Driver may be



inferior to Abbott's Vision. For example, unlike Abbott's Vision, Medtronic's Driver does <u>not</u> have an FDA indication for use in patients experiencing acute myocardial infarction (i.e., heart attack). (Ex. 26, Spano Dep. at 45:16-23.) Additionally, an objective study presented at the 2003 "TCT" conference concluded that, when mounted on a balloon for delivery, the Vision is actually <u>more</u> flexible (i.e., less stiff) than the Driver. (Ex. 30.) Based on market-share data, moreover, physicians overwhelmingly prefer Abbott's Vision to Medtronic's Driver. Specifically, in the bare-metal stent market, Medtronic's Driver is in last place with 17% of the market, compared to 63% for Abbott's Vision and 21% for Boston Scientific's Liberte. (D.I. 726, Ex. 21 at 5.) If Medtronic's Driver were truly safer or more efficacious than its competitors' stents, it surely would have a larger share of the market. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 106 F. Supp. 2d 696, 705 (D. N.J. 2000) (rejecting infringer's argument that its vaccine was safer where patentee's vaccine had 70% of the market).

Attempting to disparage Abbott's Vision and Boston Scientific's Liberte, Medtronic alleges that they "tend to scrape against the wall of blood vessels with their square, laser-cut struts, making them less deliverable." (D.I. 781 at 27.) But when asked to provide support for this serious allegation, ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Since Medtronic and its declarants have no support for their allegations that

the Vision and Liberte are less deliverable because they allegedly "scrape" blood vessels, the

Court should disregard them. *Phillips*, 157 F.3d at 876.

Medtronic also alleges, without any evidence, that its "Driver also provides superior

support for the vessel wall because its scaffolding has the smallest unsupported cell area of any

currently available bare-metal stent (including ACS's)." (D.I. 781 at 28.) ██████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████

### 3.    The Public Will Have Adequate Choice and Supply of Stents if Medtronic's Infringing Stents Are Removed from the Market

Even without Medtronic's infringing stents, the market will have ample choice and supply

of bare-metal stents in view of the stents sold by Abbott and Boston Scientific. (D.I. 727 at 12-13,

25-26.) ██████████████████████████████████████████████

███████████████████████████████████ Based on this variety of alternatives to Medtronic's

infringing stents, neither physicians nor their patients will be harmed if Medtronic is enjoined

from continuing to infringe Abbott's patents. (D.I. 727 at 13.)

Although Medtronic asserts that Abbott has not shown that it could meet the increased

demand if Medtronic is enjoined, Abbott has proven that it has more than sufficient capacity to

supply all of the stents sold by Medtronic. For example, in 2002, Abbott produced nearly five

times as many stents as it sold in 2006, and over eighteen times as many stents as Medtronic sold

in 2006. (D.I. 727 at 12.) Moreover, in her expert report, Abbott's damages expert (Dr. Oster

from Yale) provides a detailed explanation of how Abbott's manufacturing and marketing capacity

can meet all demand for Medtronic stents, including Abbott's ability to ramp up its production if necessary. (Ex. 31.) Significantly, despite a full-and-fair opportunity to explore discovery on this issue, Medtronic cites no evidence to the contrary (and presented no rebuttal evidence on the issue in its responsive damages reports, either). ████████████

████████████████████████

████████████████████

████████████

Medtronic also argues that a parade of horribles might befall the public if suddenly all of the stents on the market were simultaneously recalled and physicians had no access to any stents at all. (D.I. 781 at 33.) As support for this doomsday scenario, Medtronic relies on three minor and voluntary Abbott recalls that occurred in 2003, none of which involved sales of Abbott's Vision in the United States. (D.I. 787, Ex. C.) ███████████

████████████████████████

████████████████████

██████████ Accordingly, Medtronic's unsupported argument that hypothetical recalls might harm the public should be rejected.

