IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ADVANCED CARDIOVASCULAR SYSTEMS, INC. and GUIDANT SALES CORP., <br><br> Plaintiffs, <br><br> v. <br><br> MEDTRONIC VASCULAR, INC. and MEDTRONIC USA, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civ. No. 98-80-SLR <br> (consolidated with Civ. No. 98-314-SLR and Civ. No. 98-316-SLR) |

Frederick L. Cottrell III, Esquire and Anne S. Gaza, Esquire of Richards, Layton & Finger, Wilmington, Delaware.  Counsel for Plaintiff.  Of Counsel:  J. Michael Jakes, Esquire, Gerald F. Ivey, Esquire, and Michael A. Morin, Esquire of Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC.

Karen Jacobs Louden, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.  Counsel for Defendants.  Of Counsel:  Kevin S. Rosen, Esquire, Matthew A. Hoffman, Esquire, and Anthony S. Newman, Esquire of Gibson, Dunn & Crutcher LLP, Los Angeles, California,  H. Mark Lyon, Esquire and Frederick S. Chung, Esquire of Gibson, Dunn & Crutcher LLP, Palo Alto, California.

**MEMORANDUM OPINION**

Dated:  September 26, 2008
Wilmington, Delaware

*[signature]*
ROBINSON, District Judge

## I. INTRODUCTION

The history of the present litigation has been well-documented in the court's prior opinions, and is repeated here by way of summary. Throughout the course of the last ten years, the major manufacturers of stents have filed suit in this court asserting claims of infringement of their respective patents against their competitors. The present lawsuit originally was filed by the predecessor in interest to Medtronic Vascular Inc. and Medtronic USA, Inc. (collectively, "Medtronic"), claiming infringement by Advanced Cardiovascular Systems, Inc. and Guidant Sales Corporation (collectively, "ACS") of certain of its patents ("the Boneau patents"); ACS countersued for infringement of certain of its patents ("the Lau patents").[1] Because judgment was entered in favor of ACS in connection with the Boneau patents (D.I. 546[2]), the parties were "realigned" in order to proceed with the jury trial on the Lau patents. (D.I. 585)

In February 2005, at the conclusion of trial, the jury returned a verdict that the Lau patents were valid and infringed by Medtronic. (D.I. 629) Medtronic's infringing products include its GFX, GFX 2, GFX 2.5, BeStent2, S540, S660, S670, S7, Driver, MicroDriver, and Racer branded stents.[3] On March 30, 2007, the court denied

---

[1] Although multiple Lau patents were asserted, only four were tried: U.S. Patent Nos. 5,514,154 ("the '154 patent"), 6,066,167 ("the '167 patent"), 6,066,168 ("the '168 patent"), and 6,432,133 ("the '133 patent"). These four patents will be referred to in this context as the "Lau patents."

[2] All docket items reference documents filed in Civ. No. 98-80.

[3] Specifically, the jury found that Medtronic's Microstent II, GFX, GFX 2, GFX 2.5, S540, S660, S670, and BeStent 2 products infringe the '154 patent. Each of these stents, and in addition the S7, MicroDriver, Driver, and Racer stents, infringe the '167 patent. All of the foregoing stents infringe the '133 patent. All of these stents, except the BeStent 2, also infringe the '168 patent.

Medtronic's motions for judgment as a matter of law and for a new trial. (D.I. 711) On April 24, 2007, the court ruled that the Lau patents were not unenforceable due to inequitable conduct. (D.I. 713) The court subsequently entered judgment in favor of ACS. (D.I. 715, 719) Medtronic filed a notice of appeal to the United States Court of Appeals for the Federal Circuit on May 9, 2007. (D.I. 716) ACS subsequently moved this court for a permanent injunction. (D.I. 725) The Federal Circuit dismissed Medtronic's appeal as premature in view of ACS's motion for a permanent injunction. *See Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 231 Fed. Appx. 962 (Fed. Cir. Aug. 1, 2007) (unpublished).