### D.    The Balance of Hardships Favors an Injunction

Due to Medtronic's infringement, Abbott has been suffering irreparable harm, including loss of market share, loss of good will, damage to ████████████, and damage to ████████████. ████████████

████████████ this hardship was entirely foreseeable, given that Medtronic knowingly built its entire business on the sales of infringing stents. *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d. 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to

18

complain if an injunction against continuing infringement destroys the business so elected.")

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Indeed, since

Medtronic's sales of infringing stents accounted for only 0.21% of Medtronic's revenue in 2006,

losing the revenue stream from its infringing stents will hardly cripple this medical device

conglomerate. (D.I. 727 at 23.) Accordingly, when balancing the hardships, the equities strongly

favor enjoining Medtronic from continuing to infringe the patents-in-suit.

### E.    Medtronic Has Not Established Unclean Hands

In an effort to divert attention from Medtronic's adjudged unlawful behavior, Medtronic

alleges unclean hands based on innuendo and assertions that have been rejected by the Court

(D.I. 781 at 37-39.) To establish unclean hands, Medtronic would need to show, by clear and

convincing evidence, that Abbott "conducted [itself] as to shock the moral sensibilities of the

judge . . . ." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 398 F. Supp. 2d 305, 310 (D.

Del. 2005); *Johns Hopkins*, 2007 WL 2682001, at *6. Here, there is no evidence that Abbott has

done anything of the sort.

Medtronic first tries to resurrect its failed inequitable conduct defense, asserting allegations

that it admits "were addressed at length in the inequitable conduct trial and in Medtronic's post-

trial brief." (D.I. 781 at 37.) The Court, however, has already rejected Medtronic's inequitable

conduct defense based on these same allegations (D.I. 713) and also held on summary judgment

that Mr. Boneau was not an inventor of Abbott's patents-in-suit (D.I. 544). Medtronic's unclean

hands defense based on these previously rejected allegations is therefore frivolous.

Next, Medtronic alleges that Abbott "committed litigation misconduct by beginning its

19

cross-examination of Mr Boneau at trial" by impeaching him for lying under oath. (D.I. 781 at 38.) As an initial matter, it is undisputed that Medtronic's witness, Mr. Boneau, did lie under oath, for he was sanctioned in another stent case for perjury and admitted, in his deposition in this case, that he lied under oath. While Abbott misunderstood the Court's *in limine* ruling to apply only to the sanctions finding in the other case and not to his admission in this case that he lied under oath, an appropriate instruction was agreed to by the parties and given to the jury. (D.I. 637 at 1509 ) Abbott's impeachment of Mr. Boneau for lying under oath does not constitute unclean hands.

Finally, Medtronic's allegation that Abbott "timed its Injunction Motion and leaked it to Morgan Stanley on the eve of Medtronic's announcement of the successful results of its late-stage clinical trial for its Endeavor" (D.I. 781 at 19 n.14, 39), because an analyst report published two days after Abbott's motion became public, makes absolutely no sense. An analyst report issued two days after news becomes public cannot establish that the news was "leaked" beforehand. In fact, since Medtronic knew when Abbott would be filing its motion weeks before Abbott filed it (Ex. 32), if anything, Medtronic timed its announcement to coincide with Abbott's motion.

## III.    CONCLUSION

For the reasons stated above and in Abbott's opening brief, the Court should grant Abbott's motion and permanently enjoin Medtronic from infringing the patents-in-suit.

Dated: November 21, 2007

Of Counsel:

J. Michael Jakes
Gerald F. Ivey
Michael A. Morin
FINNEGAN, HENDERSON, FARABOW
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

*Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7509
*Attorneys for Plaintiffs Abbott Cardiovascular
Systems Inc. and Abbott Laboratories Inc*

20

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2007, I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Karen Jacobs Louden, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347

I hereby certify that on November 30, 2007, I have sent by Federal Express the foregoing document to the following non-registered participants:

Kevin S. Rosen, Esquire
Matthew Hoffman, Esquire
Anthony S. Newman, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avgneue
Los Angeles, CA   90071-3197

H. Mark Ryan, Esquire
Frederick S. Chung, Esquire
Gibson, Dunn & Crutcher LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211

Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
gaza@rlf.com