On August 6, 2007, this court stayed plaintiff's motion for a permanent injunction insofar as it related to the "Endeavor" stent, pending arbitration on the issue of whether Medtronic had an express or implied license to sell "Endeavor" under the Lau patents. (D.I. 756) The Arbitrator answered this question in the negative on February 26, 2008. (D.I. 824, ex. A) That same day, ACS moved the court to lift its stay on proceedings relating to "Endeavor." (D.I. 824) The court now turns to ACS's motions for a permanent injunction and to lift the stay relating to Medtronic's "Endeavor" stent. (D.I. 725, 824) For the reasons that follow, the court lifts the stay and denies ACS's motion for a permanent injunction *in toto*.

## II. BACKGROUND

Prior to the inventions at issue in this case, coronary stents utilized in the United States generally comprised one of two types of stent: coil design and a slotted-tube design. In the 1990s, ACS developed a second generation stent combining the radial strength and longitudinal flexibility benefits of each of these prior designs into one bare-

2

metal stent having a connected-ring design. This connected-ring design is covered by the Lau patents, and embodied in ACS's "Multi-Link" family of stents.

The Multi-Link stent was released to market in October 1997. Prior to that time, Cordis Corporation ("Cordis") maintained the dominant (67%) share of the market with its slotted-tube design stent. (D.I. 726, ex. 6 at ACS129353) Within a few months of ACS's product launch, Multi-Link had captured 64% of the U.S. market, dropping Cordis's share to 23%. (Id.) Medtronic released its infringing MicroStent II in December 1997. Between January 1998 and July 1998, Medtronic progressively chipped away at ACS's market share. In January 1998, ACS led with 59% to Medtronic's 18%. (Id. at ACS185912) Medtronic released its infringing GFX stent in April 1998. By July 1998, Medtronic surpassed ACS in market share (45% to 39%) to become the leading supplier of second-generational stents. (Id.)

Also at this time, however, Boston Scientific Corporation ("BSC") entered the U.S. market. By July 1998, BSC had aquired only a 5% market share. Within two months, BSC's market share grew to about 30%, where it remained relatively constant through January 1999. (Id.) "ACS quickly reclaimed its leadership position in the stent market with the release of its next Multilink stent (the 'Duet') in November 1998, and [has] held onto that position in the bare-metal stent market ever since [that time, although] Medtronic has continued to hold a significant share[.]" (D.I. 729 at ¶ 5) In January 1999, ACS led the market with a 52% share, BSC was second with a 28% share, and Medtronic third with a 16% share. Cordis[4] held a 3% share. (D.I. 726, ex. 6

---

[4]Cordis was aquired by Johnson & Johnson ("J&J") in 1995, and became a subdivision of that company.

3

at ACS185912)

In April 2000, ACS licensed the Lau patents to Cordis as part of the parties' settlement of a series of patent infringement lawsuits (brought by ACS) in the the Northern District of California. (D.I. 728 at ¶ 2; D.I. 790, ex. F at ACS007677522, ACS00767565) Similarly, in May 2000, ACS licensed the Lau patents to BSC as part of another settlement agreement relating to suits brought by ACS in Indiana and BSC in California. (D.I. 728 at ¶ 3; D.I. 790, ex. E at ¶ 1.3) Both agreements involved cross-licenses to the parties' intellectual property.

In 2003, a new type of stent, the drug-eluting stent ("DES"), was introduced to market in the U.S. Generally, a DES is a normal metal stent that has been coated with a drug known to interfere with the process of restenosis (reblocking of the artery). Cordis's "Cypher" stent was the first DES to market in the U.S. in April 2003, followed closely by BSC's "Taxus" DES in March 2004. (D.I. 726, ex. 13, 14) Both the Cypher and Taxus stents are on the market under licenses to ACS's Lau patents secured in 2000. (D.I. 727 at 10) That is, Cyper and Taxus stents comprise a metal platform described by the Lau patents. Medtronic's "Endeavor" stent was the third DES to market in February 2008;[5] "Endeavor" was the first DES approved by the FDA in four years. The "Endeavor" DES uses as its platform the infringing Driver stent. ACS gained FDA approval for its "Xience" DES on July 2, 2008, and now competes in the U.S. DES market. (D.I. 842 & ex. 1, 2)

### III. PERMANENT INJUNCTION STANDARD

---

[5] See http://www.fda.gov/bbs/topics/news/2008/new01787.html.

4

In *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837 (2006) (vacating and remanding *MercExchange, L.L.C. v. eBay Inc.*, 401 F.3d 1323, 1339 (2005)) (hereinafter "*eBay*"), the Supreme Court overruled the Federal Circuit's longstanding "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." Permanent injunctions in patent cases must be based on a case-by-case assessment of the traditional equitable factors governing injunctions. *Id.* at 1839. That is, to be awarded a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 1841.

## IV. DISCUSSION

### A. Irreparable Harm

#### 1. ACS's arguments

ACS asserts that Medtronic's infringement is causing irreparable harm for several reasons. ACS and Medtronic are head-to-head competitors in the bare-metal stent industry, and ACS is unable to exercise its right to exclude. ACS's loss of market share to Medtronic has "forced ACS to spend less on research and development

["R&D"] than it otherwise could have without Medtronic on the U.S. market." (D.I. 727 at 8) Specifically, ACS has a policy of investing 15-17% of its corporate revenue back to R&D; the less it makes, the less is allocated in this manner. (D.I. 805 at 6; D.I. 806, ex. 24 at 55, 58) Further, ACS claims that its loss of sales "hurt ACS's ability to recruit and maintain employees important to its stent business," as "ACS and Medtronic are both located in Northern California and thus competed for the same pool of potential employees." (D.I. 727 at 9) Finally, according to ACS, it will be "difficult for ACS to regain a significant portion of the [DES] market share taken by Medtronic" notwithstanding the release of ACS's "Xience" DES. (D.I. 727 at 8-9, 14, 17-18) Medtronic has not removed its products from the market or otherwise shown any sign of altering its infringing activities.

### 2. Direct/head-to-head competition and loss of market share

Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor. In this regard, the parties each advocate a different "relevant market" for the purposes of determining the degree to which ACS and Medtronic compete. Medtronic asserts that "[t]he overall stent market is the relevant market for the purposes of ACS's injunction motion because the market demand for drug-eluting stents directly affects the demand for bare-metal stents and because . . . physicians choose between drug-eluting stents and bare-metal stents for patients for coronary artery disease based on a number of factors." (D.I. 781 at 7 n.3, citations omitted) In contrast, ACS asks the court to define the relevant market for purposes of its motion as the "bare-metal stent market," a

subclass of the overall stent market.[6]

The market data supplied by the parties indicates that the U.S. stent market is currently comprised of two sub-markets: the bare-metal stent market and the DES market. (D.I. 726, ex. 21 at 5)[7] The two markets are related. For example, between 2003 and 2004, after the introduction of the first DES, the number of bare-metal stent procedures plummeted, as did the overall sales of bare-metal stents in the U.S. (*Id.*) The number of DES procedures grew dramatically, as did DES sales. (*Id.*) This indicates the existence of two separate markets having an inverse relationship.

That being said, ACS and Medtronic compete directly in both markets. While Cordis and BSC greatly overshadow ACS and Medtronic in the overall stent market,[8] ACS and Medtronic are major players in the bare-metal stent (sub)market. In 2006, ACS held a 63% market share in the bare-metal stent market, followed by BSC with a 21% share, and Medtronic with a 17% share. (*Id.*) The most current market data shows, therefore, three "head-to-head" competitors in the bare-metal stent market with the infringer holding the smallest market percentage.

The court evaluates ACS's arguments against this backdrop. In this regard,

---

[6]ACS suggests an even narrower market definition, insofar as ACS and Medtronic are the only manufacturer of cobalt-chromium alloy (bare-metal) stents on the market. (D.I. 805 at 3)

[7]The court denies ACS's motion to supplement the record and to file evidentiary objections. (D.I. 809) The court notes, however, with respect to the Morgan Stanley report objected to by ACS and cited by the court throughout this opinion (D.I. 726, ex. 21), ACS relied on this same report in its opening brief (D.I. 727 at 9) and thus waived any objections to this document.

[8]ACS (5.1%) and Medtronic (1.3%) together accounted for only 6.4% of the overall stent market in 2006. (D.I. 727 at 11, citing D.I. 726, ex. 21 at 5)

there is no indication that Medtronic is currently drawing bare-metal stent sales away from ACS, as compared to BSC.[9] ACS notes that Morgan Stanley predicts that Medtronic's bare-metal stent market share will increase from 17% (2006) to 33% by 2010, while ACS's share is predicted to decrease from 63% (2006) to 56%. (D.I. 805 at 2) This same report, however, predicts that BSC's market share will drop from 21% (2006) to 11% by 2010. (D.I. 726, ex. 21 at 5) Though Medtronic appears to be gaining market momentum, it appears to be not only at the cost of ACS, clouding the relationship between Medtronic's infringement and ACS's losses. *Compare TruePosition Inc. v. Andrew Corp.*, No. Civ. A. 05-747, 2008 WL 2944657 at *25-26 (D. Del. July 31, 2008) (irreparable harm found where plaintiff and defendant were the "only suppliers in a two-supplier market") (granting permanent injunction); *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 482 (W.D. Pa. 2007) ("Plaintiff and defendants are direct competitors in a two-supplier market. If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value.") (granting

---

[9]ACS's focus on prior market data, specifically, its market share losses in the late 1990s upon Medtronic's launch of its infringing stents, is misplaced. (D.I. 805 at 1-6) ACS cites to a comment by a California District Court that "harm suffered in the past may frequently be the best method for determining how future harm would impact [p]laintiffs." (*Id.* at 4, citing *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214 n. 18 (C.D. Cal. 2007)) This same court subsequently noted, however, that "a permanent injunction should not issue unless there is reason to believe that future infringements would constitute irreparable harm." *Metro-Goldwyn-Mayer Studios*, 518 F. Supp. at 1214 n.18.

In the case at bar, the bare-metal stent market has undergone significant metamorphosis since 1997. ACS claims that it "never regained" the majority of its initial market share loss, and that "a significant portion of the market share [ACS] initially lost to Medtronic was lost permanently." (D.I. 805 at 2) ACS also admits, however, that by 2006 it had gained the majority 63% market share with its "Vision" bare-metal stent. (*Id.* at 16) The 2006 market data is a more reliable indicator of future harm than is older data.

permanent injunction); *Novozymes A/S v. Genecor Intern., Inc.*, 474 F.Supp.2d 592, 612-13 (D. Del. 2007) ("These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology.") (granting permanent injunction). ACS has not addressed the fact that BSC holds a larger market share than Medtronic. Moreover, ACS has not identified any specific customers it has lost, or stands to lose, directly as a result of Medtronic's continued sales of infringing stents.[10] ACS admits that it has recaptured nearly all of the market share lost to Medtronic, and is currently the leading producer of bare-metal stents. The court finds no irreparable harm on this record.[11]

### B. Adequacy of Money Damages

The court also notes that ACS's willingness to forego its patent rights for compensation supports the court's conclusion that ACS will not suffer irreparable harm absent an injunction. ACS has licensed the Lau patents to both Cordis (in April 2000) and BSC (in May 2000). ACS asserts that it has not licensed its patents simply for

---

[10]This court has previously declined to grant a permanent injunction in a two-competitor market in the absence of similar information. *See Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440, 443 (D. Del. 2007) (declining to grant permanent injunction where plaintiff and defendant were only two market competitors, where evidence indicated that sales of the patented technology accounted for low percentages of each party's business and plaintiff did not identify precisely what customers it lost to defendant".). *Compare Tivo, Inc. v. EchoStar*, 446 F. Supp. 2d 664 (E.D. Tex. 2006) (granting permanent injunction where, *inter alia*, parties were direct competitors, "plaintiff [was] losing market share at a critical time in the market's development," and the parties agreed that customers in the relevant market tend to remain customers of the company they first purchased from).

[11]The court declines to consider pending rejections of the Lau patents in current reexamination proceedings for purposes of the motions at bar, as the final question of patentability has not yet been determined.

money – to do so would violate its "general policy" – but in exchange for cross-licenses and to settle litigations. (D.I. 805 at 7-8) The fact that ACS was selective regarding its licensing compensation – exchanging its technology only for other licenses to competing technology – does not rectify the fact that ACS was willing, ultimately, to forego its exclusive rights for some manner of compensation. Money damages are rarely inadequate in these circumstances;[12] rather, permanent injunctions are typically granted in two-competitor situations where the patentee has demonstrated an unwillingness to part with the exclusive right. *Compare Novozymes*, 474 F. Supp. 2d at 613 (D. Del. 2007) (finding irreparable harm where patentee only licensed its patent to its subsidiary who competed head-to-head with the infringer) (granting permanent injunction), *with Voda v. Cordis Corp.*, No. Civ. A. 03-1512, 2006 WL 2570614 at *6 (W.D. Okla. Sept. 5, 2006) (denying permanent injunction where plaintiff was a willing licensor, rejecting plaintiff's argument that "ongoing infringement will damage his relationship with [plaintiff's exclusive licensee]" as "simply the other side of the right-to-exclude coin").

## C. Public Interest

---

[12]As explained in *eBay*,

> some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test, and we see no basis for categorically denying them the opportunity to do so.

126 S. Ct. at 1840. ACS did not need to license its patents to develop its technology or to achieve market entry; its licensing activity is not similarly reconcilable with a finding of irreparable harm.

Finally, the court notes that the public interest favors the denial of a permanent injunction in this case. A strong public interest in maintaining diversity in the coronary stent market has been previously recognized by this court and the Federal Circuit. *See Cordis Corp. v. Boston Sci. Corp.*, 99 Fed. Appx. 928, 935 (Fed. Cir. May 28, 2004) (unpublished) ("[A] strong public interest supports a broad choice of drug-eluting stents, even though no published study proves the superiority of either Cordis's Cypher of BSC's Taxus stent."); *Cordis Corp. v. Boston Scientific Corp.*, Nos. Civ. A. 03-027, 03-283, 2003 WL 22843072, *2 (D. Del. Nov. 21, 2003) (noting the "obvious concern of depriving the public of the best and safest medical devices by limiting competition").

Notwithstanding, the court notes that the record contains evidence of physician preference for Medtronic stents. *See, gen., Datascope Corp. v. Kontron, Inc.*, 611 F. Supp. 889, 895 (D. Mass. 1985), *aff'd*, 786 F.2d 398 ("Defendant has also made some showing that the public will be harmed by an injunction in that some physicians prefer defendant's dual lumen IABs.") (denying preliminary injunction motion). Medtronic has filed declarations by four interventional cardiologists, each performing hundreds of coronary intervention operations per year, all expressing a preference for Medtronic's Driver and/or MicroDriver stents. (D.I. 782 (Dr. Rodney S. Badger, M.D.); D.I. 785 (Dr. Thaddeus R. Tolleson, M.D.); D.I. 786 (Dr. Douglas G. Ebersole, M.D.); D.I. 787 (Dr. David L. Pearle, M.D.)) Each cardiologist also expresses concern for the success of their surgeries should Medtronic's products be removed from the market.[13] ACS's

---

[13](D.I. 786 at ¶ 10 ("[T]here would be a lower [percutaneous coronary intervention] success rate in patients with tortuous lesions[.]"; D.I. 782 at ¶ 5 ("[R]emoving Driver from the market would result in some cases where the side branch could not otherwise be accessed, possibly resulting in myocardial injury in these

11

testifying cardiologist, Dr. Joel K. Kahn, M.D., acknowledges that some physicians prefer the Driver stent. (D.I. 790, ex. B at 57:19-59:1) In connection with litigation in the district court for the Southern District of New York, where ACS is a defendant, ACS has itself acknowledged a "[s]ocial [i]nterest [i]n [i]ncreasing [c]ompetition [i]n [t]he DES [m]arket"; such an interest logically extends to the bare-metal stent market.[14] (*Id.*, ex. P at 20)

### D. Conclusion

For the aforementioned reasons, ACS has failed to demonstrate irreparable injury, the inadequacy of money damages, and that the public interest favors a

---

patients."; *id.* at ¶ 9 ("[T]here are instances where ACS's Vision or [BSC's] Liberte stents will not be able to be delivered to the same lesions to which a Driver stent could have been delivered."); D.I. 785 at ¶ 6 ("[I]f Driver/MicroDriver were not available, I would be unable to treat the subset of my patients with tortuous, calcified, or otherwise difficult anatomy, as the currently available bare-metal stents lack the deliverability to successfully cross many of these lesions."); *id.* at ¶ 4 ("I have had a number of experiences where Driver was the only stent I could deliver through an especially tortuous or calcified blood vessel."); D.I. 787 at ¶ 13 ("[P]atients have widely different anatomies, plaque morphologies, and lesion distributions. While a particular brand of stent may have more desirable performance characteristics in one patient, it may have less favorable characteristics in another patient."); *id.* at ¶ 21 ("[An injunction] would deprive physicians and patients of what I and many other cardiologists consider to be the single best bare-metal stent on the market."))

[14]Civ. No. 06-7685. ACS made the foregoing statement in a brief in support of its motion to dismiss the complaint in that action, in which J&J brought breach of contract, breach of the implied duty of good faith and fair dealing, and tortious interference claims against Guidant Corporation ("Guidant"), BSC, and ACS relating to a merger agreement between Guidant and J&J preceding Guidant's takeover by BSC. The court declines to disregard or lessen the import of ACS's statement based upon the fact that the New York litigation implicates different facts and legal issues.
The court is sympathetic to the argument that Medtronic has sought an injunction in this very case on its stent patents (which motion was denied), and in other litigations against ACS, BSC, and Cordis. (D.I. 727 at 26) Like ACS, Medtronic should be held accountable for its contrary litigation positions. However, these contrary positions do not alter the fact that ACS has not carried its burden on its permanent injunction motion.

permanent injunction in this case. With respect to the balance of hardships, the court notes that ACS and Medtronic are both multi-billion dollar companies that have incurred the costs of this litigation for well over a decade. While ACS cites the loss of sales, market share and goodwill associated with Medtronic's infringement, Medtronic asserts that significant financial losses would be incurred to its "Coronary and Peripheral Division" of Medtronic Vascular, the subsidiary manufacturing bare-metal stents out of Santa Rosa, California, creating the potential for job loss. ACS asserts, however, and Medtronic does not dispute in its answering papers, that Medtronic's infringing U.S. sales of bare-metal stents accounted for only 0.21% of its $11.3 billion in total sales in 2006. The court is not convinced that this tips the scales entirely in ACS's favor but, insofar as ACS has not met its burden on the remaining factors, which predominantly favor Medtronic, the court need not make extensive findings with respect to the balance of hardships.

### E. "Endeavor"

Because the court finds that the equities do not favor an injunction, the court declines to enjoin Medtronic's production of its "Endeavor" DES,[15] which infringes the Lau patents because it incorporates the Driver stent. As discussed previously, a strong public interest favors diversity in the DES market. Also as noted previously, the DES market is made up of several major players; ACS and Medtronic compete directly, but

---

[15] The court grants ACS's motion to lift the stay on proceedings relating to "Endeavor" (D.I. 824) for the purpose of denying its permanent injunction motion with respect to all of the infringing stents and, in ACS's proposed terms, "any products containing or using any of those infringing stents." (D.I. 725, pt. 3) Medtronic's motion for leave to file a surreply to ACS's motion to lift the stay is denied. (D.I. 832)

BSC and Cordis dominate the DES market. Specifically, BSC held a 54% market share in 2006, and Cordis a 46% share. (D.I. 726, ex. 21 at 5) ACS's "Xience" DES and Medtronic's "Endeavor" DES are emerging market competitors, but there is no indication that the "Endeavor" is drawing sales directly from "Xience." *Id.* Rather, analysts predict a decrease in BSC's DES market share to 30% in 2010 (18% for its "Promus" DES and 12% for its "Taxus Liberte" DES), and a decrease in Cordis's market share to 10% by 2010, while both ACS and Medtronic are expected to experience substantial market gains. *Id.* ACS has not addressed the other market players, nor has it identified specific DES customers it has lost, or stands to lose, directly as a result of Medtronic's sales of "Endeavor." On this record, the court does not enjoin Medtronic's sales of its infringing DES.

## IV. CONCLUSION

For the foregoing reasons, the court grants ACS's motion to lift the stay on proceedings relating to "Endeavor" (D.I. 824), but denies ACS's motion for a permanent injunction. (D.I. 725) An appropriate order shall issue.